UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LEWIS SWIFT,

                                    Petitioner,

                                                        9:18-CV-01204
v.                                                      (GTS/TWD)

SUPERINTENDENT,

                                    Respondent.
_____

APPEARANCES:                                OF COUNSEL:

LEWIS SWIFT
   *Petitioner, pro se*
15-B-0607
Marcy Correctional Facility
P.O. Box 3600
Marcy, NY 13403

HON. LETITIA JAMES                          PAUL B. LYONS, ESQ.
Attorney General of the State of New York   Assistant Attorney General
   *Counsel for Respondent*
28 Liberty Street
New York, NY 10005

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**REPORT-RECOMMENDATION AND ORDER**

## I.    INTRODUCTION

This matter has been referred for a Report-Recommendation by the Hon. Glenn T.

Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3(c).  Lewis Swift ("Swift" or "Petitioner"), proceeding *pro se*, challenges his New York

State convictions under 28 U.S.C. § 2254.  (Dkt. No. 1, Petition ("Pet.").)  Respondent opposed

the petition.  (Dkt. No. 13, Answer; Dkt. No. 14, Memorandum of Law ("R. Mem."); Dkt.

15, State Court Record.[1])  Petitioner filed a reply.  (Dkt. No. 18, Traverse.)  For the following reasons, the Court recommends denying the petition, and declining to issue a Certificate of Appealability.

## II.    BACKGROUND

### A.    Indictment

On September 19, 2013, Swift, along with codefendant Gregory Ware ("Ware"), a/k/a "Country", was charged in a two count indictment with first degree manslaughter and third degree criminal possession of a weapon.  (SR 11.)  Count 1 alleged that Swift and Ware, while acting in concert with each other and an unidentified third person, caused the death of Carnell Marshall ("Marshall") by repeatedly striking Marshall, "causing him to suffer severe head trauma, multiple facial fractures, and a lacerated left eye, and left him, while in this vulnerable condition, outdoors, exposed to the elements, allowing him to suffer environmental hypothermia, thereby causing his death."  *Id*.  Count 2 alleged that Swift and Ware, while acting in concert with each other and an unidentified third person, "possessed a dangerous or deadly instrument with the intent to use the same unlawfully against another."  *Id*.

### B.    Ware's Conviction

Prior to Swift's trial, Ware was convicted, upon his guilty plea, of manslaughter in the first degree.  *People v. Ware*, 159 A.D.3d 1401 (4th Dep't), *lv. denied*, 31 N.Y.3d 1122 (2018).

---

[1]  To maintain consistency, the Court adopts Respondent's convention for citing to the record. To that end, the prefix "SR" refers to the State Court Record, found at Dkt. No. 15-1, followed by the page numbering provided by Respondent.  Citations to the trial testimony refer to the witness' surname name and the original page number of the transcript found at Dkt. No. 15-2 though Dkt. No. 15-9, except that Diamante Swift, Petitioner's son, is referred to as "Diamante". Other citations to the trial simply employ the prefix "T.".  The prefix "S." refers to the sentencing minutes, found at Dkt. No. 15-10.  Citations to the Pet., R. Mem., and Traverse refer to the pagination generated by the CM/ECF, the Court's electronic filing system.

Ware was sentenced to twenty five years' imprisonment followed by five years of post-release supervision.  (T. 40; *see* S. 7-11.)

### C.    Trial

Swift proceeded to a jury trial on January 12, 2015, in Onondaga County, during which nineteen witnesses testified for the prosecution.[2]  Petitioner presented no evidence at trial.  (T. 951-52.)

The evidence at trial established that on April 9, 2012, Swift and Marshall, a long-time acquaintance from the same Syracuse neighborhood, had a minor verbal altercation in the check-out line of a supermarket in Syracuse.[3]  (Diamante: 391-92, 420-21; Hardnett: 471-72.)  The People introduced security footage from the supermarket's cameras, which was played for the jury.  (T. 445.)  After the argument, Marshall and Swift had a friendly conversation in the parking lot and "exchanged phone numbers."  (Diamante: 422-23.)

Three days later, on April 12, 2012, Marshall called Swift, asking, "Hey, are we okay?" (Diamante: 423-24.)  Swift responded, "Yeah, right, no problems."  (Diamante: 424-25.)  Swift also asked Marshall to pick him up so that they could "chill" together.  (SR 315-16.)  Marshall asked Hardnett if she wanted to "hang out" with him and Swift but she declined.  (Hardnett: 446-49.)  Later, at around 9:30 p.m., while out with a friend, Hardnett saw Swift, Ware, and another man known as "Rat" together.  (Hardnett: 449-50.)

Between 10:30 p.m. and 11:00 p.m., Marshall's girlfriend heard him talking on the phone and thereafter someone picked up Marshall from their house in Syracuse.  (Scanes: 766-67, 769.)

---

[2]  Ware did not testify at Swift's trial.

[3]  Swift was shopping at the supermarket with his girlfriend, sister, and teenage son, Diamante; Marshall was shopping with his niece, Stacey Hardnett ("Hardnett"), and her two cousins. (Diamante: 391-92, 420-21; Hardnett: 440, 471-72.)

Marshall was wearing a red zip-up hooded sweatshirt, jeans, a white T-shirt, Timberland boots, and a square earring that consisted of nine diamonds.  (Scanes: 767-69.)  He had a red "doo-rag" in his pocket.  (Scanes: 767.)  The police recovered evidence of multiple telephone calls between Swift and Marshall that night, from 10:29 p.m. through 11:41 p.m.  (T. 1018-19.)

On the evening of April 12, 2012, Marshall arrived at Swift's house.  (Diamante: 396-98, 427-28.)  Swift, Diamante, Ware, Rat, and Marshall were drinking and socializing at Swift's house together.  (Diamante: 392, 394-97, 400-01, 425-26.)

At approximately 11:15 p.m., Marshall called Hardnett and told her that "if anything happened to him," he was with Swift.  (Hardnett: 450-51, 454-55.)  At 11:49 p.m., Hardnett received a text message from Marshall stating, "Yo I think those nigga set me up, but its Sammy brother lou."  (SR 161; Hardnett: 451-55;[4] Glauberman: 756-58.)  Hardnett replied, "So go home."  (SR 161; Hardnett: 454.)  Hardnett subsequently sent Marshall text messages and called him numerous times, but he did not respond.  (Hardnett: 454-55.)

At some point, Marshall "kind of left" Swift's house, but then returned.  (Diamante: 397-98.)  Diamante, who was in the kitchen, overheard Rat tell Swift, "He's back."  (Diamante: 397-98, 425, 428.)  Swift responded, "Hit him, that's orders."  (Diamante: 402, 436.)  "Right after" Diamante heard "mad tumbling" in the living room.  (Diamante: 402-03, 427.)  Diamante walked into the living room and saw Ware and Rat attacking and kicking Marshall, who was on the floor.  (Diamante: 402-03, 427-29, SR 318.)  Ware grabbed a board and hit Marshall with it.  (Diamante: 403.)  This assault continued for "a couple of minutes" until Swift ordered Ware and Rat, "get him out of the house."  (Diamante: 404-05.)  Diamante watched as Rat dragged

---

[4]  Hardnett testified that she understood that Marshall was again referring to Swift.  (Hardnett: 454-55.)  Sammy Swift is Petitioner's brother.  (Diamante: 394, SR 160.)

Marshall out of the house by the hood of his red sweatshirt.  (Diamante: 404-05.)  Marshall and

Rat continued to assault Marshall.  (SR 318-19.)  "The whole while," Swift and Diamante

watched the assault from Swift's front porch.  (SR 319.)  "After about 6 or 7 minutes of watching

this beating take place," Rat and Ware "dump[ed]" Marshall behind the Cole Muffler, across the

street from Swift's house.  (SR 319, Diamante: 407.)  Diamante saw Rat and Ware come back

into the house.  (Diamante: 407-08, 433.)  Swift walked away while Rat and Ware "cleaned up

where the struggle was."  (Diamante: 433-34.)

 Diamante could hear Marshall screaming "over and over" from outside.  (Diamante: 408-

409.)  A woman later came over to the house, and Diamante "guessed" that Swift had sex with

her.  (Diamante: 408.)  Swift said, "good night" to Diamante and went to bed, as Swift had "had

to[o] much to drink."  (SR 319.)  Swift woke up around 3 a.m. or 4 a.m., and heard Marshall

"still screaming for help outside," but he went back to sleep.  (SR 319-20.)

 The next day, Ware showed Swift and Diamante a video from his cellphone depicting

Ware and Rat "beating and to[rtu]ring" Marshall, spitting and urinating on him, and burning him

all over with a cigarette.  (SR 320.)  Marshall appeared to Swift to be asleep in the video.  (SR

320.)  A little later, Rat walked over from the vacant lot to Swift's house carrying "a bloody

board."  (SR 321.)  Rat told Swift that he thought Marshall was dead, pointing to Marshall's

body in the lot.  Swift told Rat to "get the fuck away from my house."  Swift then called Ware

and told him that Marshall was dead.  (SR 321.)

 That same day, on April 13, 2012, Diamante found Marshall's cellphone in Swift's

house.  (Diamante: 409-10, 434.)  Diamante opened the cellphone and saw Marshall's text

message to Hardnett stating that "he thought he had got set up."  (Diamante: 410, 434.)  When

"[t]hey started cleaning up", Rat took Marshall's cellphone and a beer bottle and put it in the trash can behind Swift's house.  (Diamante: 434-35.)

On April 14, 2012, at approximately 10:26 a.m., Syracuse police responded to a dead-on-arrival dispatch to the Cole Muffler located at 2527 South Salina Street on the corner of McAllister Avenue.  (Greco: 361-63; Whitehead: 385-86; McGinn: 497.)  A partially clothed black male, later identified as Marshall, was found in the vacant lot of 107 McAllister Avenue, located behind the Cole Muffler and across the street from Swift's house.  (Greco: 364-67; McGinn: 498-500, 515.)  Marshall was wearing only a blood-soaked and dirty T-shirt and one sock.  (Greco: 367; McGinn: 516, 522, 560-62, 567, 574.)  He had "severe trauma" to his face, with dried blood seeping from his nostrils, mouth, and swollen-shut eyes.  (Greco: 368.)  He was pronounced dead at 10:29 a.m.  (Whitehead: 386-87; Knight: 910, 921.)

Based on Marshall's body temperature, rigor mortis, and lividity, as well as the outside temperatures, Dr. Knight determined that Marshall had been dead for at least 12 hours and up to 36 hours from the time he was pronounced dead.  (Knight: 921-25.)  Dr. Knight testified that, "[i]f Marshall was exposed to a windchill of 37 degrees Fahrenheit, he was certainly inappropriately dressed for that with only a T-shirt on and would have been subject to hypothermia."  (Knight: 924.)  Specifically, Dr. Knight opined, to a reasonable degree of medical certainty, that Marshall died as a result of "environmental hypothermia, or cold exposure," and that "the blunt force injuries of his head, his alcohol intoxication and asthma were contributory conditions to his death."  (Knight: 935.)

When asked to estimate "the length of time of exposure to the cold that would have caused this environmental hypothermia," Dr. Knight opined that, although "[i]t's difficult to say in a given individual how long it would take to kill them from hypothermia given individual

variations," her "best estimate would be that [Marshall] was likely exposed for a few hours." (Knight: 937.)  Dr. Knight testified that Marshall "[c]ertainly . . . could have survived" had Marshall received medical assistance.  (Knight: 937-38.)

Diamante testified that on the morning of April 14, 2012, he saw the police across the street at Cole Muffler.  (Diamante: 411.)  When Diamante told his father, Swift replied, "There is no blood on me or anything" that the police can find.  (Diamante: 411.)  Swift told Diamante to tell the police that Marshall came to the house to apologize.  (Diamante: 412.)

The police noticed Swift watching them from the doorway of his house.  (Greco: 369-70.) Detective Rood spoke with Swift during a neighborhood canvas, but Swift stated that he had no information.  (Rood: 779-81.)

That same morning, Detective McGinn commenced a crime scene investigation. (McGinn: 493-511.)  McGinn noticed bloodstains on the front porch of Swift's house and in the walkway and roadway in front of the house.  These bloodstains consisted of "drag patterns, swipe patterns, drip patterns."  (McGinn: 512, 516, 518-19, 523-24.)  The drag or swipe patterns in the roadway and on the curb were consistent with a body being dragged from the house and across the street towards the vacant lot.  McGinn also found drag patterns along with blood stains in the dirt of the vacant lot.  (McGinn: 516-20.)  Marshall's t-shirt was dirty and blood-soaked, and dirt and scratches were on his legs, all consistent with being beaten and dragged across the ground.  (McGinn: 522-23.)  A "red doo-rag" and red sweatshirt – both blood-soaked – were found near the body.  (McGinn: 523, 560-61, 571, 575.)

McGinn also found partial footwear patterns in the dirt of the vacant lot.  (McGinn: 520-21.)  Blood splatter was found on the rear wall of Cole Muffler, relatively close to Marshall's

body.  (McGinn: 522.)  Police also recovered a large rock covered with what was determined to be Marshall's blood.  (McGinn: 520, 524, 570; Cowen: 700-02.)

Later that day, Detective Rood returned to Swift's house and was invited in to talk. (Rood: 781-82.)  Both Petitioner and Diamante agreed to be interviewed at the police station. (Diamante: 412-15; Rood: 782-83.)  At the Criminal Investigation Division, Detective MacBlane interviewed Diamante, while Detective Rood separately interviewed Petitioner.  (Rood: 782-83; MacBlane: 828.)  Petitioner ultimately provided a written statement, which was received into evidence and which Detective Rood read into the record.  (Rood: 792-97; SR 159-60.)

Swift told the police that at around 11:30 p.m. on April 12, 2012, Marshall had called him, saying "'I need to holla at u.'"  (SR 160; Rood: 797.)  A short while later, Marshall showed up at Swift's door but only spoke to Diamante.  (Rood: 797.)  Diamante later told Swift that Marshall had said that "he wanted to apologize" about the supermarket incident, and that Marshall then left the house.  (SR 160; Rood: 788-89.)  Swift told the police that Marshall had never been in his house and that the police were welcome to search it, but that they "won't find anything."  (Rood: 797.)  Petitioner also stated that Marshall was better friends with his brother, Sammy Swift.  (SR 160.)

Diamante also gave the police a written statement on April 14, 2012.  (Diamante: 414-15.)  At trial, Diamante admitted that he had not told the police the "whole truth" because he "didn't want anybody to get in trouble."  (Diamante: 415.)

During their interviews, Petitioner and Diamante voluntarily surrendered the sneakers they were wearing.  (Diamante: 412; Rood: 798-99, 811.)  Diamante was wearing size 10-1/2 Adidas (Exhibit 10) and Swift was wearing size 10 Nikes (Exhibit 9).  (Diamante: 412-13; McGinn: 613-15; Rood: 799.)  The tread pattern on the bottom of Diamante's Adidas sneakers

was consistent with partial patterns found in the vacant lot, though it was impossible to say whether there was an exact match. (McGinn: 612-14.) There was no match with Petitioner's Nikes sneakers. (McGinn: 615.)

Small bloodstains were found on the bottom of both Swift's and Diamante's sneakers. (McGinn: 616-22, 655.) A forensic scientist tested the bloodstains on Diamante's sneakers and determined that Marshall and Swift were the two highest DNA contributors. (Cowen: 674-77.) Swift's sneakers also tested positive for blood, but only Swift's DNA was found. (Cowen: 672-74.)

On April 20, 2012, eight days after the assault, the police executed a search warrant for Swift's apartment. (McGinn: 530, 598, 602; Rood: 810-11.) They recovered Marshall's broken cellphone (Exhibit 13) in a trash container behind the house. (Hardnett: 476-78; McGinn: 530-32, 536; Scanes: 771-72.) The police also recovered a beer can from Petitioner's trash (Exhibit 14), which had a mixture of DNA from both Marshall and Swift. (McGinn: 531, 576; Cowen: 677-82; Perlin: 746-48.)

On April 24, 2012, Swift was hiding from the police at a friend's house. He fled into the attic when police arrived to arrest him, asking his friend's girlfriend to tell the police that he was not there. (DeClerck: 901-04; Jasniewski: 905-06.) Swift was arrested without further incident.

In May of 2012, John Bondi and Swift were incarcerated in the same Mental Health Ward at the Onondaga County Justice Center. (Bondi: 863-65, 868, 875; Egan: 891-93, 897-99.) Bondi was being held on drug-related charges, among other things, and he was in the mental health "pod" because he suffered from posttraumatic stress disorder from his military service. (Bondi: 864-66, 875, 886.)

Swift and Bondi had been childhood friends growing up in the same Syracuse neighborhood. (Bondi: 863-64, 868.) Upon meeting up at the jail, the two men were reacquainted. Swift then described the events that led to his arrest and incarceration. (Bondi: 868-69, 880.) Swift told Bondi that a fight had started "downstairs" in his house. Swift and two other men assaulted the victim and then dragged the victim to a vacant lot across the street. Swift stated that he personally "caved [the victim's] face in with a rock," and that the group "beat him senseless" and "left him there." (Bondi: 868-69.)

Swift also sent three letters dated May 12, 15, and 24, 2012, addressed to "Detective," stating that he had information about the case and wished to meet with detectives. (SR 315-24; MacBlane: 829-31, 839-40; Mull: 857-59.) The three letters were received into evidence and read aloud to the jury. (MacBlane: 829-40.)

In his third letter, dated May 24, 2012, Swift described the April 12, 2012, assault in some detail, but claimed that he was merely present, and that Ware and Rat were solely to blame for Marshall's death. (MacBlane: 829-40.)

### D.    Verdict and Sentencing

On January 21, 2012, the jury found Swift guilty on both counts –manslaughter in the first degree and criminal possession of a weapon in the third degree. (T. 1098, 1144-45.) On February 11, 2015, the trial court sentenced Swift, as a second felony offender, to a determinate term of 25 years in prison and 5 years of post-release supervision for manslaughter and a concurrent indeterminate term of 3½ to 7 years for criminal possession of a weapon. (See S.9-11; SR9-10, 335.)

### E.    Direct Appeal

Through counsel, Swift appealed his conviction arguing: (1) the trial court erred by admitting evidence of the hearsay statements made by the victim; (2) the People failed to establish the victim's death from hypothermia was reasonably foreseeable; (3) the verdict was legally insufficient and against the weight of the evidence; and (4) the sentence was harsh and excessive.  (SR 349-86.)  The Appellate Division of the New York Supreme Court unanimously affirmed the judgment of conviction in a reasoned opinion issued on April 27, 2018.  *People v. Swift*, 160 A.D.3d 1341 (4th Dep't 2018).  Swift filed a counseled application for leave to appeal to the New York Court of Appeals, which was summarily denied on June 26, 2018.  *People v. Swift*, 31 N.Y.3d 1122 (2018).

### F.    Habeas Petition

On October 10, 2018, Petitioner filed a petition for a writ of habeas corpus with this Court.  Petitioner challenges his state court convictions raising the identical grounds he asserted in his state court appeal.  (Pet. at ¶¶ 9, 22 (referring the Court to the attached appellate brief (Dkt. No. 1-1) to reiterate the arguments advanced during his state court appeal).)

## III.    STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)). The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'") (quoting *Richter*, 562 U.S. at 103).

To the extent that the petition raises issues of the proper application of state law, they are beyond the purview of this Court. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence." *Schriro v.*

*Landrigan*, 550 U.S. 465, 473-74 (quoting 28 U.S.C. § 2254(e)(1)).  "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings."  *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (internal quotation marks omitted).  Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]"  *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

## IV.    DISCUSSION

### A.    Weight of the Evidence and Legal Sufficiency

Petitioner claims his conviction was: (1) against the weight of the evidence; and (2) based on legally insufficient evidence.  (Pet. at ¶ 22, SR 372-83.)  Respondent argues the weight of the evidence claim is not cognizable and the legal sufficiency claim is partially procedurally barred and entirely meritless.  (R. Mem. at 27-63.)  The Court agrees with Respondent.

#### 1.    Petitioner's weight of the evidence claim is not cognizable.

"It is well-settled that claims attacking a verdict as against the weight of the evidence are not cognizable in a federal habeas proceeding."  *Kimbrough v. Bradt*, 949 F. Supp. 2d 341, 360 (N.D.N.Y. 2013); *see McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) ("[T]he argument that the verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus.") (collecting cases).  Thus, because Petitioner's weight of the evidence argument is not cognizable, the Court recommends denying the petition on this ground.

**2.    Petitioner's legal sufficiency claim is partially procedurally barred and entirely meritless.**

Incorporating his direct appeal argument, Petitioner claims the evidence was legally insufficient to support his convictions because the People failed to establish: (1) that he acted with the requisite intent to cause serious physical injury to another person; (2) that the victim's death from hypothermia was reasonably foreseeable; and (3) that there was evidence he possessed a weapon.  (Pet. at ¶ 22; SR 372-83.)  In rejecting this claim, the Appellate Division recited the arguments advanced by Swift, i.e., intent, foreseeability, and possession, and concluded he

> failed to preserve the majority of those contentions for our review inasmuch as his general motion for a trial order of dismissal was not "specifically directed" at those alleged shortcomings in the evidence.  In any event, viewing the evidence in the light most favorable to the People with respect to defendant's preserved and unpreserved contentions, we conclude that the evidence is legally sufficient to support the conviction.

*Swift*, 160 A.D.3d 1342 (internal citations omitted).

Although the Appellate Division did not expressly state which of the arguments were unpreserved, the Court agrees with Respondent that the Appellate Division deemed the foreseeability argument to be unpreserved, given that in his counseled brief Swift "conceded" that it was unpreserved and argued the Appellate Division should address the foreseeability portion of the insufficiency claim "in the interest of justice" or with respect to the weight of the evidence.  (SR 374-75;[5] *see* R. Rem. at 43-46.)  Further, a searching review of the record reveals no other "unpreserved" arguments with respect to the sufficiency of the conviction, i.e., intent, foreseeability, or possession.  *See Sanchez-Reyes v. Strack*, No. 94-CV-1317 (RSP/DNH), 1995

---

[5]  On direct appeal, the People agreed with Swift that the foreseeability claim was unpreserved.  (SR 406.)

WL 759029, at *1 (N.D.N.Y. Dec. 15, 1995) ("Even in light of any ambiguity in the [Appellate Division's] written opinion, [the Court] can presume that the [decision] was based on independent and adequate state procedural grounds where the issue was not raised in the trial court and the procedural bar was argued by the state on appeal.") (citing *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)).

### a. Petitioner's foreseeability argument is procedurally barred.

Federal habeas review of a state court decision is prohibited if the state court rested its judgment on adequate and independent state grounds. *Harris v. Reed*, 489 U.S. 255, 261-62 (1989); *Cotto v. Herbert*, 331 F.3d 217, 239-40 (2d Cir. 2003). "[T]his rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). If the state court "explicitly invokes a state procedural bar rule as a separate basis for decision," a federal court is precluded from considering the merits of federal claims in a habeas petition. *Harris*, 489 U.S. at 264 n. 10; *see Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (In order for federal review to be barred, "[t]he state court must actually have relied on the procedural bar as an independent basis for its disposition of the case.") (quoting *Harris*, 489 U.S. at 261-62).

"In New York State, a defendant may not raise, for the first time on appeal, arguments concerning the legal sufficiency of the prosecution's evidence that were not raised with specificity in the trial court." *King v. Artus*, 259 F. App'x 346, 347 (2d Cir. 2008) (citing CPL § 470.05(2)); *People v. Gray*, 86 N.Y.2d 10, 19 (1995) ("even where a motion to dismiss for insufficient evidence was made, the preservation requirement compels that the argument be 'specifically directed' at the alleged error"); *see also Garvey v. Duncan*, 485 F.3d 709, 714-15 (2d Cir. 2007); *see, e.g.*, *People v. Pratcher*, 34 A.D.3d 1522, 1524 (4th Dep't 2015) ("Although

defendant moved for a trial order of dismissal, he did not contend in that motion that the victim's death was not the foreseeable result of the injuries the victim sustained during the commission of the crimes, and thus failed to preserve his legal sufficiency contention for our review.").

The Second Circuit has held that CPL § 470.05(2) is "firmly established and regularly followed," and "New York courts consistently interpret [CPL] § 470.05(2) to require that a defendant specify the grounds of alleged error in sufficient detail so that the trial court may have a fair opportunity to rectify any error." *Garvey*, 485 F.3d at 715-16; *see Meja v. Artus*, No. 12 Civ. 2241, 2016 WL 1305162, at *10-11 (E.D.N.Y. Mar. 31, 2016).

At trial, Swift's counsel moved for a trial order of dismissal upon completion of the People's proof on the ground that the People had not made out a prima facie case with respect to the counts in the indictment. (T. 948-49, 954-55.) However, with respect to Count 1, first degree manslaughter, trial counsel only argued the People failed to prove Swift's intent to cause any serious physical injury. (T. 948-49, 954-55.) The record is void of any discussion that the victim's death from hypothermia was not the foreseeable result of the injuries the victim sustained during the assault. (T. 948; *see also* T. 954-55.) Thus, the Court agrees with Respondent that the objection was "too general" to preserve Petitioner's foreseeability argument for appellate review and, therefore, is procedurally barred.[6]

---

[6] Where, as in this case, the state court denies the claim on the merits using the phrase "in any event" its "primary reliance on this state procedural law constitutes an independent ground for its decision." *See Serrano v. Kirkpatrick*, No. 11 Civ. 2825, 2013 WL 3226849, at *11 (S.D.N.Y. June 25, 2013); *Fama*, 235 F.3d at 810 & n.4 (noting that when a state court opines that a claim is "not preserved for appellate review" and then rules "in any event" that the claim also fails on the merits, the claim rests on independent state procedural rule which precludes federal habeas review); *Harris*, 489 U.S. at 264 n.10 (finding that a state court decision relying on a procedural rule to dismiss a claim, but that, in the alternative, also proceeds to dismiss the claim on the merits, relies on the independent state law ground for dismissal); *Fore v. Ercole*, 594 F. Supp. 2d 281, 289 (E.D.N.Y. 2009) (citations omitted).

A procedural default will "bar federal habeas review of the federal claim, unless the . . .

petitioner can show 'cause' for the default and 'prejudice attributable thereto,'" or demonstrate

that "failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'"

*Coleman*, 501 U.S. at 749-50 (citations omitted).  Because Petitioner has not alleged, much less

established, "cause" for his default, this Court need not address the issue of prejudice.  *See*

*Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 127 (2d Cir. 1995); *Burkett v. Artus*, No. 9:14-

CV-0110 (BKS), 2016 WL 6659492, at \*6 (N.D.N.Y. Nov. 10, 2016) ("If a petitioner fails to

establish cause, a court need not decide whether he suffered actual prejudice, because federal

habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and

prejudice are demonstrated.").[7]  Nor has Petitioner alleged a fundamental miscarriage of justice,

such as evidence that he was actually innocent of the crime.  *See Schlup v. Delo*, 513 U.S. 298,

325 (1995).

Therefore, Petitioner's foreseeability claim is procedurally barred from federal habeas

review.  As such, the Court recommends the petition be denied on this ground.  In any event,

assuming *arguendo* that this claim is reviewable, it is substantively without merit, as set forth

below.

### b.    Petitioner's legal sufficiency claim is entirely meritless.

The law governing habeas relief from a state conviction based on insufficiency of

evidence is well established.  A petitioner "bears a very heavy burden" when challenging the

legal sufficiency of the evidence in a state criminal conviction.  *Einaugler v. Supreme Court of*

*the State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997).  "[T]he relevant question is whether, after

---

[7] Nevertheless, there is also no evidence of prejudice, because, as discussed herein, Petitioner's
substantive foreseeability claim is meritless.

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). "[T]he findings of the state court are presumptively correct and entitled to a high degree of deference as that court was in the best position to view the credibility of the witnesses and all of the facts as they were adduced at trial." *Santos v. Zon*, 206 F. Supp. 2d 585, 589 (S.D.N.Y. 2002) (citations and alterations omitted).

Even when "faced with a record of historical facts that supports conflicting inferences [the court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326) (internal quotation marks omitted).

A petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, "'no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Flowers v. Fisher*, 296 F. App'x 208, 210 (2d Cir. 2008) (quoting *Jackson*, 433 U.S. at 324); *accord Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). Thus, a conviction stands if "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)); *Loving v. People of State of New York*, No. 04-CV-1284, 2007 WL 1825401, at *7 (E.D.N.Y. June 21, 2007) ("Ultimately, so long as the evidence

at trial establishes 'any valid line of reasoning and permissible inferences [that] could lead a rational person' to convict, then the conviction will survive sufficiency review.").

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). Here, the Court agrees with Respondent that the jury had more than sufficient evidence to convict Petitioner of both manslaughter and possession of a weapon, and it is at least "possible" that a fairminded jurist could agree with the Appellate Division's decision denying Petitioner's legal sufficiency claim. (*See* R. Mem. at 30-43, 46-63.)

                    *i.    Manslaughter*

In New York, a person commits first degree manslaughter when "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.20(1). New York law provides that "'[s]erious physical injury' means physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10). "A person need not directly cause the death of another to be criminally liable for first-degree manslaughter." *Martinez v. Breslin*, No. 07 CIV. 8671, 2009 WL 2244633, at *5 (S.D.N.Y. July 28, 2009). Under New York law, a person may be criminally liable for the conduct of another:

> When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

N.Y. Penal Law § 20.00. A person whose criminal liability is premised upon the conduct of another person may be held liable even though the other person is not criminally liable for the

offense, or is not prosecuted for or convicted of the offense.  N.Y. Penal Law § 20.05(1) & (2);

*see, e.g.*, *People ex rel. Guido v. Calkins*, 9 N.Y.2d 77 (1961) (holding that one who "aids and

abets" in committing a crime can be prosecuted even if principal has been acquitted).

Here, Petitioner claims that his conviction is not supported by legally sufficient evidence

because he lacked the requisite intent to be convicted of first degree manslaughter.  (Pet at ¶ 22,

SR 372-82.)  However, viewing the evidence in the light most favorable to the prosecution and

drawing all permissible inferences in its favor, a rational fact finder could have found—and did

find—that Petitioner acted with an intention to cause serious physical injury upon Marshall.[8]

"[A] person acts intentionally with respect to a result or to conduct described by a statute

defining an offense when his conscious objective is to cause such result or to engage in such

conduct."  N.Y. Penal Law § 15.05(1).  There is a presumptive inference that a person intends

that which is the natural and probable consequences of his acts.  *People v. Getch*, 50 N.Y.2d 456,

465 (1980); *People v. Meacham*, 84 A.D.3d 1713, 1714 (4th Dep't 2011).  The requisite intent

may be inferred from the circumstances, including the actions of the accused, and may be proven

by direct or circumstantial evidence.  *Stone v. Stinson*, 121 F. Supp. 2d 226, 247 (W.D.N.Y.

2000); *People v. Price*, 35 A.D.3d 1230, 1231 (4th Dep't 2006), *lv. denied* 834 N.Y.S.2d 516

(2007).  The issue of intent is "one of fact for the jury."  *People v. Cabey*, 85 N.Y.2d 417, 421-22

(1995).

---

[8]  To the extent Petitioner attacks the value of the evidence against him, this Court is precluded
from either re-weighing the evidence or assessing the credibility of witnesses.  *See Maldonado v.
Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim because "assessments of the
weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal
on appeal" and deferring to the jury's assessments of the particular weight to be accorded to the
evidence and the credibility of witnesses).

In this case, the evidence at trial demonstrated Swift intended to cause serious physical injury to Marshall when he (1) personally assaulted Marshall and/or (2) ordered Ware and Rat to assault Marshall.

First, the People offered testimony that Swift admitted that he personally "caved [the victim's] face in with a rock," and that Swift and two other men, "beat him senseless" and "left him there." (Bondi: 868-69.) Courts have consistently held that "'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.'" *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004) (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979)). Here, the record established that Bondi received no benefit from the prosecution for testifying. (Bondi: 870-72, 881, 883, 887-89.) Moreover, Bondi's testimony was corroborated by the medical examiner's testimony that some of Marshall's injuries were consistent with being struck by a rock (Knight: 929); the discovery of the large rock with Marshall's blood on it (McGinn: 520, 524; Cowen: 700-02); and the discovery of Petitioner's and Marshall's blood on Diamante's sneaker (Cowen: 674-77).

The medical examiner testified that Marshall sustained "a severe beating," consisting of multiple blunt force trauma strikes, particularly to the head. (Knight: 918-19.) The medical examiner testified Marshall's jaw was fractured in two places – the result of very substantial force. (Knight: 914, 918-19, 930, 934-35.) His face and scalp sustained multiple cuts, scrapes, and bruises that were caused by blunt force trauma, either by fists or other objects. (Knight: 913-14, 916, 926-30.) Marshall's right eye was swollen virtually shut and lacerated. (Knight: 913, 926-27.) His left eyeball suffered blunt force trauma so severe that it was "ruptured," or "caved in." (Knight: 926-27, 929.) Marshall's brain was "mildly swollen overall," with hemorrhages

and bruising. (Knight: 916.) He had "a small area of a remote stroke or remote injury on the right frontal lobe" of the brain. (Knight: 917.)

Marshall also sustained numerous internal injuries, such as bruising, hemorrhaging and a broken rib. (Knight: 916-17, 919.) His left testicle suffered blunt force trauma. (Knight: 919-20.) He had cuts, scrapes, burn marks, bruises, and swelling all over his body, including his back, arms, hands, and legs. (Knight: 914-15.) The scrapes on his arms and legs were consistent with being dragged along the ground without wearing pants. (Knight: 915, 919, 931-33.)

Second, the jury could have reasonably concluded that, by personally assaulting Marshall, i.e., "caving in" Marshall's face with a rock,[9] and "beating him senseless" and by "le[aving] him there", Swift intended to cause a serious physical injury. A jury may infer that a defendant intended the natural and probable consequences of his actions. *See Getch*, 50 N.Y.2d at 465. "A person's intent may be inferred from his acts and conduct." *Id*.; *see, e.g.*, *People v. Aveille*, 148 A.D.2d 461, 461-62 (2d Dep't 1989) (evidence showing that during an argument, the defendant threw a stone, approximately eight inches in length, at victim, was sufficient to show that he had the intent to cause serious physical injury).

Further, that the attack was on Marshall's "head, a vital part of the body, provided further support for the conclusion that [Swift] intended to injure [Marshall] seriously." *People v. Steinberg*, 170 A.D.2d 50, 69 (1st Dep't 1991), *aff'd*, 79 N.Y.2d 673 (1992); *accord People v. Aveille*, 148 A.D.2d at 461-62.

---

[9] A rock has been held to be a "dangerous instrument," which is statutorily defined as "readily capable of causing death or other serious physical injury." *Gonzales-Martinez v. Kirkpatrick*, 16-CV-5119, 2017 WL 3891649, at *13 (E.D.N.Y. Sept. 6, 2017) (quoting N.Y. Penal Law § 10.00(13)).

Additionally, there was more than sufficient evidence that Petitioner commanded Ware and Rat to assault Marshall, thus establishing Petitioner's intent to seriously injure Marshall. *See* N.Y. Penal Law §20.00. Petitioner was convicted of being an accessory to manslaughter. (SR 11; T. 1075-76, 1081.) Under the accessory statute "there is no distinction between liability as a principal and criminal culpability as an accessory." *People v. Rivera*, 84 N.Y.2d 766, 770 (1995) (citations and internal quotation marks omitted). "[D]irect proof of an express agreement or statement" between principal and accessory is not required. Rather "[t]he intent to commit a crime may be implied by the act itself, or it may be established by the defendant's conduct and the surrounding circumstances." *Martinez*, 2009 WL 2244633, at *6 (citations and internal quotation marks omitted) (finding that although the evidence at trial showed that a codefendant administered the blows that directly caused victim's death, a reasonable jury could have reasonably concluded that defendant was an active and willing participant from start to finish).

As discussed above, Diamante testified that he overheard Swift tell Rat, "Hit him, that's orders." (Diamante: 436-37.) "Right after" Petitioner's order, Ware and Rat assaulted Marshall in the living room, kicking Marshall and beating him with a board. (Diamante: 402-03, 428-29; *see also* SR 318.) This assault continued for "a couple of minutes" until Swift ordered Ware and Rat, "get him out of the house." (Diamante: 404-05.) Additionally, the medical examiner testified that some of Marshall's injuries, "particularly the puncture-like lacerations on the face that had a square shape, would have been created by a square-pattern object." (Knight: 914, 918, 929.) Based on the bloodstain evidence, the detective concluded that there were four distinct areas where a beating occurred. (McGinn: 523-25, 652-54.) The assault began on the front porch of Swift's house, as evidenced by blood droplets on the floor of the porch, the stairs, and the sidewalk in front. The assault then continued into the roadway in front of the house, where

Marshall had to have been in a "downward position," based on the "low angle of impact" of the blood on the roadway. His body was then dragged across the street into the vacant lot where another beating occurred (and where the large rock was found). Finally, Marshall was dragged to the rear of the vacant lot, against the wall of the Cole Muffler, where his body was found and where bloodstains indicated another beating took place. (McGinn: 523-25, 652-54.)

The detective also observed, inside Swift's house, a broken wallboard, and Swift's bloodstains. Further, there was evidence that the scene had been cleaned up. Accordingly, the detective could not rule out that the assault began inside the house. (McGinn: 602-05, 636-38, 651-55, 657-58.)

Here, drawing all inferences in the People's favor, the jury could have reasonably concluded that Petitioner, acting in concert with Ware and Rat, was at all times in charge – "that's orders" – and that Ware and Rat did precisely as Swift directed.[10] Specifically, when Swift commanded that Marshall be "hit," they responded by assaulting him with kicks and a board, and when Swift directed that they take Marshall "out of the house," they continued the assault outside and dragged him to the vacant lot as Petitioner watched. (Diamante: 402-05, 428-29, 436-37; *see also* SR 318.) Given that Swift ordered the assault and then watched, and did not stop the beating, the jury could have reasonably concluded that Ware and Rat followed Swift's orders. *See, e.g.*, *People v. Vaughn*, 36 A.D.3d 434, 435 (1st Dep't 2007) (finding a defendant liable for his subordinates' assault of a victim where, as here, the defendant "gave his subordinates an instruction that was open-ended with respect to how the victim was to be assaulted, and remained throughout the assault"); *see In re Tatiana N.*, 73 A.D.3d 186, 190-91

---

[10]  The trial court denied the People's motion to be permitted to elicit evidence regarding Swift's affiliation with the Crips gang to explain why Ware and Rat followed Swift's orders. (SR 135-37; T.5-21.)

(1st Dep't 2010) ("[T]he necessary knowledge and intent [to prove accessorial liability] need not be admitted directly or verbally acknowledged. They may be established through the actions of the accused, based on the entire series of events.").

In sum, drawing all inferences in the People's favor, the jury could have reasonably concluded that Swift personally assaulted Marshall and/or ordered Ware and Rat to assault Marshall, intending to cause him serious physical injury. The jury's decision should not be second-guessed, given the doubly deferential standard of review under *Jackson* and the AEDPA. *See Johnson*, 566 U.S. at 651.

Turning to Petitioner's foreseeability argument, to convict Petitioner of first degree manslaughter, the People were required to prove that Swift's conduct was "a sufficiently direct cause" of Marshall's death. *People v. DaCosta*, 6 N.Y.3d 181, 184 (2006). "Sufficiently direct causation is established by proof of the following: (1) that defendant's actions were an actual contributory cause of [the] death, in the sense that they forged a link in the chain of causes which actually brought about the death;[11] and (2) that the fatal result was reasonably foreseeable."

---

[11]  In his counseled brief on direct appeal, Swift did not contest this prong of causation. Nevertheless, drawing every inference in the People's favor, a rational jury could have concluded that Petitioner's conduct was an actual contributory cause of Marshall's death. Here, the jury could have reasonably determined that Petitioner oversaw the assault, given that he: initially ordered and personally took part in the assault; later ordered that the assault be moved out of the house; and admitted watching the assault for several minutes without attempting to stop it. *See People v. Vaughn*, 36 A.D.3d at 435 (finding defendant liable where he "gave his subordinates an instruction that was open-ended with respect to how the victim was to be assaulted, and remained throughout the assault" without attempting to stop it). Moreover, given that Petitioner stood by and watched, without interfering, as Ware and Rat subsequently "dumped" and abandoned Marshall in the vacant lot (*see* SR 319; Diamante: 407), the jury could have reasonably concluded that Petitioner directed that action as well. *See Vaughn*, 36 A.D.3d at 435. Further, Petitioner did nothing thereafter to come to Marshall's aid as he lay screaming for help. (SR 319-20.) Lastly, Dr. Knight opined to a reasonable degree of medical certainty that Marshall died as a result of "environmental hypothermia, or cold exposure," and that "the blunt force injuries of his head, his alcohol intoxication and asthma were contributory conditions to his death." (Knight: 935.) Dr. Knight also testified that Marshall "[c]ertainly . . . could have

*People v. Davis*, 28 N.Y.3d 294, 300 (2016) (citations and internal quotation marks omitted); *accord Matter of Anthony M.*, 63 N.Y.2d 270, 280 (1984).

With respect to foreseeability of the death, the People must prove "that the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the accused." *Davis* 28 N.Y.3d at 301 (citing *People v Kibbe*, 35 N.Y.2d 407, 412 (1974)). A victim's death is reasonably foreseeable if it "'should have been foreseen as being reasonably related to the acts of the accused.'" *Id.* (quoting *People v. Kibbe*, 35 N.Y.2d at 412). However, "[f]oreseeability does not mean that the result must be the most likely event." *People v. Hernandez*, 82 N.Y.2d 309, 319 (1993); *accord Matos*, 83 N.Y.2d at 512.

For example, in *People v. Davis*, the Court of Appeals found "there was legally sufficient evidence to support the jury's findings that defendant's assault of the victim during a home invasion was an actual contributory cause of the victim's death and that the victim's death, induced by the stress of the violent event, was a reasonably foreseeable result of defendant's conduct." 28 N.Y.3d at 296-97. There, the defendant violently attacked the victim, in his home, breaking his jaw and leaving him on the floor in a blood-spattered room where he was found dead. From all of the evidence and the circumstances surrounding this violent encounter, the proof was sufficient to permit the jury to conclude that the victim's heart failure, induced by the extreme stress and trauma of such a violent assault, was a directly foreseeable consequence of defendant's conduct." *Id.* at 298-99 (citing *Matos*, 83 N.Y.2d at 511-512).

---

survived" had he received medical assistance. (Knight: 937-38.) Accordingly, the evidence established that Petitioner "set[] in motion the events which ultimately result[ed] in the victim's death." *People v. Matos*, 83 N.Y.2d 509, 512 (1994). In sum, there was more than sufficient evidence to conclude that Petitioner's conduct – in beating Marshall, abandoning him in the vacant lot in a helpless condition and in the cold, and doing nothing thereafter to assist him as he lay there for hours – was an actual contributory cause of Marshall's death.

Moreover, in its analysis of the weight of the evidence, the Appellate Division rejected Swift's claim that Marshall's "death from hypothermia was not a reasonably foreseeable result of the beating that he received." *Swift*, 160 A.D.3d 1342. As summarized by the Appellate Division:

> With respect to an allegedly intervening cause of death, it is only where the death is solely attributable to the secondary agency, and not at all induced by the primary one, that its intervention constitutes a defense. Here, the victim's injuries left him unable to see because both of his eyes were swollen shut and one was ruptured, he was confused and likely concussed due to head trauma, and he sustained several broken facial and skull bones. The jury could have concluded that defendant ordered the codefendants to attack the victim, that he took part in the ensuing assault, and that he and the codefendants removed most of the victim's clothing and left him outside while the wind chill was below 40 degrees. Thus, defendant may not avoid responsibility by arguing that other causes contributed since his acts [and those of the codefendants that he requested] were also factors in the victim's demise.

*Id*. (internal quotation marks and citations omitted, brackets in original). That decision was neither contrary to, nor an unreasonable application of, *Jackson*.

Here, Dr. Knight testified that hypothermia was the cause of death, and that, given Marshall's debilitated condition, he likely died within "a few hours." (Knight: 935-37.) Drawing all inferences in the People's favor, the jury could have reasonably concluded that, by severely beating Marshall and abandoning him outside, nearly naked, in a helpless condition and in near-freezing temperatures, Swift placed Marshall at risk of death. *See, e.g.*, *People v. Kibbe*, 35 N.Y.2d at 410-13 (holding defendants were liable for "directly foreseeable consequences of their own actions" where they robbed the victim and threw him out of a car onto the shoulder of a rural highway, leaving him alone at night in near-zero degree weather with limited visibility

conditions, without his glasses, and with his pants down, shoeless and his shirt rolled up around his chest, where the victim was struck and killed by a truck).

In sum, the record does not compel the conclusion that no rational trier of fact could have found proof that Swift was guilty of first degree manslaughter especially considering the double deference owed under *Jackson* and the AEDPA.  Swift therefore cannot prevail on his insufficiency of the evidence claim either.  As such, the Court recommends denying the petition on this ground.

ii.    *Criminal Possession of a Weapon*

In New York, a person commits third degree criminal possession of a weapon when he "commits the crime of criminal possession of a weapon in the fourth degree as defined in subdivision one, two, three or five of section 265.01, and has been previously convicted of any crime."  N.Y. Penal Law § 265.02(1).  In turn, a person commits criminal possession of a weapon in the fourth degree when he possesses "any . . . dangerous or deadly instrument or weapon with intent to use the same unlawfully against another."  N.Y. Penal Law § 265.01(2). Because Swift admitted that he had been previously convicted of a crime (T. 30-34, 336-38), the trial court charged that Swift could be found guilty of criminal possession of a weapon if, personally or acting in concert with others, he knowingly possessed a dangerous instrument and did so with the intent to use it unlawfully against another.  (T. 1089-90; SC 11.).  A "dangerous instrument" means "any instrument . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury."  N.Y. Penal Law § 10.00(13).

The Appellate Division rejected Swift's claim that, "because there [was] no evidence that he possessed a weapon," the evidence was legally insufficient to support the conviction on the

weapon charge. *Swift*, 160 A.D.3d at 1342. That decision was neither contrary to, nor an unreasonable application of, *Jackson*.

In this case, the People presented more than sufficient evidence to establish the elements of possession of a weapon. As discussed above, Bondi testified that Swift personally "caved [the victim's] face in with a rock" (Bondi: 868-69), and Bondi's testimony was corroborated both by the medical examiner's testimony that some of Marshall's injuries were consistent with being struck by a rock (Knight: 929), and by the recovery of a rock that was covered with Marshall's blood (Cowen: 700-02). *See Gonzales-Martinez*, 2017 WL 3891649, at *13 (finding a rock considered a dangerous instrument under N.Y. Penal Law § 265.01(2).) Although Diamante testified only Ware and Rat beat Marshall with a board, any discrepancies between Bondi's and Diamante's testimonies are presumed to be decided by the jury in favor of the prosecution, to which this Court gives great deference.

Additionally, the jury could have reasonably found Petitioner liable for possession of the weapon under a theory of constructive possession, *see* N.Y. Penal Law § 10.00(8), as Petitioner "exercised dominion and control over the persons who possessed" the board and the rock. *Vaughn*, 36 A.D.3d at 435 (citing *People v. Carvajal*, 6 N.Y.3d 305, 314 (2005); *People v. Manini*, 79 N.Y.2d 561, 572-75 (1992)). Moreover, the jury could have rationally concluded that Petitioner possessed a weapon – including a rock and a board – through his control over his accomplices, on an acting-in-concert theory. *See, e.g.*, *People v. Johnson*, 94 A.D.3d 1408, 1409 (4th Dep't 2012).

Thus, the Court finds that, viewing the evidence presented at trial most favorably to the prosecution, there was sufficient evidence for a rational trier of fact to convict Petitioner of third

degree possession of a weapon.  Accordingly, the Court also recommends denying habeas relief on this ground.

### B.    Admission of Hearsay Statements

Petitioner claims, as he did on direct appeal, the trial court erred in admitting hearsay evidence consisting of certain text messages and a phone conversation between Marshall and Hardnett.  (Pet. at ¶ 22; SR 362-72.)  Generally, Respondent argues that the decision to admit the statements concerned a state evidentiary issue and is not subject to federal habeas review.  (R. Mem. at 63-64.)  Respondent further contends that even if the Court liberally construed the petition to assert a federal constitutional claim – such as for a violation of the Fourteenth Amendment Due Process Clause – that claim should be denied as unexhausted and procedurally defaulted because it was raised in state court in solely state law terms.  *Id*. at 64-67.  Finally, Respondent maintains that even if the Court were to very liberally construe Petitioner's claim to assert a violation of federal due process, and even if the Court were to find that the claim was properly exhausted, the claim should be denied as meritless because, as the Appellate Division held, any error in admitting the evidence was "harmless."  *Id*. at 67-71.  In his reply, Petitioner asserts this claim invokes violations of his constitutional rights under the Sixth and Fourteenth Amendments and, therefore, is cognizable.  (Traverse at 2-8.)  He further contends he exhausted this claim and habeas relief is warranted on the merits.  *Id*.

Before trial, the People moved for permission to offer evidence of the telephone conversation and text messages between Marshall and Hardnett on the evening of April 12, 2012, asserting various hearsay exceptions.  (SR 137-41; T. 21-24.)  Swift's trial counsel opposed, arguing that the evidence was "clearly hearsay."  (T. 24-26.)  The trial court admitted the

evidence, adopting the various hearsay exceptions asserted by the prosecution "in toto".  (T. 25-28.)

The Appellate Division considered and rejected this claim on direct appeal as follows:

> The witness testified that the victim had called and texted her, indicating in each communication that he thought defendant had set him up, and to look to defendant if anything happened to the victim.  Contrary to the People's contention, we conclude that defendant preserved his contention for our review, and we agree with defendant that the text messages and testimony in question constituted hearsay.  Nevertheless, even assuming, *arguendo*, that the court erred in admitting the communications in evidence under the present sense impression and excited utterance exceptions to the hearsay rule, we conclude that any such error is harmless.

*Swift*, 160 A.D.3d 1342 (internal citations omitted).

"Evidentiary questions are generally matters of state law and raise no federal constitutional issue for habeas review."  *Sudler v. Griffin*, No. 9:12-CV-0367 (NAM/ATB), 2013 WL 4519768, at *3 (N.D.N.Y. Aug. 26, 2013); *accord Estelle v. McGuire*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Here, even assuming, without deciding, that Petitioner's hearsay claim is cognizable and exhausted, the Court agrees with Respondent that it fails on the merits.

## 1.    Petitioner's hearsay claim is meritless.

"Federal courts may issue a writ of habeas corpus based upon a state evidentiary error only if the petitioner demonstrates that the alleged error violated an identifiable constitutional right, and that the error was so extremely unfair that its admission violates fundamental conceptions of justice."  *Buchanan v. Chappius*, No. 9:15-CV-0407 (LEK), 2016 WL 1049006, at *4 (N.D.N.Y. Mar. 11, 2016) (citations and internal quotation marks omitted); *accord*

*Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) ("The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'").  That is a "heavy burden, for 'generally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation.'"  *Bonet v. McGinnis*, 98 Civ. 6529, 2001 WL 849454, at *2 (S.D.N.Y. July 27, 2001).

"For the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  *Id.* (citations and internal quotation marks omitted); *accord Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985); *Smith v. Grenier*, 117 F. App'x 779, 781 (2d Cir. 2004).

Accordingly, for Petitioner to succeed with his federal habeas corpus petition asserting state evidentiary errors, he must establish that (1) the trial court's evidentiary rulings were erroneous as a matter of state law, (2) the admitted evidence deprived him of a fundamentally fair trial, and (3) under the AEDPA, the state court's ruling was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  *See, e.g.*, *Sorrentino v. LaValley*, No. 12-CV-7668, 2016 WL 11482062, at *16 (S.D.N.Y. Feb. 3, 2016) ("erroneously admitted hearsay statements cannot provide a basis for federal habeas relief unless the evidentiary error so undermined the fairness of the trial as to violate the petitioner's constitutional right to due process.").

On the record presented, Petitioner cannot meet that standard because even if the trial court's admission of the challenged statements constituted evidentiary error, the court's ruling cannot be said to have deprived Petitioner of a fundamentally fair trial. *See Vega v. Portuondo*, 120 F. App'x 380, 382 (2d Cir. 2005) ("Even assuming, for the sake of argument, that petitioner is correct to assert that admission of [the evidence] was erroneous as a matter of [state] law, this alone would not suffice to merit federal habeas relief . . . . 'The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice.'") (citations omitted).

Here, although the Appellate Division "agreed" the statements at issue were hearsay and assumed, *arguendo*, the trial court erred in admitting the communications in evidence under the present sense impression and excited utterance exceptions to the hearsay rule, the state court determined "any such error is harmless." *Swift*, 160 A.D.3d 1342. Petitioner fares no better on habeas review.

Where, as in this case, "a state court makes a harmless error determination on direct appeal," the Court "owe[s] the harmlessness determination itself deference under the [AEDPA]." *Orlando v. Nassau Cty. Dist. Attorney's Off.*, 915 F.3d 113, 127 (2d Cir. 2019). A hearsay "[e]rror is harmless if it is highly probable that it did not contribute to the verdict." *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010) (quoting *United States v. Kaiser*, 609 F.3d 556, 573 (2d Cir. 2010)); *see* 3A Charles A. Wright, Federal Practice & Procedure § 854, at 311 (2d ed. 1982) ("Error in the admission of evidence is harmless if the facts shown by that evidence are already before the jury through other properly-admitted evidence."). In determining whether an alleged error is harmless, a court considers, among other factors, "the importance of the wrongly

admitted testimony" and "whether such evidence was cumulative of other properly admitted evidence." *United States v. Kaplan*, 490 F.3d 110, 123 (2d Cir. 2007); *see, e.g.*, *Morman v. Superintendent, Mid-State Corr. Facility*, No. 9:18-CV-01338 (MAD/DJS), 2021 WL 5139718, at *7 (N.D.N.Y. Nov. 4, 2021) (concluding the testimony offered, while improper, was harmless because of the overwhelming evidence presented at trial); *Anderson v. Martuscello*, No. 17-CV-9638, 2021 WL 4429333, at *10 (S.D.N.Y. Sept. 27, 2021) (finding the petitioner not entitled to habeas relief on his hearsay claim where petitioner failed to demonstrate that the county court's alleged error in admitting the police dispatcher's statement deprived him of a fundamentally fair trial).

In this instance, Hardnett testified, in sum and substance, that Marshall told her in a phone call placed at 11:15 p.m. on April 12, 2012, that "if anything happened to him," he was with Swift. (Hardnett: 450-51, 454-55.) While this statement may have reflected Marshall "sens[ed] something was about to happen to him," (*see* T. 27) and that he was with Swift and Swift was to be blamed, the Court agrees with Respondent that the statement was not so material as to provide the basis for conviction or remove a reasonable doubt that would otherwise have existed. *Arena v. Kaplan*, 952 F. Supp. 2d 468, 492-93 (E.D.N.Y. 2013). As Respondent points out, this evidence established that Swift and Marshall were together on the night of April 12, 2012, which was also established by other credible evidence, including Diamante's testimony, Petitioner's admissions to Bondi, and Petitioner's own letters and statements to the police. (*See* R. Mem. at 67-73.) Further, as to any "blame" to be placed on Swift if "anything happened" to

Marshall, such evidence was established by Diamante's testimony and Petitioner's admission to Bondi.[12]

As to Marshall's text message to Hardnett, "Yo, I think those nigga set me up, but it's Sammy brother, Lou", the Court agrees with Respondent that the somewhat cryptic text message was, at best, cumulative of other evidence including Sammy Swift is Petitioner's brother, Swift ordered Ware and Rat to assault Marshall ("Hit him, that's orders."), Bondi's testimony that Swift admitted taking part in the assault (including hitting the victim with a rock); and Petitioner's letter to the police admitting that he watched the entire assault. Thus, even if the statements at issue were admitted in error, the statements neither provided the basis for Petitioner's conviction, nor did it remove reasonable doubt that would have existed in the absence of the statement. *See Johnson*, 955 F.2d at 181.

In sum, the Court agrees with Respondent that, even assuming *arguendo* that the state court erred in admitting the evidence regarding Marshall's phone call with and text message to Hardnett, such evidence added little to the People's case. *See Brown v. Walker*, 275 F. Supp. 2d 343, 351 (E.D.N.Y. 2003) ("There is no reasonable probability that the result of petitioner's trial would have been different even if all of the contested hearsay testimony had been deemed inadmissible by the trial court upon an objection from defense counsel.").[13]

Accordingly, Petitioner has failed to establish that admission of this evidence was so "egregious" or fundamentally unfair as to violate due process. *See Evans v. Fischer*, 712 F.3d

---

[12]  Again, to the extent Petitioner attacks the value of the evidence against him, this Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. *See Maldonado v. Scully*, 86 F.3d at 35.

[13]  While Petitioner may disagree with the way in which the jury weighed the evidence or with the credibility assessments that the jury made, "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on habeas appeal." *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (alterations and citation omitted).

125, 133 (2d Cir. 2013). Moreover, given the extremely broad deference due to state court decisions under the AEDPA, Petitioner has not established that there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" on due process. *Richter*, 562 U.S. at 102. Accordingly, the Court recommends denying the petition on this ground.

### 2.    Petitioner's confrontation claim is meritless.

To the extent Petitioner contends that his right to confront the victim under the Sixth Amendment was violated by the introduction of the victim's statements through the trial testimony of Hardnett, the Court agrees with Respondent that the claim lacks merit. (Traverse at 2-8; R. Mem. at 65 n.17.)

As Respondent correctly observes, the record does not support the conclusion that the victim's statements to Hardnett regarding Petitioner (as testified to by Hardnett, who was subject to cross-examination) were testimonial in nature. (*See* R. Mem. at 65 n.17.) "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006). Here, there is no indication that the declarant (i.e., the victim) had any reasonable expectation that his statements, made to Hardnett outside the context of any proceeding, investigation, or formal complaint, would be used in future judicial proceedings. *See United States v. Saget*, 377 F.3d 223, 228-230 (2d Cir. 2004); *see generally Giles v. California*, 554 U.S. 353, 376 (2008) (noting that "only testimonial statements are excluded by the Confrontation Clause[, and s]tatements to friends and neighbors about abuse and intimidation . . . would be excluded, if at all, by hearsay rules"). Thus, Petitioner is not entitled

to habeas relief on this basis.  Therefore, the Court also recommends denying the petition on this ground.

### C.     Harsh and Excessive Sentence

Finally, Petitioner challenges his sentence as overly harsh and excessive.  (Pet. at 22; SC 383-85, 442.)  Respondent argues Petitioner's sentencing claim is not cognizable.  (R. Mem. at 71.)  The Court agrees with Respondent.

On direct appeal, Swift argued his sentence was "harsh and excessive," and asked the Appellate Division to exercise its discretionary powers under CPL § 470.15 to reduce the sentence "in the interest of justice" because, *inter alia*, he received the exact same sentence as codefendant Ware, who "actually" "brutalized" the victim.  (SR 383-85 ("To impose the exact same sentence on [Swift] who did little more than stand idly by (even if one credits the testimony that he told Ware and Rat to 'hit him') is excessive[.]").)  The Appellate Division denied the claim, finding the sentence was "not unduly harsh or severe."  *Swift*, 160 A.D.3d at 1343.

The issue of whether a sentence is overly harsh or excessive is not a proper issue for review in the federal habeas context unless the sentence was outside of the permissible range provided for by state law.  *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."); *accord Maldonado v. Lee*, No. 09-CV-5270, 2012 WL 3240710, at *3 (E.D.N.Y. July 31, 2012.)  Here, Petitioner has never claimed that his sentence was outside the statutory range.[14]  Accordingly, his state-law sentencing claim is not cognizable in this Court.  *White*, 969

---

[14]  As the People argued on direct appeal, "the sentencing court did not abuse its discretion when it imposed the legally permissible maximum sentence of 25 years in prison for manslaughter in the first degree[.]"  (SR 413.)  *See, e.g.*, *People v. Sullivan*, 37 A.D.3d 974, 975 (3d Dep't 2007) (sentence of 25 years for first degree manslaughter found not harsh or excessive "in light of the brutal nature of the attack" and the defendant's failure to take responsibility or show remorse for

F.2d at 1383; *see also Alfini v. Lord*, 245 F. Supp. 2d 493, 502 (E.D.N.Y. 2003) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law."); *McCalvin v. Senkowski*, 160 F. Supp. 2d 586, 589 (S.D.N.Y. 2001) ("Sentencing decisions are not cognizable on habeas corpus review unless the sentence imposed falls outside the range prescribed by state law.").

Therefore, the Court recommends denying the petition on this ground.

## V.    CERTIFICATE OF APPEALABILITY

"Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." 28 U.S.C. § 2253(c)(1); *see also* Fed. R. App. P. 22(b)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Hohn v. United States*, 524 U.S. 236, 240 (1998). Because Petitioner has not satisfied this standard, the Court recommends declining to issue a Certificate of Appealability in this matter.

## VI.    CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein the Court hereby

**RECOMMENDS** that the petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED and DISMISSED**; and the Court

---

his actions following his guilty plea), *abrogated on other grounds by People v. Lewis*, 48 A.D.3d 880, 851 N.Y.S.2d 295 (2008).

**RECOMMENDS** that no Certificate of Appealability shall be issued with respect to any of Petitioner's claims; and the Court

**ORDERS** that the Clerk provide Petitioner with a copy of this Order and Report-Recommendation along with a copy of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[15]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

**IT IS SO ORDERED.**


Dated: February 17, 2022
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[15] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 40 of 172
Sanchez-Reyes v. Strack, Not Reported in F.Supp. (1995)
1995 WL 759029

1995 WL 759029
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Felix SANCHEZ-REYES, Petitioner,
v.
Wayne STRACK, Superintendent, Fishkill
Correctional Facility, Respondent.

No. 94-CV-1317(RSP/DNH).
|
Dec. 15, 1995.

**Attorneys and Law Firms**

Felix Sanchez-Reyes, Petitioner, Pro Se.

Dennis C. Vacco, New York State Attorney General, Department of Law, Albany, New York, for Respondent; Deirdre Roney, Assistant Attorney General, of counsel.

ORDER

POOLER, District Judge.

**\*1** The above matter comes to me following a report-recommendation by Magistrate Judge David N. Hurd, duly filed on the 11th day of September, 1995. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein. Respondent submitted written objections, and petitioner submitted no objections.

Although respondent does not object to the magistrate's recommendation, he does object to the fact that the magistrate judge reviewed two of petitioner's contentions on the merits rather than find that the claims were procedurally barred. With respect to the prosecutorial misconduct and judicial bias claims, respondent argues that habeas review is precluded because the state appellate court relied on independent and adequate state procedural grounds to find that the claims were unpreserved. I agree. Even in light of any ambiguity in the Fourth Department's written opinion, [1] I can presume that the Fourth Department's affirmance was based on independent

and adequate state procedural grounds where the issue was not raised in the trial court and the procedural bar was argued by the state on appeal. *Quirama v. Michele,* 983 F.2d 12, 14 (2d Cir. 1993). A review of the transcript of the trial proceedings indicates that defense counsel did not object to the portions of the summation and charge that petitioner now challenges. The state also argued on direct appeal that petitioner never objected to the court's charge. Thus, there is no good reason to believe that the Fourth Department decided these issues on the merits. *See id.* The magistrate judge erred in deciding petitioner's claims on the merits because they were procedurally defaulted. Petitioner failed to show cause for his failure to make objections at trial, nor prejudice therefrom. Therefore, habeas review is precluded.

With respect to the Eighth Amendment issue, the report-recommendation found that no constitutional violation occurred because petitioner's sentence was within the statutory guidelines. I reject respondent's contention that the magistrate judge analyzed the severity of petitioner's sentence.

Therefore, after careful review of all of the papers herein, including the magistrate judge's report-recommendation and respondent's objections thereto, it is

ORDERED, that:

1. The report-recommendation hereby is approved as modified.

2. Petitioner's petition is denied and dismissed.

IT IS SO ORDERED.

[1]    After discussing three of petitioner's grounds for appeal, the Fourth Department stated that "[w]e have reviewed defendant's remaining contentions and find them to be either unpreserved or, where preserved, lacking in merit." *People v. Sanchez-Reyes,* 569 N.Y.S.2d 539, 540 (4th Dep't 1991).

**All Citations**

Not Reported in F.Supp., 1995 WL 759029

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Mejia v. Artus, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 41 of 172

2016 WL 1305162

2016 WL 1305162
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Cinto MEJIA, Petitioner,
v.
Dale ARTUS, Superintendent, Wende
Correctional Facility, Respondent.

No. 12 Civ. 2241 (VMS)
|
Signed 03/31/2016

**Attorneys and Law Firms**

Cinto Mejia, Alden, NY, pro se.

Kings County District Attorneys Office - Generic, New York
State Attorney Generals Office - Generic, New York State
Attorney Generals Office, Alla Ageyeva, Brooklyn, NY, for
Respondent.

### MEMORANDUM & ORDER

VERA M. SCANLON, United States Magistrate Judge

**\*1  I. Introduction**
Pro se Petitioner Cinto Mejia ("Petitioner"), after a bench trial
before New York Supreme Court Justice Neil Jon Firetog, was
convicted of manslaughter in the first degree and sentenced
to twenty-two years in prison and five years of post-release
supervision. Tr. of Pet'r's State Court Trial ("Trial Tr.") at 156
& Tr. of Pet'r's Sent. ("Sent. Tr.") at 16-17 attached as Ex. A
to Resp. to Order to Show Cause ("Resp."), ECF No. 6. He
now petitions this Court pro se for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254. Pet. for Writ of Habeas Corpus
("Pet."), ECF No. 1. [1] The Court ordered the District Attorney
of Kings County to show cause "why a writ of habeas corpus
should not be issued." Order to Show Cause, ECF No. 4, to
which the District Attorney of Kings County ("Respondent"
or "the People") responded. See generally Resp.

[1]     In reviewing the petition, the court is mindful that a
        "document filed pro se is to be liberally construed,
        and a pro se complaint, however inartfully pleaded,
        must be held to less stringent standards than formal
        pleadings drafted by lawyers." Erickson v. Pardus,
        551 U.S. 89, 94 (2007) (internal quotation marks &

citations omitted). Petitioner attaches to his petition
his briefs to the New York State Appellate Division
and incorporates them by reference in his petition,
and the Court will therefore consider them. Pet. at
3.

In this habeas petition, Petitioner challenges his conviction
and confinement by arguing that Respondent failed to prove
his guilt beyond a reasonable doubt; that he was denied
the effective assistance of counsel and his United States
Constitution Sixth Amendment right to confront the witnesses
against him when defense counsel entered into a stipulation to
admit a DNA report at trial; and that his inculpatory statement
to the police which was admitted at trial was obtained in
violation of his United States Constitution Fifth Amendment
right to counsel. See generally Pet. For the reasons set forth
below, Petitioner's petition is denied in its entirety.

### II. Background
In brief, after a bench trial before New York Supreme Court
Justice Neil Jon Firetog, Justice Firetog found Petitioner
guilty of manslaughter in the first degree. See generally Trial
Tr. Petitioner was convicted of stabbing Mr. Anthony Senisi
as Mr. Senisi walked past Petitioner on the way home to
his apartment from buying milk at the store. Mr. Senisi died
40 to 45 minutes later as the stab wound had severed both
iliac arteries. Petitioner was with two other individuals at the
time of the incident, Mr. Angel Terron and Mr. Jairo Carillo,
who identified Petitioner to New York Police Department
("NYPD") detectives and, after Petitioner's arrest, identified
Petitioner in a line-up. The detectives recovered clothes from
Petitioner's home with blood on them, which DNA tests
confirmed was Mr. Senisi's blood. Petitioner was arrested
on August 8, 2007 at a relative's home in Pennsylvania.
Petitioner then waived his Miranda rights and gave oral and
written statements to NYPD detectives.

**\*2**  Respondent has submitted the state court trial record
for Case No. 7645/07, pursuant to which Petitioner was
convicted for manslaughter in the first degree based on events
occurring on August 4, 2007. The following is a factual
summary of Petitioner's case drawn from: (1) the transcripts
of Petitioner's bench trial, conviction and sentencing; (2)
Petitioner's and Respondent's state appellate briefs, and the
decision and order issued by the Second Department of
the New York State Supreme Court, Appellate Division
("Appellate Division"), affirming Petitioner's conviction; and
(3) Petitioner's application for leave to appeal to the New York

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 42 of 172

Mejia v. Artus, Not Reported in Fed. Supp. (2016)
2016 WL 1305162

State Court of Appeals and the Court of Appeals certificate denying leave to appeal.

### a. Summary Of Evidence Presented At Bench Trial

#### i. Testimony Of NYPD Officer Frederick Drone

Officer Drone testified that at 10:58 p.m. on the night of August 4, 2007, he responded to a radio dispatch indicating that a man was shot. Trial Tr. 9-10. When he arrived at the scene, he noticed a man lying on his back, but he observed very little blood on the victim. Id. The victim, who Officer Drone later identified as Mr. Senisi from the identification cards in the victim's wallet, was surrounded by his father and brother. Id. at 19. EMS arrived shortly thereafter and located a stab wound on Mr. Senisi, secured him to a gurney, and took him in an ambulance to Lutheran Medical Center. Id. at 10-11. Officer Drone rode in the ambulance and performed CPR on Mr. Senisi. Id. After arriving at the hospital, Mr. Senisi was pronounced dead. Id. at 13. The next day he identified Mr. Senisi for the Chief Medical Examiner at the morgue. Id.

#### ii. Testimony Of Jairo Carillo

Mr. Carillo testified that he was a member of the gang Panchitos, or "PCS", along with Petitioner (who he identified in the courtroom at trial). Id. at 26. On August 4, 2007, at approximately 11:00 p.m., he stated that he was "hanging out" in front of his house in Brighton Beach with Mr. Angel Terron. Id. at 26. Mr. Carillo testified that Petitioner, who he knew from PCS, approached the two men and that Petitioner appeared angry. Id. at 26-29. Mr. Carillo testified that Petitioner stated he had been jumped and appeared to have scratch marks on his face. Id. at 29-31. Mr. Carillo said that he and Mr. Terron then began walking up Brighton 6th Street with Petitioner to the train station. Id. at 31-32. Petitioner did not say anything during this time. Id. As they approached the corner, a white male who was carrying a grocery bag walked towards them. Id. at 32. The white male did not say or do anything other than walk with a shopping bag in his hand. Id. at 50. Mr. Carillo stated that as the individual approached Petitioner, Petitioner swung out three times at the individual's left side saying "what up, Puto?" Id. at 33-34. As Petitioner pulled away, Mr. Carillo saw a knife in his hand. Id. Petitioner then walked away. Mr. Carillo said he saw the individual drop to the ground, bleeding and crying for help. Id. at 34-35. After staring at the individual, Mr. Carillo ran

back home with Mr. Terron. Id. at 34-35. Approximately two hours later, NYPD detectives came to Mr. Carillo's house and questioned him. Id. at 35-36. They then took him to view a line-up four days later, during which he identified Petitioner as the person who had stabbed the white male. Id. at 36-37.

#### iii. Testimony Of NYPD Detective Michael Taylor

Detective Taylor testified that he was called to 2852 Brighton 6th Street to investigate a 911 call. Id. at 52-53. Detective Taylor observed a victim being placed into an ambulance when he arrived. Id. at 53. Detective Taylor then began canvassing the area and looking for witnesses. Id. at 54. He later spoke to Mr. Terron and took him back to his precinct. Id. at 55. Mr. Terron gave Detective Taylor Petitioner's name and information about Petitioner's prior arrest. Id. With this information, Detective Taylor was able to determine Petitioner's address. Id. at 56. On August 5, 2007, Detective Taylor went to Petitioner's home, which was a single room occupancy building, and spoke to the building's porter, Ms. Marjorie Bonilla. Id. at 56-57. Ms. Bonilla indicated that Petitioner had been in a fight, and that she had cleaned blood from in front of the building. Id. at 57. The building's owner, Mr. Kurtz, took Detective Taylor and his partner to Petitioner's room. Detective Taylor observed blood leading to and in front of Petitioner's room. Id. Detective Taylor knocked on the door to Petitioner's room, but when there was no answer, Mr. Kurtz let him in. Id. at 58. Detective Taylor observed bloody clothes on the bed. Id.

**\*3** At this point, Detective Taylor went to obtain a search warrant for Petitioner's room. Id. at 59-60. Detective Taylor returned to the building where Petitioner lived with the search warrant and crime scene investigators. Id. The search warrant was executed, and the bloody clothes were vouchered and sent to the lab for DNA analysis. Id. at 64.

#### iv. Testimony Of Eyewitness Angel Terron

Mr. Terron testified that he was a member of the gang PCS until the night of August 4, 2007, when he decided to leave the gang. Id. at 73-74. On that night, he was playing cards outside his house with his brother and Mr. Carillo. Id. at 74. Mr. Terron testified that Petitioner (who he identified in the courtroom at the trial), who he knew from PCS by his nickname, Adrian, approached the group and said he had been stabbed in the leg. Id. Mr. Terron then testified that Petitioner

Mejia v. Artus, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 43 of 172

2016 WL 1305162

called him over to take a walk with him. Id. at 76. Mr. Terron stated that Petitioner seemed drunk and mad. As Petitioner walked, he stated that he was going to get revenge on the person that stabbed him. Id. at 76-77. Mr. Terron then testified that "out of nowhere," Petitioner stabbed a man who was walking towards him carrying bags. Id. at 78. The man did not say anything or make any movements towards Petitioner. Id. at 78-79. Mr. Terron stated that Petitioner called the man a "stupid mother fucker" and stabbed him once on his left side with a six to twelve-inch cooking knife. Id. at 79-80. After Petitioner stabbed the man, he walked up the street and disappeared. Id. at 80. The victim was on his feet, then he fell down screaming. Id. at 81. Mr. Terron said he then ran back home. Id. at 81-82.

Later on, NYPD detectives came to take Mr. Terron in for questioning. Id. at 82. He told the detectives Petitioner's name and about his prior arrest. Id. A few days later, Mr. Terron identified Petitioner in a line-up. Id. at 83.

### v. Testimony Of Eyewitness Sergey Efremov

Mr. Efremov testified that he and his friend were smoking a cigarette outside of his apartment on the night of August 4, 2007, between 10:30 p.m. and 11:00 p.m. Id. at 97. He then saw three or four individuals of Mexican descent walk around the corner. Id. at 97-98. At the same time, an Italian man walked from the opposite direction and towards the group of Mexican men. Id. at 98-99. One of the three or four individuals approached the Italian man. Id. at 99. According to Mr. Efremov, the man who approached the Italian man was wearing three-quarter-length jeans and a navy collared t-shirt. Id. at 99. He said that a Mexican man approached the Italian man and stabbed him. Id. at 99-100. He yelled something unintelligible at the Italian man that Mr. Efremov could not understand. Id. at 101. Mr. Efremov stated that the knife was wrapped in something and that the Mexican man unwrapped it before stabbing the Italian man. Id. at 101-02. The Italian man did not say anything to any of the Mexican men before the one individual stabbed him. Id. at 102. The Italian man then ran a few feet towards his house before falling, while at the same time, the Mexican man walked away "really slow[ly]" towards Neptune Avenue. Id. at 102-03. Mr. Efremov then saw two of the other Mexican men run back in the direction from which they had come. Id. at 103. None of the other two or three Mexican men said anything to the Italian man or made any gestures towards the victim. Id. at 104. Mr. Efremov was

approximately fifteen feet from where the incident occurred. Id. at 105.

### vi. Testimony Of Medical Examiner Floriana Persechino

 *4 Dr. Persechino is a forensic pathologist for the Chief Medical Examiner of the City of New York and has been employed with them for ten and a half years. Id. at 115. She was admitted as an expert in the field of forensic pathology. Id. at 116. Dr. Persechino testified that she performed an autopsy on Mr. Senisi. Id. at 117. She identified a stab wound on Mr. Senisi's back that entered through the back, into his abdominal cavity, through the left common iliac artery and entered the right common iliac artery. Id. As a result of the stab wound, there was internal bleeding. Id. at 117-18. The wound was approximately five-and-a-half-to-six-and-a-half inches deep. Id. at 118. From the depth, width and edges of the wound, Dr. Persechino was able to formulate that the wound was caused by a smooth blade that was five to six inches in length, three-quarters of an inch wide and one-sixteenth of an inch tall. Id. at 122. According to Dr. Pereschino, the stab wound to the back that injured the iliac arteries caused Mr. Senisi's death. Id.

### vii. Testimony Of NYPD Detective Wayne Perry

Detective Perry testified that he was assigned to Brooklyn South Homicide Squad on August 4, 2007. Id. at 124-25. He was assigned to assist in the investigation of the stabbing of Mr. Senisi. Id. at 126. On the night of August 4, 2007, he was called to the scene of the stabbing where he interviewed a woman who said that Mr. Terron and Mr. Carrillo were with the person who stabbed Mr. Senisi and she directed him to their home. Id. at 127. Detective Perry testified that he interviewed Mr. Terron first. Id. Mr. Terron told Detective Perry that Petitioner (who Detective Perry identified in the courtroom at the trial) had stabbed Mr. Senisi and Petitioner had previously been arrested in Queens on a specific date. Detective Perry pulled up the photographs of everyone in New York City who was arrested on that date, and as Mr. Terron sifted through the photographs, he was able to identify Petitioner as the stabber. Id. at 128.

Detective Perry stated that Petitioner was apprehended in Hazelton, Pennsylvania on August 8, 2007. One of Petitioner's friends had told Detective Perry where Petitioner was staying. Detective Perry's partner knocked on the door

Mejia v. Artus, Not Reported in Fed. Supp. (2016)

2016 WL 1305162

of the location with a photo of Petitioner and the man who answered the door said that Petitioner was upstairs. Id. at 129. Detective Perry took Petitioner to the Hazelton State Trooper barracks to conduct an interview. Id. Detective Craig, from the NYPD 60th Precinct Detective Squad, interviewed Petitioner with Detective Perry. Id. at 129-30. Detective Craig read Petitioner's Miranda warnings to him in Spanish as Detective Craig is fluent in Spanish. Id. at 130. The NYPD's 60th Precinct had faxed to the Hazelton state troopers the Miranda warnings, which were the warnings that the NYPD used for every arrest. Petitioner indicated his Miranda warnings were read to him by initialing and signing next to each warning on a form that was admitted into evidence. Id. at 131.

Petitioner then gave a statement to Detective Perry in English. He said that he had drunk five to six beers and was on his way home when he was jumped by a group of Salvadoran people. Id. at 132. He went to clean himself up at his apartment and went back out, but the Salvadoran people were gone. Id. at 132-33. He then went to find his friends, Mr. Terron and Mr. Carillo, and they walked together along Brighton 4th Terrace. When they reached the corner of Brighton 6th Street, they crossed paths with Mr. Senisi, and Petitioner stabbed him. Id. Petitioner stated that he had been beat-up and stabbed in the past and that he was afraid of Mr. Senisi, so he stabbed him. Id. at 133. Petitioner stated that he did not remember what he did with the knife. Id. at 133. After the incident he paid a livery van thirty dollars to take him to Hazelton. Id. at 134.

Petitioner then agreed to give Detective Perry the same statement in writing. Id. at 134-35. Petitioner then tore up the paper after writing down his statement. Id. Detective Perry recovered the pieces of the written statement and sent them to the NYPD lab to have the statement put together and translated, which it later was. Id. at 135-35. At the top of the paper, Detective Perry wrote the date and time and stated that Petitioner's Miranda warnings were read to him. Id. at 136. The statement and a translation were admitted into evidence. Id. at 136-38.

 *5  Petitioner then agreed to record the same statement on an audiotape in Spanish. Id. at 135. The audio recording and a translation were admitted into evidence. Id. at 137-38.

Petitioner was offered food and drink when he was first taken into custody. Id. at 138. The entire interview process lasted approximately two and a half to three hours. Id. at 129, 139. Petitioner was eventually brought back to New York and charged with homicide. Id. at 139.

On cross-examination, Petitioner's attorney clarified that Detective Perry does not speak Spanish and therefore could not independently determine whether Detective Craig's translation of his Miranda rights was fair and accurate. Id. at 140-41. Detective Perry also promised Petitioner that his two friends would not be arrested. Id. at 141.

### viii. DNA Report Stipulation

The parties stipulated that the chain of custody had been maintained for three items – a pair of blue jean shorts, a multi-colored blanket and a blue t-shirt – that had been recovered from Petitioner's apartment and sent to the Chief Medical Examiner. Id. at 92-93. The parties also stipulated to the admission of a DNA report from the Chief Medical Examiner that showed that Mr. Senisi's DNA was found on the clothes that were recovered from Petitioner's apartment. Id. at 92-93, 111; Resp. at 8; Pet'r's App. Br. attached to Pet. at 3-9.

### ix. Petitioner's Pre And Post-Trial Motions

At the end of the People's presentation of evidence, Petitioner's attorney moved to have the physical evidence (the clothing) suppressed, arguing that the search of Petitioner's home was in violation of his constitutional rights and the application to obtain the search warrant was improper. Trial Tr. at 143-44. Respondent argued that there was sufficient probable cause to go into the location where the clothing was recovered and that the search warrant was properly executed. Id. at 145. Petitioner's attorney also moved on the record to suppress the identification of Petitioner. Id. at 144. In opposition, Respondent contended that both witnesses knew Petitioner. Id. at 145. In particular, Mr. Carillo saw Petitioner at least two times a week and had known him for a couple of months. Id.

Petitioner's attorney also moved to suppress Petitioner's statement on the grounds that there was not sufficient proof to establish that Petitioner knowingly and voluntarily waived his Miranda rights. Id. at 145. Respondent argued in opposition that Detective Perry indicated that Detective Craig translated directly from the form, that it was a self-serving statement and that the tone of the audiotape indicated that the defendant gave the statement after knowingly and voluntarily waiving his rights. Id.

Mejia v. Artus, Not Reported in Fed. Supp. (2016)
Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 45 of 172
2016 WL 1305162

Petitioner's attorney then moved to dismiss the case on the basis that the People had not made a prima facie case. Id. at 144.

The Supreme Court denied Petitioner's pre-trial motions as to the clothing and the identifications. Id. at 146. The Court indicated that it wanted to review the audiotape before deciding whether the People had shown beyond a reasonable doubt that it was given knowingly and voluntarily, and although the Court indicated that as all three statements were consistent, "the People may have, in fact, met their burden." Id. at 147. The Court decided it would also reserve judgment on Petitioner's post-trial motion to dismiss based on his decision on the admissibility of Petitioner's statements. Id.

### x. Closing Arguments

*6 During closing arguments, Petitioner's attorney asked the Court to consider manslaughter in the first and second degrees in lieu of a conviction of murder in the first and second degrees. Id. at 151.

### xi. Petitioner Was Convicted Of Manslaughter In The First Degree

On December 10, 2008, Justice Firetog found Petitioner guilty of manslaughter in the first degree. Trial Tr. at 159.

### xii. The Trial Court Sentenced Petitioner

On January 5, 2009, Justice Firetog sentenced Petitioner to a term of imprisonment of twenty-two years and five years of post-release supervision. Sent. Tr. at 16-17

### xiii. Petitioner Appealed His Conviction

Petitioner's appellate counsel appealed his conviction, asserting that the People failed to prove beyond a reasonable doubt that Petitioner intended to seriously injury Mr. Senisi, in order to sustain a conviction of manslaughter in the first degree. Def.'s Br. to App. Div. attached as Ex. B to Resp. at 9-15. Petitioner submitted his own pro se appellate brief arguing that he was denied the effective assistance of counsel when his defense counsel stipulated to the admission of a DNA report showing that Mr. Senisi's DNA was found on

Petitioner's clothing instead of requiring the People to call her as a witness, and then cross-examining her, Pet'r's App. Br. at 3-9; and that Petitioner's statements to the NYPD should have been suppressed because the statements were made in violation of Petitioner's right to counsel, Pet'r's App. Br. at 10-16.

### xiv. The New York State Appellate Division Affirmed Petitioner's Conviction

On January 25, 2011, on Petitioner's appeal of his convictions in Case No. 7654/07, the Appellate Division unanimously affirmed the guilty conviction. See People v. Cinto, 80 A.D.3d 775 (2d Dep't 2011). In so ruling, the Appellate Division held that

> To the extent that the defendant contends that the evidence was legally insufficient to establish his guilt of manslaughter in the first degree, that contention is unpreserved for appellate review and, in any event, is without merit. In fulfilling our responsibility to conduct an independent review of the weight of the evidence ... we nevertheless accord great deference to the factfinder's opportunity to view the witnesses, hear the testimony, and observe demeanor. Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence. The evidence presented at trial supported a finding that the defendant acted with intent to cause serious physical injury to the victim (see Penal Law § 125.20[1]).

> The defendant's contention, raised in his pro se supplemental brief, that the Supreme Court should have suppressed certain statements he made to law enforcement personnel is unpreserved for appellate review, as the defendant did not seek suppression of his statements in the Supreme Court on the ground he now advances. In any event, the defendant's contention is without merit.

> The defendant's contention, raised in his pro se supplemental brief, that he was deprived of the effective assistance of counsel is without merit.

Cinto, 80 A.D.3d at 775-76 (internal citations omitted).

### xv. The New York Court Of Appeals Denied Petitioner's Motion For Leave To Appeal The New York State Appellate Division's Decision

Mejia v. Artus, Not Reported in Fed. Supp. (2016)

2016 WL 1305162

**\*7** On January 25, 2011, the New York Court of Appeals denied Petitioner's motion for leave to appeal the Appellate Division's decision. See People v. Cinto, 16 N.Y.3d 893 (2011).

**b. Petitioner Filed The Instant Habeas Petition**

On May 3, 2012, Petitioner filed the instant habeas petition challenging his convictions in Case No. 7654/07. See generally Pet. In his habeas petition, Petitioner makes the same arguments that were set forth by him and his appellate counsel before the state courts. Pet.; Pet'r's App. Br. attached to Pet.

**III. Legal Standards**

**a. Federal Habeas Applications Brought Pursuant To Section 2254(d)**

**i. Section 2254(d), Generally**

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA") to regulate "the power of federal courts to grant writs of habeas corpus to state prisoners." See Williams v. Taylor, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a prisoner in custody pursuant to the judgment of a state court on a claim adjudicated on the merits may file a habeas petition pursuant to Section 2254 of United States Code, Title 28, but a federal habeas petition

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). In other words, AEDPA's "test is fairly read simply as a command that a federal court not issue the habeas writ unless the state court was wrong as a matter of law or unreasonable in its application of law in a given case." Williams, 539 U.S. at 385 (citing 28 U.S.C. § 2254). "This is a difficult to meet and highly deferential standard for evaluating

state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) (citations omitted). "The petitioner carries the burden of proof." Id.

**ii. The Meaning Of "Clearly Established Federal Law, As Determined By The Supreme Court"**

**1. "Clearly Established Federal Law, As Determined By The Supreme Court," Refers To The State Of The Law At The Time The Habeas Petitioner's State Conviction Became Final**

The definition of "clearly established Federal law, as determined by the Supreme Court," in any given federal habeas case is made with reference to the state of Supreme Court law at the time the habeas petitioner's state conviction became final, unless the Supreme Court makes a new constitutional rule retroactive for the purposes of collateral review. See 28 U.S.C. § 2254(e)(2)(A)(i); Williams, 539 U.S. at 364.

**2. "Clearly Established Federal Law, As Determined By The Supreme Court," Need Not Arise From A Fact Pattern That Is Identical To The Fact Pattern In The Habeas Petition Under Review**

"In most situations, the task of determining what [the Supreme Court has] clearly established will be straightforward." Lockyer v. Andrade, 538 U.S. 63, 72 (2003). There will be circumstances in which a federal habeas court will be unable to find "clearly established Federal law, as determined by the Supreme Court," with specificity. See Panetti v. Quarterman, 551 U.S. 930, 952-53 (2007). This should not end a federal habeas court's inquiry, for "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule." Id. at 953 (citing Carey v. Musladin, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment)). "Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involved a set of facts 'different from those of the case in which the principle was announced.'" Panetti, 551 U.S. at 953 (citing Lockyer, 538 U.S. at 76). "The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." Panetti, 551 U.S. at 953 (citing Williams, 529 U.S. at 362); see 28

U.S.C. § 2254(d)(1) (stating that habeas relief may be granted when a state-court decision "unreasonabl[y] appl[ied] ... clearly established Federal law, as determined by the Supreme Court").

### iii. The Meaning Of "Contrary To" Clearly Established Federal Law, As Determined By The Supreme Court

**\*8** The Supreme Court has said that a state court's decision is "contrary to" the Supreme Court's clearly established precedents if (1) the decision applies a rule that contradicts the governing rule set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law; or (2) the state court was presented with a set of facts that was materially indistinguishable from facts underlying a decision of the Supreme Court but reaches a different result. See Williams, 529 U.S. at 405-06; Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam). Despite the fact that AEDPA sought to ensure that federal courts would treat state-court decisions with deference, when a court inquires as to what is "contrary to ... Federal law" in the context of Section 2254(d)(1), "it surely is not a requirement that federal courts actually defer to a state-court application of federal law that is, in the independent judgment of the federal court, in error." Id. at 387.

### iv. The Meaning Of An "Unreasonable Application" Of Clearly Established Federal Law, As Determined By The Supreme Court

An "unreasonable application" of federal law occurs where a state court "identifies the correct governing legal principle" from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Cullen, 131 S. Ct. at 1399. It is also an "unreasonable application" of federal law when a state court "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407; see Musladin, 549 U.S. at 77 (affirming the denial of habeas relief when no Supreme Court case required the application of a constitutional rule to a new context). In order for a court to find that a state court's application of Supreme Court precedent was "unreasonable" under Section 2254(d)(1), a petitioner must demonstrate that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." Williams,

U.S. at 409; Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam). "The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." Williams, 529 U.S. at 409-10.

### v. In The Event That A Petitioner Meets His Or Her Burden Under Section 2254(d), Petitioner May Be Entitled To Habeas Relief Without More, Or Additional Proceedings May Be Needed

In the event that a Petitioner meets his or her burden under Section 2254(d) by showing that the state-court decision was "contrary to" or "an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court," the nature of the proven constitutional violation determines whether the federal habeas court must conduct additional proceedings before granting the petitioner habeas relief.

There are two categories of proven constitutional violations which entitle a petitioner who satisfies the Section 2254(d) standard to habeas relief without more. For example, habeas relief is obtained in the event that the proven constitutional error is structural, and prejudice is thus presumed. See Vazquez v. Hillery, 474 U.S. 254, 264 (1986) (holding reversal mandatory for unlawful exclusion of members of a defendant's race from the grand jury); McKaskle v. Wiggins, 465 U.S. 168, 177-78 n.8 (1984) (stating that depriving a defendant of the right to self-represent at trial is not harmless). In addition, the petitioner obtains habeas relief when the demonstration of the constitutional error already required the court to find prejudice. See Strickland v. Washington, 466 U.S. 668, 687 (1984) (requiring a showing of ineffective assistance of counsel and prejudice in order to establish a violation of the Sixth Amendment right to counsel); Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that suppressed evidence favorable to an accused had to have been material to guilt or punishment in order to establish a due process violation from the prosecution's failure to disclose).

**\*9** There are also certain types of constitutional error which, once established, still require additional inquiry before the federal habeas court may grant the petitioner relief. Under such circumstances, the federal habeas court must examine whether the constitutional error had a "substantial and

2016 WL 1305162

injurious effect or influence in determining the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (finding that the state's improper use for impeachment purposes of the defendant's post—Miranda silence did not have a "substantial and injurious effect or influence in determining the jury's verdict" that the defendant did not accidentally shoot the victim).

## IV. Legal Analysis

### a. Petition Exhausted His State Remedies As Required Before Filing The Instant Habeas Application

Before a petitioner may pursue habeas relief in federal court, he or she must exhaust "the remedies available in the courts of the State." Banks v. Dretke, 540 U.S. 668, 690 (2004) (quoting 28 U.S.C. § 2254(b)); O'Sullivan v. Boerckel, 526 U.S. 838, 855 (1999); see Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005). In New York, a defendant is considered to have exhausted his state remedies when the New York Court of Appeals denies the defendant's motion for leave to appeal, unless the denial was for lack of specificity. Id. at 74. Here, as Petitioner appealed his conviction to the New York Court of Appeals and that court denied his motion for leave to appeal without any indication that the application lacked specificity, Petitioner exhausted the state remedies available to him before filing the instant petition.

### b. The Petition Is Untimely

The AEDPA imposes a one-year limitation period on a state prisoner's application for a writ of habeas corpus. See 28 U.S.C. § 2244(d)(1). Here, Petitioner had ninety days from January 25, 2011, when the New York Court of Appeals denied Petitioner's motion for leave to appeal, Cinto, 16 N.Y.3d at 893, to seek a writ of certiorari from the United States Supreme Court, see Saunders v. Senkowski, 587 F.3d 543, 547-49 (2d Cir. 2009); Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001), Ross v. Artuz, 150 F.3d 97, 98 (2d Cir.1998). Once those ninety days expired on April 25, 2011, AEDPA required Petitioner to file his habeas petition within one year, or on or before April 25, 2012. See 28 U.S.C. § 2244(d)(1)(A). Petitioner filed his Petition on May 3, 2012, which was eight days past the April 25, 2015 statute of limitations deadline for filing his petition.[2] Pet. at 1. The Court gave Petitioner an opportunity to identify any reasons for the Court to find that the limitations period was tolled, but Petitioner failed to respond to the Court's order. See 2/12/2016 Order.

[2] District courts in the Second Circuit have consistently looked to the date the habeas petition was signed in order to determine the date on when it is deemed filed. See, e.g., Porter v. Greiner, 00 Civ. 6047 (SJ) (VVP), 2005 WL 3344828, *7 (E.D.N.Y. Nov. 18, 2005) ("Where it is unclear when a pro se state prisoner mailed his or her habeas petition, the court assumes that the petition is filed on the day it is signed and dated."); Johnson v. Coombe, 156 F. Supp. 2d 273, 277 (S.D.N.Y. 2001) ("Although it is not clear when the [petitioner] gave his complaint to prison officials, absent evidence to the contrary, the Court assumes that the prisoner gave his petition to prison officials for mailing on the date he signed it."). Here, the only date on the petition is the May 3, 2012 filing date, and the mailing envelope was not attached to the petition. Therefore, the Court is unable to find an earlier deemed filed date to apply. Regardless, the Court reached the merits of Petitioner's petition.

*10 The AEDPA one-year limitations period is an affirmative defense, not a jurisdictional bar, and it is therefore the respondent's burden to plead it. Acosta v. Artuz, 221 F.3d 117, 122 (2d Cir. 2000). Nevertheless, "district courts are permitted, but not obliged, to consider, sua sponte, the timeliness of a state prisoner's habeas petition," Day v. McDonough, 547 U.S. 198, 209 (2006), provided that the parties are given "fair notice and an opportunity to present their positions," id. at 201, and that the government has not deliberately waived the statute of limitations defense, see Wood v. Milyard, 132 S. Ct. 1826, 1830 (2012). A district court must "determine whether the interests of justice would be better served by addressing the merits or by dismissing the petition as time-barred." Day, 547 U.S. at 210 (internal citations & quotations omitted). Because Respondent does not raise the untimeliness of the petition, the Court will address the merits of Petitioner's claims. See Jamison v. Auburn Corr. Facility, 10 Civ. 3440 (MKB), 2015 WL 8770079, at *5 (E.D.N.Y. Dec. 14, 2015) (considering time-barred Section 2254 habeas petition where respondent failed to raise the untimeliness of the petition).

### c. Petitioner's Habeas Petition Fails Procedurally And On Its Merits

### i. Petitioner's Claim That Respondent Failed To Prove His Guilt Beyond A Reasonable Doubt

Mejia v. Artus, Not Reported in Fed. Supp. (2016)
2016 WL 1305162

**Is Procedurally Barred By Independent And
Adequate State Grounds And Is Without Merit**

Petitioner argues that the People failed to prove beyond a reasonable doubt that Petitioner intended to seriously injure the victim when he swung at him with a knife, and that the conviction was against the weight of the evidence. Pet. at 6. Respondent argues that the Court is procedurally barred from evaluating Petitioner's claim that Respondent failed to prove Petitioner's guilt beyond a reasonable doubt because Petitioner failed to comply with New York Criminal Procedure Law § 470.05(2), which is New York's contemporaneous objection law.

Section 470.05(2) "require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." Garcia v. Lewis, 188 F.3d 71, 78 (2d Cir. 1999) (quoting People v. Luperon, 85 N.Y.2d 71, 78 (1995)). With regard to Petitioner's claim, section 470.05 required Petitioner to challenge the sufficiency of the evidence with specificity before the trial court in order to preserve this claim for his appeal, which he failed to do when defense counsel made a general motion to dismiss. See People v. Hawkins, 11 N.Y.3d 484, 492 (2008) ("To preserve for this Court's review a challenge to the legal sufficiency of a conviction, a defendant must move for a trial order of dismissal, and the argument must be "specifically directed" at the error being urged. As we have repeatedly made clear – and underscore again – general motions simply do not create questions of law for this Court's review." (internal citations omitted)). As such, the Appellate Division found that his claim was not preserved for his appeal. Regardless, the Appellate Division found that "[t]he evidence at trial supported a finding that the defendant acted with intent to cause serious physical injury to the victim." Cinto, 80 A.D.3d at 775.

Federal courts are generally not permitted to "review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). A state law ground is deemed "adequate" if the rule "is firmly established and regularly followed by the state in question." Whitley v. Ercole, 642 F.3d 278, 286 (2d Cir. 2011) (quoting Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999)). New York's contemporaneous objection

rule is a firmly established and regularly followed rule that provides an adequate and independent ground barring federal habeas review. See Kozlowski v. Hulihan, 511 F. App'x 21, 25 (2d Cir. 2013) ("the contemporaneous objection rule provides an independent state-law ground for barring federal habeas review"); Downs v. Lape, 657 F.3d 97, 104 (2d Cir. 2011) ("we have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule"); Garcia, 188 F.3d at 79 ("we have observed and deferred to New York's consistent application of its contemporaneous objection rules.") Here, Petitioner's claim that the evidence was legally insufficient is procedurally barred because his failure to preserve his claim by raising a contemporaneous objection at trial was an adequate and independent state law ground upon which the Appellate Division rested its decision.

**\*11** The fact that the Appellate Division proceeded to evaluate the merits of Petitioner's claim does not eliminate the procedural bar. "[W]hen a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted." Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) (quoting Glenn v. Bartlett, 98 F.3d 721, 725 (2d Cir. 1996)); see also Young v. New York, 11 Civ. 0110 (JFB), 2012 WL 6644993, at *12 (E.D.N.Y. Dec. 20, 2012) ("When a state court relies on an independent and adequate state law ground – such as, in this case, failure to preserve the issue for appeal – federal habeas review is foreclosed. This is true even if the state court rules in the alternative on the merits of petitioner's claims." (citations omitted)). Accordingly, despite the alternative holding by the Appellate Division, Petitioner's sufficiency of the evidence claim is procedurally barred.

A federal court may review a claim that is procedurally barred by an independent and adequate state ground if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; see also Rush v. Lempke, 500 F. App'x 12, 15 (2d Cir. 2012) ("When a petitioner 'has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" (quoting

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 50 of 172

Mejia v. Artus, Not Reported in Fed. Supp. (2016)

2016 WL 1305162

Coleman, 501 U.S. at 750)). Here, Petitioner has made no such demonstration. Thus, the procedural bar is not excused.

Nevertheless, the Court reviewed the merits of Petitioner's claim and found them without merit. A "petitioner 'bears a very heavy burden' when challenging the legal sufficiency of the evidence in a state criminal conviction." Archer v. Fischer, 05 Civ. 4990 (JFB), 2009 WL 1011591, at *8 (E.D.N.Y. Apr. 13, 2009) (quoting Einaugler v. Supreme Court of the State of N.Y., 109 F.3d 836, 840 (2d Cir. 1997)), aff'd, Mannix v. Phillips, 619 F.3d 187 (2d Cir. 2010). "In a challenge under 28 U.S.C. § 2254 to the evidentiary sufficiency of a state criminal conviction, ... the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (internal citations & quotations omitted); see also Malik v. McGinnis, 06 Civ. 3361 (RJS) (GWG), 2010 WL 3239216, at *13 (S.D.N.Y. Aug. 16, 2010) ("To prevail [on a sufficiency of the evidence claim], the [habeas] petitioner must show that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." (internal quotation marks omitted)); Vassell v. McGinnis, 04 Civ. 856 (JG), 2004 WL 3088666, at *5 (E.D.N.Y. Dec. 22, 2004) (a "state criminal conviction will be upheld if, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' ") (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Indeed, "[e]ven when 'faced with a record of historical facts that supports conflicting inferences, [the court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Archer, 2009 WL 1011591, at *8 (quoting Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994)). In reviewing habeas claims predicated on the legal insufficiency of the trial evidence, the court "'must look to state law to determine the elements of [each] crime.'" Id. at *8 (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999)); see also Ponnapula, 297 F.3d at 179.

**\*12** Having reviewed the underlying state court record and the relevant provisions of New York Penal Law as set forth below, the court finds that the trial evidence, viewed in the light most favorable to the prosecution, amply supported the judge's conclusion that petitioner was guilty beyond a reasonable doubt of manslaughter in the first degree. Under New York Penal Law, a person is guilty of manslaughter

in the first degree when, "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.20. Here, the sufficiency of the evidence, which included three eyewitness accounts and the testimony of an expert in forensic pathology, showed that Petitioner acted with the requisite intent to cause serious physical injury to Mr. Senisi when he stabbed him, and that by stabbing Mr. Senisi, he caused Mr. Senisi's death. See Testimony of Mr. Carillo, Trial Tr. at 32-37 (describing that Petitioner swung at Mr. Senisi and stabbed him on his left side); Testimony of Mr. Terron, Trial Tr. at 76-83 (describing how Petitioner swung at Mr. Senisi with a six-to-twelve-inch cooking knife, yelling "stupid mother fucker" and stabbing him on the left side); Testimony of Mr. Efremov, Trial Tr. at 97-105 (describing how an individual of Mexican descent yelled something unintelligible and stabbed Mr. Senisi; Testimony of Dr. Persechino, Trial Tr. at 118-22 (stating that in her expert opinion the stab wound to Mr. Senisi's left side caused his death). Therefore, Petitioner's claim that there was insufficient proof to find that he was guilty of manslaughter in the first degree is denied.

### ii. Petitioner's Claims That He Was Denied Effective Assistance Of Counsel And That He Was Denied His Sixth Amendment Right To Confront The Witnesses Against Him Are Without Merit

Petitioner argues that his defense counsel was ineffective because he stipulated to the admission of a DNA report that found Mr. Senisi's blood on Petitioner's clothing without cross-examining the expert who performed the DNA analysis. Pet. at 7; Pet'r's App. Brief at 3-9. Respondent argues that the Appellate Division correctly concluded that Petitioner's ineffective assistance of counsel claim was without merit, and that as such, the Court may only grant Petitioner relief on this claim is the trial court's adjudication of the claim was contrary to, or an unreasonable application of, Supreme Court precedent. Resp. at 7.

The Court must evaluate Petitioner's claim of ineffective assistance of counsel under the two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984), which is the applicable Supreme Court precedent. First, Petitioner "must show that counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 687-88. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable

Mejia v. Artus, Not Reported in Fed. Supp. (2016)

2016 WL 1305162

professional judgment." Id. at 690. Second, Petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Decisions about trial strategy, "if reasonably made, cannot support an ineffective assistance claim." United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999). "The decision whether to call any witnesses on behalf of the defendant, and if so[,] which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." Id.; see United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) ("[a]ctions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance") (internal quotations omitted); United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997) ("the tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation"). Additionally, the Second Circuit has held that defense counsel may "waive a defendant's Sixth Amendment right to confrontation where the decision is one of trial tactics or strategy that might be considered sound," which includes the decision to enter into stipulations. United States v. Plitman, 194 F.3d 59, 63-64 (2d Cir. 1999). The Second Circuit, in so finding, signaled the deference that it gives to defense counsel in making these trial strategy decisions.

Petitioner has not shown that defense counsel's representation fell below an objective standard of reasonableness. The decision to stipulate to the DNA report versus requiring the medical examiner to testify to her findings was a sound trial strategy that did not constitute ineffective assistance. See, e.g., People v. Knox, 80 A.D.3d 887, 889 (3d Dep't 2011) (defense counsel's "stipulation to admission of the forensic reports, without requiring live testimony from the fingerprint expert, DNA tester or firearms examiner, could be seen as part of a valid strategy to avoid dwelling on facts that would almost certainly be established and instead maintain his focus on the hotly contested elements of possession and the applicability of the home exception"); People v. Young, 35 A.D.3d 958 (3d Dep't 2006) (defense counsel's conduct in drug prosecution of conceding that substance sold to undercover investigator was cocaine was reasonable trial strategy related to defense theory that defendant was merely a drug "mule" carrying drugs for others with no intent to sell, and therefore was not ineffective assistance"); People v.

Rodriguez, 186 A.D.2d 838 (3d Dep't 1992) (stipulation to the introduction of a controlled substance and the laboratory report identifying it as such into evidence was not ineffective assistance of counsel where defense was based upon a theory that the defendant was not involved in the crimes alleged). As the medical examiner's testimony would have been directed mostly to the admissibility of the DNA report, there is no reason to believe that cross-examining the medical examiner would have been advantageous to Petitioner's case or would have resulted in the exclusion of the DNA report. Petitioner does not offer any basis in fact as to why the report would have been excluded for any scientific or similar reasons that might have been revealed on cross-examination of the medical examiner. Given that the case was tried to the bench, the Court was likely familiar with DNA evidence. It is unlikely that cross-examining the medical examiner about the evidence would have been fruitful.

*13  Moreover, as is clear from his closing argument, defense counsel's strategy was to show that Petitioner did not intend to murder Mr. Senisi, not that Petitioner was completely innocent of the stabbing, so as to obtain a manslaughter conviction instead of a murder conviction for Petitioner. Trial Tr. at 151. Thus, admission of DNA report showing that the blood on Petitioner's clothing was Mr. Senisi's was incidental to defense counsel's strategy. As defense counsel succeeded in obtaining a manslaughter conviction instead of the murder conviction that Respondent sought, the record suggests that Petitioner's defense counsel was highly effective, and his decision to agree to admit the DNA report did not fall below an objective standard of reasonableness.

Furthermore, as noted above, under the prejudice prong of Strickland, Petitioner was required to show that but for his defense counsel's errors, the result of the proceeding would have been different. "[W]here there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus." Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005). Here, defense counsel did not commit errors, and even if he had, there was overwhelming evidence of Petitioner's guilt including three eyewitnesses who testified that they saw Petitioner stab Mr. Senisi.

Petitioner received effective assistance of counsel; thus, the Appellate Division's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of Supreme Court precedent. Therefore, Petitioner's claim that his counsel was ineffective for stipulating to the admission of

Mejia v. Artus, Not Reported in Fed. Supp. (2016)

2016 WL 1305162

DNA evidence instead of calling the medical examiner to the stand in order to cross-examine her is denied.

### iii. Petitioner's Claim That His Fifth Amendment Right To Counsel Was Violated Is Procedurally Barred By Independent And Adequate State Grounds And Is Without Merit

Petitioner argues that his oral and written statements were taken in violation of his right to counsel. Pet. at 5; Pet'r's App. Br. at 10-16. Notably, Petitioner neither contests that he was read his Miranda rights nor that he waived them. Id. at 13. He solely claims that his statements were taken in violation of his right to counsel. Id. at 10-16. Respondent argues that Petitioner's claim is procedurally barred as Petitioner failed to preserve it for appellate review and the Appellate Division found that it was without merit. Resp. at 11. Respondent also argues that the claim is without merit.

As discussed above with regard to Petitioner's first argument, this claim is also procedurally barred from federal review. The Appellate Division's decision with regard to this claim rested upon an adequate and independent state-law ground – i.e. that Petitioner did not raise the claim before the New York trial court that his statement was taken in violation of his right to counsel, and therefore, Petitioner did not preserve the claim for appellate review pursuant to section 470.05(2). See Cinto, 80 A.D.3d at 775. Moreover, the Appellate Division found the claim without merit. Id. Petitioner has also not alleged any circumstances justifying federal review of this procedurally barred claim. See Coleman, 501 U.S. at 750.

Nevertheless, the Court will address the merits of Petitioner's claim. The Supreme Court has recognized that a criminal defendant has a Sixth Amendment right to counsel and also a different "right to counsel" found "in this Court's jurisprudence relating to the Fifth Amendment guarantee that '[n]o person ... shall be compelled in any criminal case to be a witness against himself.' " McNeil v. Wisconsin, 501 U.S. 171, 176 (1991). These two rights are different in their nature and effects. The Supreme Court has called the Fifth Amendment right to counsel the "Miranda-Edwards 'Fifth Amendment' right to counsel" because it arises in part from the Supreme Court's development of prophylactic Miranda rights which were developed to "counteract the 'inherently compelling pressures' of custodial interrogation." McNeil, 501 U.S. at 177 (citing Miranda v. Arizona, 384 U.S. 436, 475 (1966)). Thus, whereas the Sixth Amendment right to

counsel seeks to "protect[t] the unaided layman at critical confrontations" with his "expert adversary," the government, after "the adverse positions of the government and defendant have solidified" with respect to a particular alleged crime," McNeil, 501 U.S. at 178 (citing United States v. Gouveia, 467 U.S. 180, 188 (1984)) (emphasis in the original), "the purpose of the Miranda-Edwards guarantee, on the other hand —and hence the purpose of invoking it—is to protect a quite different interest: the suspect's 'desire to deal with the police only through counsel,' " McNeil, 501 U.S. at 178 (citing Edwards v. Arizona, 451 U.S. 477, 484 (1981)).

*14 Although the Sixth Amendment right to counsel "arise[s] automatically on the initiation of the adversary process and no action by the defendant is necessary to make them active in his or her case," Taylor v. Illinois, 484 U.S. 400, 410 (1988), "[t]o trigger the right to counsel under the Fifth Amendment, the suspect must unambiguously request counsel[.]" United States v. Taveras, 04 Crim. 156 (JBW), 2006 WL 626248, at *6 (E.D.N.Y. Feb. 22, 2006) (citing Davis v. United States, 512 U.S. 452, 459 (1994)). "The Fifth Amendment right is not asserted until, at a minimum, the suspect has made some 'expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police.'" Clarke v. Goord, 07 Civ. 0366 (BMC), 2007 WL 2324965, at *4 (E.D.N.Y. Aug. 10, 2007) (citing McNeil, 501 U.S. at 178). "[H]e must articulate his desire to have counsel sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Taveras, 2006 WL 626248, at *6.

The Court's examination of the record shows that Petitioner was read his Miranda rights and that and he did not invoke his right to counsel either before or after he was read his rights or before he gave his statement to the officers. In his Petition, Petitioner does not even assert that he invoked his right to counsel and the detectives ignored him, but rather, Petitioner generally argues that he should have been provided counsel during his interrogation. As federal law required Petitioner to invoke his right to counsel during interrogation, and the record before the Court does not suggest that he made any invocation, the Court finds Petitioner's claim without merit.

### V. Conclusion

For the reasons set forth above, Petitioner's motion pursuant to 28 U.S.C. § 2254 is denied in its entirety. Petitioner is further denied a certificate of appealability, as Petitioner failed to make a "substantial showing of the denial of a constitutional

2016 WL 1305162

right." See 28 U.S.C. § 2253(c)(2); see also Lucidore v. N.Y.S. Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000) (holding that a substantial showing exists where the issues involved in the case are debatable among jurists of reason, or a court could resolve the issues in a different manner, or the questions are adequate to deserve encouragement to proceed further). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and,

therefore, in forma pauperis status is denied for purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1305162

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 6659492
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Daiman H. BURKETT, Petitioner,
v.
Dale ARTUS, Respondent.

9:14-CV-0110 (BKS)
|
Signed 11/10/2016

**Attorneys and Law Firms**

Daiman H. Burkett, 09-A-6328, Attica Correctional Facility, Box 149, Attica, New York 14011, Petitioner, pro se.

HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, 120 Broadway, OF COUNSEL: MICHELLE ELAINE MAEROV, ESQ., Ass't Attorney General, New York, New York 10271, Attorneys for Respondents.

**DECISION and ORDER**

Brenda K. Sannes, United States District Judge

**I. INTRODUCTION**

 *1  Petitioner Daiman H. Burkett ("petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a 2010 judgment of conviction in the Rensselaer County Court, convicting him, upon a jury verdict, of murder in the second degree (N.Y. Penal Law ("Penal Law") § 125.25(1)) and criminal possession of a weapon in the third degree (Penal Law § 265.02(1)). Dkt. No. 1, Petition ("Pet."). Respondent filed a response to the petition and pertinent records from the state court proceedings. Dkt. No. 7-1, Respondent's Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus ("R. Mem."); Dkt. Nos. 8-9, State Court Records. Petitioner filed a reply. Dkt. No. 13, Reply.

**II. BACKGROUND** [1]

[1]  The following background information is derived from the state court records and the parties' submissions.

The Appellate Division, Third Department, summarized the pertinent facts as follows:

At approximately 5:45 a.m. on February 26, 2009, paramedics and then police responded to a 911 call from the home of Des-Hawn Parker in the City of Troy, Rensselaer County. Upon arrival, they encountered defendant, Parker's former boyfriend, covered in blood, wearing only trousers and pacing outside; defendant brandished a knife and aggressively advanced at them. Officers subdued defendant and entered the home, where paramedics found Parker's frightened but unharmed children on the first floor; they followed a trail of blood to a basement bedroom, where they discovered Parker's lifeless but still warm body on her bloodied bed. Parker had no knife wounds or defensive wounds but had sustained fatal blunt force trauma to her neck and, despite resuscitation efforts, was pronounced dead. An autopsy determined that the cause of death was asphyxiation due to manual strangulation, and that death had occurred at 3:00 a.m. to 4:00 a.m. The mostly superficial slicing wounds to defendant's chest, arms and ankles were not life threatening and were determined to have been self-inflicted, as the defense conceded at trial, and he had no defensive wounds. DNA tests determined that defendant was the source of the blood in the house and on the victim's neck. Following a jury trial, defendant was convicted of intentional murder in the second degree and criminal possession of a weapon in the third degree.

People v. Burkett, 101 A.D.3d 1468, 1468-69 (3d Dep't 2012). The specific facts are known to the parties and will be referenced only to the extent necessary to resolve petitioner's claims.

After trial, petitioner filed a motion to vacate the judgment of conviction pursuant to Criminal Procedure Law ("CPL") § 440.10. In his motion, petitioner contended that: (1) he was deprived of the assistance of counsel at his local court arraignment; and (2) trial counsel was ineffective in failing to retain an expert to testify on petitioner's behalf. Dkt. No. 8-1 at SR 2-8, Affidavit in Support, sworn to April 5, 2012; *id.* at SR 10-27, Memorandum of Law and Exhibits. [2] Notably, in his affidavit, petitioner asserted that he became "emotionally traumatized by the discovery of his girlfriend's body" and, as a result, "attempted suicide" before police officers arrived at the scene. Dkt. No. 8-1 at SR 2-3 ¶ 4.

[2]    More specifically, with regard to his ineffective assistance of trial counsel argument, petitioner contended that an expert retained on his behalf would have testified that (1) the time of death set forth in the medical examiner's autopsy report was inconsistent with the fact that the victim was given an IV and "endotrachal tube" when she was placed in an ambulance, at which point she would have been in "the first stages of rigor mortis"; (2) the medical examiner was negligent in failing to establish a specific time of death by completing a "temperature probe of [the victim's] liver"; and (3) the medical examiner was negligent in failing to obtain "sufficient DNA" from the victim's fingernails, which could have "exonerated" him. Dkt. No. 8, Attach. 1, at SR 5-6.

**\*2** In a written decision and order, the Rensselaer County Court denied petitioner's motion. *Id.* at SR 45-48, Decision and Order, dated July 26, 2012. The court concluded that, in light of the direct examination of Dr. Michael Sikirica, the medical examiner, and counsel's cross examination, counsel's decision not to call an expert was a tactical decision that "did not deprive [petitioner] of effective representation at trial." *Id.* at SR 47. The court further concluded that petitioner had not established that " but for trial counsel's alleged errors the result of the trial would have been different." *Id.* Moreover, the court rejected petitioner's claim that he was denied his right to counsel at arraignment. *Id.* at SR 47-48. The court found that the arraigning court advised petitioner of his right to an attorney and asked him if he had an attorney, and petitioner, "[f]ar from invoking his right to counsel," provided nonresponsive answers to the court's questions. *Id.* at SR 48. An assistant public defender had also been assigned "during [petitioner's] arraignment." *Id.* Petitioner did not seek leave to appeal from the denial of his § 440.10 motion.

Petitioner also pursued a direct appeal and, in a counseled brief to the Appellate Division, Third Department, contended that: (1) the trial court erred in admitting evidence regarding prior bad acts pursuant to *People v. Molineux,* 168 N.Y. 264 (1901) without properly balancing the probative value of that evidence for a permissible purpose against the prejudicial effect to petitioner; (2) the court erred in not charging second degree manslaughter as a lesser included offense of the second degree murder charge; (3) the verdicts were against the weight of the evidence; (4) the sentence imposed was harsh and excessive; and (5) restitution was improperly imposed. Dkt. No. 8-1 at SR 76-98, Appellate Brief to the Appellate Division, Third Department.

The Appellate Division affirmed the judgment of conviction. *Burkett,* 101 A.D.3d at 1469-73. In concluding that the verdicts were supported by the weight of the evidence, the Appellate Division explained that "the manner of death firmly established that [petitioner's] conscious objective was to kill Parker." *Id.* at 1470. The court recounted that "[t]he medical examiner testified that the victim would have lost consciousness in about [fifteen] seconds if sufficient pressure were applied to her neck to completely cut off her blood supply, and that death would have occurred only after an additional two to three minutes of continuous applied pressure." *Id.* This "violent, protracted conduct by" petitioner, even after Parker lost consciousness, "strongly supported the jury's conclusion that his conscious objective was to kill and not merely subdue or injure her." *Id.* (footnote omitted). Moreover, the Appellate Division observed that petitioner "did not raise the affirmative defense of extreme emotional disturbance," codified in Penal Law § 125.25(1)(a). *Id.* at 1470 n.2. Nonetheless, the Appellate Division explained that petitioner's "self-inflicted superficial wounds" and behavior upon the arrival of law enforcement "were more suggestive of an attempt to feign despair and fabricate an exculpatory crime scenario and did not undermine a finding regarding defendant's ability to form intent." *Id.*

With regard to his *Molineux* contention, the Appellate Division found that the County Court held "a detailed ... pretrial hearing" and "properly admitted limited testimony regarding [petitioner's] prior abusive, threatening and controlling behavior against Parker and a former girlfriend," which was probative of petitioner's identity as the perpetrator, his intent and motive, and also "provided necessary background information regarding the nature of their relationship[.]" *Burkett,* 101 A.D.3d at 1470. The prosecution

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 56 of 172

Burkett v. Artus, Not Reported in Fed. Supp. (2016)

2016 WL 6659492

had proffered proposed testimony from seven different witnesses regarding "more than [twelve] instances of [petitioner's] controlling and threatening conduct toward Parker and other former girlfriends." *Id.* at 1471. The County Court addressed each specific instance and "preclud[ed] much of the proffer, including all or parts of the testimony of two of [petitioner's] ex-girlfriends, limiting or excluding the testimony of three of the victim's close girlfriends," and permitting evidence of only one of two proffered "domestic violence reports" that Parker filed in 2008 against him. *Id.* The Appellate Division noted that, other evidence, including voicemail messages left by Parker and threatening statements later made by petitioner to police officers, were precluded entirely due to their prejudicial nature. *Id.* In sum, the Appellate Division concluded that the court had appropriately weighed the relevant factual circumstances, case law, and the probative value of the evidence—which established petitioner's "identity, intent, and motive in murdering Parker"—against its probative value. *Id.* at 1471-72. Additionally, the trial court provided "an appropriate limiting instruction" in its jury charge. *Id.* at 1471 (footnote omitted).

**\*3** With regard to the denial of petitioner's request that the court charge second degree manslaughter as a lesser included offense of second degree murder, the Appellate Division found that contention "foreclosed" because petitioner was actually convicted of second degree murder and the jury "never reached the next lesser included offense of manslaughter in the first degree," which was charged to the jury. *Burkett*, 101 A.D.3d at 1472-73 (citing *People v. Boettcher*, 69 N.Y.2d 174, 180 (1987)) (further citations omitted). Finally, the Appellate Division concluded that the sentence imposed was not an abuse of discretion and that the restitution ordered was appropriate. *Id.* at 1473.

Petitioner sought leave to the appeal to the New York Court of Appeals, contending in a counseled application that the court erred in: (1) permitting prior bad acts evidence pursuant to *Molineux*; (2) refusing petitioner's request to instruct the jury with regard to second degree manslaughter as a lesser included offense; and (3) ordering that restitution include reimbursement for the victim's funeral expenses. Dkt. No. 8-5 at SR 1032-34, Letter Application to the New York Court of Appeals, dated February 1, 2013. The Court of Appeals denied petitioner's application on March 28, 2013. *Burkett*, 20 N.Y.3d 1096 (2013).

In papers dated November 13, 2013, petitioner filed an application for a writ of error coram nobis. Dkt. No. 8-5 at SR 1039-72, Petition for Writ of Error Coram Nobis. Petitioner asserted that appellate counsel rendered ineffective assistance because he failed to argue on direct appeal that: (1) petitioner was deprived of his right to testify before the grand jury; (2) he was denied his right to counsel at his pre-indictment arraignment; (3) trial counsel was ineffective because he did not present an extreme emotional disturbance defense and advised petitioner not to testify at trial; and (4) petitioner's confrontation rights were violated by the admission of prior statements made by the victim. *Id.* at SR 1047-72. The Appellate Division denied petitioner's application, and the Court of Appeals thereafter denied leave to appeal. *Id.* at SR 1101, Decision and Order on Motion of the Appellate Division, Third Department, entered December 27, 2013; *People v. Burkett*, 23 N.Y.3d 1018 (2014).

## III. THE PETITION

Petitioner raises the following grounds for habeas relief: (1) he was denied the right to counsel at his initial arraignment; (2) his right to testify before the grand jury pursuant to CPL § 190.50 was violated; (3) trial counsel was ineffective because he: (a) failed to investigate, advise petitioner concerning, and pursue at trial, an extreme emotional disturbance defense, and (b) advised petitioner not to testify at trial; (4) he was denied a fair trial by the trial court's *Molineux* ruling, inasmuch as the prejudicial effect of the "prior bad acts and uncharged crimes" evidence outweighed its probative value; (5) his confrontation rights were violated by the admission of testimony concerning prior statements made by the victim; (6) the trial court erred in not charging second degree manslaughter as a lesser included offense to second degree murder; and (7) the restitution portion of his sentence was illegally imposed. Pet. at 4-7. [3]

3    Citation to the petition refers to the pagination provided by CM/ECF, the Court's electronic filing system.

## IV. DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law,

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 57 of 172

Burkett v. Artus, Not Reported in Fed. Supp. (2016)
2016 WL 6659492

as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 181, 185-86 (2011); *Premo v. Moore*, 562 U.S. 115, 120-121 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

**\*4** The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.' " *Nevada v. Jackson*, ___ U.S. ___, 133 S. Ct. 1990, 1992 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, ___ U.S. ___, 133 S. Ct. 1781, 1787 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' ") (quoting *Richter*, 562 U.S. at 103).

Additionally, AEDPA foreclosed " 'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.' " *Parker v. Matthews*, ___ U.S. ___, 132 S. Ct. 2148, 2149 (2012) (per curiam) (quoting *Renico*, 559 U.S. at 779). A state court's findings are not unreasonable under § 2254(d)(2) sim ply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." *Schriro*, 550 U.S. at 473. Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with " 'clear and convincing evidence.' " *Id.* at 473-74 (quoting § 2254(e)(1)).

**B. Ground One: Right to Counsel at Initial Arraignment**

Petitioner contends that his right to counsel was violated because he did not have an attorney at his local court

arraignment. Pet. at 4. Petitioner's claim is unexhausted and procedurally defaulted.

An application for a writ of habeas corpus may not be granted until a prisoner has exhausted all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254 (b)(1)(A), (B)(i), (ii). A petitioner must exhaust his or her claim both procedurally and substantively. Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in the habeas corpus petition. Substantive exhaustion requires that a petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)); *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011); *Cotto v. Herbert*, 331 F.3d 217, 237 (2d Cir. 2001) (petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it."). "While 'a state prisoner is not required to cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.' " *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Carvajal*, 633 F.3d at 104).

A petitioner satisfies the fair presentation requirement by: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Carvajal*, 633 F.3d at 104 (quoting *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982) (en banc)); *see Baldwin*, 541 U.S. at 33 ("Reese, however, has not demonstrated that Oregon law uses the words 'ineffective assistance' in the manner he suggests, that is, as referring only to a federal-law claim.").

**\*5** "[W]hen a 'petitioner fail[s] to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (citation

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 58 of 172

Burkett v. Artus, Not Reported in Fed. Supp. (2016)
2016 WL 6659492

omitted). Unexhausted claims may be deemed exhausted if "it is clear that the unexhausted claim is procedurally barred by state law," rendering presentation of the claim in state court "futile." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citing *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997)).

Here, petitioner presented his right to counsel claim in his CPL § 440.10 motion. Dkt. No. 8-1 at SR 2-8, 14-17. After his motion was denied, however, petitioner did not seek leave to appeal pursuant to CPL § 460.15. *See* Pet. at 3. "Since he never sought leave to appeal from [the motion] denial[ ], he plainly failed to exhaust his state-court remedies." *Pollard v. Gonyea*, No. 1:11-CV-5712, 2012 W L 2389663, at *12 (S.D.N.Y. Mar. 14, 2012), *adopted* 2012 WL 2389755 (S.D.N.Y. June 25, 2012); *accord. Ture v. Racette*, No. 9:12-CV-1864 (JKS), 2014 WL 2895439, at *4 (N.D.N.Y. June 26, 2014) ("Although Ture raised the remaining claims in his pro se CPL § 440.10 motion, Ture did not seek leave to appeal the denial of that motion. Thus, these claims are unexhausted."); *Lee v. Greene*, No. 9:05-CV-1337, 2011 WL 500673 (GTS/DEP), at *4 n.4 (N.D.N.Y. Feb. 10, 2011). [4] Petitioner's claim is also procedurally defaulted, inasmuch he had thirty days within which to seek leave to appeal. That time period has long since expired, as has the one-year period within which he could have sought an extension of time within which to file a leave application. *See* CPL §§ 460.10(4)(a), 460.30; *Garner v. Superintendent*, No. 9:10-CV-1406 (GTS), 2012 WL 3929944, at *6 (N.D.N.Y. Sept. 10, 2012); *Santos v. Rock*, No. 1:10-CV-2896, 2011 W L 3449595, at *6-7 (S.D.N.Y. Aug. 5, 2011). [5]

[4]    Petitioner asserts in his reply that he exhausted this issue by raising it in his motion for a writ of error coram nobis. Reply at 2. "The only constitutional claim [a petitioner is] permitted to raise in seeking a writ of error coram nobis [is] ineffective assistance of appellate counsel, a claim that is distinct from" the underlying claim that he was deprived of his right to counsel at the initial arraignment. *Rush v. Lempke*, 500 Fed.Appx. 12, 15 (2d Cir. 2012) (summary order) (quoting *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001)); *accord. Jones v. Senkowski*, 42 Fed.Appx. 485, 487 (2d Cir. 2002); *Gilliam v. Artus*, 653 F. Supp. 2d 315, 326 (W.D.N.Y. 2009) ("Although Gilliam asserted the claim in his coram nobis application, in New York, such an application is not the proper means for asserting claims of error at the trial-court level.").

Moreover, petitioner does not assert ineffective assistance of appellate counsel as a basis for relief in this proceeding.

[5]    There is authority for the proposition that courts may not properly "deem" § 440.10 motions exhausted if the petitioner failed to seek leave to appeal from the denial of the motion. *See Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990) ("We have no authority to declare as a matter of state law that an appeal from the denial of his original Section 440.10 motion is unavailable or that he cannot raise [his] claim in a new Section 440.10 action."). Nevertheless, the Court is persuaded that the Supreme Court's subsequent decision in *Coleman v. Thompson*, 501 U.S. 722 (1991), "makes clear that federal courts are to determine whether an avenue of appeal regarding a habeas claim is available to a petitioner under state law, and therefore whether a petitioner's request for review of that claim by a state court would be futile." *Garner*, 2012 WL 3929944, at *6 (concluding that, in light of *Coleman*, petitioner's claim was deemed exhausted but procedurally defaulted for failure to seek leave to appeal the denial of his motion to vacate); *see also e.g. Strain v. Perez*, No. 9:11-CV-0345 (TJM), 2012 WL 1900550, at *4 & n.7 (N.D.N.Y. May 24, 2012); *Santos*, 2011 WL 3449595, at *7-8.

**\*6**   A "procedural default can only be cured by a showing of cause for the default plus prejudice, or a showing of actual innocence." *Aparicio*, 269 F.3d at 91 (citing *Coleman*, 501 U.S. at 748-749); *see House v. Bell*, 547 U.S. 518, 536-39 (2006); *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995); *Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003); *Rodriguez v. Mitchell*, 252 F.3d 191, 204 (2d Cir. 2001). T o establish cause, petitioner must demonstrate that some objective external factor impeded his ability to comply with the procedural rule at issue. *Maples v. Thomas*, ___ U.S. ___, 132 S. Ct. 912, 922 (2012); *Coleman*, 501 U.S. at 753. If a petitioner fails to establish cause, a court need not decide w hether he suffered actual prejudice, because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are dem onstrated. *Murray v. Carrier*, 477 U.S. 478, 496 (1988); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

Petitioner contends that he did not seek leave to appeal from the denial of his § 440.10 motion because his motion was denied pursuant to CPL § 440.10(2)(b). Pet. at 3 ¶ 11(d).

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 59 of 172

Burkett v. Artus, Not Reported in Fed. Supp. (2016)

2016 WL 6659492

That statute requires denial of a motion to vacate where the judgment is, at that time, "appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal." Although the prosecution argued that petitioner's claims could be denied on the basis of CLP § 440.10(2)(b), the court plainly denied petitioner's motion on the merits, given that it discussed the facts at issue in relation to the legal standards applicable to petitioner's claims and found that he was not entitled to relief. Dkt. No. 8-1 at SR 46-48. Petitioner could have sought leave to appeal from the motion court's denial of his claims on the merits, but he failed to do so. He provides no basis for finding cause, and the Court can discern none. *See Schlup*, 513 U.S. at 314. Although he raises several technical arguments regarding the conviction, he has not proffered any new evidence that would make a reasonable jury doubt his factual guilt. *See Poindexter v. Nash*, 333 F.3d 372, 380 (2d Cir. 2003) (noting that the concept of actual innocence is distinct from the concept of legal innocence, and a petitioner whose "argument is a technical one" does not raise "a claim of 'actual innocence' as that term is used ... in habeas jurisprudence generally"). The procedural default thus bars federal habeas review of these claims.[6]

[6] In any event, petitioner's claim is without merit. The right to counsel is guaranteed at "critical stages" of criminal proceedings, such as "the type of arraignment ... where certain rights might be sacrificed or lost[.]" *United States v. Wade*, 388 U.S. 218, 225, 227 (1967); *accord. Claudio v. Scully*, 982 F.2d 798, 802 (2d Cir. 1992). "Courts in this Circuit have held that habeas relief is not warranted where a criminal defendant was denied his right to counsel at an initial arraignment, but the defendant was not deprived of his rights or otherwise prejudiced." *Singleton v. Lee*, No. 6:10-CV-6094, 2013 WL 3187106, at *4 (W.D.N.Y. Jun. 20, 2013) (citing *Holland v. Allard*, No. 2:04-CV-3521, 2005 WL 2786909, at *7 (E.D.N.Y. Oct. 26, 2005)) (further citations omitted). Moreover, the state court record reflects that, at his initial arraignment in Troy City Court on February 28, 2009, the court advised petitioner of his right to an attorney. Dkt. No. 8-1 at SR 38-40, Transcript of Arraignment. Petitioner provided nonresponsive answers to the court's questions about his understanding of the charges, his rights, and his employment, and so the local court,

unauthorized to set bail on the charge, assigned counsel, entered a not guilty plea on petitioner's behalf, and scheduled the next court appearance. *Id.* at SR 39-40. The record does not support the conclusion that petitioner sacrificed any rights as a result of the steps taken at his initial arraignment redressable by way of federal habeas relief. For these reasons, the state court's denial of petitioner's claim, as presented in his § 440.10 motion, was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it an unreasonable determination of the facts in light of the evidence presented.

### C. Ground Two: Right to Testify Before the Grand Jury

**\*7** Petitioner contends that he was deprived of his right to testify at the grand jury presentation of his case and that he received no notice of the presentation. Pet. at 4. This claim is not cognizable on federal habeas review and, in any event, any error related to the grand jury proceedings was cured upon petitioner's conviction by a petit jury.

Claims of alleged deficiencies in state grand jury proceedings are not cognizable on federal habeas corpus review. *Lopez v. Riley*, 865 F.2d 30, 32-33 (2d Cir. 1989); *accord Davis v. Mantello*, 42 Fed.Appx. 488, 490-91 (2d Cir. 2002) (summary order) ("Claims of deficiencies in the state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court."). Such errors underlying state convictions do not warrant federal habeas relief because the Fifth Amendment right to a grand jury indictment "has not been incorporated against the states through the Fourteenth Amendment." *LanFranco v. Murray*, 313 F.3d 112, 118 (2d Cir. 2002) (citations om itted); *see Fields v. Soloff*, 920 F.2d 1114, 1118 (2d Cir. 1990) (citing *Hurtado v. California*, 110 U.S. 516 (1884)). Moreover, "it is well established that defendants have no constitutional right to appear before a grand jury." *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990). T hese principles bar petitioner's claim that his was deprived of his right to appear before the grand jury, which, in New York State, is a purely statutory right. *Bailey v. Sheahan*, No. 6:13-CV-6438, 2014 W L 2895448, at *2 (W.D.N.Y. June 26, 2014) (citing *Velez v. People of State of N.Y.*, 941 F. Supp. 300, 315 (E.D.N.Y. 1996)); *Blond v. Graham*, No. 9:12-CV-1849 (JKS), 2014 W L 2558932, *9 (N.D.N.Y. June 6, 2014); *see* CPL § 190.50.

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 60 of 172

**Burkett v. Artus, Not Reported in Fed. Supp. (2016)**

2016 WL 6659492

Additionally, even if petitioner's right to appear before the grand jury was violated, any error was rendered harmless when he was convicted following a jury trial. *Lopez*, 865 F.2d at 32 (" '[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding ... was harmless beyond a reasonable doubt.' ") (quoting *United States v. Mechanik*, 475 U.S. 66, 70 (1986)); *Perez v. Lempke*, No. 1:10-CV-0303, 2011 WL 2746785, at *3 (W.D.N.Y. July 13, 2011) ("Because Petitioner was convicted after a jury trial at which the prosecution proved his guilt beyond a reasonable doubt, any error with regard to his right to testify at the grand jury proceeding was rendered harmless."). Here, petitioner was found guilty on all charges submitted to the trial jury and thus any error regarding his right to testify at the grand jury presentation was harmless. Dkt. No. 9-7 at 110, Trial Transcript. Petitioner's claim is therefore denied and dismissed.

### D. Ground Three: Ineffective Assistance of Counsel

Petitioner next asserts that trial counsel was ineffective because he failed to pursue an extreme emotional disturbance ("EED") defense in relation to petitioner's second degree murder charge, and advised petitioner not to testify at trial. Pet. at 5. Petitioner appears to be reiterating the same grounds raised in his motion for a writ of error coram nobis. *See* Dkt. No. 8-5 at SR 1057-66. In that application, petitioner cited his " serious attempts on his own life" after Parker's death, his mental condition when he was brought into custody, a "psychiatric evaluation" which "supported his mental instability," and the circumstances surrounding the victim's death. *Id.* at SR 1057-63; *see* Reply at 2-14. [7] Petitioner noted that he "did not intend to kill Ms. Parker," but that "the act was truly an accidental one which caused her death due to two people engaged in an unstable, physically romantic relationship." *Id.* at SR 1064. Petitioner also argued in his coram nobis motion that trial counsel was ineffective in "not investigating and pursuing" an EED defense and instead presenting a defense based upon the identity of the culprit. *Id.* at SR 1060-61.

[7]     In this regard, petitioner appears to refer to a "patient progress sheet" generated while he was admitted at Albany Medical Center for self-inflicted lacerations after he was taken into custody at the crime scene. Dkt. No. 8-5 at SR

1086-87, Patient Progress Sheet, dated 2/27/2009. The document—which bears the stamp of Robin Tassinari, M.D.—is difficult to decipher, but appears to reflect that petitioner was "groggy" and had been given morphine. *Id.* at SR 1086. Dr. Tassinari noted that he or she "cannot ascertain any psych hx" and would have to attempt to contact petitioner's family. *Id.* In a later note, Dr. Tassinari stated that petitioner had experienced "no change" and that, if "medically cleared," he would be arrested for "menacing." *Id.* at 1086-87. Dr. Tassinari further noted that, if petitioner were held in custody, it would be recommended that petitioner be placed on "watch for suicide and be followed by county psychiatric staff." *Id.* at SR 1087. It is not clear from the record whether Dr. Tassinari was at any point able to communicate with petitioner regarding his psychiatric history before petitioner was taken into custody, whether Dr. Tassinari or any other professional actually conducted a psychiatric evaluation of petitioner, or whether petitioner was considered a suicide risk while in custody pending trial.

**\*8** In his reply in further support of the present habeas petition, petitioner asserts that "behavioral and medical experts should have been hired for their testimonies in defense, and to rebut ... the prosecution's prejudicial expert witness testimony of Dr. Sikirica." Reply at 9. Moreover, petitioner contends that counsel also "could have called ... numerous friends and family members ... who were very willing to testify in defense of his character[.]" *Id.* at 10. Petitioner told counsel that he "choked" Parker to death while "having rough sex," and that he could have testified as to the cause of death at trial. *Id.* at 12-13, 15.

As an exhibit to his reply, petitioner has also attached the affidavit that he filed with the Appellate Division in support of his petition for a writ of error coram nobis, sworn to on August 12, 2013. Dkt. No. 13 at 31-33, Af fidavit; *accord*, Dkt. No. 8-5 at SR 1076-78. [8] In his affidavit, petitioner asserts that he "wanted to testify in his case" but was "not informed of that opportunity to explain the circumstance surrounding ... Park's death, and what truly occurred on February 26, 2009." Dkt. No. 13 at 31 ¶ 1. In that regard, petitioner asserts that Parker invited him to her house to talk and, when he arrived at Parker's house around 2:30 a.m. on the date at issue, they had an argument. *Id.* at ¶ 3. Soon after, petitioner apologized, and the two began a "rough sexual encounter" as they had many times in the past. *Id.* at ¶¶ 4-5. On some

Burkett v. Artus, Not Reported in Fed. Supp. (2016)

2016 WL 6659492

occasions, petitioner was "taunted with foul remarks" by Parker, but those occasions "rarely ... involve[d] choking since, according to [Parker, petitioner] squeezed like a bitch." *Id.* at ¶ 5. However, on the occasion at issue, petitioner "h[e]ld [Parker] by the neck with [his] right hand[ ] while engaging in intercourse," without "realizing ... the amount of strength [he] applied to [his] grasp while [his] hand was around her throat." *Id.* Petitioner realized that he choked Parker "too tightly" when she "stopped responding to [his] passionate dialogue and ceased in saying more of her own." *Id.* at ¶ 6. Blood began running from Parker's nose, and petitioner "panicked" and "stopped all sexual activity," sat Parker upright, and began "calling her name for a response." *Id.* When Parker remained unresponsive, petitioner "started crying hysterically." *Id.* at 33 ¶ 7. Petitioner called 911, but was "traumatized by what [he] was experiencing[.]" *Id.* at ¶ 7. Before medical personnel arrived, petitioner "attempted suicide with a nearby kitchen knife." *Id.* at ¶ 8.

8      Citation to the exhibits to petitioner's reply refer to the pagination provided by CM/ECF, the Court's electronic filing system.

Petitioner has not properly exhausted his ineffective assistance of trial counsel claim in state court. Petitioner raised these bases of ineffective assistance of trial counsel in his motion for a writ of error coram nobis, but did not raise an ineffective assistance claim on direct appeal. "[T]he only constitutional claim [petitioner] was permitted to raise in seeking a writ of error coram nobis was ineffective assistance of *appellate* counsel, a claim that is distinct from his claims of ineffective assistance of *trial* counsel." *Gilliam*, 653 F. Supp. 2d at 328 (emphasis in original) (noting that petitioner's "claim of ineffective assistance of trial counsel, and its sub-parts, raised as 'stand-alone' claim s in his *coram nobis* application, remain unexhausted"); *accord, Rush*, 500 Fed.Appx. at 15; *Turner*, 262 F.3d at 123. Moreover, petitioner raised other arguments sounding in ineffective assistance in his § 440.10 motion, but not those advanced in his habeas petition.

**\*9** Section 2254 "prohibits federal courts from *granting* relief to an applicant who has not exhausted the remedies available in the courts of the State," but allows "federal courts to deny the petition, regardless of whether the applicant exhausted his state court remedies." *Abuzaid v. Mattox*, 726 F.3d 311, 321 (2d Cir. 2013) (emphasis in original, internal quotation marks omitted) (citing 28 U.S.C. § 2254(b)(1)(A), (b)(2)). Unexhausted claims may be denied on the merits if the claims are "plainly meritless" (*Rhines v. Weber*, 544 U.S. 269, 277 (2005)) or "patently frivolous." *McFadden v. Senkowski*, 421 F. Supp. 2d 619, 621 (W.D.N.Y. 2006); *see* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Because petitioner's unexhausted claims fail under either standard, the Court will dispose of them.

A petitioner seeking to establish constitutionally ineffective assistance of counsel must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circum stances, the challenged action 'might be considered sound trial strategy.' " *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Even if a petitioner can establish that counsel was deficient, he still must show that he was prejudiced, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *accord Premo*, 562 U.S. at 121 (noting that petitioner "must show both deficient performance by counsel and prejudice.") (citation and internal quotation marks omitted). The standard "must be applied with scrupulous care" in habeas proceedings, because such a claim "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial] proceeding s[.]" *Premo*, 562 U.S. at 122.

"When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (citing *Strickland*, 466 U.S. at 690). "Counsel is not obliged to advance every nonfrivolous argument that could be made." *Aparicio*, 269 F.3d at 95 (citations omitted). Moreover, the decision "whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotation marks omitted) (citing *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) ("The decision whether to call any witnesses on behalf of a defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense counsel in almost every trial.")). Courts "must consider the totality of the evidence before the judge or jury" in adjudicating an ineffective assistance claim. *Strickland*, 466 U.S. at 695.

Under New York law, "[t]he affirmative defense of extreme emotional disturbance serves to reduce the degree of criminal

culpability for acts that would otherwise constitute murder. A defendant who proves by a preponderance of the evidence that the homicide was committed while 'under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse' will be guilty of first-degree manslaughter rather than second-degree murder[.]" *People v. Diaz*, 15 N.Y.3d 40, 44-45 (2010) (quoting Penal Law § 125.25(1)(a)). The defense "requires evidence 'of a subjective element, that defendant acted under an extreme emotional disturbance, and an objective element, that there was a reasonable explanation or excuse for the emotional disturbance.' " *Diaz*, 15 N.Y.3d at 45 (quoting *People v. Smith*, 1 N.Y.3d 610, 612 (2004)); *accord*, *Lopez v. Ercole*, No. 09-CV-1398, 2014 WL 285079, at *1 n.1 (S.D.N.Y. Jan. 27, 2014) ("Since this is an affirmative defense, defendant bears the burden of convincing the jury by a preponderance of evidence that (1) the defendant actually acted under the influence of EED, and (2) the explanation or excuse for this EED was reasonable.") (citing *People v. Roche*, 98 N.Y.2d 70, 75 (2002)). The objective element "requires proof that defendant's emotional disturbance was supported by a reasonable explanation or excuse," which is " 'determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, however inaccurate that perception may have been, and assessing from that standpoint whether the explanation or excuse for [the] emotional disturbance was reasonable[.]' " *Roche*, 98 N.Y.2d at 76 (quoting *People v. Harris*, 95 N.Y.2d 316, 319 (2000)). "A defendant cannot establish an extreme emotional disturbance defense without evidence that he or she suffered from a mental infirmity not rising to the level of insanity at the time of the homicide[.]" *Id.* at 75.

**\*10** In this case, the record does not support the conclusion that trial counsel rendered ineffective assistance by not pursuing an EED defense, or that such a defense was remotely likely to succeed at trial. Even accepting the contentions in petitioner's affidavit as true, these contentions suggest only that (1) petitioner and Parker engaged in a "civil" conversation about their romantic history, got into an argument, and petitioner apologized, (2) petitioner deliberately "h[e]ld her by the neck" while they engaged in sexual intercourse, as he purportedly had done on past occasions at Parker's dem and, and (3) petitioner became emotionally disturbed and began "crying hysterically" *after* he realized that Parker lost consciousness while he was choking her. Dkt. No. 13 at 31-32 ¶¶ 1-3, 5, 7. To the extent that petitioner may be understood to assert that he

was provoked by Parker's disparaging remarks about his strength in choking her (an assertion not clearly advanced in his affidavit), the Court notes that, even if accepted as true, "[a]cting out of anger or embarrassment is 'not equivalent to the loss of self control generally associated with" the defense of extreme emotional disturbance.' " *Linnen v. Poole*, 766 F. Supp. 2d 427, 463-64 (W.D.N.Y. 2011) (quoting *People v. Walker*, 64 N.Y.2d 741, 743 (1984), and collecting cases). In short, petitioner's version of events does not suggest that he behaved in a manner consistent with an extreme emotional disturbance in the time leading up to Parker's death, or that such a disturbance would have been supported by a reasonable explanation or excuse in light of the surrounding circumstances. *Roche*, 98 N.Y.2d at 75-76. [9] Trial counsel did not render ineffective assistance by failing to pursue a defense that lacked merit when considered in light of petitioner's own account of Parker's death.

[9]   The Court notes that the evidence adduced at trial is also at odds with the account in petitioner's affidavit and does not suggest that counsel was ineffective for failing to pursue an EED defense. Specifically, petitioner's physical abuse of Parker was neither an anomaly occasioned by an emotional disturbance on the night of Parker's death nor limited to times when the two engaged in consensual sexual intercourse. R.M., Parker's son, testified that, one night in September 2008, Parker called out R.M.'s name and, when he ran to Parker's bedroom, he observed petitioner choking her. Dkt. No. 9-6 at 135-36, Trial Transcript. Thereafter, petitioner ran upstairs and left Parker's house. *Id.* at 136. Moreover, R.M. testified that, on the morning of Parker's death and before law enforcement confronted petitioner, R.M. observed Petitioner washing his hands and a knife in the bathroom. *Id.* at 132, Trial Transcript. R.M. instructed his younger sister, who had awoken, to "lay back down," and, at that point, petitioner looked into R.M.'s room and "ran out the front door." *Id.* at 133. Based upon the evidence adduced at trial, the Court finds that the Appellate Division's observation that petitioner's "self-inflicted superficial wounds and behavior when police arrived were more suggestive of an attempt to feign despair and fabricate an exculpatory crime scenario" was an apt one. *Burkett*, 101 A.D.3d at 1470 n.2.

2016 WL 6659492

To the extent that petitioner argues in his reply that trial counsel was ineffective because he dissuaded petitioner from testifying and because he failed to call witnesses willing to testify "in defense of his character assassination," Reply at 10, these arguments also warrant no relief. Petitioner has failed to provide any facts in support of his claim that counsel refused to permit him to testify, [10] nor does he state how he was prejudiced by that decision. [11] Petitioner also has not identified which witnesses should have been called to testify as to his character, much less how any of these unidentified witnesses would have been helpful to his case. "It is well established that conclusory allegations, such as these, are insufficient to meet the rigorous standard under *Strickland v. Washington*." *Smalls v. McGinnis*, No. 04-CV-0301, 2004 W L 1774578, at *23 (S.D.N.Y. Aug. 10, 2004); *see Encarnacion v. McGinnis*, No. 01-CV-0586, 2008 W L 795000, at *13 (N.D.N.Y. Mar. 24, 2008) (Sharpe, J. adopting Report-Recommendation of Bianchini, M.J.) (rejecting ineffective assistance of counsel claim based upon counsel's failure to investigate unspecified "exculpatory leads" and failed to properly investigate or interview potential defense witnesses because "[p]etitioner does not identify many of the potential witnesses nor state with particularity how the testimony or evidence in question would have been exculpatory"); *Powers v. Lord*, 462 F. Supp. 2d 371, 381-82 (W.D.N.Y. Nov. 2, 2006) (rejecting claim that counsel was ineffective for not investigating and calling witnesses at trial because petitioner did not identify the witnesses or how they would have revealed information helpful to his case); *United States v. Vargas*, 871 F. Supp. 623, 624 (S.D.N.Y. 1994) (rejecting ineffective assistance claim based on failure to investigate and failure to call character witnesses where there was "no evidence that avenues suggested by the client which might have altered the outcome were ignored" and petitioner "fail[ed] to identify what persuasive character witnesses would have been involved, or to show that counsel was unwise in not opening up such witnesses to cross-examination"). These claims of ineffective assistance are too vague and conclusory to state a proper ground for habeas relief and are therefore dismissed.

[10]    In a letter to trial counsel dated June 10, 2013, petitioner noted that, during the course of trial, trial counsel "informed" petitioner that he "should not testify." Dkt. No. 13 at 47, Letter to Trial Counsel.

[11]    To the contrary, the record supports the conclusion that, if trial counsel did dissuade petitioner from testifying, that decision was one of trial strategy

and which was entirely reasonable. Petitioner argues in a conclusory manner that he could have "provided the jury with an explanation of his behavior" on the night of Parker's death, "contradicted the state's theory about both the motive and circumstances surrounding the killing," and explained why he choked Parker with one hand while "intentional murderers ... commonly have used two hands"). Reply at 15. However, petitioner provides no factual support indicating that his failure to testify was prejudicial to his case and, as noted above, his affidavit—even if credited—does not provide a basis for concluding that he was suffering from an extreme emotional disturbance (much less a reasonable one) at the time of Parker's death. It is also unclear how petitioner could have offered admissible testimony distinguishing Parker's death on the basis that "intentional murderers" typically strangle their victims with two hands, instead of one hand, or that the jury would have found such testimony persuasive in light of the prosecution's evidence of petitioner's guilt. Petitioner's assertion in his affidavit that he stopped choking Parker and attempted to elicit a response from her as soon as she stopped talking is at odds with the conclusions of the medical examiner, who testified at trial that Parker would have lost consciousness in approximately fifteen seconds but would have died only after an additional two to three minutes of continued pressure. *Burkett*, 101 A.D.3d at 1470. Moreover, petitioner would have been subject to cross-examination not only about his version of the events at issue (i.e., that he accidentally killed Parker during "rough" sexual intercourse), but also his previous threatening, verbally abusive, and violent behavior toward Parker as well as a prior girlfriend. Moreover, the Court notes that petitioner has not rebutted the presumptive correctness of the state courts' factual findings with "clear and convincing evidence." *Schriro*, 550 U.S. at 473-74 (quoting § 2254(e)(1)). Thus, while petitioner may have been able to offer testimony in contradiction to that provided by other witnesses, his vague and conclusory assertions in support of his habeas petition provide no support for the proposition that his testimony would have been persuasive or that he was prejudiced by trial counsel's advice not to testify.

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 64 of 172

Burkett v. Artus, Not Reported in Fed. Supp. (2016)
2016 WL 6659492

**\*11** Moreover, petitioner argues (again, in his reply) that counsel should have retained "behavioral and medical experts" to testify on his behalf and to rebut Dr. Sikirica's testimony concerning the "range" of time of pressure to the neck that could have resulted in the victim's death. Reply at 9-10. "The decision whether or not to call an expert witness generally falls within the wide sphere of strategic choices for which counsel will not be second-guessed on habeas review." *Savinon v. Mazucca*, 04-CV-1589, 2005 WL 2548032, at *33 (S.D.N.Y. Oct. 12, 2005), *adopted*, 2006 WL 2669331 (S.D.N.Y. Sept. 18, 2006) (quoting *Stapleton v. Greiner*, No. 98-CV-1971, 2000 W L 1207259, at *16 (E.D.N.Y. July 10, 2000)); *accord*, *Best*, 219 F.3d at 201 (noting that "counsel's decision as to whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation") (citation and internal quotation marks omitted); *United States v. Kirsh*, 54 F.3d 1062, 1072 (2d Cir. 1995), *cert. denied*, 516 U.S. 927 (1995). Petitioner's vague, conclusory assertion provides the Court with no basis upon which to conclude that there was a witness who could have offered relevant and probative evidence in support of his version of the events at issue or to counter the medical examiner's testimony regarding the length of time that a continuously applied pressure to the neck may result in death. Under these circumstances, the decision of trial counsel not to call his own expert "cannot be considered objectively unreasonable" because petitioner "has only presented his vague hope that another expert might have reached a different result than the government expert." *Savinon*, 2005 WL 2548032, at *33 (quoting *Leaks v. United States*, 841 F. Supp. 536, 545 (S.D.N.Y. 1994) (footnote omitted), *aff'd*, 47 F.3d 1157 (2d Cir. 1995), *cert. denied*, 516 U.S. 926 (1995)). Moreover, petitioner cannot establish prejudice because he has not show n that a defense expert would have contradicted the prosecution's evidence. *See James v. United States*, No. 00-CV-8818, 2002 WL 1023146, at *16 (S.D.N.Y. May 20, 2002) (rejecting petitioner's claim that trial counsel was ineffective in failing to obtain expert testimony where petitioner "provide[d] no reason to believe that an ... expert hired by the defense would have offered any exculpatory testimony or indeed any testimony that differed from the Government expert"); *Murden v. Artuz*, 253 F.Supp.2d 376, 389 (E.D.N.Y. Sept. 7, 2001), *aff'd*, 60 Fed.Appx. 344 (2d Cir. 2003) (concluding that the petitioner failed to show prejudice based on attorney's decision not to hire an expert where the petitioner did not "come forward with affidavits or other admissible evidence showing that there is an expert witness who would have testified" concerning

issues that would have raised a reasonable doubt as to petitioner's guilt).

Accordingly, petitioner has provided no basis for concluding that he received ineffective assistance of counsel during the course of the prosecution, and this ground for habeas relief is therefore denied and dismissed.

**E. Ground Four: The Trial Court's *Molineux* Ruling**
Petitioner contends that the trial court's *Molineux* ruling resulted in an unfair trial because the probative value of the prior bad acts evidence that the prosecution was allowed to present was outweighed by the prejudicial effect of its admission. Pet. at 5; Reply at 22-25. More particularly, in his reply, petitioner argues that the trial court should not have permitted Tarita Owens, petitioner's ex-girlfriend, to testify regarding an incident in 2001 during which he "strangled [Owens] to a state of unconsciousness[.]" Reply at 23.

At trial, Owens testified that, one evening in March 2001 when she returned to her apartment after work, she discovered petitioner (with whom she was no longer romantically involved) hiding in a hall closet. Dkt. No. 9-6 at 73, 75-77, T rial Transcript. All the lights in the apartment were off. *Id.* at 77. Owens demanded that petitioner leave and attempted to call the police, but observed that the "wire to the phone" had been cut and the line was dead. *Id.* at 78. Soon thereafter, petitioner "turn[ed] on the gas to the stove," took out a lighter and "threaten[ed] to blow [himself and Owens] up[.]" *Id.* at 80. A physical altercation ensued in view of Owens' daughter, and, eventually, petitioner pinned Owens on her bed and grabbed her by the neck. *Id.* at 82. According to Owens, during the struggle, petitioner stated, "If I can't have you, no one else can have you." *Id.* "At some point," Owens briefly "passed out" as a result of petitioner choking her. *Id.* at 83.

"Evidentiary questions are generally matters of state law and raise no federal constitutional issue for habeas review." *Sudler v. Griffin*, No. 9:12-CV-0367 (NAM/ATB), 2013 WL 4519768, at *3 (N.D.N.Y. Aug. 26, 2013); *accord, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the Untied States."). "A decision to admit evidence of a defendant's uncharged crimes or other bad acts under [*Molineux*] constitutes an evidentiary ruling based on state law." *Sudler*, 2013 WL 4519768, at *3 (citing *Sierra v. Burge*,

Burkett v. Artus, Not Reported in Fed. Supp. (2016)

2016 WL 6659492

Case 9:18-cv-01204-GTS-TWD Document 25 Filed 02/17/22 Page 65 of 172

No. 06-CV-14432, 2007 W L 4218926, at *5 (S.D.N.Y. Nov. 30, 2007)); *accord, Buchanan v. Chappius*, No. 9:15-CV-0407 (LEK), 2016 WL 1049006, at *4 (N.D.N.Y. Mar. 11, 2016).[12] "Federal courts may issue a writ of habeas corpus based upon a state evidentiary error only if the petitioner demonstrates that the alleged error violated an identifiable constitutional right, and that the error was so extremely unfair that its admission violates fundamental conceptions of justice." *Buchanan*, 2016 WL 1049006, at *4 (quoting *Sudler*, 2013 WL 4519768, at *3) (further citations and internal quotation marks omitted); *accord, Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990), *cert. denied*, 525 U.S. 840 (1998)). "For the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan*, 137 F.3d at 125 (citations and internal quotation marks omitted); *accord, Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985).

[12]  Moreover, the Supreme Court has not expressly addressed whether a state law permitting the use of "prior crimes" evidence to show criminal propensity would violate the Due Process Clause, and such a ruling therefore could not be said to contravene or unreasonably apply clearly established Supreme Court precedent. *Estelle*, 502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").

**\*12** Under New York law, evidence of uncharged crimes, prior convictions, or bad acts is admissible to prove a specific crime if it tends to establish motive, intent, absence of mistake or accident, a common scheme or plan between the commission of two or more crimes, or the identity of the person charged with the commission of the crime. *Molineux*, 168 N.Y. at 293; *accord, People v. Ventimiglia*, 52 N.Y.2d 350, 359 (1981). Moreover, New York courts have found evidence of prior acts of domestic violence perpetrated by a defendant relevant not only to the issues of identity and intent, but also "to provide background information concerning the context and history of [the] defendant's relationship with the victim[.]" *People v. Wertman*, 114 A.D.3d 1279, 1280 (4th Dep't 2014), *lv. denied*, 23 N.Y.3d 969 (2014), *habeas denied sub nom. Wertman v. Annucci*, No. 9:15-CV-0941 (JKS), 2016

W L 2903250, at *7 (N.D.N.Y. May 18, 2016) (citations and internal quotation marks omitted); *accord, e.g., Wise v. Superintendent of Attica Corr. Facility*, No. 08-CV-6312, 2010 W L 3943733, at *7 (W.D.N.Y. Oct. 7, 2010); *People v. Meseck*, 52 A.D.3d 948, 950 (3d Dep't 2008), *lv. denied*, 11 N.Y.3d 739 (2008); *People v. Doyle*, 48 A.D.3d 961, 964 (3d Dep't 2008), *lv. denied*, 10 N.Y.3d 862 (2008).

On direct appeal, the Appellate Division concluded that, after its "detailed *Molineux* pretrial hearing," the County Court properly admitted "limited testimony" concerning petitioner's "prior abusive, threatening and controlling behavior against Parker and" Owens because the testimony was relevant to petitioner's identity as the perpetrator, intent, and motive, and also "provided necessary background information regarding the nature of their relationship, which Parker had tried to terminate and the context in which [petitioner's] conduct occurred[.]" *Burkett*, 101 A.D.3d at 1470. As the Appellate Division noted, under New York law, prior bad acts in the context of domestic violence situations "are more likely to be considered relevant and probative evidence because the aggression and bad acts are focused on one particular person, demonstrating the defendant's intent, motive, identity and absence of mistake or accident[.]" *Id.* (quoting *People v. Westerling*, 48 A.D.3d 965, 966 (3d Dep't 2008)). Additionally, the Appellate Division observed that the prosecution had "requested testimony from seven witnesses regarding more than 12 instances of [petitioner's] controlling and threatening conduct toward Parker and other former girlfriends." *Burkett*, 101 A.D.3d at 1471.[13] The County Court, the Appellate Division concluded, had properly considered each instance and "preclud[ed] much of the proffer, including all or parts of the testimony of two of [petitioner's] ex-girlfriends and limiting or excluding the testimony of three of the victim's close girlfriends, and allowed evidence of only one of two domestic violence reports that Parker had filed in 2008[.]" *Id.*

[13]  In this case, the prosecution sought to present evidence of numerous instances of petitioner's alleged prior bad acts, including, among other things, the following: (1) the testimony of Theresa Vessels, petitioner's ex-girlfriend, with respect to incident in 1996 in which petitioner broke her nose and "spit in her face" out of an anger when another man placed a phone call to Vessels; (2) the testimony of Owens, petitioner's ex-girlfriend, with respect to (a) petitioner's violent behavior in 1999, (b) the 2001 incident during which petitioner

choked Owens to the point of unconsciousness, for which he was convicted of menacing in the third degree; (3) the testimony of Latonia Berkley-Taylor, Parker's best friend, with respect to (a) her observations of petitioner's abusive behavior toward Parker between 2002 and 2004, and (b) Parker's statements to Berkley-Taylor in February 2009 that she was intending to end her relationship with petitioner; (4) the testimony of R.M., with respect to (a) the incident in September 2008 in which he observed petitioner choking Parker, (b) an incident shortly before Parker's death in which petitioner "tr[ied] to pull the sunroof off the car" and "bang[ed] on the car window," and (c) the fact that petitioner moved because she did not want petitioner to know where she was living; (5) the testimony of Lorraine King, Parker's friend, with respect to petitioner's angry and jealous behavior toward Parker in 2008; (6) the testimony of Birt Adams, Parker's friend, with respect to, *inter alia*, threatening statements and behavior on the part of petitioner on New Year's Eve of 2008; (6) the testimony of Cheryl Hall-Clark, Parker's friend, with respect to (a) petitioner's angry, confrontational, and jealous behavior toward Parker around 2002 at Parker's workplace, (b) Parker's statements that petitioner "forced himself upon ... Parker sexually," and accused Parker of cheating on him, (c) Hall-Clark's awareness that Parker was attempting to end her relationship with petitioner due to his behavior, (d) the fact that Parker left her cellular phone open and connected when petitioner came to her residence, so that Hall-Clark could hear what was occurring as a safety measure; (7) prior domestic incident reports from February 2008 and June 2008; and (8) voicemail messages left by Parker on petitioner's cellular phone. Dkt. No. 8-5 at SR 937-948, Prosecution's Motion in Limine. As the Appellate Division explained, much of the prosecution's proffer was excluded, including Vessels' proposed testimony in its entirety. *See* Dkt. No. 9-6 at 215, Trial Transcript.

**\*13** In sum, for the same reasons set forth by the Appellate Division, the trial court properly permitted the prosecution to present evidence of certain prior bad acts that were relevant to material issues at trial, while excluding other instances that lacked sufficient probative value to justify the prejudicial effect of admitting them. Petitioner provides no

basis to conclude that the state courts' rulings on this issue —with respect to the prior bad acts evidence in general or to Owens' testimony in particular—violated New York evidentiary rules, much less that they were fundamentally unfair and thus contrary to, or an unreasonable application of, clearly established Supreme Court precedent. [14] As a result, petitioner is not entitled to habeas relief on this ground, and it is therefore denied and dismissed.

[14]     In his reply, petitioner argues that several of the details to which Owens testified concerning the occasion in 2001 on which petitioner choked her and threatened her were not included in her police statement generated in 2001. Reply at 23. Petitioner argues that Owens' testimony was therefore "perjured" and the subject of "rehearsal." *Id.* Petitioner's contentions in this regard are entirely conclusory and speculative, and afford him no basis for habeas relief. The Court notes only that trial counsel throughly cross-examined Owens with respect to the fact that certain details of her testimony were not memorialized in her earlier police statement. Dkt. No. 9-6 at 96-103, Trial Transcript.

**F. Ground Five: Right to Confront Witnesses**
In Ground Five of his petition, petitioner contends that his right to confront the victim under the Sixth Amendment was violated by the introduction of the victim's statements through the trial testimony of her friends and family. Pet. at 6; Reply at 26-27. Petitioner's claim is unexhausted and procedurally defaulted.

Petitioner argued in his motion for a writ of error coram nobis that his right to confrontation was violated, but he did not assert this claim on direct appeal. Dkt. No. 8-5 at SR 1066-69. Presentation of his claim in the context of his coram nobis motion (the purpose of which is to advance a claim of ineffective assistance of appellate counsel) was not sufficient to fairly present to an appropriate state court petitione r's underlying confrontation claim. *Gilliam*, 653 F. Supp. 2d at 328. Moreover, the basis of petitioner's claim is apparent on the record and could have been raised on direct appeal. Petitioner can no long er file a direct appeal or leave application to exhaust his claim because a defendant is "entitled to one (and only one) appeal to the Appellate Division" and "New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal." *Aparicio*, 269 F.3d

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 67 of 172

Burkett v. Artus, Not Reported in Fed. Supp. (2016)
2016 WL 6659492

at 91 (citing CPL § 440.10 (2)(c)); *see Clark*, 510 F.3d at 393 (noting that, "even if no state court had applied section 440.10(2)(c) to Clark's claim, the district court itself should have done so in the first instance pursuant to the exhaustion requirement for federal habeas").

Petitioner has not demonstrated cause for his failure to raise the issue or resulting prejudice, nor has he alleged that he is actually innocent. [15] *Aparicio*, 269 F.3d at 91. As a result, petitioner's claim is barred, and it is therefore denied and dismissed. [16]

[15]    Moreover, as discussed above, petitioner does not assert in his petition that appellate counsel rendered ineffective assistance for failing to advance his Confrontation Clause claims on direct appeal.

[16]    In any event, for the reasons set forth in the Government's memorandum of law, the Court concludes that Petitioner's claim is lacking in merit. Dkt. No. 7-1 at 44-45. As the Government correctly observes, the record does not support the conclusion that the victim's statements to her friends and family regarding petitioner (as testified to by those individuals, who were subject to cross-examination) were testimonial in nature. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006). Here, there is no indication that the declarant (i.e., the victim) had any reasonable expectation that her statements, made to friends and family outside the context of any proceeding, investigation, or formal complaint, would be used in future judicial proceedings. *See United States v. Saget*, 377 F.3d 223, 228-230 (2d Cir. 2004); *see generally Giles v. California*, 554 U.S. 353, 376 (2008) (noting that "only *testimonial* statements are excluded by the Confrontation Clause[, and s]tatements to friends and neighbors about abuse and intimidation ... would be excluded, if at all, by hearsay rules"). The Court notes that, as the Appellate Division concluded, the testimony at issue was admissible for nonhearsay purposes. *Burkett*, 101 A.D.3d at 1472 n.4 ("While some of the background information consisted of hearsay statements of the victim or was based thereon, no hearsay objections were raised during trial but, in

any event, the testimony was admissible on the issue of the victim's state of mind related to and fear of defendant and to explain her behavior toward him.") (citation omitted). Petitioner is not entitled to habeas relief on this basis.

**G. Ground Six: Failure to Charge Lesser Included Offense**

**\*14**    Petitioner next contends that the trial court erred in refusing to charge the jury with respect to "reckless manslaughter" as a lesser included offense of murder in the second degree. [17] Pet. at 6. Petitioner's claim is not cognizable on habeas review.

[17]    "A person is guilty of manslaughter in the second degree when ... [h]e recklessly causes the death of another person." Penal Law § 125.15(1).

Both the United States Supreme Court and the Second Circuit have explicitly refrained from deciding whether the United States Constitution requires that juries be instructed with respect to lesser included offenses in non-capital cases. *Beck v. Alabama*, 447 U.S. 625, 637-38 & n.14 (1980); *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996) (per curiam). As the Second Circuit has noted, reaching this issue "would involve the announcement of a new rule" in violation of *Teague v. Lane*, 489 U.S. 288, 299-300, 316 (1989). *Jones*, 86 F.3d at 47. Accordingly, petitioner's claim is not cognizable on habeas review. *Id.* at 47-48; *accord, Bonilla v. Lee*, 35 F. Supp. 3d 551, 569 (S.D.N.Y. 2014) ("*Jones* and *Teague* preclude consideration of the petitioner's claim that he was entitled to the lesser charge of manslaughter in the first degree."); *Hendrie v. Greene*, No. 9:06-CV-0370 (TJM/RFT), 2010 WL 786467, at \*9 (N.D.N.Y. Mar. 3, 2010) ("[P]ending the pronouncement of a new constitutional rule, a claim based on an alleged error to charge a lesser included offense is not cognizable in a habeas proceeding because absent such a rule, there is no basis to find an unreasonable application and/or violation of clearly established federal law."); *Mills v. Girdich*, 614 F. Supp. 2d 365, 382 (W.D.N.Y. 2009).

For the sake of completeness, the Court notes that, as the Appellate Division concluded on petitioner's direct appeal, petitioner also was not entitled to an instruction with respect to second degree manslaughter under New York State law. *Burkett*, 101 A.D.3d at 1472 (concluding that petitioner's claim was "foreclosed" because he "was in fact convicted of second degree murder as charged in the indictment and the jury never reached the next lesser included offense of

2016 WL 6659492

manslaughter in the first degree which was included in the court's charge"). At petitioner's request, the trial court instructed the jury with respect to manslaughter in the first degree in violation of Penal Law § 125.20(1) ("[w]ith intent to cause serious physical injury to another person," causing the death of that person) as a lesser included offense to murder in the second degree. Dkt. No. 9-6 at 187-204, Charge Conference Transcript; Dkt. No. 9-7 at 72-75, Jury Charge Transcript. Petitioner was convicted of murder in the second degree, and the jury thus had no occasion to consider manslaughter in the first degree as a lesser included offense. "[W]here a court charges the next lesser included offense [manslaughter first] of the crime alleged in the indictment [murder second], but refuses to charge lesser degrees than that, ... defendant's conviction of the crime alleged in the indictment forecloses a challenge to the court's refusal to charge the remote lesser included offenses [manslaughter second][.]" Burkett, 101 A.D.3d at 1473 (quoting Boettcher, 69 N.Y.2d at 180).

**\*15** For these reasons, petitioner is not entitled to habeas relief on this ground, and it is therefore denied and dismissed.

### H. Ground Seven: Illegally Imposed Restitution

Finally, petitioner contends that the sentencing court's order that petitioner pay the victim's funeral expenses was "illegally imposed." Pet. at 7. Plaintiff cites no federal constitutional principle or Supreme Court precedent in support of his contention.

Following trial, the sentencing court ordered that, as part of his sentence, petitioner pay restitution in the amount of $13,000, representing the victim's funeral expenses, which had been paid in part by the New York Office of Victim Services and by the father of the victim's surviving children. Dkt. No. 9-8 at SR 9-12, Sentencing Transcript. On direct appeal, petitioner contended that the restitution order was improper because "reimbursement for funeral expenses does not constitute payment to a victim within the meaning of" Penal Law § 60.27(4)(b) and New York Executive Law § 621. Dkt. No. 8-1 at SR 97.

Petitioner's contention that restitution was illegally imposed is not cognizable on habeas review. Hodges v. Bezio, No. 9:11-CV-0439 (LEK/DEP), 2014 W L 2779267, at \*9 (N.D.N.Y. June 19, 2014) (concluding that petitioner's argument that "the amount of restitution awarded by the state court violate[d] Penal Law § 60.27" had "no basis ... in constitutional or federal law" and was thus not cognizable

on habeas review); accord, Rojas v. Heath, No. 11-CV-4322, 2012 W L 5878679, at \*8 n.19 (S.D.N.Y. Oct. 18, 2012), adopted, 2012 WL 5878752, at \*1 (S.D.N.Y. Nov. 16, 2012) (noting, in the context of a restitution claim, that habeas relief "is unavailable for claims that have no effect upon a petitioner's custody"); see also United States v. Boyd, 407 Fed.Appx. 559, 560 (2d Cir. 2011) (summary order) (explaining, in the context of 28 U.S.C. § 2255, that "[r]estitution orders cannot be challenged through a habeas petition because a 'monetary fine is not a sufficient restraint on liberty to meet the in custody requirement,' even if raised in conjunction with a challenge to a sentence of imprisonment") (quoting Kaminski v. United States, 339 F.3d 84, 87-88 (2d Cir. 2003)) (further internal quotation marks omitted).

Accordingly, this ground provides no basis for the relief petitioner seeks, and it is therefore denied and dismissed.

### V. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the petition, Dkt. No. 1, is **DENIED AND DISMISSED** in its entirety; and it is further

**ORDERED** that no Certificate of Appealability ("COA") shall issue because petitioner failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[18] and it is further

[18]    Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); see Richardson v. Greene, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, and (2) that the applicant has established a valid constitutional violation" (emphasis in original)).

**\*16** **ORDERED** that the Clerk send petitioner copies of the unpublished decisions cited in this Decision and Order in accordance with Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

2016 WL 6659492

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6659492

---

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2007 WL 1825401
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Demetrious LOVING, Petitioner,

v.

PEOPLE OF THE STATE OF
NEW YORK, Respondent.

Civil Action No. CV-04-1284(DGT).
|
June 21, 2007.

**Attorneys and Law Firms**

Demetrious Loving, Bronx, NY, pro se.

Alyson Joy Gill, New York State Attorney Generals Office,
New York, NY, Queens County District Attorneys Office, for
Respondent.

*ORDER*

TRAGER, J.

 **\*1** Petitioner Demetrious Loving ("petitioner" or "Loving")
brings this *pro se* petition for writ of habeas corpus pursuant
to 28 U.S.C. § 2254 to vacate his conviction, arguing that the
evidence adduced at his bench trial was legally insufficient.

For the following reasons, the petition is denied.

**Background**

**(1)**

**Factual Background**

Petitioner was charged with Assault in the Second Degree
(N.Y. Penal Law § 120.05(2)), Criminal Possession of a
Weapon in the Third Degree (N.Y. Penal Law § 265.02(1))
and two counts of Criminal Possession of a Weapon in
the Fourth Degree (N.Y. Penal Law § 265.01(2)). Petitioner
and co-defendant, his girlfriend Dora Manning ("Manning"),
were tried together at a bench trial before the Honorable

Judge Barry Kron. At the bench trial, the state introduced
the following evidence. On July 27, 2000, at approximately
7 p.m., petitioner and Manning encountered complainant
Sherrell Holloway ("Holloway") outside of her apartment
building on 1-20 Astoria Boulevard in Queens County. Trial
Tr. ("Tr.") at 36:24-37:17; 131:20-25. Petitioner and Manning
got into an argument with Holloway, and Manning punched
Holloway in the face. Tr. at 39:9-14. A fight ensued between
the two women, prompting petitioner to break up the fight and
push Holloway away. Tr. at 39:15-19; 54:3-18. At some point
either before or after Holloway began to walk back into her
apartment building, Manning slashed Holloway five times in
the arm. Tr. at 75:24-77:5; 92:9-16. Although Holloway did
not see a weapon in Manning's hand, she testified she believed
it was a razor. Tr. at 39:20-40:9. Holloway's mother saw her
daughter's arm bleeding and testified that she saw Manning
holding "a knife or a blade." Tr. at 31:13-16.

Holloway and her mother called the police, who arrived ten
to fifteen minutes later to take a report of the incident. Tr.
at 33:12-13; 79:1-4. The police officer observed "surface
scratches," Tr. at 110:6-8, that "looked like a razor cut," Tr. at
109:19,[1] on Holloway's arm and offered medical attention,
which Holloway refused, saying that she would take care of
the cuts herself, Tr. at 41:1-3; 107:14-17.

[1]    On cross-examination, the police officer testified
       that the cuts could have been made with someone's
       nails. Tr. at 110:11-13.

About approximately 7:30 p.m. that same night, Holloway
drove with her friend, Melissa Cooper ("Cooper"), to the
drug store to get ointment for her cuts. Tr. at 41:13-19.
As Holloway was getting out of Cooper's car, a car driven
by petitioner pulled up beside her and pinned her right
leg between his car and a gate. Tr. at 41:21-24. Manning
jumped out of the car and started to assault Holloway. Tr. at
41:25-42:5. When Manning yelled, "she cut me, she cut me,"
Tr. at 42:5-6, petitioner exited the car and stabbed Holloway
once in the arm with a black-handled steak knife, telling her,
"I got you, bitch," Tr. at 42:4-23; 85:12-14. Holloway started
fighting petitioner and Manning pulled out a razor and cut
Holloway's arms. Tr. at 42:7-11; 86:16-19. Manning also bit
Holloway's thumb during the fight. Tr. at 43:5-11.

 **\*2** Holloway was bleeding so badly that her "whole outfit
was completely drenched in blood," Tr. at 44:21-22, and was
in "a lot" of pain, Tr. at 44:23-45:3. Cooper took her to
the hospital and then left to bring Holloway's mother to the

hospital. Tr. at 44:5-11. When Holloway was told she would have to wait for medical attention, she left the hospital and began to walk home. Tr. at 44:5-9. Holloway's mother, en route to the hospital, spotted Holloway walking back from the hospital and flagged down a police officer. Tr. at 22:24-23:16; 44:10-15. The police officer testified he observed "a very large laceration" on Holloway's arm and that Holloway was complaining of a lot of pain in her leg. Tr. at 108:7-11. The police officer called an ambulance to take Holloway to another hospital. Tr. at 23:14-16; 45:8-17. Holloway received between 15 and 30 stitches at that hospital. Tr. at 45:20-24.

Petitioner presented no witnesses, though his attorney asked the trial judge to take judicial notice of the criminal complaint, which stated that petitioner had a razor knife during the second incident and "cut as opposed to stabbed" Holloway. Tr. at 168:8-24.

Manning took the stand in her defense and testified that she and Holloway used to be friends but had been involved in a longstanding feud since 1994 or 1995. Tr. at 127:16-128:16. Manning described three subsequent incidents, one where Holloway attacked Manning and petitioner, another where Manning believed Holloway had vandalized her car and, finally, where Holloway's sister broke the passenger window of petitioner's car while petitioner and Manning were inside it. Tr. at 130:11-139:18. When petitioner and Manning went to the police station on August 5, 2000 to report this last incident, petitioner and Manning were placed under arrest and searched. Tr. at 96:9-24; 100:23-101:9. A black-handled steak knife was recovered from Manning's pocketbook. Tr. at 96:14-99:14. There was no fingerprint or blood testing done on the knife. Tr. at 99:25-100:10. The detective who recovered the knife testified that he did not observe blood on the knife when he recovered it. Tr. at 100:5-7.

## (2)

### Procedural Background

On May 30, 2001, petitioner was adjudicated a second felony offender and convicted of all counts in a bench trial in New York State Supreme Court, Queens County. Tr. at 188:18-189:17. On June 13, 2001, petitioner was sentenced to concurrent prison terms of three years on the second-degree assault count, two to four years on the third-degree criminal possession of a weapon count and two one-year terms on the fourth-degree weapon count. June 13, 2001 Sentencing Tr. at 6:1-7.

On May 12, 2002, petitioner, by counsel, appealed his conviction on the grounds that the verdict was against the weight of the evidence and that the state presented insufficient evidence to establish petitioner's guilt beyond a reasonable doubt. Petitioner's conviction was unanimously affirmed by the Appellate Division, Second Department on February 24, 2003. *People v. Loving,* 302 A.D.2d 607, 755 N.Y.S.2d 623 (2d Dep't 2003). Specifically, in denying petitioner's appeal on the merits, the Appellate Division found that "the verdict of guilt was not against the weight of the evidence" and that the evidence "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Id.* at 607, 755 N.Y.S.2d at 623. Leave to appeal to the New York State Court of Appeals was denied on May 27, 2003. *People v. Loving,* 100 N.Y.2d 540, 793 N.E.2d 420, 763 N.Y.S.2d 6 (2003).

*3 On November 13, 2003, petitioner filed a *pro se* motion to vacate the judgment in New York Supreme Court, Queens County, pursuant to New York Criminal Procedure Law ("CPL") § 440.10, arguing that the trial court's verdict was against the weight of the evidence. The motion was denied as petitioner had already raised this claim on direct appeal and it had been rejected by the Appellate Division.

Petitioner filed a *pro se* petition for writ of habeas corpus on February 8, 2004, arguing that: 1) "the judge erred or didn't notice the weight of the evidence at trial" because a police officer testified that the cuts on Holloway's arm "appeared to be consistent with her being injured by someone's nails rather than a weapon"; 2) the detective who recovered a steak knife from petitioner's co-defendant "never requested laboratory testing [ ][be] performed on the knife"; 3) "the medical records do[ ] not support the complainant['s] testimony at trial because they "do [ ] not say anything about any stab wound" and "fail[ ] to mention anything about stitches"; and 4) "an adverse inference should have been drawn" by the state's failure to call Melissa Cooper, an eyewitness, to testify. Pet. under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Petition") at 5-6. [2]

[2]      Many of these claims are couched as "weight of the evidence" challenges, which are not cognizable under habeas review. Nevertheless, because petitioner is *pro se,* these claims will be construed as "insufficiency of the evidence" claims. *See, e.g., Hernandez v. Conway,* ---

Loving v. People of State of New York, Not Reported in F.Supp.2d (2007)

2007 WL 1825401

F.Supp.2d ----, No. 03-CV-0852, 2007 WL 1213334, *5 (W.D.N.Y. Apr.25, 2007) (recognizing that complaints of *pro se* petitioners are to be considered liberally in their favor and, therefore, construing *pro se* petitioner's "weight of the evidence" claims as "insufficiency of the evidence" claims); *Davis v. McLaughlin,* 122 F.Supp.2d 437, 441 (S.D.N.Y.2000) (same).

The state filed an opposition, conceding that the petition was timely and that the claims asserted in it have been exhausted. Mem. of Law in Opp. to Pet. for a Writ of Habeas Corpus ("Mem. in Opp.") at 7-9. However, the state argues that petitioner's claims are meritless because there was legally sufficient evidence to support his conviction and the appellate division's holding that petitioner's conviction was supported by legally sufficient evidence was not contrary to, or an unreasonable application of, Supreme Court law.

Petitioner failed to submit a reply to the state's opposition.

## Discussion

## (1)

## Standard of Review

When reviewing a habeas corpus petition by a prisoner challenging a state court conviction that was adjudicated on the merits, federal courts apply a deferential standard of review under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d). Where, as here, petitioner's claim has been adjudicated on the merits in state court, habeas relief will be available only if the petitioner can show that the state court decision: 1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or 2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court adjudication is "contrary to" clearly established federal law either if the state court " 'applies a rule that contradicts the governing law', or 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a different result from [Supreme Court] precedent.' " *Santana v. Poole,* No. 03-CV-3946, 2006 WL 3483923, at *4 (E.D.N.Y. Nov.6, 2006) (quoting *Williams v. Taylor,* 529 U.S. 362, 405-06,

120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A state court's decision involves an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from the [Supreme] Court's cases, but unreasonably applies [that principle] to the facts" of a prisoner's conviction. *Id.* at *4 (quoting *Williams,* 529 U.S. at 407-08). Determination of factual issues made by a state court "shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

*4 Thus, the Appellate Court's decision that the evidence presented at petitioner's trial was legally sufficient to sustain his conviction must be deferred to unless it is determined that that decision was an unreasonable application of, or contrary to, clearly established federal law, as determined by the United States Supreme Court.

## (2)

## Petitioner's Sufficiency of the Evidence Claim

### a. Standard

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case by requiring proof beyond a reasonable doubt of every element of the crime with which he is charged. *See Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In a § 2254 challenge to the evidentiary sufficiency of a state criminal conviction, the federal habeas court must view the evidence in the light most favorable to the state and determine whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dixon v. Miller,* 293 F.3d 74, 81 (2d Cir.2002) (emphasis in original) (quoting *Jackson,* 443 U.S. at 319). Habeas corpus relief is only warranted when the record is "totally devoid of evidentiary support," *Gonzalez v. Reiner,* 177 F.Supp.2d 211, 218 (S.D.N.Y.2001), and the reviewing court finds that no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial, *Jackson,* 443 U.S. at 319.

A habeas court must defer to the credibility assessments made by the fact-finder and may not "make its own subjective determination of guilt or innocence." *Jackson,* 443 U.S. at 319 n. 13. *See also Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds

for reversal on [habeas] appeal"). In fact, "[w]here the record supports conflicting inferences, the court 'must presume ... that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Santana,* 2006 WL 3483923, at *7 (quoting *Jackson,* 443 U.S. at 326). Thus, a petitioner bears a "very heavy burden" in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence. *Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir.2002) (citations omitted). *See also Francischelli v. Potter,* No. 03-CV-6091, 2007 WL 776760, at *8 (E.D.N.Y. Mar. 12, 2007) ("Given that the reviewing court may not substitute its judgment for that of a rational jury, the burden of a convicted individual in challenging the sufficiency of evidence upon which he was convicted has often been described as a heavy one.").

**b. Analysis**

In order for petitioner to sustain his insufficiency claim, he must show that no rational trier of fact could have found proof of guilt beyond a reasonable doubt that his actions fulfilled all the elements necessary to commit assault in the second degree and criminal possession of a weapon in the third and fourth degrees and, therefore, the Appellate Division's decision affirming the conviction was either contrary to, or an unreasonable application of, Supreme Court precedent. *Francischelli,* 2007 WL 776760, at *8.

*\*5* When considering a challenge to a state conviction based upon the sufficiency of evidence, a federal habeas court must look to state law to determine the elements of a crime. *Ponnapula,* 297 F.3d at 179. To convict petitioner on a charge of second degree assault under New York Penal Law section 120.05(2), the state needs to prove beyond a reasonable doubt that petitioner intentionally caused "physical injury"[3] to another person "by means of a deadly weapon or a dangerous instrument."[4] N.Y. Penal Law § 120.05(2). Here, testimony given at trial established that petitioner stabbed Holloway in the arm with a black-handled steak knife while yelling, "I got you, bitch!"; that the stabbing caused bleeding and pain; and that the resulting wound required stitches and caused scarring. Corroborating this testimony were Holloway's medical records, the need for fifteen to thirty stitches, the judge's observation of Holloway's scarring and the police officer's testimony that he observed a large laceration on Holloway's arm and heard her complain of leg pain before Holloway went to the hospital. Finally, the black-handled steak knife, which Holloway testified petitioner stabbed her with, was recovered in Manning's purse approximately two

weeks after the attack. Viewing this evidence in the light most favorable to the state, the fact-finder could reasonably infer that petitioner intentionally stabbed Holloway in the arm with a dangerous weapon and caused a physical injury, which required up to thirty stitches. Thus, there was legally sufficient evidence to convict petitioner of second degree assault. *See, e.g ., People v. Easterling,* 191 A.D.2d 579, 579, 594 N.Y.S.2d 805, 806 (2d Dep't 1993) (evidence legally sufficient to support conviction of assault in the second degree where victim testified that she was stabbed multiple times and suffered "a lot of pain," victim displayed scars to the jury as a result of the assault and state introduced victim's hospital records).

3    Under New York Penal Law, "physical injury" is defined as "impairment of physical condition or substantial pain." N.Y. Penal Law § 10.00(9).

4    Under New York Penal Law, a "dangerous instrument" is defined as "any instrument ... which, under the circumstances in which it is used ... is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13).

Furthermore, there was legally sufficient evidence to find petitioner guilty of two counts of criminal possession of a weapon in the fourth degree[5] and one count criminal possession of a weapon in the third degree. A person is guilty of criminal possession of a weapon in the fourth degree when "[h]e possesses any ... dangerous knife, ... razor, ... or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N.Y. Penal Law § 265.01(2). Here, in order to make out both counts of fourth degree criminal possession of a weapon, the state had to prove that petitioner possessed both the razor allegedly Manning used to cut Holloway, via accomplice liability, as well as the black-handled steak knife petitioner allegedly used to cut Holloway. First, as to possession of the razor, petitioner's participation in Manning's attack on Holloway was sufficient to show that petitioner acted as Manning's accomplice, and, therefore, was liable for criminal possession of the razor in the fourth degree. Testimony established that, during the second incident on July 27, 2000, petitioner pinned Holloway's leg against the fence with his car, enabling Manning's attack on Holloway. This is sufficient to show that petitioner shared Manning's intent to injure Holloway and encouraged and aided Manning's attack. *See, e.g., People v. Long,* 294 A.D.2d 614, 616, 741 N.Y.S.2d 592, 594 (3d Dep't 2002) (finding evidence that defendant pushed victim toward garage and held garage door closed while co-defendant beat

Loving v. People of State of New York, Not Reported in F.Supp.2d (2007)

2007 WL 1825401

victim sufficient to establish defendant's guilt of assault). Furthermore, as to possession of the knife, testimony at trial established that petitioner was prompted to get out of the car after his girlfriend complained Holloway "got" her; that petitioner actually used the knife to stab Holloway; and that petitioner stabbed Holloway while stating, "I got you, bitch!". This evidence is legally sufficient to support the conclusion that petitioner possessed a knife with intent to harm Holloway. *See, e.g., People v. Perez,* 45 N.Y.2d 204, 209, 380 N.E.2d 174, 176, 408 N.Y.S.2d 343, 345 (1978) ("[I]t is not necessary to prove a defendant's possession of a weapon with intent to use it against a person unlawfully by evidence independent of the defendant's conduct during the commission of a greater crime."). From this evidence, the judge sitting as fact-finder could easily conclude that petitioner had been in possession of both the knife and the razor and that he intended to use them unlawfully against another person, thus, establishing his guilt of the two weapon-possession charges in the fourth degree.

5    Both counts of criminal possession of a weapon in the fourth degree stem from petitioner's and Manning's second attack on Holloway. One of the counts is for criminal possession of the razor; the other is for criminal possession of the steak knife.

**\*6** Finally, a person is guilty of criminal possession of a weapon in the third degree when "[s]uch person commits the crime of criminal possession of a weapon in the fourth degree .. and has been previously convicted of any crime." N.Y. Penal Law § 265.02(1). The state introduced uncontroverted evidence that petitioner had been previously convicted of a crime. Tr. at 117:22-119:5. As discussed above, there was sufficient evidence to find petitioner guilty of criminal possession of a weapon in the fourth degree. Thus, the state introduced sufficient evidence for the judge sitting as the trier of fact to convict petitioner of criminal possession of a weapon in the third degree.

None of petitioner's arguments change this result. Petitioner's first and third arguments-that an officer testified on cross-examination that the cuts on Holloway's arms could have been made by a person's nails and that the medical records failed to mention a stab wound-do not alter the fact that the judge sitting as fact-finder could readily conclude that petitioner stabbed Holloway with a steak knife and that Manning, acting in concert with petitioner, cut Holloway with a razor. The trial judge saw the hospital medical records, *see* Tr. at 45:25-46:10, observed the scarring on Holloway's arms, *see* Tr. at 38:15-39:7; 42:21-43:4; 43:16-24; 188:12-17 ("the injuries on [Holloway's] arm were indeed from my

observation of them significant injuries involving permanent scarring and obvious injuries of consequence to still have the physical manifestation showing this amount of time after the injuries"), and heard testimony about the attacks and about Holloway's injuries. Ultimately, the trial judge made credibility assessments and determined that the state had met its burden. *See United States v. Strauss,* 999 F.2d 692, 696 (2d Cir.1993) (citations omitted) (noting that the fact-finder "is exclusively responsible for determining a witness' credibility"); *Gruttola v. Hammock,* 639 F.2d 922, 928 (2d Cir.1981) ("The jury chose to believe the State's witnesses, despite the inconsistencies in the evidence and the character testimony. We cannot say that no rational jury could have found guilt beyond a reasonable doubt on all the evidence.").

Petitioner's second argument-that there was no laboratory testing preformed on the steak knife recovered from petitioner's co-defendant-does not render the evidence offered at trial legally insufficient to support petitioner's conviction. The trial judge heard testimony from Holloway that petitioner stabbed her with a black-handled steak knife and that same knife was recovered from Manning, petitioner's girlfriend, two weeks after the attack while petitioner was with her. This presented enough circumstantial evidence for the trial judge to infer that the black-handled steak knife that was used to stab Holloway was the same black-handled steak knife recovered from Manning, regardless of the lack of "testing." *See, e.g., United States v. Sureff,* 15 F.3d 225, 228 (2d Cir.1994) (recognizing that "guilt beyond a reasonable doubt may be established entirely by circumstantial evidence"); *Strauss,* 999 F.2d at 696 (citations omitted) ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence."). Furthermore, the two-week delay between Holloway's stabbing and petitioner's and Manning's arrest easily explains why the detective did not observe any blood on the knife at the time of arrest.

**\*7** Finally, the trial judge himself directly addressed petitioner's final argument-that "an adverse inference should have been drawn" by the state's failure to call Melissa Cooper, an eyewitness, to testify. The trial judge specifically mentioned that he considered the fact that Cooper was not called to the stand when rendering his decision, but, nonetheless, found petitioner guilty of all counts. Tr. at 187:17-20 ("I also take into account that it would have been natural for Ms. [ ] Cooper to be a witness in this case. And that she was not called. And that is factored in as well."). Ultimately, so long as the evidence at trial establishes "any valid line of reasoning and permissible inferences [that] could

2007 WL 1825401

lead a rational person" to convict, then the conviction will survive sufficiency review. *People v. Williams,* 84 N.Y.2d 925, 926, 644 N.E.2d 1367, 1367, 620 N.Y.S.2d 811, 811 (1994). This was the case here.

Thus, petitioner has failed to prove that the record is devoid of evidence to support the essential elements of his convictions and, thus, failed to show that the Appellate Division's conclusion that there was legally sufficient evidence to support his conviction was contrary to clearly established federal law or that it involved an unreasonable application of

that law. Petitioner, therefore, has no basis for habeas relief. 28 U.S.C. §§ 2254(d). As such, petitioner's petition for writ of habeas corpus is denied. The Clerk of the Court will enter judgment accordingly and close the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1825401

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2244633
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Angel MARTINEZ, Petitioner,
v.
Dennis BRESLIN, Respondent.

No. 07 Civ. 8671(DC).
|
July 28, 2009.

West KeySummary

1    **Habeas Corpus** 🔑 Particular Issues and Problems

Defendant was not entitled to habeas corpus relief on his claim that there was insufficient evidence to prove he was guilty of first-degree manslaughter. Although the evidence at trial showed that a co-defendant administered the blows that directly caused victim's death, a reasonable jury could have reasonably concluded that defendant was an active and willing participant from start to finish. Eyewitness testimony established that defendant initiated the chase of the victim; he began the attack on the victim*;* and he continued the assault even after co-defendant began striking deadly blows to victim's head with what apparently was a flashlight. 28 U.S.C.A. § 2254.

**Attorneys and Law Firms**

Franzlau Dratch, P.C., by: Stephen N. Dratch, Esq., New York, NY, for Petitioner.

Robert T. Johnson, Esq., District Attorney, Bronx County, by: Christopher Blira–Koessler, Esq., Assistant District Attorney, Bronx, NY, for Respondent.

*MEMORANDUM DECISION*

CHIN, District Judge.

**\*1** Petitioner Angel Martinez brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Martinez was convicted by a jury of first-degree manslaughter in the Supreme Court of the State of New York, Bronx County. He was sentenced to a term of imprisonment of ten years.

Martinez challenges his conviction on the following grounds: (1) the evidence was legally insufficient to support his conviction, and (2) the trial court erred in refusing to submit third-degree assault as a lesser-included offense of first-degree manslaughter. For the reasons set forth below, the petition is denied.

This is a companion case to *Fernandez v. Smith,* which was brought by Martinez's cousin, Christopher Fernandez ("Christopher"), based on the same facts and same trial in the Supreme Court, Bronx County. I granted Christopher's habeas petition. *See Fernandez v. Smith,* 558 F.Supp.2d 480 (S.D.N.Y.2008). I accepted Martinez's petition as a related case.

*BACKGROUND*

**A. *The Facts***

On June 30, 2001, Martinez got into a "commotion in the street" with Anthony Santiago and several other youths. (Trial Tr. at 32–33, 298–99). They threw "fists" at each other. (*Id.* at 299).

Martinez's cousins Christopher and Carlos Fernandez ("Carlos") pulled up in their car and saw that Martinez was in the middle of a fight. (*Id.* at 32, 299). Carlos testified that:

> I saw about three or four youths, at least they looked like they were swinging, at least one of them were swinging at Angel and they were in the middle of the street so we couldn't go and Angel looked like he had been hit.

(*Id.* at 32). Carlos testified that Martinez's chest was "like red" and that "he looked like he had scratches on him." (*Id.*). Martinez also looked "really scared, really scared." (*Id.* at

33). Christopher, who was driving, yelled at Martinez to get in the car; Martinez did so, and "the kids ran off." (*Id* . at 33–34). The three proceeded to try to go home and Martinez was "visibly upset." (*Id.* at 35). Martinez then saw Santiago running up the block and wanted to go after him. (*Id.*). Christopher and Carlos tried to dissuade Martinez but Martinez "wanted to go and get them, and so Chris paused for a second and then he drove off" after Santiago. (*Id.*). Christopher slowed the car down, and before it came to a complete stop, Martinez jumped out. (*Id.* at 40). Immediately upon exiting the car, Martinez began hitting Santiago. (*Id.* at 160). Christopher then got out of the car and walked over, initially trying to hold Martinez back. (*Id.* at 42). Soon thereafter, Christopher started hitting Santiago as well, striking him in the head with an object, apparently a flashlight, four or five times. (*Id.* at 42–43, 155–56, 160). Carlos called out to Martinez and Christopher, telling them to come back to the car. (*Id.* at 156). Martinez pulled Christopher away and they both got back into the vehicle and drove off, leaving Santiago lying on the ground in the middle of the intersection. (*Id.* at 45, 156).

**\*2** A bystander called the police. She walked over to Santiago, who rolled over onto his back, bleeding. (*Id.* at 156–57). She stood over him, in the intersection, to make sure that no cars hit him, and waited for the police to come. (*Id.* at 157).

The police arrived on the scene at approximately 3:20 a.m. and found Santiago lying on his back, with an apparent head wound and cuts and abrasions on his face. (*Id.* at 96). Santiago appeared to be intoxicated, as his eyes were glassy and he had the smell of alcohol on his breath. (*Id.* at 97). Emergency medical services arrived, treated Santiago, and took him to Lincoln Hospital in the Bronx. (*Id.* at 99–100). When he arrived, he was alert and oriented (*id.* at 610–11), but exhibited signs of intoxication (*id.* at 612). In fact, he was intoxicated, as his blood alcohol level exceeded the legal level of intoxication in New York. (*Id.* at 594, 612). The intoxication might have led to his not being properly treated, because the symptoms associated with intoxication are similar to those associated with head injuries such as those sustained by Santiago. (*Id.* at 578, 609–12). His condition deteriorated, and he died as a result of the internal bleeding caused by the blows to his head. (*Id.* at 574). He was pronounced dead at 5:55 a.m. on June 30, 2001. (*Id.* at 555).

**B. *Prior Proceedings***

    **1. *The Trial Court***

**a. *The Indictment***

Martinez and Christopher were indicted in the Supreme Court of the State of New York, Bronx County, on November 16, 2001 for manslaughter in the first and second degrees. (Blira–Koessler Aff. ¶ 5). On May 13, 2002, they were further indicted for two counts of murder in the second degree after additional evidence was presented to a second grand jury. (*Id.*).

**b. *The Trial***

Trial commenced on September 10, 2003, before Justice Joseph Fisch and a jury. (Trial Tr. at 1). In its opening statement, the prosecution declared that "[t]he People will prove to you [that defendants] intended to cause [Santiago's] death and they did cause his death by literally beating the life out of him." (*Id.* at 12).

The prosecution argued its case on a theory that Martinez acted in concert with Christopher and caused Santiago's death. The jury was instructed that when a defendant "acted with the state of mind required for the commission of the crime and ... solicited, requested, commanded, importuned or intentionally aided another person to engage in that crime," that defendant was criminally liable for the conduct of another. (*Id.* at 788). The jury was also instructed that "the extent or degree of the defendant's participation in the crime does not matter" once it was proven beyond a reasonable doubt that he is criminally liable for the conduct of another. (*Id.*).

Following the lawyers' summations, the court charged the jury on September 22, 2003. (*Id.* at 678–768, 770–807). The jury was presented with four counts against both defendants: two counts of murder (intentional murder and depraved indifference murder) and manslaughter in the first and second degrees. (*Id.* at 674).

**\*3** Count one charged the defendants with murder in the second degree, based on an intentional murder theory. N.Y. Penal Law § 125 .25(1) (intentional murder). The court instructed the jury that if it found the defendant it was considering guilty on count one, its deliberations were complete as to that defendant, but that if it found the defendant not guilty on count one, it was then to consider count two. (Trial Tr. at 790–91). Count two also charged murder in the second degree, but based on a depraved indifference theory. N.Y. Penal Law § 125.25(2) (depraved indifference murder). The court then instructed the jury that if it found the defendant it was considering guilty on count two, its deliberations were

2009 WL 2244633

complete, but that if it found the defendant not guilty on count two, it was to consider count three, which charged manslaughter in the first degree. (Trial Tr. at 793). The court explained that a defendant committed manslaughter in the first degree "when with intent to cause serious physical injury to another person, he causes the death of such person." (*Id.* at 794). N.Y. Penal Law § 125.20(1).

Finally, the court instructed the jury that if it found the defendant it was considering guilty on count three, its deliberations were complete, but that if it found the defendant not guilty on count three, it was to consider count four, which charged the defendants with manslaughter in the second degree. (Trial Tr. at 795). The court explained that a person was guilty of manslaughter in the second degree when he "recklessly causes the death of another person." (*Id.*). N.Y. Penal Law § 125.15(1).

On September 23, 2003, the jury returned its verdict. It found Martinez not guilty on counts one and two and guilty on count three, manslaughter in the first degree. (Trial Tr. at 826). The jury found Christopher, the co-defendant, not guilty on count one and guilty on count two, the depraved indifference murder count. (*Id.* at 825). On December 17, 2003, Martinez was sentenced to a term of 10 years for his conviction of manslaughter in the first degree.

### 2. *The Appeals*

On appeal to the Appellate Division, Martinez argued that (1) the trial court improperly refused to include third-degree assault as a lesser offense, (2) the evidence was legally insufficient to prove first-degree manslaughter, (3) the conviction was against the weight of the medical evidence, and alternatively, (4) the sentence imposed was harsh and unduly excessive in light of various mitigating factors. (Resp't Ex. 1). In opposing the appeal, the People argued that defendant's guilt of first-degree manslaughter was proven beyond a reasonable doubt, there was no reasonable view of the evidence to support a jury charge for third-degree assault and Martinez's sentence was fair and proper. (Resp't Ex. 2).

On June 29, 2006, the First Department unanimously affirmed Martinez's conviction, holding that "[t]he verdict was based on legally sufficient evidence and was not against the weight of the evidence," and "the court properly declined to submit [a third-degree assault] charge." *People v. Martinez,* 30 A.D.3d 353, 353, 817 N.Y.S.2d 288 (1st Dep't 2006). On October 24, 2006, a judge of the Court of Appeals denied Martinez leave

to appeal. *People v. Martinez,* 7 N.Y.3d 868, 824 N.Y.S.2d 613, 857 N.E.2d 1144 (2006).

### 3. *The Habeas Petitions*

**\*4** Christopher petitioned this court for a writ of habeas corpus, which was granted on June 5, 2008. The writ was granted based on changes in the law governing the depraved indifference murder statute under which Christopher was convicted. As a matter of law, the evidence was insufficient to support a conviction for depraved indifference murder. The conviction was vacated and the case was remanded to state court for further proceedings in accordance with the changes in law defining "depraved indifference." *See Fernandez,* 558 F.Supp.2d at 504. These changes in the law are not applicable to Martinez's petition, as he was not convicted of depraved indifference murder.

On October 9, 2007, Martinez filed this petition for a writ of habeas corpus, raising two issues: (1) the legal insufficiency of the evidence to support a first-degree manslaughter conviction and (2) the trial court's purported error in refusing to submit a third-degree assault charge to the jury as a lesser-included offense.

### *DISCUSSION*

### A. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to any judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2).

---

" '[C]learly established Federal law' in § 2254(d)(1) 'refers to the holdings, as opposed to the dicta,' " of Supreme Court decisions as of the time of the relevant state-court decision. *Carey v. Musladin,* 549 U.S. 70, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006) (*quoting Williams,* 529 U.S. at 412) (internal quotations omitted). Moreover, AEDPA has been interpreted to require a petitioner to show not only that clearly established federal law was erroneously or incorrectly applied, but that the application was unreasonable. *See Williams,* 529 U.S. at 411; *see also Lockyer v. Andrade,* 538 U.S. 63, 66, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Bell v. Cone,* 535 U.S. 685, 688, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). As the Second Circuit has explained, "[a] state court decision is 'contrary to' Supreme Court precedent only if it either 'arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite result].' " *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001) (*quoting Williams,* 529 U.S. at 405). The standards set forth by AEDPA apply to all habeas petitions filed after the state's effective date of April 24, 1996. *See Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir.2001) (*citing Williams,* 529 U.S. at 402).

**\*5** AEDPA also specifies the applicable standard for federal review of state court factual findings: a petitioner must demonstrate that a decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In habeas proceedings, a "determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting this presumption "by clear and convincing evidence." *Id.*

**B. *Petitioner's Claims***

**1. *Insufficiency of Evidence***

**a. *Applicable Law***
When reviewing a habeas petition claiming that the evidence at trial was insufficient to support a conviction, courts ask whether the evidence "could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[T]he findings of the state court are presumptively correct and entitled to a high degree of deference as that court was in the best position to view the credibility of the witnesses and all of the facts as they were adduced [at trial]." *Santos v. Zon,* 206 F.Supp.2d 585, 589 (S.D.N.Y.2002) (*quoting*

*Smithwick v. Walker,* 758 F.Supp. 178, 184 (S.D.N.Y.1991)). As the Court noted in *Jackson,* the question is not whether a court believes that the evidence at trial could support a finding of guilt beyond a reasonable doubt, but whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307 at 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560. Accordingly, when bringing a claim of insufficiency of the evidence, the "[p]etitioner bears a 'very heavy burden' in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence." *Panapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir.2002).

Under New York law, a person is guilty of first-degree manslaughter when "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.20(1).

A person need not directly cause the death of another to be criminally liable for first-degree manslaughter. Under New York law, a person may be criminally liable for the conduct of another.

> When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

N.Y. Penal Law § 20.00.

A person whose criminal liability is premised upon the conduct of another person may be held liable even though the other person is not criminally liable for the offense, or is not prosecuted for or convicted of the offense. N.Y. Penal Law § 20.05(1) & (2); *see, e.g., People ex rel. Guido v. Calkins,* 9 N.Y.2d 77, 211 N.Y.S.2d 166, 172 N.E.2d 549 (1961) (holding that one who "aids and abets" in committing a crime can be prosecuted even if principal has been acquitted).

**b. *Application***

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 80 of 172
Martinez v. Breslin, Not Reported in F.Supp.2d (2009)
2009 WL 2244633

#### i. *Evidence Supporting Manslaughter Conviction*

**\*6** Here, there was sufficient evidence in the record for a rational trier of fact to find, beyond a reasonable doubt that Martinez was guilty of first-degree manslaughter. The issue is whether the People presented sufficient evidence to establish Martinez's liability for Santiago's death on an accessorial or "acting in concert" theory of liability under N.Y. Penal Law § 20.00.[1] I conclude that, based on the evidence presented at trial, a rational juror could have found beyond a reasonable doubt that Martinez acted in concert with Christopher causing serious physical injury to Santiago, resulting in his death.

[1]   New York cases treat the term "acting in concert" as functionally equivalent with accessorial liability under N.Y. Penal Law § 20.00. *See People v. Sanchez,* 57 A.D.3d 1, 866 N.Y.S.2d 78 (1st Dep't 2008).

Although the evidence at trial showed that Christopher administered the blows that directly caused Santiago's death, a reasonable jury could have reasonably concluded that Martinez was an active and willing participant from start to finish. Eyewitness testimony established that Martinez initiated the chase of Santiago (Trial Tr. at 35); he began the attack on Santiago (*id.* at 160, 211 N.Y.S.2d 166, 172 N.E.2d 549); and he continued the assault even after Christopher began striking deadly blows to Santiago's head with what apparently was a flashlight. (*Id.* at 42–43, 155–56, 160, 211 N.Y.S.2d 166, 172 N.E.2d 549). Although Martinez and Christopher's actions were not planned beforehand, the totality of the evidence permits only the conclusion that Martinez "knowingly participated and continued to participate even after his companion's intentions became clear," supporting the jury's conclusion that Martinez "shared a 'community of purpose' with his companion." *People v. Allah,* 71 N.Y.2d 830, 832, 527 N.Y.S.2d 731, 522 N.E.2d 1029 (1988).

Martinez argues that the weight of the medical evidence shows he could not have caused Santiago's death, as the medical examiner concluded Santiago died from trauma sustained from a beating by a blunt instrument and only Christopher hit Santiago with such an item. Whether Martinez administered the fatal blows that directly led to Santiago's death, however, is immaterial. Under New York Law, whether one is the actual perpetrator of the offense or an accomplice is irrelevant for these purposes. *People v. Rivera,* 84 N.Y.2d 766, 622 N.Y.S.2d 671, 646 N.E.2d 1098 (1995). There is no distinction between liability as a principal and criminal

culpability as an accessory. *See People v. Katz,* 209 N.Y. 311, 103 N.E. 305 (1913). Although there might have been insufficient evidence to support a first-degree manslaughter conviction on a theory that Martinez alone caused Santiago's death, the jury could reasonably have found that Martinez, "with intent to cause serious physical injury to another person," acted in concert with Christopher and caused the death of Santiago. N.Y. Penal Law § 125.20(1). This is sufficient for criminal liability.

Contrary to petitioner's arguments, direct proof of an express agreement or statement between Christopher and Martinez is not required to show that Martinez acted either as a principal or an accessory to a crime. *Jones v. Keane,* 250 F.Supp.2d 217, 238 (W.D.N.Y.2002); *People v. Alvarez,* 88 Misc.2d 709, 389 N.Y.S.2d 980, 987 (N.Y.Sup.1976). In fact, "[t]he intent to commit a crime may be implied by the act itself, or it may be established by the defendant's conduct and the surrounding circumstances." *People v. Stevens,* 26 A.D.3d 396, 397, 811 N.Y.S.2d 84 (2d Dep't 2006) (citation omitted).

**\*7** The testimony showed that Martinez and Christopher were striking Santiago simultaneously. Additionally, once Christopher began hitting Santiago in the head with a weapon, Martinez did not stop his assault or try to stop Christopher. Instead, he continued to kick Santiago, leaving him prone and defenseless on the ground. The evidence was sufficient to allow a reasonable jury to infer that even if Martinez did not deal the fatal blow to Santiago, he "solicit[ed], request[ed], command[ed], importune[d], or intentionally aid [ed]" Christopher in causing the death of Santiago. N.Y. Penal Law § 20.00. Furthermore, the testimony established that Martinez pulled Christopher and the two fled the scene together by car leaving the victim in the road. The fact that Martinez and co-defendant fled together provides further evidence tending to corroborate a community of purpose. *People v. Skinner,* 269 A.D.2d 202, 203, 704 N.Y.S.2d 18 (1st Dep't 2000).

*People v. Peralta* is instructive. There, the First Department held that evidence showing the defendant punched and kicked the victim as he was lying helpless on the ground after the co-defendant had hit him on the head with a beer bottle established defendant's intent to cause serious physical injury and his accessorial liability for the death of the victim. The defendant's first-degree manslaughter conviction was unanimously affirmed after the court concluded that the verdict was based on legally sufficient evidence and was not against the weight of the evidence. *People v. Peralta,* 1

2009 WL 2244633

A.D.3d 115, 116, 767 N.Y.S.2d 70 (1st Dep't 2003). Here, as in the *Peralta* case, it was the co-defendant Christopher who hit the victim Santiago on the head with the weapon that caused his death. Martinez, like Peralta, did not administer the blow that led to Santiago's death, but he did continue to kick Santiago as he lay helpless on the ground. [2] As in *Peralta,* the conviction here should be upheld. Martinez has not met his heavy burden of showing that the evidence was insufficient to support his conviction.

[2]     In fact, Christopher was convicted of depraved indifference murder, although, as noted, I held that he could not have committed depraved indifference murder as a matter of law, as he acted intentionally—not indifferently—when he attacked Santiago.

Finally, the difference in Martinez and Christopher's verdicts does not imply a lack of acting in concert. The inconsistency may be based on mistake, compromise or lenity by the jury and does not warrant the conclusion that Martinez seeks to reach. *See United States v. Powell,* 469 U.S. 57, 65, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). Furthermore, it is legally plausible, under an accomplice theory of liability, for a defendant to be guilty of manslaughter and his co-defendant to be guilty of murder because accomplices may be convicted of differing degrees of homicide depending on each one's specific intent. *See Maiorino v. Scully,* 746 F.Supp. 331 (S.D.N.Y.1990); N.Y. Penal Law § 20.15. Even when a jury acquits a co-defendant, it does not preclude the imposition of accomplice liability on the defendant. N .Y. Penal Law § 20.05(2); *People v. Thomas,* 5 A.D.3d 305, 307, 774 N.Y.S.2d 137 (1st Dep't 2004). Similarly, the overturning of Christopher's conviction on habeas corpus does not affect the validity of Martinez's conviction.

### 2. *Failure to Submit Jury Charge for Third–Degree Assault*

#### a. *Applicable Law*

**\*8**  To establish entitlement to a lesser-included offense charge, a defendant must show that "(1) it is theoretically impossible to commit the greater crime without committing the lesser and (2) a reasonable view of the evidence would permit the jury to find that the defendant had committed the lesser, but not the greater, offense ." *Rice v. Hoke,* 846 F.2d 160, 165 (2d Cir.1988); *see also Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); N.Y.Crim. Proc. Law § 300.50(1).

The standard for habeas review of state jury instructions "is not whether the state court's 'instruction is undesirable, erroneous, or even universally condemned.' " *Wright v. Smith,* 569 F.2d 1188, 1191 (2d Cir.1978) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)) (quotations omitted). Errors in state jury charges are questions of state law and therefore are not reviewable on a petition for a writ of habeas corpus absent a showing that the jury charge deprived the defendant of a federal constitutional right. *See Blazic v. Henderson,* 900 F.2d 534, 540 (2d Cir.1990); *United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45, 50 (2d Cir.1975), *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975). For an error in state law to violate the federal constitution and deprive petitioner of a constitutional right, the error "by itself [must have] so infected the entire trial that the resulting conviction violates due process.' " *Blazic,* 900 F.2d at 541 (quoting *Cupp,* 414 U.S. at 147).

In *Beck v. Alabama,* the Supreme Court held that where the evidence warrants such a charge, due process requires a trial court to submit jury instructions on lesser-included offenses in capital cases. 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Both the Supreme Court and the Second Circuit, however, have declined to extend this requirement to non-capital cases. *See id.* at 638 n. 14; *Jones v. Hoffman,* 86 F.3d 46, 48 (2d Cir.1996); *Knapp v. Leonardo,* 46 F.3d 170, 179 (2d Cir.1995).

#### b. *Application*

The trial court's refusal to submit third-degree assault as a lesser-included offense of first-degree manslaughter does not raise a federal constitutional claim reviewable on a petition for a writ of habeas corpus. Without reaching a conclusion as to whether or not it is theoretically impossible to commit first-degree manslaughter without committing third degree assault, Martinez fails to satisfy the second prong of the two-part test explained in *Rice.* Here, the theory of liability is based on the idea that Martinez and his co-defendant were acting in concert. Martinez, although not the actual perpetrator, is liable for the acts of his co-defendant. Under an acting in concert theory of liability, a reasonable view of the evidence would not permit the jury to find that Martinez had committed third-degree assault but not first-degree manslaughter. Therefore, Martinez has not established that he was entitled to a third-degree assault charge.

2009 WL 2244633

### CONCLUSION

 **\*9**  For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because petitioner has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2254 (as amended by AEDPA). I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal taken from this decision would not be in good faith. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2244633

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4519768
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ijal SUDLER, Petitioner,

v.

Patrick GRIFFIN, Respondent.

No. 9:12–CV–0367.
|
Aug. 26, 2013.

**Attorneys and Law Firms**

Ijal Sudler, Fallsburg, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, The Capitol, Thomas B. Litsky, Esq, Assistant Attorney General, of Counsel, Albany, NY, for Respondent.

***ORDER***

NORMAN A. MORDUE, Senior District Judge.

 **\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Andrew T. Baxter, duly filed on the 1st day of August 2013. Following fourteen (14) days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. The petition is denied and dismissed. A certificate of appealability is denied.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a judgment of conviction rendered in the Albany County Court on February 15, 2008. Petitioner was convicted after a jury trial of two counts of Criminal Possession of a Controlled Substance, Third Degree, N.Y. Penal Law § 220.16[1] (Counts One and Three); one count of Criminal Possession of a Controlled Substance, Fourth Degree, N.Y. Penal Law § 220.16 [12] (Count Four); one count of Criminal Possession of a Controlled Substance, Fourth Degree, N.Y. Penal Law § 220.09[1] (Count Two); and one count of Criminally Using Drug Paraphernalia, Second Degree, N.Y. Penal Law § 220.50 [2] (Count Six). [1] Petitioner was sentenced as a second felony offender to an aggregate determinate sentence of thirty years to be followed by three years of post-release supervision. The Appellate Division, Third Department affirmed his conviction on July 22, 2010, and the New York Court of Appeals denied leave to appeal on December 1, 2010. *People v. Sudler,* 75 A.D.3d 901, 906 N.Y.S.2d 373 (3d Dep't 2010), *lv. denied,* 15 N.Y.3d 956, 917 N.Y.S.2d 116, 942 N.E.2d 327 (2010).

[1]    Count Five of the indictment was dismissed at the close of proof on stipulation of the parties. (Oct. 16 Trial Tr. 419, Dkt. No. 13–11).

Petitioner raises eight grounds in his amended petition for this court's review:

(1) the police lacked probable cause for petitioner's arrest and for the search warrant for Apartment 405, Bleeker Terrace ("apartment 405") [2];

[2]    Apartment 405 at Bleeker Terrace, Building 4, in Albany, was occupied by Kristle Walker. She had given petitioner a key, and told police that petitioner stayed there from time to time.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(2) Detective Vincent should not have been permitted to testify as both a fact and expert witness;

(3) the trial court gave an improper jury instruction on the purpose of summations;

(4) the prosecutor engaged in misconduct by using the personal term "I" when asking the jury to find the petitioner guilty;

(5) the evidence was insufficient to establish petitioner's guilt;

(6) the trial court should have granted petitioner's motion for a mistrial after the prosecutor elicited testimony about an uncharged crime that was not part of the People's *Molineux* [3] application;

[3]    *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286 (1901) (a defendant is entitled to a pre-trial hearing to determine the admissibility of the defendant's uncharged crimes as part of the People's direct case).

**\*2** (7) ineffective assistance of trial counsel for failing to preserve the claims in grounds 2, 3, and 4, above; and

(8) the county court improperly found petitioner to be a second felony offender, and directed that certain sentences run consecutively.

Am. Pet. at 7–8, Dkt. No. 5. Respondent has filed an answer and memorandum of law, together with the pertinent state court records. (Dkt.Nos.12–14.) For the following reasons, this will recommend dismissal of the petition.

## DISCUSSION

### I. *Factual Background*

After receiving tips from two informants that petitioner was in the area with drugs, the City of Albany Police Department surveilled petitioner's vehicle and apartment 405. Police also listened to a cellular telephone conversation while an informant made arrangements for a controlled purchase of crack cocaine from petitioner. Soon afterward, police arrested Boshaun Gregory, who was driving petitioner's car to deliver the drugs. Petitioner was arrested after he arrived at the scene to retrieve his car. After obtaining a warrant, police searched apartment 405 and found narcotics and drug paraphernalia. *See People v. Sudler,* 75 A.D.3d at 901–02, 906 N.Y.S.2d 373.

Petitioner was indicted on three counts of criminal possession of a controlled substance in the third degree, one count of criminal possession of a controlled substance in the fourth degree, one count of criminal possession of marijuana, and one count of criminally using drug paraphernalia in the second degree. Petitioner's motion to suppress physical evidence was denied, and petitioner fled. As a result, petitioner was tried in absentia by a jury. *See People v. Sudler,* 75 A.D.3d at 902, 906 N.Y.S.2d 373. Petitioner was subsequently arrested pursuant to a bench warrant on February 7, 2008, and sentenced on February 15, 2008 to thirty years of incarceration followed by three years of post-release supervision. (Feb. 15th Sent. Tr. 2, 15, Dkt. No. 13–2.)

### II. *Suppression*

#### A. Legal Standards

In *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court held that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a petitioner may not challenge an allegedly unconstitutional search and seizure in an application for federal habeas relief. *Id.* at 481–82; *see also Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992). The Second Circuit has determined that review of a Fourth Amendment claim in a habeas corpus application is proper only if: (1) the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (2) the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in that process. *See Capellan,* 975 F.2d at 70; *Gates v. Henderson,* 568 F.2d 830, 839–40 (2d Cir.1977). New York provides an approved mechanism for litigating Fourth Amendment claims. *See Capellan,* 975 F.2d at 70 (citing N.Y.Crim. Proc. § 710.10 et seq.).

#### B. Application

**\*3** Petitioner argues, as he did in his appeal to the Appellate Division, that his conviction should be overturned because his motion to suppress evidence should have been granted. (*See* Am. Pet. 7–9; Dkt. No. 5). Petitioner bases his claim on the allegation that the officers arrested him and obtained a search warrant for apartment 405 without probable cause. *Id.* Petitioner's Fourth Amendment claim is barred from federal habeas review by *Stone v. Powell.* Petitioner utilized New York State's mechanism by making his motion to suppress, which the trial court denied. Petitioner then appealed the

2013 WL 4519768

trial court's decision, and the Appellate Division denied his appeal and upheld the decision of the trial court. Petitioner has not here alleged any facts that would demonstrate an unconscionable breakdown of the process. Based upon *Stone,* petitioner cannot now challenge the legality of his arrest and the validity of the search warrant. Petitioner's claim based on the Fourth Amendment is barred from federal review and should be dismissed.

## III. *Molineux*

### A. Legal Standards

Evidentiary questions are generally matters of state law and raise no federal constitutional issue for habeas review. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1999) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions[;][i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). A decision to admit evidence of a defendant's uncharged crimes or other bad acts under *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286 (N.Y.1901), constitutes an evidentiary ruling based on state law. *Sierra v. Burge,* No. 06–CV–14432, 2007 WL 4218926, at *5 (S.D.N .Y. Nov. 30, 2007) (citing *Roldan v. Artuz,* 78 F.Supp.2d 260, 276–77 (S.D.N.Y.2000) ("A habeas claim asserting a right to relief on *Molineux* grounds must rise to the level of a constitutional violation ... because *Molineux* is a state law issue.") (citations omitted)). Federal courts may issue a writ of *habeas corpus* based upon a state evidentiary error only if the petitioner demonstrates that the alleged error violated an identifiable constitutional right, and that the error was "so extremely unfair that its admission violates fundamental conceptions of justice." *Dunnigan,* 137 F.3d at 125 (quoting *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)); *see Jones v. Conway,* 442 F.Supp.2d 113, 130 (S.D.N.Y.2006). Petitioner "bears a heavy burden because evidentiary errors generally do not rise to constitutional magnitude." *Sierra,* 2007 WL 4218926, at *5 (quoting *Copes v. Shriver,* No. 97–2284, 1997 WL 659096, at *3 (S.D.N.Y. Oct.22, 1997) (citations omitted)).

### B. Application

Petitioner claims that the trial court erred when it denied petitioner's motion for a mistrial and petitioner's motion to set aside the verdict on the ground that the prosecution had allegedly violated *Molineux.* (Am.Com pl.10–11, Dkt. No. 5) The prosecutor elicited testimony from Detective Vincent

that petitioner had previously supplied drugs to informant Ernestine Smith on an occasion not charged in the indictment. (Am.Compl.10–11, Dkt. No. 5). Trial counsel objected to this testimony, and moved for a mistrial on the ground that the uncharged crime was not part of the prosecutor's *Molineux* application. (October 16 Trial Tr. 11–12, Dkt. No. 13–11).

**\*4** The trial court found that petitioner knew that Smith had allegedly worked with police to set up the transaction with petitioner that was the subject of the indictment; thus petitioner had sufficient notice of the uncharged crime as being an intrinsic part of the indicted charges against petitioner. (October 16 Trial Tr. 14, Dkt. No. 13–11). The trial court denied petitioner's motion and gave the jury a limiting instruction. (Oct. 16 Trial Tr. 67–68, Dkt. No. 13–11).

The above issues raised only an evidentiary claim that was not resolved in petitioner's favor. He did not claim in state court, and he does not claim here, that his *Molineux* claim rose to the level of a constitutional claim. Here, petitioner is merely rearguing his state evidentiary claim. Because petitioner failed to assert his claim based on *Molineux* in federal constitutional terms, this claim is noncognizable and should be dismissed. [4]

[4]     In any event, petitioner has not demonstrated that evidence of his prior dealings with Ernestine Smith was improperly admitted under New York law. This evidence was admitted not to show petitioner's propensity to possess and sell drugs, but to show how he became the target of the investigation and to give background about Ernestine Smith's prior interactions with petitioner and her role in the investigation. The Appellate Division held that the testimony was admissible because it was "inextricably interwoven with the charged crimes," "probative of intent to sell," and "more probative than prejudicial." *People v. Sudler,* 75 A.D.3d at 904, 906 N.Y.S.2d 373. The admission of this testimony did not render the trial "so extremely unfair" as to "violate fundamental conceptions of justice." *Dunnigan,* 137 F.3d at 125.

## IV. *Exhaustion*

### A. Legal Standard

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, ... thereby giving the State the opportunity to pass upon and correct

2013 WL 4519768

alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (citing *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865, (1995) (internal quotation and other citations omitted); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.; Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994).

"A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.' " *Hernandez v. Conway,* 485 F.Supp.2d at 273 (quoting *Daye v. Attorney General,* 696 F.2d 186, 194 (2d Cir.1982)).

### B. Application

Petitioner exhausted his prosecutorial misconduct claim, his legal sufficiency claim, and his ineffective assistance of counsel claim. Petitioner failed to exhaust his expert witness claim and his jury charge claim relating to the purpose of summation because he failed to assert them in federal constitutional terms, and neither of these claims "immediately" brings to mind a right protected by the federal constitution. (Pl.'s Appellate Div. Br. 23–35, Dkt. No. 13–1). As stated above, evidentiary rulings are generally based on state law principles. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1999) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions[;][i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). The same is true for claims relating to jury charges. *Saracina v. Artus,* 452 Fed. App'x 44, 46 (2d Cir.2011) (citing *Estelle,* 502 U.S. at 67–68). Thus, petitioner has failed to exhaust his expert witness claim and his jury charge claim.

**\*5** Respondent argues that petitioner also failed to exhaust his sentencing claims, because he failed to raise them in any form on direct appeal. (Def.'s Br. 22–23; *see also* Pet.'s Appellate Div. Br., Dkt. No. 13–1). However, petitioner has two sentencing claims. Respondent is correct that petitioner

failed to make his claim based on the court sentencing him as a second felony offender in federal constitutional terms. (*See* Pet.'s Appellate. Div. Br. 50–52, Dkt. No. 13–1). As will be discussed below, that portion of petitioner's sentencing claims is noncognizable on federal habeas review. However, petitioner made his sentencing claim based on the alleged gross disproportionality of his sentence in federal terms when he cited *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), in his direct appeal to the appellate division. (Pl.'s Appellate Div. Br. 51, Dkt. No. 13–1). Petitioner argued that serving two concurrent sentences consecutively to his other two concurrent sentences, totaling 30 years of incarceration, was grossly disproportionate. (Pet.'s Appellate Br. 50–52, Dkt. No. 13–1). Thus, one of petitioner's sentencing claims is exhausted while the other is not.

If a petitioner has failed to exhaust his state-court remedies, but such remedies are no longer available, then his claims are "deemed" exhausted, but may also be barred by procedural default. *See Bossett v. Walker,* 41 F.3d at 828; *Aparicio v. Artuz,* 269 F.3d 78, 90 (2d Cir.2001).

### V. *Procedural Bar*

#### A. Legal Standard

A federal judge may not issue a writ of habeas corpus if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim. *See Wainwright v. Sykes,* 433 U.S. 72, 81–85, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A federal habeas court generally will not consider a federal issue in a case if a state court decision " 'rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " *Garvey v. Duncan,* 485 F.3d 709, 713 (2d Cir.2007) (quoting *Lee v. Kemna,* 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)) (emphasis added). This rule applies whether the independent state law ground is substantive or procedural. *Id.*

A state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that he is "actually innocent." *Clark v. Perez,* 510 F.3d 382, 393 (2d Cir.2008) (internal quotation and citations omitted). "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule."

*Murray v. Carrier,* 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation. *Stickler v. Greene,* 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

### B. Application

#### 1. Prosecutorial Misconduct

**\*6** Petitioner argues that the prosecutor committed misconduct by using the personal term "I" when asking the jury to find the petitioner guilty. (Am. Pet. at 10, Dkt. No. 5). During his summation, the prosecutor stated, "ladies and gentlemen, I'll ask you to find the defendant guilty" and "what I'm asking you to do is hold [petitioner] responsible." (October 18–19 Trial Transcript 472, 475, Dkt. No. 13–12).

The Appellate Division found that petitioner's prosecutorial misconduct claim was not preserved for appellate review because no objection on that ground was made during the trial. *People v. Sudler,* 75 A.D.3d at 905, 906 N.Y.S.2d 373 (citing, *inter alia,* N.Y.Crim. Proc. Law § 470.05(2). The Appellate Division also held that "the prosecutor's use of the word 'I' during summation 'was merely stylistic and not an impermissible expression of personal opinion,' " and that the "prosecutor's further comments were neither so egregious nor pervasive as to deprive defendant of a fair trial." *People v. Sudler,* 75 A.D.3d at 906, 906 N.Y.S.2d 373 (citations omitted). New York's contemporaneous objection rule provides that issues not raised at trial, and issues that are not preserved by a specific objection at the time of a claimed error, will not be considered on appeal. N.Y.Crim. Proc. Law § 470.50(2). Petitioner has not established cause [5] or prejudice, and his claim based on prosecutorial misconduct is procedurally barred from federal habeas review. *Id.*

[5]  Petitioner also raises counsel's failure to object to this and other alleged evidentiary errors in the context of ineffective assistance of counsel, which, if successful, could constitute cause. *See Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). In order to establish cause for a procedural default, the ineffective assistance of counsel claim must be exhausted in the state courts as an independent claim. *Id.* For the reasons discussed in the section analyzing petitioner's ineffective assistance of counsel claims, this court finds that counsel was not ineffective. Therefore, even though petitioner properly exhausted his ineffective assistance of counsel claim, it cannot serve to establish cause for the purpose of overcoming the procedural default.

#### 2. Sufficiency of Evidence

Petitioner argues that the evidence was insufficient to establish his guilt beyond a reasonable doubt because witness testimony was incredible as a matter of law. (Am.Pet.10, Dkt. No. 5). The Appellate Division found that petitioner's claim based on alleged legal insufficiency was not preserved for appellate review because trial counsel's general motion for a trial order of dismissal at the close of proof was not sufficient to preserve this claim as it was not specifically directed at the alleged error. *People v. Sudler,* 75 A.D.3d at 904, 906 N.Y.S.2d 373 (citing, *inter alia,* N.Y.Crim. Proc. Law § 290.10; *People v. Gray,* 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 652 N.E.2d 919 (1995) (internal quotation marks omitted). The Appellate Division also found that trial counsel's post-trial motion to set aside the verdict on the insufficiency ground was properly denied because an appellate court cannot address an insufficiency argument unless it has been properly preserved for review during trial. *People v. Sudler,* 75 A.D.3d at 904, 906 N.Y.S.2d 373 (citing, *inter alia,* N.Y.Crim. Proc. Law § 330.30[1]; *People v. Hines,* 97 N.Y.2d 56, 61, 736 N.Y.S.2d 643, 762 N.E.2d 329 (2001) (internal quotation marks omitted)).

Petitioner has not alleged cause or prejudice, and he has not established actual innocence. Thus his claim based on the alleged insufficiency of the evidence is procedurally defaulted and barred from federal habeas review on adequate and independent state law grounds. *Id.*

#### 3. Expert Testimony

Petitioner claims that because Detective Vincent was not declared an expert, it was improper for him to offer expert testimony. (Am. Pet. at 9–10, Dkt. No. 5). At trial, Detective O'Hare testified that he recovered crack cocaine, small plastic bags, a plastic plate, razor blades, and a safe containing cocaine from a bedroom at Apartment 405. (Trial Trans. 343–44, 353–54, Dkt. No. 13–11). Detective Vincent then testified that he had been working on narcotics cases for a number of years, participating in over a thousand arrests, and that plastic bags, like the ones seized inside Apartment 405, are "commonly used to package narcotics" for sale. (Trial Trans. 40–41, Dkt. No. 13–11). Because petitioner

**Sudler v. Griffin, Not Reported in F.Supp.2d (2013)**

2013 WL 4519768

failed to raise this claim in Federal Constitutional terms on direct appeal, this claim is unexhausted. However, this claim is also procedurally barred because trial counsel did not object to this evidence. Petitioner has not established cause [6] or prejudice, and his claim based on Detective Vincent testifying as an expert is procedurally defaulted and barred from federal habeas review on adequate and independent state law grounds. [7] *Id.*

[6]  Petitioner also raises counsel's failure to object to this and other alleged evidentiary errors in the context of ineffective assistance of counsel, which, if successful, could constitute cause. *See* note 5, above. For the reasons below, this court finds that counsel was not ineffective. Therefore, even though petitioner properly exhausted his ineffective assistance of counsel claim, it cannot serve to establish cause for the purpose of overcoming the procedural default.

[7]  The Appellate Division also held that Detective Vincent's testimony that the plastic bags found in Apartment 405 were the type usually used to package drugs and that the circumstances indicated that the drugs found by police were packaged with the intent to sell were not within the knowledge and experience of the average juror. *People v. Sudler,* 75 A.D.3d at 905, 906 N.Y.S.2d 373. The Appellate Division pointed out that under New York State law, qualified police officers may testify as experts, no explicit explanation that the officer was testifying as an expert was required, and Detective Vincent's testimony as to his education, training, and experience in narcotics investigations provided a sufficient foundation. *Id.* (citing *People v. Hicks,* 2 N.Y.3d 750, 751, 811 N.E.2d 7, 778 N.Y.S.2d 745 (2004); *People v. Davis,* 235 A.D.2d 941, 943, 653 N.Y.S.2d 404 (1997); *People v. Lamont,* 21 A.D.3d 1129, 1132, 800 N.Y.S.2d 480 (2005).

### 4. Jury Charge

**\*7** Petitioner claims the trial court gave an improper instruction on the purpose of summations. (Am. Pet. at 10; Dkt. No. 5). The court instructed the jury:

In their summations, counsel will refer to the evidence that you have heard and seen during the course of this trial and will suggest to you certain inferences and conclusions

which they, in their opinion, believe may be properly drawn from the evidence. And that's the purpose of summations.

If you find that an attorney's analysis of the evidence is correct and that the evidence as summed up and analyzed by that attorney is accurate, and if you find that the inferences and conclusions which you're asked to draw are logical and sensible, then you are at liberty to adopt those inferences and conclusions either in whole or in part. On the other hand, if you believe that either attorney's analysis of the facts or inferences and conclusions which you're asked to draw are illogical or not supported by the evidence, then you may disregard them in while or in part. You are, of course, free to draw your own conclusion from the evidence.

Please bear in mind, ladies and gentlemen, that nothing the attorneys say in their summations is evidence and nothing that I will say during my instructions to you is evidence. You have heard all of the evidence. You and you alone are the sole and exclusive judges of the facts in this case ...

(October 18–19 Trial Tr. 432–33, Dkt. No. 13–12). The court also instructed the jury on summations during final jury instructions:

In their summations, the District Attorney and defense counsel have commented on the evidence and have suggested to you certain inferences and conclusions you might reasonably and logically draw from the evidence. The summations of counsel are, of course, not evidence. However, if the arguments of counsel strike you as reasonable and logical and supported by the evidence, you may adopt them. On the other hand, if you find those arguments to be unreasonable or illogical or unsupported by the evidence, you may reject them. In the last analysis, it is the function of you the jurors to draw your own inferences or conclusions from the evidence as you recollect it and as you found that evidence to be credible and believable.

(October 18–19 Trial Tr. 481–482, Dkt. No. 13–12).

The Appellate Division found that petitioner's claim based on an inappropriate jury charge was not preserved for appellate review because no objection on that ground was made during the trial. *People v. Sudler,* 75 A.D.3d at 905, 906 N.Y.S.2d 373 (citing, *inter alia,* N.Y.Crim. Proc. Law § 470.05(2). Petitioner has not established cause [8] or prejudice, and his jury charge claim is barred from federal habeas review on adequate and independent state law grounds. [9] *Id.*

[8]    Petitioner also raises counsel's failure to object to this and other alleged evidentiary errors in the context of ineffective assistance of counsel, which, if successful, could constitute cause. *See* note 5, above. For the reasons discussed below, this court finds that counsel was not ineffective. Therefore, even though petitioner properly exhausted his ineffective assistance of counsel claim, it cannot serve to establish cause for the purpose of overcoming the procedural default.

[9]    The Appellate Division also found that petitioner's jury charge claim was meritless, finding that "it [was] readily apparent when read in context that the court did no more than instruct that each side would be presenting its theory of the case," and that the charge "fairly instructed the jury on the correct principles of law to be applied to the case." *People v. Sudler,* 75 A.D.3d at 905–06, 906 N.Y.S.2d 373 (internal quotations and citations omitted).

## VI. *Review of Remaining Claims on the Merits*

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that, when a state court has adjudicated the merits of a petitioner's claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See also, e.g., Noble v. Kelly,* 246 F.3d 93, 98 (2d Cir.2001); *Brown v. Alexander,* 543 F.3d 94, 100 (2d Cir.2008). This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt."

*Cullen v. Pinholster,* —— U.S. ——, ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (citations omitted).

**\*8**  A state-court decision is "contrary to" clearly established federal law if the state court's conclusion on a question of law is "opposite" to that of the Supreme Court or if the state court decides a case differently than the Supreme Court's decision "on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle, but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case. *Id.*

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo. Washington v. Shriver,* 255 F.3d 45, 55 (2d Cir.2001).

### B. Application

#### 1. Ineffective Assistance of Counsel

Petitioner exhausted his ineffective assistance of counsel claim, and the state court denied this on the merits. Petitioner argues that trial counsel was ineffective because he did not object to Detective Vincent's testimony, the jury instructions, or the prosecutor's use of the pronoun "I" in his summation. (Am.Pet.11, Dkt. No. 5). The general standard for ineffective assistance of counsel, which applies to both trial and appellate counsel, was articulated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687–696, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *McKee v. United States,* 167 F.3d 103, 106 (2d Cir.1999) (*Strickland* standard also applies to effectiveness of appellate counsel). This test requires an affirmative showing that counsel's performance fell below an objective standard of reasonableness, and that prejudice resulted because there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688, 694.

When assessing counsel's performance, courts " 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998) (quoting

2013 WL 4519768

*Strickland,* 466 U.S. at 689). Courts should not use hindsight to second-guess sound tactical decisions made by attorneys. *McKee v. United States,* 167 F.3d at 106 (citing *Strickland,* 466 U.S. at 689).

In evaluating the prejudice component of *Strickland,* a "reasonable probability" that the outcome of the proceeding would have been different means "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, Unlike the performance determination, the prejudice analysis may be made with the benefit of hindsight. *McKee v. United States,* 167 F.3d at 106–107 (citing, *inter alia, Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)). *See also Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (explaining the limited exceptions to general rule requiring showing of prejudice).

**\*9** As explained above, the Appellate Division addressed petitioner's claims based on trial counsel's failure to object to Detective Vincent testifying as an expert, the trial court's jury instructions regarding summations, and the prosecutor's use of the pronoun "I" in his summation. The Appellate Division found each claim to be meritless, and trial counsel cannot be faulted for failing to raise a meritless objection. *See United States v. Arena,* 180 F.3d 380, 396 (2d Cir.1999) ("Failure to make a meritless argument does not amount to ineffective assistance.").

### 2. Sentencing

Petitioner claims that his sentence was excessive because 1) the trial court improperly sentenced him as a second felony offender based on a previous Connecticut felony conviction without proof that petitioner was actually the defendant in that case and 2) because the trial court directed that the sentence imposed for the two counts based on the cocaine seized from Boshaun Gregory's person (Count One and Count Two) run consecutively to the sentences imposed for the two counts based on the cocaine seized from inside Apartment 405 (Count Three and Count Four). [10] (Am. Pet. 11; Dkt. No. 5).

[10]    The one-year determinate sentence for Count Six, a misdemeanor, merged with the other sentences. (Feb. 15 Sentencing Tr. 15; Dkt. No.13–12).

#### i. Sentencing as a Second Felony Offender
Petitioner's claim that the trial court improperly sentenced him as a second felony offender is noncognizable. [11]

"[W]hether a New York Court erred in applying a New York recidivist sentencing enhancement statute is a question of New York State law, not a question of fact, and the province of a federal habeas court is not to reexamine state-court determinations on state-law questions." *Gilbo v. Artus,* No. 9:10–CV–0455, 2013 U.S. Dist. LEXIS 5539, \*50, 2013 WL 160270 (N.D.N.Y. Jan.15, 2013) (quoting *Saracina v. Artus,* 452 Fed. App'x 44, 46 (2d Cir.2011) (internal quotations and citations omitted).

[11]    The court also notes that this claim is not exhausted, because petitioner did not bring the claim on his direct appeal. (*See* Pet.'s App. Br. 50–52, Dkt. No. 13–1). Although petitioner did raise sentencing claims on appeal, they were related to the alleged disproportionality of his sentence, as will be discussed in the next section. Because the claim is unexhausted, and petitioner would not be able to return to state court to raise this claim, the claim is also procedurally defaulted. *See Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) (If a petitioner has not exhausted his state-court remedies, but no longer has remedies available in state court with regard to these claims, they are "deemed" exhausted, but are also procedurally defaulted.) A state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that he is "actually innocent." *Clark v. Perez,* 510 F.3d 382, 393 (2d Cir.2008) (internal quotation and citations omitted). Petitioner cites no cause or prejudice. This is an alternative basis for dismissal of this claim.

#### ii. Consecutive Sentences
In his appeal, petitioner argued that his sentence was excessive and grossly disproportionate. (Pet.'s App. Br. 50–51, Dkt. No. 13–1). Petitioner also cited *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), when discussing the alleged disproportionality of his sentence, which allowed the Appellate Division to consider petitioner's sentence in federal constitutional terms. Thus, petitioner's claim that his sentence was disproportionate was exhausted, and this court will now consider whether the court's denial of petitioner's sentencing

Sudler v. Griffin, Not Reported in F.Supp.2d (2013)

2013 WL 4519768

claim was contrary to, or an unreasonable application of clearly applicable federal constitutional law.

The Eighth Amendment forbids only *extreme* sentences which are "grossly disproportionate" to the crime of conviction. *Lockyer v. Andrade,* 538 U.S. 63, 72–73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The Second Circuit has consistently held that "[n]o federal constitutional issue is presented where ... the sentence is within the range prescribed by state law." *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992). *See also, Ewing v. California,* 538 U.S. 11, 25, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003); *Ross v. Conway,* 9:08–CV–731, 2010 U.S. Dist. LEXIS 141102, *52, 2010 WL 5775092 (N.D.N.Y. Dec.6, 2010).

 **\*10** Petitioner contends that his sentence of two concurrent fifteen-year sentences consecutive to two concurrent fifteen-year sentences followed by three years of post-release supervision was harsh and severe. The crime of third-degree criminal possession of a controlled substance is a Class B felony, requiring a determinate sentence of 9 to 25 years (*see* N.Y. Penal Law § 70.06(3)[b] ), and period of post-release supervision of 2 to 12 years (*see* N.Y. Penal Law § 70.70(3)(b) [i] ). Petitioner's sentences fell within the applicable statutory range and, in response to an Eighth Amendment claim on appeal, the Appellate Division found that the sentence was not unduly harsh or severe. *People v. Sudler,* 75 A.D.3d at 906, 906 N.Y.S.2d 373.

The Second Circuit has consistently held that "[n]o federal constitutional issue is presented where ... the sentence is within the range prescribed by state law." *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992). *See also Bellavia v. Fogg,* 613 F.2d 369, 373–74, n. 7 (2d Cir.1979) (sentencing is properly the province of the state legislature, and long mandatory sentence imposed pursuant to statute did not constitute cruel and unusual punishment); *Ewing v. California,* 538 U.S. 11, 25, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003). The Eighth Amendment forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction. *Lockyer v. Andrade,* 538 U.S. 63, 72–73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

"The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." *Id.* at 77. Outside of the context of capital punishment, successful challenges to the proportionality of particular sentences under the Eighth Amendment have been "exceedingly rare." *Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). The Supreme Court in *Lockyer* held that a state appeals court's determination that a habeas petitioner's sentence of two consecutive prison terms of 25 years to life for petty theft under California's "Three Strikes" law was not disproportionate, did not constitute cruel and unusual punishment, and was not an unreasonable application of clearly established Supreme Court law. *Lockyer,* 538 U.S. at 77. Under these standards, the Appellate Division's decision that the petitioner's sentence of 30 years was not unduly harsh or severe is not contrary to, or an unreasonable application of clearly applicable federal constitutional law.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the petition be **DENIED and DISMISSED,** and it is further

**RECOMMENDED,** that a certificate of appealability be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of HHS,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 72.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4519768

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1049006
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony BUCHANAN, Petitioner,
v.
P. CHAPPIUS, Respondent.

9:15-cv-0407 (LEK)
|
Signed 03/11/2016

**Attorneys and Law Firms**

Anthony Buchanan, Elmira, NY, pro se.

Alyson J. Gill, Priscilla I. Steward, Office of Attorney General, State of New York, New York, NY, for Respondent.

**DECISION and ORDER**

Lawrence E. Kahn, U. S. District Judge

**I. INTRODUCTION**

**\*1** Petitioner Anthony Buchanan ("Petitioner") filed a Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, dated March 19, 2015. Dkt. No. 1 ("Petition").[1] He challenges his judgment of conviction, following a jury trial in Albany County Court, of ten counts of drug and weapon possession charges. Id. at 1. Petitioner raises four grounds for habeas relief: (1) that he was denied due process and a fair trial "by the People's eliciting evidence of uncharged drug activity" during the trial; (2) the verdict was not supported by legally sufficient evidence and was against the weight of the evidence; (3) ineffective assistance of trial counsel; and, (4) ineffective assistance of appellate counsel. Id. at 4-5. Respondent opposes the Petition. Dkt. Nos. 7 ("Response"); 7-1, ("Response Memorandum"); 8-1, 8-2 ("State Court Record");[2] 8-3, 8-4 ("Transcript"). For following reasons, the Petition is denied and dismissed.

[1]    The cited page numbers for the Petition refer to those generated by the Court's electronic filing system ("ECF").

[2]    The citations to the State Court Records refer to the consecutive pagination, prefixed "SR," found at the top center of each page of those records.

**II. BACKGROUND**

In August 2001, Petitioner became the target of a police narcotics investigation in the city of Albany, New York. Tr. at 338:6-21. The investigation included surveillance of Petitioner as he went back and forth from 46 Lexington Avenue and 677 Third Street, his suspected residence in Albany, over a period of days. Tr. at 340:2-346:13. After observing Petitioner drive to and from the two locations over the course of the month, police set up fixed surveillance near 46 Lexington Avenue on August 31, 2001. Tr. at 346:11-13. That day, police observed Petitioner entering and exiting the building twice. Tr. at 383:17-386:6. Each time Petitioner exited the building, he was observed holding a plastic bag containing a large off-white chunky substance which Petitioner would then give to a companion, who then placed the substance in his pants. Tr. at 384:25-385:4, 386:1-5. Based on these observations, along with several controlled buys with the assistance of confidential informants, the police obtained and executed a search warrant at both locations. SCR at SR 396-399. The police recovered several weapons and over ten ounces of crack cocaine, among other things. Tr. at 352:4-20, 354:18-25, 431:6-432:22.

An Albany County grand jury returned an indictment charging Petitioner with First Degree Criminal Possession of a Controlled Substance (N.Y. Penal Law § 220.21(1)), Second Degree Criminal Possession of a Controlled Substance (N.Y. Penal Law § 220.18(1)), two counts of Third Degree Criminal Possession of a Controlled Substance (N.Y. Penal Law § 220.16(1)), two counts of Criminally Using Drug Paraphernalia in the Second Degree (N.Y. Penal Law § 220.50(2), (3)), and four counts of Third Degree Criminal Possession of a Weapon (N.Y. Penal Law § 265.02(1), (4)). SCR at SR 51-60.

**\*2** Petitioner proceeded to trial before a jury in Albany County Court and was convicted of all counts. SCR at SR 49. On July 19, 2002, Petitioner was sentenced as a second felony offender, to an aggregate prison term of 21 years to life. Id. On May 12, 2012, the Appellate Division, Third Department, unanimously affirmed Petitioner's conviction.[3] The New York Court of Appeals denied leave to appeal on December 3, 2013. People v. Buchanan, 944 N.Y.S.2d 378 (App. Div. 2012), lv denied, 22 N.Y.3d 1039 (2013).

2016 WL 1049006

3      Petitioner previously filed a habeas petition under 28 U.S.C. § 2254 on October 12, 2010, raising as his sole ground for relief that the delay in processing his direct appeal constituted a denial of due process. Buchanan v. Bezio, No. 9:10-cv-1228 (N.D.N.Y. filed Oct. 14, 2010), Dkt. No. 1. On February 27, 2012, the district court denied the petition, holding that "the Supreme Court, while recognizing the right to a 'speedy trial,' has not yet recognized a similar right to a 'speedy appeal.'" Id., Dkt. No. 13 at 4 n.13 (citing Barker v. Wingo, 407 U.S. 514 (1972)).

## III. DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2); Cullen v. Pinholster, 563 U.S. 170, 181 (2011); Premo v. Moore, 562 U.S. 115, 120-21 (2011); Schriro v. Landrigan, 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." Felkner v. Jackson, 562 U.S. 594, 598 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'" Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013) (per curiam) (quoting Harrington v. Richter, 562 U.S. 86, 102 (2011)); see also Metrish v. Lancaster, 133 S. Ct. 1781, 1787 (2013) (explaining that a petitioner in a habeas case premised on § 2254(d)(1) must "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'" (quoting Harrington, 562 U.S. at 103)).

Additionally, the AEDPA foreclosed "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Parker v. Matthews, 132 S. Ct. 2148, 2149 (2012) (per curiam) (quoting Renico, 559 U.S. at 779). A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. Wood v. Allen, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro, 550 U.S. at 473.

*3  Federal habeas courts must presume that the state court's factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence." Id. at 473-74 (quoting § 2254(e)(1)). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits ...." Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).

### B. Ground One – Admission of Uncharged Crimes

Petitioner claims he was denied due process of law and a fair trial when the trial court allowed the prosecution to admit evidence of Petitioner's uncharged drug activities without first obtaining a pre-trial Molineux /Ventimiglia ruling. [4] Pet. at 4. As he did on direct appeal, Petitioner argues that the prejudicial impact of allowing a police officer to testify at trial about his observations of Petitioner's uncharged drug activities "substantially outweighed its probative value." Id. For the following reasons, this claim is denied.

4      People v. Molineux, 168 N.Y. 264 (1901), and People v. Ventimiglia, 52 N.Y.2d 350 (1981), describe the New York procedure for determining in advance of trial whether evidence of uncharged bad acts and/or crimes is admissible for the purpose of showing, e.g., 1) motive, 2) intent, 3) absence of mistake or accident, 4) common scheme or plan, or 5) identity, and for determining whether the probative value outweighs the prejudicial effect.

Prior to trial, the prosecution made a Molineux application seeking to admit as evidence an uncharged drug sale Petitioner allegedly made to a confidential informant on August 31, 2001. SCR at SR 237-49. The trial court denied the request after a Molineux /Ventimiglia hearing.

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 94 of 172

Buchanan v. Chappius, Not Reported in Fed. Supp. (2016)

2016 WL 1049006

During the trial, however, Detective Jeffrey Roberts testified regarding his observations while conducting surveillance of Petitioner on August 31, 2001. See Tr. at 373-404. He testified that on that date, he was performing surveillance near 46 Lexington Avenue when he observed Petitioner engage in what appeared to be two separate drug exchanges with a Philip Stanfield ("Stanfield").[5] Tr. at 382:12-386:6. Detective Roberts testified to observing Petitioner and Stanfield enter and exit the building at 46 Lexington Avenue on two occasions. Id. Each time Petitioner exited the building, Detective Roberts saw Petitioner hand Stanfield a plastic bag containing a chunky off-white substance, which Stanfield would then place in his pants. Tr. at 384:25-385:4, 386:1-6. Detective Roberts did not state that he observed any sale between Petitioner and Stanfield, only that he witnessed Petitioner in possession of a white substance. Id. Detective Roberts videotaped these activities, and the video was received into evidence and shown to the jury. Tr. at 387:22-389:19.

[5]    Stanfield was not a confidential informant, and was arrested along with Petitioner on August 31, 2001, as a result of the police investigation. People v. Stanfield, 777 N.Y.S.2d 546 (App. Div. 2004). Stanfield was charged and convicted of the crime of Criminal Possession of a Controlled Substance in the Third Degree. Id. Although the Appellate Division ruled that Stanfield's conviction was not against the weight of the evidence, it nevertheless remitted the case because the "Supreme Court improperly denied defendant's repeated requests for disclosure of the informant's identity," which was relevant to the issue of whether defendant had possession of the controlled substance. Id. at 548-59. In contrast to the trial court's ruling before Petitioner's trial, the court in Stanfield allowed the police to testify about the controlled buys Stanfield allegedly engaged in with a confidential informant. Id.

 *4  Petitioner's counsel moved for a mistrial, arguing that Petitioner was "denied a fair trial" as a result of the admission of Detective Roberts' testimony concerning the uncharged drug activities. Tr. at 412:17-414:22. Although the trial court admonished the prosecution for not including the uncharged acts as part of its Molineux application, Tr. at 416:1-2, the court went on to hold a Molineux /Ventimiglia discussion on the record, and concluded that the uncharged crimes were "inextricably intertwined with the events and investigation

that day," and tended to prove Petitioner's knowledge, dominion over the premises, and intent, Tr. at 416:1-418:9. Petitioner's motion for a mistrial was denied. Tr. at 418:9.

The trial court's evidentiary ruling was an exercise of discretion, grounded in state law, and is not properly reviewed by the Court in a habeas proceeding. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1999) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); Sirico v. N.Y. Att'y Gen., No. 12-CV-0358, 2015 WL 3743126, at *7 (E.D.N.Y. June 15, 2015) ("As a threshold matter, Molineux sets forth a state evidentiary rule, not a rule of clearly established federal law, and 'it is not the province of a federal habeas court to re-examine state court determinations of state-law questions.'" (quoting Cox v. Bradt, No. 10-CV-9175, 2012 WL 2282508, at *14 (S.D.N.Y. June 15, 2012))); Sudler v. Griffin, No. 12-CV-0367, 2013 WL 4519768, at *3 (N.D.N.Y. Aug. 26, 2013) ("A decision to admit evidence of a defendant's uncharged crimes or other bad acts under People v. Molineux ... constitutes an evidentiary ruling based on state law.").

In any event, Petitioner has not demonstrated that his constitutional right to a fair trial was violated. "Federal courts may issue a writ of habeas corpus based upon a state evidentiary error only if the petitioner demonstrates that the alleged error violated an identifiable constitutional right, and that the error was 'so extremely unfair that its admission violates fundamental conceptions of justice.'" Sudler, 2013 WL 4519768, at *3 (quoting Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998)) (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)); see also Evans v. Fischer, 712 F.3d 125, 133-35 (2d Cir. 2013) (holding that a state appellate court's determination that it was harmless error to admit certain hearsay testimony was not an unreasonable application of due process law and did not render petitioner's trail fundamentally unfair).

Here, the Appellate Division held that "it is apparent that the contemporaneous uncharged sales were admissible to establish the intent to sell element under N.Y. Penal Law § 220.16(1), were inextricably interwoven with the drug possession charges and, finally, provided a complete and coherent narrative of the events leading to defendant's arrest." Buchanan, 944 N.Y.S.2d at 382 (internal citations omitted). The Appellate Division "had no quarrel with Supreme Court's

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 95 of 172

Buchanan v. Chappius, Not Reported in Fed. Supp. (2016)
2016 WL 1049006

determination that the uncharged sales were highly probative and admissible under one or more of the recognized <u>Molineux</u> exceptions," and was "satisfied that Supreme Court balanced 'the probative value and the need for the evidence against the potential for delay, surprise and prejudice.'" <u>Id.</u> (quoting <u>People v. Wilkinson</u>, 892 N.Y.S.2d 535, 540 (App. Div. 2010)). Similarly, the Court is satisfied that the Appellate Division's decision finding the admission of the uncharged crimes did not violate Petitioner's right to a fair trail was not contrary to, or an unreasonable application of Supreme Court precedent. <u>Dowling</u>, 493 U.S. at 352.

### C. Ground Two – Weight and Sufficiency of the Evidence

**\*5**  Petitioner argues in Ground Two of his Petition that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence. Pet. at 4. Petitioner raised these claims on direct appeal, and the Appellate Division rejected them. SCR at SR 32-40; <u>Buchanan</u>, 944 N.Y.S.2d at 379. The Appellate Division went on to consider each of the elements of the crimes and found the evidence legally sufficient, and also concluded the verdict was not against the weight of the evidence. <u>Buchanan</u>, 944 N.Y.S.2d at 379-81.

#### 1. Sufficiency of the Evidence

Respondent argues that Petitioner's legal sufficiency claim is procedurally barred by an adequate and independent state law ground. Resp. Mem. at 18-20. The Court agrees.

Federal habeas review of a state court decision is generally prohibited if the state court's rejection of the federal claim rested "on a state law ground that is independent of the federal question and adequate to support the judgment." <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991); <u>see also</u> <u>Harris v. Reed</u>, 489 U.S. 255, 261-62 (1989). "This rule applies whether the state law ground is substantive or procedural." <u>Coleman</u>, 501 U.S. at 729.

If the state court "explicitly invokes a state procedural bar rule as a separate basis for decision," the federal court is precluded from considering the merits of the federal claims in a habeas petition. <u>Harris</u>, 489 U.S. 255, 264 n.10; <u>see also</u> <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d 804, 809 (2d Cir. 2000) (stating that "[t]he state court must have actually relied on the procedural bar as an independent basis for its

disposition of the case" in order to bar federal review in a habeas petition). Moreover, if a state court explicitly finds that a petitioner failed to preserve an argument for appellate review, but alternatively, or "in any event," rules the argument is without merit, the procedural bar still applies. <u>Fama</u>, 235 F.3d at 810 n.4. If there is ambiguity, however, such as "when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." <u>Id.</u> at 810; <u>see also</u> <u>Doe v. Perez</u>, No. 13-CV-0921, 2015 WL 7444342, at \*3 (N.D.N.Y. Oct. 30, 2015), <u>adopted</u>, 2015 WL 7432385 (N.D.N.Y. Nov. 23, 2015).

Under New York Law, challenges to the sufficiency of the evidence must be properly preserved for appellate review. Pursuant to New York's contemporaneous objection rule, "appellate courts will review only those errors of law that are presented at a time and in a manner that reasonably prompted a judge to correct them during criminal proceedings." <u>Downs v. Lape</u>, 657 F.3d 97, 103 (2d Cir. 2011); <u>see</u> N.Y. CRIM. PROC. LAW § 470.05(2) ("For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same."). The Second Circuit has held that "the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule." <u>Downs</u>, 657 F.3d at 104.

Here, the Appellate Division rejected Petitioner's sufficiency of the evidence challenge due to his failure to preserve it. <u>Buchanan</u>, 944 N.Y.S.2d at 380. The Appellate Division specifically stated that Petitioner's "initial claim—that the verdict is not supported by legally sufficient evidence —is unpreserved for our review in light of [Petitioner's] failure to make a particularized motion for dismissal at the close of the People's case." <u>Id.</u> (citing <u>People v. Caston</u>, 874 N.Y.S.2d 623, 625 (App. Div. 2009) ("Because his counsel made only a general motion to dismiss at the close of the People's case, defendant failed to preserve his claim regarding the legal sufficiency of the evidence.")); <u>accord</u> <u>People v. Gray</u>, 86 N.Y.S.2d 10, 20 (1995).

**\*6**  Since the Appellate Division based its denial of Petitioner's legal sufficiency claim on the contemporaneous objection rule, federal habeas review of the claim is barred by an adequate and independent state ground. [6] This bar

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 96 of 172
Buchanan v. Chappius, Not Reported in Fed. Supp. (2016)
2016 WL 1049006

to federal review may be lifted, however, if Petitioner can show cause for the default and resulting prejudice, or that the failure to review the claim will result in a "miscarriage of justice," i.e., that he is actually innocent. House v. Bell, 547 U.S. 518, 536-39 (2006); Maples v. Thomas, 132 S.Ct. 912, 922 (2012); Schlup v. Delo, 513 U.S. 298, 327 (1995). To establish cause, Petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule. Maples, 132 S.Ct. at 922.

6    Petitioner has not argued the Appellate Division's application of the preservation rule was inadequate to preclude federal habeas review. Nor does the Court find anything in this record to conclude that the Appellate Division's application of the preservation rule in this case was an "exorbitant misapplication" that does not serve a "legitimate state interest." Downs, 657 F.3d at 102 (citing Walker v. Martin, 562 U.S. 307 (2011); Lee v. Kemna, 534 U.S. 362 (2002)); see also Green v. Haggett, No. 13-CV-0016, 2014 WL 3778587, at *5 (N.D.N.Y. July 31, 2014) (listing New York cases applying the preservation rule to parties arguing on appeal that the evidence was legally insufficient).

Petitioner has not alleged or shown cause for the default of his sufficiency claim. Pet. Although Petitioner raises an ineffective assistance of counsel claim in his habeas petition, he does not identify his trial counsel's failure to preserve his sufficiency claim as a basis for that claim. See id. [7] Furthermore, as discussed below, Petitioner's ineffective assistance of trial counsel claim is without merit, and therefore does not serve as "cause" for a procedural default. Murray v. Carrier, 477 U.S. 478, 488-89 (1986). Therefore, having failed to raise or demonstrate cause, the Court need not decide whether Petitioner suffered actual prejudice. Id. at 495-96. Petitioner has also failed to present any new evidence that he is "actually innocent" of the crimes for which he was convicted, and that failure to review this claim would result in a "miscarriage of justice." House, 547 U.S. at 536-39; Schlup, 513 U.S. at 327. Accordingly, Petitioner's legal sufficiency claim is therefore barred from habeas review and is denied and dismissed. [8]

7    The ineffectiveness of counsel for not preserving a claim in state court may be sufficient to show cause for a procedural default, but only when counsel's performance was so ineffective

that the representation violated the petitioner's Sixth Amendment right to counsel. Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

8    The Appellate Division considered "the evidence adduced as to each of the elements of the challenged crimes" for which Petitioner was convicted because he also raised a state-law weight of the evidence claim which, unlike sufficiency of the evidence, did not require preservation. Buchanan, 944 N.Y.S.2d at 380. As discussed in section III.C.2, Petitioner's weight of the evidence claim is not cognizable on federal habeas review. However, inasmuch as the Appellate Division ruled that the elements of each crime was proven, that ruling was not contrary to or an unreasonable application of clearly established Supreme Court precedent. Jackson v. Virginia, 443 U.S. 307 (1979).

### 2. Weight of the Evidence

Petitioner raised his weight of the evidence claim on direct appeal and the Appellate Division rejected it. Buchanan, 944 N.Y.S.2d at 380. To the extent that Petitioner challenges the weight of the evidence supporting his conviction, such argument is grounded in New York's Criminal Procedure Law § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5). Since weight of the evidence claims are grounded in state criminal procedure law, they are not cognizable on federal habeas review. See 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); Swarthout v. Cooke, 562 U.S. 216, 219 (2011) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting Estelle v. McGuire, 502 U.S. 62, 67 (1991))); McKinnon v. Sup't Great Meadow Corr. Facility, 422 F. App'x 69, 75 (2d Cir. 2011) ("[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus."); Clairmont v. Smith, No. 12-CV-1022, 2015 WL 5512832, at *18 (N.D.N.Y. Sept. 16, 2015) (holding that the petitioner's argument that the verdict was against the weight of the evidence "states a claim only under state law, [and] is

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 97 of 172

Buchanan v. Chappius, Not Reported in Fed. Supp. (2016)

2016 WL 1049006

not cognizable on habeas corpus"). Petitioner's weight of the evidence claim is therefore denied and dismissed.

### D. Grounds Three and Four – Ineffective Assistance of Counsel

**\*7** Grounds Three and Four of the Petition assert that Petitioner was denied the effective assistance of counsel. Pet. at 5.

In Ground Three, Petitioner maintains his trial counsel was ineffective for not challenging the sufficiency of the search warrant in a Darden hearing, and otherwise not moving to suppress the evidence seized upon execution of the search warrant. Id. The Appellate Division rejected this claim on the merits and, as articulated below, the Court finds the Appellate Division's decision was not contrary to, or an unreasonable application of the Supreme Court precedent set forth in Strickland v. Washington, 466 U.S. 668 (1984).

In Ground Four Petitioner argues that his appellate counsel failed to timely seek leave to pursue a discretionary appeal to the New York State Court of Appeals. Pet. at 5. Petitioner's claim is not cognizable on habeas review and is also denied.

### 1. Standard of Review

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show "both deficient performance by counsel and prejudice." Premo v. Moore, 562 U.S. 115, 121 (2011) (quoting Knowles v. Mirzayance, 556 U.S. 111, 122, 129 (2009)); Strickland v. Washington, 466 U.S. 668, 694 (1984). Deficient performance requires a showing that counsel's performance fell below an objective standard of professional reasonableness. Premo, 562 U.S. at 121; Harrington, 562 U.S. at 104. "Strickland does not guarantee perfect representation, only a reasonably competent attorney." Harrington, 562 U.S. at 110 (quoting Strickland, 466 U.S. at 687). A petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Even assuming a petitioner can establish counsel was deficient, he still must demonstrate prejudice. Id. at 693-94. This requires more than showing "the errors had some conceivable effect on the outcome," but that the counsel's errors were "so serious

as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687, 693.

Meeting this burden is "never an easy task ... [and] establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Premo, 131 S. Ct. at 739-40. When reviewing a state court's decision under § 2254, "[t]he question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." Knowles, 556 U.S. at 123. Federal habeas courts "must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)" because "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable." Harrington, 562 U.S. at 105. Instead, "the question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. Finally, it is "difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." Id. at 111.

### 2. Ineffective Assistance of Trial Counsel

**\*8** Petitioner contends his trial counsel was ineffective because his counsel did not request a Darden hearing to assess the reliability of a confidential informant who provided the basis for the search warrant, and otherwise was ineffective in failing to move to suppress the evidence seized upon execution of the warrant. Pet. at 5.

Where, as here, the "defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); see also United States v. Cox, 59 F. App'x 437, 439 (2d Cir. 2003); United States v. Tisdale, 195 F.3d 70, 71 (2d Cir. 1999). Furthermore, "[a]lthough a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim like [Petitioner's], a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief." Kimmelman, 477 U.S. at 382. A counsel's "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." Id. at 384. Instead, only petitioners who can demonstrate under

Strickland that "they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence." Id. at 382; see also Palacios v. Burge, 589 F.3d 556, 561 (2d Cir. 2009).

Finally, a petitioner must do more than show a constitutional violation on habeas review. Because Petitioner's ineffective assistance of counsel claim was rejected by the Appellate Division on the merits, see Buchanan, 944 N.Y.S.2d at 382-83, Petitioner "must also show that the state court's 'application of Strickland was not merely incorrect, but objectively unreasonable.'" Palacios, 589 F.3d at 561-62 (quoting Hemstreet v. Greiner, 491 F.3d 84, 89 (2d Cir. 2007)).

As the Appellate Division stated, during the trial "[defense] counsel provided cogent opening and closing statements, made appropriate motions and objections—including a motion for a mistrial—and effectively cross-examined the People's witnesses." Buchanan, 944 N.Y.S.2d at 382. With regard to counsel's alleged ineffectiveness for failing to request a Darden hearing, Petitioner merely restates his claim made on direct appeal that "[f]or reasons that cannot be deemed strategic, the defense attorney never moved for a suppression hearing in a case where the accused was charged with possessing more than six ounces of crack cocain, drug paraphernalia, and guns." Pet. at 5.

Petitioner "has not shown that a meritorious issue existed regarding the confidential informant's identity and reliability such that the trial judge would have found the confidential information unreliable and suppressed the drugs and drug paraphernalia recovered from his bedroom." Anderson v. Philips, No. 03-CV-5192, 2005 WL 1711157, at *6 (E.D.N.Y. July 20, 2005) (citing Kimmelman, 477 U.S. at 375); see Tolliver v. Greiner, No. 02-CV-0570, 2005 WL 2179298, at *8 (N.D.N.Y. Sept. 8, 2005) (holding that defense counsel did not render ineffective assistance by failing to move to suppress evidence obtained pursuant to search warrant; petitioner did not allege any facts in his petition or in state court demonstrating how the affidavit filed in support of the search warrant was untrue or misleading), adopted 2005 WL 2437021 (N.D.N.Y. Sept. 30, 2005). Since Petitioner has not presented any evidence suggesting a Darden hearing would have been successful, his counsel's failure to request such a hearing was not objectively unreasonable. Cf. Tisdale, 195 F.3d at 73-74 ("Trial counsel's failure to bring a meritless suppression motion cannot constitute ineffective

assistance."). Accordingly, the Appellate Division's decision rejecting Petitioner's claim of ineffective assistance of trial counsel was not contrary to, or an unreasonable application of Strickland, and Petitioner's third ground for relief is denied and dismissed.

### 3. Ineffective Assistance of Appellate Counsel

**\*9** Petitioner argues in Ground Four of his Petition that he was denied the right to effective assistance of appellate counsel. Pet. at 5. Specifically, he claims his appellate counsel failed to timely seek leave to appeal to the New York State Court of Appeals. Id. In opposition, Respondent argues the claim is unexhausted and plainly meritless. Resp. Mem. at 25-26.

A claim of ineffective assistance of appellate counsel is reviewed under the same standard set forth in Strickland. See Smith v. Robbins, 528 U.S. 259, 285 (2000) ("[T]he proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective in neglecting to file a merits brief is that enunciated in Strickland v. Washington."); Smith v. Murray, 477 U.S. 527, 535-36 (1986) (applying Strickland to claim of appellate error); Chrysler v. Guiney, 806 F.3d 104, 117-18 (2d Cir. 2015). To satisfy the rigorous Strickland standard when reviewing appellate counsel's performance, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." Giraldi v. Bartlett, 27 F. App'x 75, 77 (2d Cir. 2001) (quoting Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000)). Petitioner must show that appellate counsel's performance was "outside the wide range of professionally competent assistance," and that there is a "reasonable probability" that, but for the deficiency in performance, the outcome of the proceeding would have been different. Id. (quoting Strickland, 466 U.S. at 690).

After filing his federal habeas petition, Petitioner filed an application for a writ of error *coram nobis* in the Appellate Division. Dkt. No. 9 ("Motion for Stay"). Petitioner then sought permission to stay the habeas proceedings until his state application was decided. Id. at 3-4. Respondent opposed the Motion for a stay. Dkt. No. 10. On October 15, 2015, the Court denied the request for a stay, holding that Petitioner "failed to establish good cause for not exhausting those claims before seeking federal habeas relief." Dkt. No. 11 ("Decision and Order") at 2-3. Shortly thereafter, on October 22, 2015,

2016 WL 1049006

the Appellate Division denied Petitioner's application for a writ of error *coram nobis*. [9] On January 19, 2016, the Court of Appeals denied Petitioner's application for leave to appeal the *coram nobis* motion. Therefore, Petitioner's claim of appellate counsel ineffectiveness is now exhausted, and is subject to AEDPA standards of review.

[9]     The Court takes judicial notice of the Order of the New York State Court of Appeals denying Petitioner's application for leave to appeal the Order of the Appellate Division, Third Department, which denied his application for a writ of error *coram nobis*. See Ariola v. LaClair, No. 08-CV-116, 2014 WL 4966748, at *22 n.2 (N.D.N.Y. Sept. 30, 2014) ("The court also looks to, and takes judicial notice of, matters of public record, including certain documents filed in other courts.").

Petitioner's claim of ineffective assistance relates solely to his appellate counsel's alleged failure to seek leave to pursue a discretionary appeal to the New York State Court of Appeals. Habeas relief, however, is not available for such claims. The Supreme Court has held that a petitioner's "right to counsel is limited to the first appeal as of right," Hernandez v. Greiner, 414 F.3d 266, 269 (2d Cir. 2005) (quoting Evitts v. Lucey, 469 U.S. 387, 394 (1985)), and has also ruled there is no constitutional right to counsel to pursue discretionary appeals. See Chalk v. Kuhlmann, 311 F.3d 525, 528 (2d Cir. 2002) (citing Ross v. Moffitt, 417 U.S. 600, 610-11 (1974)). Furthermore, as relevant here, the Supreme Court specifically held in Wainwright v. Torna, that habeas relief may not be granted based on a claim that a petitioner's counsel failed to timely file an application for discretionary review to the state's highest court. Wainwright, 455 U.S. 586, 587 (1982).

 **\*10** Here, Petitioner's counsel perfected an appeal on his behalf before the Appellate Division. Petitioner had no constitutional right to counsel to pursue further discretionary appellate review. Hernandez, 414 F.3d at 269. Nevertheless, and contrary to Petitioner's claim, his appellate counsel did, in fact, file a late application seeking leave to appeal to the Court of Appeals. SCR at SR 403-08. The record shows the Court of

Appeals accepted the application and, on December 30, 2013, denied the application for leave. Id. at SR 409. Even assuming Petitioner had a right to counsel under these circumstances, there is no factual basis in the record for his claim. Therefore, the Appellate Division's decision rejecting his *coram nobis* motion was not contrary to, or an unreasonable application of Strickland, 466 U.S. 668, and Petitioner's Fourth Ground for relief is denied and dismissed.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Petition (Dkt. No. 1) is **DENIED and DISMISSED**; and it is further

**ORDERED**, that no Certificate of Appealability ("COA") shall issue because Petitioner failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires. [10] Any further request for a Certificate of Appealability must be addressed to the Court of Appeals (FED. R. APP. P. 22(b)); and it is further

[10]     Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); see also Richardson v. Greene, 497 F.3d 212, 217 (2d Cir. 2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, and (2) that the applicant has established a valid constitutional violation").

**ORDERED**, that the Clerk of the Court serve copies of this Decision and Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2016 WL 1049006

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 849454
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Padro BONET, Petitioner

v.

Michael MCGINNIS, Respondent.

No. 98 CIV. 6529(HB).
|
July 27, 2001.

OPINION & ORDER

BAER, District J.

**\*1** Pro se petitioner Pedro Bonet seeks a writ of habeas corpus pursuant to 29 U.S.C. § 2254 challenging his March 29, 1995 conviction for criminal possession of a controlled substance in the third degree.[1] Bonet challenges the trial court conviction on the following grounds: (1) that the trial court precluded relevant evidence and curtailed his opportunity for cross examination; (2) that the court admitted evidence of an uncharged crime in violation of his due process rights; (3) that the court improperly excluded his fiancé from the courtroom; and (4) that the court imposed an excessive sentence. For the following reasons, the petition is dismissed.

[1]    Radha Natarajan, an Intern in my Chambers during the summer of 2001, was of substantial assistance in the research and writing of this opinion.

BACKGROUND

On March 29, 1995, petitioner was convicted of criminal possession of a controlled substance in the third degree, pursuant to N.Y. Penal Law § 220.16[1]. The judge sentenced petitioner, a second felony offender, to an indeterminate prison term of seven and a half to fifteen years.

Evidence introduced at trial established that on May 4, 1994, while in the presence of an undercover officer, petitioner removed several glassines of heroin from his sock. The officer attempted to buy two of the glassines from petitioner, but petitioner refused to sell them telling the officer that he feared that police were in the area. Subsequently, two other undercover officers saw petitioner sell heroin to a third party, but when an officer searched the suspected buyer shortly thereafter, he did not find any heroin. However, the officer did recover eight glassines of heroin and some cash from petitioner. The officer arrested petitioner and he was charged with criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree.[2]

[2]    The charge of criminal sale was based on petitioner's alleged attempted sale to the undercover officer and not his alleged sale to the third party.

At trial, the court declared a mistrial because a witnesses offered testimony that the court found to be unduly prejudicial. In a second trial, the jury found petitioner guilty of criminal possession of a controlled substance in the third degree but acquitted him on the criminal sale charge. Petitioner appealed his conviction arguing that the trial court erred on a number of grounds including: precluding relevant evidence and curtailing his cross examination, admitting evidence of an uncharged crime, excluding his fiancé from the courtroom and imposing an excessive sentence. The Appellate Division rejected Bonet's arguments and affirmed his conviction. See People v. Bonet, 241 A.D.2d 334, 660 N.Y.S.2d 9 (1997). Petitioner filed an application for leave to appeal to the New York Court of Appeals, but his application was denied on August 28, 1997. See People v. Bonet, 90 N.Y.2d 902 (N.Y.1997). This petition followed.

DISCUSSION

I. Standard of Review

A federal court's review of state proceedings on a habeas petition is limited. 28 U.S.C. § 2254(d) precludes federal habeas relief unless a federal court finds that the state court's adjudication of the merits of the claims either:

**\*2** (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2); *see also Williams v. Taylor,* 529 U.S. 362, 390 (2000).

II. Preclusion of Evidence and Curtailment of Cross Examination

Petitioner argues that the trial court prevented him from presenting an adequate defense by curtailing his opportunity for cross examination and precluding the admission of evidence favorable to his defense.

Federal habeas review of a state court conviction is limited to determining whether the alleged error of the trial court rises to the level of a constitutional violation. *See Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991); *see also Mitchell v. Herbert,* No. 97 Civ. 5128, 1998 U.S. Dist. LEXIS 5442, at *11 (S.D.N.Y. April 16, 1998). In challenging a trial court's evidentiary ruling, petitioner bears a heavy burden, for "generally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation." *Mitchell,* 1998 U.S. Dist. LEXIS 5442, at *12 (citing *Copes v. Schriver,* No. 97 Civ. 2284, 1997 U.S. Dist. LEXIS 16349, at *8 (S.D.N.Y. Oct. 27, 1997)). Rather, to warrant habeas relief a petitioner must establish that the error had a "substantial and injurious effect or influence in determining the jury's verdict," or deprived him of a fundamentally fair trial. *Copes,* 1997 U.S. Dist. LEXIS 16349, at *8–9 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)).

Here, petitioner contends that the trial court refused to allow his counsel to introduce evidence for the purpose of impeaching the police witnesses. Specifically, Bonet sought to introduce evidence that the officer completing the arrest report had erroneously indicated that petitioner was a buyer of drugs rather than a seller. Although this was an inconsistency, the trial court was within its discretion to exclude such evidence. Certainly, it cannot be said that it deprived petitioner of a fair trial nor can I conclude that the decision to exclude this evidence was objectively unreasonable. *See Jones v. Stinson,* 229 F.3d 112, 120–121 (2d Cir.2000) (stating that even if the omission of evidence was clear error, a habeas court could only grant relief if the trial court's decision was unreasonable).

Petitioner also claims that the trial court was biased against him, undermined salient defense challenges and exhibited a preference for the prosecution's version of the facts. However, a review of the record reveals that the court sustained numerous objections by the defense and overruled a fair number of the prosecutor's objections. [3] Furthermore, the judge correctly instructed the jury that they should not construe his rulings on legal issues as indicating any bias for or against petitioner. The jury's lack of bias against the petitioner was demonstrated by their acquittal on the sale charge.

[3]
> The Appellate Division reached the same conclusion, stating that the trial court "did not interfere excessively in the proceedings or show any bias toward defendants. Rather, the court acted within its power ..." *Bonet,* 660 N.Y.S.2d at 10.

**\*3** In this way, petitioner has failed to show that the trial court's evidentiary rulings were erroneous, much less that they constituted a violation of his constitutional rights. Accordingly, this claim must be dismissed.

III. Admission of Uncharged Crimes

Petitioner argues that the trial court erred by admitting evidence that the undercover officers saw him sell heroin to a third party buyer when he was not charged with that crime. Once again, petitioner bears a heavy burden in challenging a state court's evidentiary ruling. To succeed on this claim, petitioner must demonstrate that the court admitted the evidence in error and that the evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt. *See Mitchell,* 1998 U.S. Dist. LEXIS 5442, at *15 (citations omitted); *see also Estelle,* 502 U.S. at 75 (evidence of uncharged criminal conduct should only be excluded if its introduction would "so infuse the trial with unfairness as to deny due process of law"). Moreover, while evidence of uncharged crimes is not admissible to show bad character or propensity for criminal behavior, a court may admit such evidence if its probative value exceeds its potential for prejudice to a defendant and if the evidence is admitted to show motive or intent. *See Fed.R.Evid. 404(b); see also United States v. Sappe,* 898 F.2d 878, 880 (2d Cir.1990); *Kae v. Artuz,* No. 98 Civ. 4711, 2000 U.S. Dist. LEXIS 17001, at *13 (E.D.N.Y. November 21, 2000) ("It is well established, however, that evidence of uncharged crimes may be admitted to establish the intent element of a crime.") (citations omitted).

Here, the trial court explained that it admitted the officers' testimony of the alleged transaction with a third party to demonstrate the petitioner's intent to sell. Clearly, evidence that the petitioner attempted to sell drugs to a third party mere

moments after he allegedly sold to the undercover officer is relevant to petitioner's intent. Furthermore, the jury was free to balance the testimony with the evidence that the police were unable to recover any drugs from the purported buyer and their verdict demonstrates that they did just that. Therefore, the court did not abuse its broad discretion in determining the relevancy of the evidence. *See Davis v. Senkowski,* No. 97 Civ. 2328, 1998 U.S. Dist. LEXIS 22995, at *21–22 (E.D.N.Y. August 6, 1998) ("Trial courts are given 'broad discretion' in determining the relevancy and admissibility of evidence"). [4]

[4]    Furthermore, even if the evidence had been admitted erroneously, petitioner could not show that it was sufficiently material to have formed the basis for the conviction. Indeed, the petitioner himself concedes that "possession with intent to sell was easily inferable from the state's rendition of the offer to sell [without evidence of the uncharged sale]." *See* Pet. Brief in Support, at 10. Therefore, it is unlikely that this evidence impacted the jury's decision.

For the above reasons, this claim must be dismissed.

## IV. Exclusion of Petitioner's Fiancé from the Courtroom

Petitioner contends that the trial court's decision to exclude his fiancé from the courtroom during the testimony of two undercover officers violated his Sixth Amendment right to a public trial.

The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right to a ... public trial ..." U.S. Const. Amend. VI; *see also Duncan v. Louisiana,* 391 U.S. 145, 148 & n. 10 (1968) (holding that the right to a public trial applies to states through the Fourteenth Amendment). This right is not absolute, however. The Supreme Court in *Waller v. Georgia*

set forth a four-part test to determine the validity of a closure on habeas review:

  **\*4**  (1) The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,

  (2) The closure must be no broader than necessary to protect that interest,

  (3) The trial court must consider reasonable alternatives to closing the proceeding, and

  (4) It must make findings adequate to support the closure.

467 U.S. 39, 48 (1984).

In evaluating a partial closure, courts have modified the first prong of *Waller* to require a "substantial reason" for the closure, rather than an "overriding interest." *See Guzman v. Scully,* 80 F.3d 772 (2d Cir.1996). Additionally, in applying the *Waller* test, courts must carefully guard a defendant's interest in having friends and family members present. *See In re Oliver,* 333 U.S. 257, 271–72 & n. 29 (1948); *see also Guzman,* 80 F.3d at 776; *Hoi Man Yung v. Walker,* No. 00 Civ. 1263, 2001 U.S. Dist. LEXIS 4644, at *18 (S.D.N.Y. April 20, 2001).

Here, the trial court held a *Hinton* hearing before the start of the first trial to evaluate the prosecutor's claims that closure of the courtroom was necessary to protect the undercover officer's safety and effectiveness. At the hearing, the undercover officers testified as to their duties, the part of town in which they worked and their concerns about the risks to their safety and effectiveness if their identities were disclosed. The government was careful to question the officers about the part of town in which they worked.

| Government: | And can I ask you, Officer, have you ever operated in the vicinity of Pitt and Rivington? |
| Officer: | Have I ever operated, yeah, frequently. |
| Government: | And what percent of your undercover work is in that area, just giving a percentage? |
| Officer: | This time right now, three out of four days that we work we're in that area. |

2001 WL 849454

Trans. at 9. One of the officers also explained that his investigations in the Pitt and Rivington area were ongoing

| Government: | Officer, do you believe that any current investigations of an ongoing nature in which you're involved will be jeopardized if your identity as a police officer were made public? |
|---|---|
| Officer: | Yes, if I'm known in these areas it will jeopardize most of our cases. |

Trans. at 12. Based on this testimony, the court ordered that the trial be closed to the public. However, the first trial ended in a mistrial and on the second go round, petitioner requested that his recent fiancé [5] be allowed to remain during the officers' testimony. Although the court did not hold another *Hinton* hearing, it did hear argument from both sides as to whether the defendant's fiancé should be allowed in the courtroom during the testimony. The prosecutor argued that the fiancé had a fairly extensive narcotics history [6] and lived downtown, [7] the area where the officers worked, and, therefore, that she posed a risk to the officers. Defense counsel did not dispute the fiancé's history but argued that as a family member, she should be allowed to remain in the courtroom and that she did not pose a risk to the officers as she had not had a drug conviction within the last four years. After hearing the argument from both sides, the court concluded:

[5]   Although it is somewhat unclear from the record whether petitioner was actually engaged or "common law married" or whether the "fiancé" was his girlfriend or friend, for our purposes I will consider her to be his fiancé. Whatever her status, the record reflects that the relationship was of a months' duration.

[6]   The trial transcript has an apparent discrepancy on petitioner's fiancé's criminal history. According to the most reasonable reading of the record, petitioner's fiancé was convicted three times of possession of a controlled substance, once of criminal sale of a controlled substance, and once of attempted possession. Her most recent conviction was four years prior to the trial on Columbia Street.

[7]   It turns out that the fiancé lived only one block from Pitt and Rivington, the scene of the petitioner's arrest and the area in which the officers had numerous ongoing cases.

and that exposure of his identity would likely jeopardize the investigations.

**\*5** ...the fact that [petitioner's fiancé] has this extensive record in connection with narcotics and she lives downtown, and there is a possibility they may be in the vicinity of a potential operation that these undercover officers may be involved in, and she is in the courtroom she may spot them, and she may identify them and give them up and subject their lives to danger...they could be killed on the spot if they identified them as undercover officers in an operation.

This exclusion satisfies all of the *Waller* prongs. First, closure of a trial to ensure the safety and effectiveness of undercover officers satisfies a substantial interest, thereby satisfying the first *Waller* prong. *See Woods v. Kuhlmann,* 977 F.2d 74, 76–77 (2d Cir.1992); *Bowden v. Keane,* 237 F.3d 125, 129–130 (2d Cir.2001). Second, the closure was no broader than necessary. Although the trial court ruled for a limited closure, it considered separately petitioner's request that his mother and fiancé be allowed to remain in the courtroom. Although at the time of the *Hinton* hearing petitioner was uncertain whether his mother would attend, the trial judge indicated that, if she did, he would separately consider allowing her in the courtroom. The judge stated, "I think [petitioner's mother] should be permitted to attend if at all possible. I think we can work that out, but if she decides not to that is mute [sic] and we don't have to cross that bridge." Trans. at 82. [8] In contrast, the court found that petitioner's fiancé's should not be permitted in the courtroom during the officer's testimony as her four [9] prior narcotics convictions and the area where she lived were evidence that she could expose the undercover officers' identity.

[8]   As there is no further mention of the attendance of petitioner's mother on the record, it appears that she opted not to attend at least that portion of the trial. The judge did allow relatives of the petitioner's co-defendant to be present during the officer's testimony.

2001 WL 849454

9
    The Attorney General's brief states that the fiancé had four prior narcotics convictions, although my reading of the trial transcript is that she had five. For the purposes of this opinion, I will rely on the government's representation, as it is the one more in the petitioner's favor.

The fact that the court ordered a limited closure also satisfies the third *Waller* prong. *See Ayala v. Speckard,* 131 F.3d 62, 70–72 (2d Cir.1997) (holding that when a trial court orders a limited closure of a criminal proceeding rather than a complete closure, the judge has satisfied the third prong of *Waller* and is not required to *sua sponte* consider further alternatives).

Finally, the trial court satisfies the fourth prong as it made findings adequate to support the closure. [10] The judge held a *Hinton* hearing, in which both sides were permitted to submit evidence and cross-examine the witnesses, and determined that the officers' lives would be at risk and their effectiveness compromised if they testified in open court. As to petitioner's fiancé, although her exclusion was not specifically considered at the *Hinton* hearing, as the petitioner had not requested her presence at that point, the court considered the facts presented by the prosecutor and gave the defense counsel ample opportunity to offer any counter-argument. [11] *See Woods,* 977 F.2d at 74 (where even one question posed by the judge to the witness constituted an adequate basis to assess the state's interests). Perhaps ideally the trial court would have held a second full-blown *Hinton* hearing to allow for testimony from the officers about the fiancé and other relevant evidence. However, the findings here were clearly "specific enough that a reviewing court can determine whether the closure order was properly entered." *See Waller,* 467 U.S. at 45. This is particularly true since it was a simple matter for the court to conclude that exposure was a real possibility since the fiancé lived in the neighborhood and had a history of drug involvement. [12] Thus, in light of the full *Hinton* hearing as well as the discussion with both sides regarding the specific risk posed by petitioner's fiancé, I find that the inquiry was sufficient. [13]

10
    Significantly, this case does not fall under the ambit of recent Second Circuit cases in which the court held that the exclusion of family from the courtroom was unwarranted. In all of those cases, the trial court pointed to no specific evidence to suggest that the excluded family member posed

a threat to the undercover officers. *See Vidal v. Williams,* 31 F.3d 67 (2d. Cir.1994); *see also English v. Artuz,* 164 F.3d 105 (2d. Cir.1998); *Guzman,* 80 F.3d 772. In sharp contrast, here the trial court found that petitioner's fiancé's history of drug involvement created a clear danger to the officers. The fact that the trial court properly considered whether petitioner's family members should be allowed in the courtroom is demonstrated by the fact that the court indicated that he would allow petitioner's mother to remain. This distinction is further supported by a similar "buy and bust" narcotics case, in which the New York Court of Appeals stated that had the defendant's wife been involved in the sale of drugs, the trial judge would have been justified in excluding her from the proceedings during the testimony of undercover officers. *See People v. Nieves,* 90 N.Y.2d 426, 431 (N.Y.1997).

11
    The concerns with respect to petitioner's fiancé were not addressed during the *Hinton* hearing because petitioner only asked for her inclusion at the second trial, after the hearing had already taken place.

12
    In *Guzman,* the Second Circuit distinguished between closure to protect the identity of a government witness, which the court found required only a minimal inquiry by the trial court, and closure due to a witness's fear of a person who already knew the witness's identity, which required a more extensive inquiry to show the grounds for exclusion. *See Guzman,* 80 F.3d at 776 ("Where a government witness ... is concerned for his safety due to the disclosure of his identity, a minimal inquiry might suffice ...").

13
    While it is true that both defendants were free on bail between the two trials, and ostensibly could have either spotted the undercover officers or described their appearances to acquaintances including the "fiancé", there is no evidence to that effect and this does not undermine the rationale of protecting the officers identity given the compelling state interest to guard against endangering the officers. Furthermore, the risk that a defendant will identify an undercover officer after an arrest is one assumed by undercover officers in all cases.

2001 WL 849454

**\*6** Upholding the trial court's determination also serves the purpose of enforcing the underlying policy of proceeding with caution before ordering such disproportionate relief as a new trial in a case where the trial judge did not "deliberately enforce secrecy in order to be free of the safeguards of the public's scrutiny," and in which the error is not of "the sort that risks an unreliable trial outcome and consequent conviction of an innocent person." *Brown v.. Kuhlmann,* 142 F.3d 529, 539 (2d Cir.1998).

Therefore, petitioner's claim on this ground must be denied.

V. Excessive Sentence
Finally, petitioner contends that his sentence of seven and a half to fifteen years is excessive in light of his background and the nature and circumstances of his criminal conduct.

There is no constitutional issue presented for habeas review when a sentence is within the range established by state statutory law. *See White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992); *see also Herrera,* 2001 WL 392553, at \*4. Rather, in order to prevail on such a claim, a petitioner must show the trial court's sentencing decision was an improper "arbitrary or capricious abuse of discretion" that deprived the petitioner of his liberty. *See Jones v. Hollins,* 884 F.Supp. 758, 761–62 (W.D.N.Y.1995), *aff'd,* 89 F.3d 826 (2d Cir.1995).

Petitioner's sentence was below the maximum statutory range of imprisonment of nine to twenty-five years. *See* N.Y. Penal Law § 70.06(3). Moreover petitioner does not contend that the trial judge abused his discretion in sentencing him, and the record is devoid of any evidence to support such a claim.

Therefore, petitioner's claim must be dismissed.

CONCLUSION

For the reasons stated above, the petition is denied, and the clerk is instructed to close the case.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 849454

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 11482062
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Nicholas SORRENTINO, Petitioner,

v.

Thomas LAVALLEY, Superintendent,
Clinton Correctional Facility, Respondent.

12-CV-7668 (VSB) (DF)

|

Signed 02/03/2016

**Attorneys and Law Firms**

Nicholas Sorrentino, Dannemora, NY, pro se.

Karen Sara Schlossberg, Martin John Foncello, III, New York County District Attorney's Office, New York, NY, for Respondent.

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge

**\*1 TO THE HONORABLE VERNON S. BRODERICK, U.S.D.J.:**

*Pro se* petitioner Nicholas Sorrentino ("Petitioner") has filed a petition in this Court for a writ of habeas corpus under 28 U.S.C. § 2254 (Notice of Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, dated Oct. 3, 2012 ("Pet.") (Dkt. 2) ), following his conviction by a jury, on July 17, 2009, for Murder in the Second Degree, under N.Y. Penal Law § 125.25(1). Petitioner is currently incarcerated at Clinton Correctional Facility, in Dannemora, New York, where he is serving an indeterminate prison term of 25 years to life. (Pet., at 1.)

Petitioner challenges his conviction on six grounds: (1) that the hearing court should have suppressed evidence and statements obtained from Petitioner as a result of an unlawful arrest; (2) that the trial court should have suppressed historical cell-site location data, or, at minimum, conducted a *Frye* hearing with respect to the introduction of such evidence;[1] (3) that certain hearsay statements made by the decedent and a medical examiner were erroneously admitted, resulting in a violation of Petitioner's constitutional rights; (4) that the trial court's *Sandoval* ruling denied him a fair trial;[2] (5)

that the trial court's failure to give a circumstantial-evidence instruction denied him a fair trial; and (6) that his sentence was excessive. (*See generally* Pet.) Respondent Thomas Lavalley, Superintendent of Clinton Correctional Facility ("Respondent"), argues that Petitioner's claims should be dismissed as procedurally barred and/or for lack of merit. (*See generally* Answer and Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated Apr. 2, 2013 ("Resp. Answer and Mem.") (Dkt. 10).) For the reasons set forth below, I recommend that the Petition be dismissed in its entirety.

[1]    In New York, the standard for admissibility of novel scientific evidence is derived from *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which requires that such evidence be based on a principle or procedure that has gained general acceptance in the relevant scientific community. *See People v. LeGrand*, 8 N.Y.3d 449, 457, 835 N.Y.S.2d 523, 867 N.E.2d 374 (2007).

[2]    Under *People v. Sandoval*, 34 N.Y.2d 371, 374-75, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974), a criminal defendant, before deciding whether to testify at trial, may seek an advance ruling from the court as to whether the prosecution may use evidence of prior criminal acts for impeachment purposes.

**BACKGROUND**

**A. Factual Background**

Based on the transcript of Petitioner's trial, Petitioner was convicted and sentenced for the murder of Jose Raul Prieto ("Prieto"), whose body was discovered on May 16, 2007, in his home on East 35th Street in Manhattan. (Respondent's Appendix, filed Apr. 4, 2013 ("App'x"),[3] at 619, 688-89.) From the early 1970s until about five years before the end of his life, Prieto, who was gay, would travel to a particular area in New Jersey to meet ostensibly straight men. (*Id.*, at 678-79, 904-05.) Prieto would bring these men back to his apartment in Manhattan to have sex, in some cases paying for their company or for sexual favors. (*Id.*) In the 1990s, Prieto met Petitioner, and the two began a romantic and sexual relationship that lasted for several years. (*Id.*, at 651, 903-04.) During their relationship, Prieto often provided Petitioner with money and other gifts. (*Id.*, at 651, 906.) At trial, the prosecution presented evidence that Petitioner killed Prieto

after the relationship deteriorated and Prieto withdrew his financial support. (*Id.*, at 1440.)

3  Respondent's Appendix consists of transcripts, state court decisions, and other relevant materials, totaling approximately 2,500 pages. By Order dated April 3, 2013, the Honorable Richard J. Sullivan granted Respondent permission to file an electronic version of the Appendix by submitting a compact disc to the Court, rather than by uploading PDF files to the Docket (Dkt. 12 (Endorsed Letter, dated Apr. 3, 2013) ). The Docket reflects that the Appendix was received by the Court on April 4, 2013. (Dkt. 13.)

## 1. Investigation into Prieto's Death

**\*2** On the evening of May 16, 2007, officers with the New York City Police Department ("NYPD") arrived at Prieto's apartment to investigate a possible homicide. (*Id.*, at 12-13.) When the officers entered the apartment, they found Prieto, who had suffered massive blood loss from the head, lying dead on the bedroom floor. (*Id.*, at 13.) Investigators observed that Prieto had ligature marks on his neck, and that his throat had been cut. (*Id.*, at 744-45.) Several items, including a fire extinguisher with dried blood on its base and a soda can found in a garbage container, were removed from the apartment and vouched. (*Id.*, at 14, 757-60.) From the bedroom dresser, officers removed a copy of Petitioner's birth certificate, as well as a purchase and sale agreement for a 1997 Acura that was in Petitioner's name. (*Id.*, at 1508-10; 1739-43.)

On the day that Prieto's autopsy was being performed, NYPD detectives received a report that one of Prieto's credit cards had been used at a jewelry store in Fairview, New Jersey. (*Id.*, at 79-80.) When investigators reviewed surveillance video from that jewelry store, they identified the individual who had used Prieto's credit card as Robert Johnson ("Johnson"), Petitioner's "nephew."[4] (*Id.*, at 80.) Later, investigators received calls from three of Prieto's friends, who all stated that Prieto had been having "problems" with a man named Nick, with whom Prieto had maintained a relationship. (*Id.*, at 80, 166-67, 175.) Detectives also recovered two messages from Prieto's answering machine that were left by a person named Nick (apparently Petitioner), as well as a message from a man named Frankie Fritto ("Fritto"). (*Id.*, at 81, 167-68.) Fritto later informed officers that an individual identifying himself as Nick Sorrentino had tried to use one of Prieto's

checks to rent an apartment. (*Id.*, at 82-85.) When detectives showed him a photo array, Fritto identified Petitioner as the person who had given him the check. (*Id.*, at 82-83.) On May 24, 2007, based on this information, the People obtained an order, pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. § 7203(d), and N.Y. Crim. Proc. Law §§ 705.10, 705.30, directing Petitioner's cell-phone provider to turn over historical cell-site location information from May 13, 2007, until the date of the order. (App'x, at 2137-61.) After obtaining Petitioner's phone records, the police learned that, on May 14, 2007, two days before Prieto's body was discovered, Petitioner's cell phone had made a call that was transmitted via a cell tower site located within one block of Prieto's apartment. (*Id.*, at 87-90.) In June 2007, laboratory analysis showed that Petitioner's DNA profile matched DNA found on the soda can, and that the fire extinguisher recovered from Prieto's apartment contained a mixture of DNA from both Prieto and Petitioner.[5] (*Id.*, at 93-95; 1829-32.) Finally, on July 10, 2007, Johnson was arrested for the unauthorized use of Prieto's credit cards. (*Id.*, at 997-98, 1666, 1714.) In response to questioning, Johnson eventually told police that he had received the credit cards from Petitioner. (*Id.*, at 1023-25.)

4  Petitioner was once married to a good friend of Johnson's mother, and Johnson had shared a residence with Petitioner for a few months during Johnson's childhood. (*Id.* at 971-74.) Though the two were not actually related, Petitioner and Johnson regarded each other as "uncle" and "nephew." (*Id.*)

5  Petitioner's DNA was on file because he was a registered sex offender in New Jersey. (*Id.* at 95.)

At about 5:00 p.m. on July 10, 2007, a New Jersey officer and five NYPD officers, including Detective Daniel Casey, traveled to Petitioner's workplace in New Jersey. (*Id.*, at 197-99.) When Petitioner arrived at the lounge area where the officers were waiting, Detective Casey inquired whether Petitioner would accompany them back to Manhattan to assist with an ongoing investigation. (*Id.*, at 200-01) Detective Casey testified that Petitioner "was a gentleman," and that he willingly agreed to be transported to the 13th Precinct in Manhattan. (*Id.*) Detective Casey further stated that Petitioner did not inquire as to the nature of the investigation (*id.*, at 203), and that the officers never stated that Petitioner was under arrest or that he was required to accompany them back to New York (*id.*, at 206).

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

**\*3** When Petitioner and the NYPD officers arrived at the 13th Precinct, Detective Casey handcuffed Petitioner, brought him inside, and informed the officer at the front desk that he was bringing in "a body." (*Id.*, at 204-05.) The officers then placed Petitioner in an interview room and removed his handcuffs. (*Id.*, at 205.) At about 9:40 p.m., NYPD Detectives Randall Roca and Theodore Wozniak entered the interview room, informed Petitioner that they "were conducting a credit card investigation," and read Petitioner his *Miranda* rights from a preprinted form. (*Id.*, at 18-19.) Petitioner initialed and signed the preprinted form, indicating that he understood his *Miranda* rights, and agreed to be questioned without an attorney present. (*Id.*, at 18-20.)

In response to questioning, Petitioner denied that he was in possession of any credit cards or checks that did not belong to him. (*Id.*, at 21, 109-10.) Petitioner indicated that he would be willing to make a written statement to that effect, and, after Detective Wozniak wrote out the statement, Petitioner reviewed and signed it. (*Id.*, at 21, 110-12.)

Later, while Petitioner was searching for his employer's business card, Detective Roca noticed that Petitioner was carrying several papers in his wallet. (*Id.*, at 21-23, 112.) Detective Roca asked if he could look through the wallet, and Petitioner agreed. (*Id.*, at 22-23, 112-13.) Inside the wallet was a piece of paper containing Prieto's telephone number and an address that almost exactly matched Prieto's address. [6] (*Id.*, at 23, 114-15.) Petitioner acknowledged that the handwriting on the paper was his, but he stated that he did not recognize the phone number or address. (*Id.*, at 23-24, 117-19.)

[6]       Prieto's address was 145 East 35th Street, Apartment 8ME. (*Id.* at 23, 115.) The paper found in Petitioner's wallet bore the address 145 East 33rd Street, Apartment 8ME. (*Id.*)

After further questioning, Detective Roca showed Petitioner a photograph of Prieto and asked if Petitioner recognized him. (*Id.*, at 25, 117.) Petitioner stated that the man in the photograph resembled a client whom he had driven to Kennedy Airport while working as a taxi driver. (*Id.*, at 25, 117-18.) When Detective Roca asked if Petitioner had ever been inside Prieto's apartment, Petitioner stated that he had gone up the elevator to collect luggage, but had never entered the apartment itself. (*Id.*, at 25, 118) At that point, the detectives showed Petitioner a photograph of himself sitting inside Prieto's apartment. (*Id.*, at 25-26, 119-20.) Upon viewing the photograph of himself, Petitioner "became upset

and advised that he did not like where this was going." (*Id.*, at 26.) The detectives then informed Petitioner that they had listened to messages on Prieto's answering machine left by Petitioner, and that historical cell-site information showed that Petitioner was in the vicinity of Prieto's apartment on May 14, 2007. (*Id.*, at 26, 120-21.) Petitioner then requested an attorney and stated that he did not wish to continue the interview. (*Id.*, at 26-27, 121.) At that time, detectives informed Petitioner that he was being placed under arrest. (*Id.*, at 27.)

## B. Procedural History

### 1. Pretrial Rulings

#### a. Motion To Suppress Evidence Obtained Pursuant to Allegedly Unlawful Arrest

On July 15 and 16, 2008, a pretrial *Mapp/Dunaway/Huntley/Wade* hearing was held before the Honorable Thomas Farber, J.S.C., in the Supreme Court of New York, New York County. [7] (App'x, at 1-254.) At the close of testimony, Petitioner argued that, on July 10, 2007, NYPD detectives had unlawfully arrested him at his workplace in New Jersey and then transported him to New York, and that all statements made by him and evidence seized from him as a result of this arrest should be suppressed. (*Id.*, at 222-30.) Petitioner contended that a reasonable person in his position, who was innocent of any crime, would have understood that he was not free to refuse the officers' requests when they arrived at his workplace in New Jersey. (*Id.*, at 2118-21.) Petitioner further argued that, by arresting him in New Jersey and immediately transporting him to New York, the NYPD detectives intentionally violated New Jersey's "Fresh Pursuit" statute, under which out-of-state law-enforcement officers can enter New Jersey in "fresh pursuit" of a suspect and make a felony arrest in that state, provided that, upon such arrest, the officers then bring the arrestee before a "neighboring magistrate" (*i.e.*, a local judge) without unnecessary delay, for a determination as to the lawfulness of arrest and the necessity of detaining the arrestee until an extradition warrant is issued. (*See id.*, at 2121-22.) N.J. Stat. §§ 2A:155-4, 2A:155-5.)

[7]       This hearing was held pursuant to: (1) *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), to determine whether physical evidence

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 109 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

sought to be used against Petitioner was obtained illegally; (2) *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), to determine whether there was probable cause for Petitioner's arrest; (3) *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), to determine whether any statements made by Petitioner should be suppressed; and (4) *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), to determine whether Petitioner's pretrial identification was the result of impermissibly suggestive procedures.

**\*4** By Order dated January 29, 2008, the hearing court denied Petitioner's suppression motion. (App'x, at 2126-36.) First, the court found that Petitioner was not in custody at the time that he was transported to the New York police precinct. (*Id.*, at 2132-33.) The court further determined that Petitioner was given *Miranda* warnings prior to any custodial interrogation, that the waiver of his *Miranda* rights was knowing, voluntary, and intelligent, and that Petitioner freely and voluntarily gave detectives permission to look through his wallet. (*Id.*, at 2135-36.) The court therefore denied Petitioner's motion to suppress the physical evidence and statements obtained on July 10, 2007. (*Id.*, at 2136.)

### b. Motion To Suppress Historical Cell-Site Information

On February 13, 2009, Petitioner moved before the trial court to suppress all documents and testimony pertaining to the location of cell sites or towers accessed by Petitioner's cell phone, on the grounds that: (1) New York's "pen register" and "trap and trace" statutes did not permit the release of such information; (2) the SCA did not authorize the release of such information; and (3) the acquisition of such evidence without a showing of probable cause violated Petitioner's federal and state constitutional rights. (*Id.*, at 2162-82.) Petitioner further argued that, unless the trial court ruled outright that such evidence should be suppressed, a *Frye* hearing would be required to determine whether evidence regarding the likely location of Petitioner's cell phone at certain points in time should nonetheless be deemed inadmissible. (*Id.*, at 2190-92.) On June 10, 2009, the trial court issued an oral ruling denying Petitioner's motion to suppress and request for a *Frye* hearing (*id.*, at 260-61), and, on July 17, 2009, the court issued a written decision memorializing that ruling (*id.*, at 2195-99). In that decision, the court held that the SCA authorized disclosure of historical cell-site data and that, because Petitioner had no reasonable expectation of privacy

in cell-phone records that were maintained by a third party, his Fourth Amendment rights were not violated by the seizure of such records. (*Id.*, at 2198-99.)

### c. Ruling on Admissibility of Decedent's Hearsay Statements

At a court appearance on June 10, 2009, the trial court ruled on two additional pretrial motions that relate to Petitioner's current habeas claims. (*Id.*, at 258-522.) First, the prosecution sought a ruling confirming the admissibility of certain statements attributed to Prieto by two of his friends, Richard DeLong ("DeLong") and Michael Dillon ("Dillon"), both of whom were expected to testify at trial. (*Id.*, at 295-343.) Through these witnesses, the prosecution planned to offer evidence regarding aspects of Prieto's relationship with Petitioner that each witness had claimed to learn about through conversations with Prieto. Specifically, Prieto had purportedly informed each of these witnesses that he was "having problems" with Petitioner, that Petitioner had stolen his credit cards, that Petitioner had been making several phone calls and unannounced visits to Prieto, and that Prieto was frightened of Petitioner and wanted to end the relationship. (*Id.*, at 297-99, 308-09.)

On June 12, 2009, the trial court ruled that such statements were not inadmissible hearsay because they reflected Prieto's then-existing state of mind and negated any suggestion that Petitioner had permission to use Prieto's credit card and checks or was voluntarily admitted into Prieto's apartment. (*Id.*, at 472-74.) The court further reasoned that this "background information" was "inextricably interwoven" with the narrative of the case and provided the "arguable motivation" for the crime. (*Id.*, at 474-65, 485.)

### d. *Sandoval* Ruling

**\*5** At the June 10, 2009 court appearance, Petitioner also sought an advance *Sandoval* ruling from the court as to whether the prosecution could use evidence of his prior criminal acts for impeachment purposes. (*Id.*, at 370-87.) In particular, the prosecution stated that it intended to ask Petitioner about the facts of his 2003 New Jersey conviction for Endangering the Welfare of a Child in the Third Degree, which had involved his sexual assault of his three-year-old granddaughter. (*Id.*, at 373-74.) The trial court ruled that the prosecution could bring out the fact that Petitioner

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 110 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

had been convicted of Endangering the Welfare of a Child, under circumstances involving inappropriate sexual contact, without inquiring into the specific facts of the case. (*Id.*, at 385-86.) Petitioner requested that the court reconsider the aspect of the *Sandoval* ruling that permitted the elicitation of facts regarding the conviction's sexual character, arguing that the prejudicial impact of such information outweighed its probative value. (*Id.*, at 386-87.) The trial court declined to reconsider, stating that it was "the sexual contact aspect of [the conviction] that really ma[de] it probative" as to Petitioner's credibility, and that the limitation on inquiring about the specific facts underlying the conviction struck the appropriate balance between probative value and prejudicial impact. (*Id.*, at 387.) Petitioner did not testify at trial, and the jury therefore never learned of his prior conviction.

## 2. Trial

Among the witnesses who took the stand at trial were two of Prieto's friends (DeLong and Dillon), Petitioner's "nephew" (Johnson), and a medical examiner who testified as an expert witness. As relevant to Petitioner's habeas claims, the testimony of these witnesses is summarized below.

### a. Testimony of DeLong and Dillon

DeLong testified that he had known Prieto since 1973 (*id.*, at 650), and that Prieto had confided in him regarding his relationship with Petitioner (*id.*, at 650-51). Prieto told DeLong that he had given Petitioner gifts, such as clothing or shoes, and that, on one occasion, he had purchased a car for Petitioner. (*Id.*, at 651.) Later, according to DeLong, Prieto became upset when Petitioner traded in that car for a Mercedes, believing that he could end up being responsible for payments that Petitioner could not afford. (*Id.*, at 652.) DeLong also testified that, on February 23, 2007, he met Prieto for dinner to celebrate Prieto's birthday. (*Id.*) DeLong stated that, despite the celebratory occasion, he had never seen Prieto "so obviously upset." (*Id.*) Prieto informed DeLong that Petitioner had stolen his credit cards and that Prieto was frightened that "there m[ight] be some violence involved." (*Id.*, at 653.) As Prieto was afraid to travel alone to his apartment, DeLong walked him home and waited in the hall until Prieto had "checked the apartment out." (*Id.*) After that meeting, Prieto informed DeLong that he would no longer answer Petitioner's telephone calls or allow Petitioner into his apartment. (*Id.*, at 655.)

Dillon testified that he and Prieto had been friends from 1965 until the time of Prieto's death (*id.*, at 892-93), and that he was aware that Prieto had maintained a romantic relationship with Petitioner from the early to mid-1990s until 2007 (*id.*, at 895). Prieto also told Dillon that he had given Petitioner money and gifts, and that he was unhappy after Petitioner traded in the car that Prieto had purchased for him for a more expensive vehicle. (*Id.*, at 895-96.) In 2007, Prieto expressed to Dillon that he was dissatisfied with his relationship with Petitioner and wanted to end it, because he felt that "his money was being drained." (*Id.*) Dillon testified that, at some point, Prieto informed him that Petitioner had stolen Prieto's credit cards and had attempted to make a purchase at a mall in New Jersey. (*Id.*, at 897.) Prieto also told Dillon that Petitioner had threatened him over the phone, and that he was scared to return to his apartment. (*Id.*, at 898.) Dillon spoke to Prieto on May 13, 2007 (a date close in time to Prieto's death), and testified that he thought he remembered that, during that conversation, Prieto had reiterated that he was afraid of Petitioner. (*Id.*, at 899-900.)

### b. Testimony of Johnson

Johnson testified that, while he was not related to Petitioner by blood, he had known Petitioner for his entire life and considered Petitioner to be his uncle. (*Id.*, at 972.) On May 14, 2007, while Johnson was working as a livery cab driver, Petitioner called to ask Johnson to pick him up. (*Id.*, at 975-76.) After Johnson declined, Petitioner called him several more times, but Johnson ignored his calls. (*Id.*, at 976.) Finally, Johnson answered the phone, learned that Petitioner was in New Jersey, near the entrance to the Lincoln Tunnel, and agreed to pick up Petitioner at that location. (*Id.*, at 976-77.) When Petitioner entered the vehicle, Johnson observed red spots on his shirt, and Petitioner stated that he had been in a fight and broken someone's nose. (*Id.*, at 977-79.) During that encounter, Petitioner gave Johnson several credit cards; Johnson did not remember the names on these cards, but stated that Petitioner told him that the billing address was 145 East 35th Street, New York, New York. (*Id.*, at 979-82, 989-90.)

**\*6** On May 15, 2007, Johnson used the credit cards at a jewelry store. (*Id.*, at 983.) When Johnson returned to the store around one day later, he saw two police officers viewing security camera footage. (*Id.*, at 992.) Later, Johnson's dispatcher called to inform him that "people in suits" were

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 111 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

looking for him at his place of employment. (*Id.*, at 992-93.) When he arrived at home, Johnson's wife informed him that the person whose credit cards Petitioner had given him had been murdered. (*Id.*, at 993.) After that conversation, Johnson "panicked" and "took off for a little while." (*Id.*) Upon returning home, Johnson saw Petitioner standing outside. (*Id.*, at 994.) Johnson asked Petitioner, "What happened? My wife said you killed somebody." (*Id.*) In response, Petitioner said, "Shit happens," and gave Johnson a "dirty look." (*Id.*)

Johnson was arrested in July of 2007, and both he and Petitioner were incarcerated at Rikers Island. (*Id.*, at 1028.) When Johnson and Petitioner were briefly detained in the same bullpen, the two spoke about Prieto's murder. (*Id.*, at 1029.) Johnson testified that Petitioner "told [him] exactly what he did, that he knocked a guy over the head with a fire extinguisher ... [and] used a butter knife to cut his neck." (*Id.*) [8]

[8]    In addition to Johnson, two other witnesses also testified that Petitioner had admitted to the murder. Denise Doherty ("Doherty"), Petitioner's ex-girlfriend, stated that Petitioner told her that he killed a man with a fire extinguisher after going to the home of a friend named "Raul" to rob him. (*Id.* at 1305-07.) Larry Emmons ("Emmons"), who had been charged with drug offenses and testified pursuant to a plea agreement, stated that while he and Petitioner were incarcerated at Rikers Island, Petitioner stated that he had murdered a man by hitting him with a fire extinguisher, suffocating him with a pillow, and – to the best of Emmon's recollection – either strangling him or slitting his throat. (*Id.* at 853-54.)

### c. Testimony of Dr. Peter Lin, Medical Examiner

The prosecution also called Dr. Peter Lin, a medical examiner who was employed by the City of New York and was qualified as an expert in the field of forensic pathology. (*Id.*, at 1370-73.) On May 17, 2007, Dr. Lin performed an autopsy of Prieto (*id.*, at 1376); his testimony at trial addressed his autopsy findings and his expert opinion as to the cause of Prieto's death. Ultimately, Dr. Lin opined that Prieto's death was caused by either blunt force trauma to the head or compression of the neck. (*Id.*, at 1446.) As the sequence of events could not be determined, and both types of injuries were severe enough to cause death, Dr. Lin's autopsy report listed both blunt impacts to the head and compression of the neck as the causes of death. (*Id.*)

With respect to Prieto's head injuries, Dr. Lin stated that the autopsy revealed "extensive" and "innumerable" skull fractures, as well as injuries to the brain. (*Id.* 1382, 1395.) Given the nature of Prieto's blunt-impact injuries, which he described as "non-specific," Dr. Lin opined that Prieto was struck with a "very large amount of force," and that the murder weapon could have been "any object with a flat or rounded surface," including the fire extinguisher recovered from Prieto's apartment. (*Id.*, at 1396-97.)

Dr. Lin also noted a more distinctive, rectangular-shaped laceration, however, on the right side of Prieto's head. (*Id.*, at 1392.) While he noted that it is "very difficult" to match a particular pattern injury on the skin to the particular object that caused that injury, Dr. Lin recounted that he had examined the fire extinguisher and had shown the fire extinguisher to "a number of other medical examiners," in an effort to determine whether the fire extinguisher could have caused the rectangular laceration. (*Id.*, at 1392-93.) Petitioner's counsel objected to that portion of the testimony, and, after the objection was overruled, Dr. Lin testified: "We, basically, came to the conclusion that it's possible that the fire extinguisher caused that pattern laceration, specifically, the handle region of it. But ... it wasn't a perfect match, and there were some assumptions that would have had to have been made for the fire extinguisher to have caused that pattern laceration." (*Id.*, at 1393.) In response to questions from the trial court, Dr. Lin clarified that this was his own conclusion as an expert and that it was not unusual for him to discuss difficult cases with other medical examiners. (*Id.*)

**\*7** At the conclusion of Dr. Lin's direct examination, Petitioner moved for a mistrial, on the ground that the court had permitted the witness to testify as to the medical opinions of certain colleagues whom Petitioner had no opportunity to cross-examine. (*Id.*, at 1399.) The trial court denied the motion for a mistrial, noting that the issue was not critical and that the court's follow-up questions clarified that Dr. Lin was testifying only as to his own opinion. (*Id.*, at 1401.) Moreover, the court offered to issue a curative instruction informing the jury that the witness was only entitled to testify as to his own opinion, and not that of his colleagues. (*Id.*) Petitioner's counsel stated that he was "in no way" withdrawing the objection or his motion for a mistrial (*id.*, at 1402), and he declined the trial court's offer to give a curative instruction (*id.*, at 1447).

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 112 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

### d. Request for Circumstantial-Evidence Charge

At the close of trial, Petitioner requested that the trial court issue a circumstantial-evidence instruction. (*Id.*, at 1880.)[9] The court noted its view that the "confession evidence" constituted the sole direct evidence of Petitioner's guilt, but stated that, in light of that evidence, it was prepared to instruct the jury as to the definitions of direct and circumstantial evidence without giving the full circumstantial-evidence instruction. (*Id.*, at 1882.) Petitioner's counsel objected on the ground that, as Petitioner had not admitted each element of the charged crime, his admission could not be properly characterized as a confession; for this reason, Petitioner's counsel argued that the crime could not be proven based on direct evidence in the record, and the complete circumstantial-evidence instruction should be given. (*See id.*, at 1882.) Ultimately, the judge instructed the jury on reasonable doubt and the difference between circumstantial and direct evidence (*id.*, at 2000-02, 2055-61), but did not give the jury the full circumstantial-evidence charge requested by Petitioner (*id.*, at 2000-02).[10]

[9]    The full circumstantial evidence charge contained in the New York Criminal Jury Instructions defines both direct and circumstantial evidence, giving examples of each. *See* Circumstantial Evidence, New York Criminal Jury Instructions, Second Edition, *available at* http://www.nycourts.gov/judges/cji/1-General/cjigc.shtml. The instruction then explains what is required before the jury can return a verdict of guilty based solely on circumstantial evidence, stating:

> After you have determined what facts, if any, have been proven beyond a reasonable doubt, then you must decide what inferences, if any, can be drawn from those facts. Before you may draw an inference of guilt, however, that inference must be the only one that can fairly and reasonably be drawn from the facts, it must be consistent with the proven facts, and it must flow naturally, reasonably, and logically from them. Again, it must appear that the inference of guilty is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence. If

> there is a reasonable hypothesis from the proven facts consistent with the defendant's innocence, then you must find the defendant not guilty. *Id.*

[10]    The trial court instructed the jury:

> Before you may draw an inference of guilt from circumstantial evidence, you must conclude that the inference flows naturally, reasonably, and logically from the credible evidence, that it is consistent with that evidence, and that it is not produced by strained reasoning or guesswork. Ultimately, in this case, where the People rely on a combination of both [circumstantial and direct evidence], you must carefully analyze all of the evidence and determine whether or not the People have met their burden of proving each of the elements of the crime charged, beyond a reasonable doubt.

(App'x, at 2002.) On appeal, Petitioner argued that this charge, unlike the circumstantial evidence instruction contained in the New York Criminal Jury Instructions, did not include language stating that a jury cannot reach an inference of guilt unless the evidence excludes every reasonable hypothesis of innocence, such that the inference of guilt is the only one that can be fairly drawn from the facts. (*Id.* at 2301.)

### e. Verdict and Sentencing

**\*8**  On July 2, 2009, the jury found Petitioner guilty of Murder in the Second Degree, under N.Y. Penal Law § 125.25(1). (*Id.*, at 2093-95.) Petitioner was sentenced, on July 17, 2009, to the maximum sentence of 25 years to life. (*Id.*, at 2111; *see* N.Y. Penal Law § 70.00.)

### 3. Appeal

Petitioner filed a timely notice of appeal (App'x, at 2212), and, on July 11, 2011, he filed an appellate brief, through counsel, raising six claims: (1) that officers had unlawfully arrested Petitioner in New Jersey, without bringing him before a local judge, in order to subvert his constitutional right to counsel, and that the hearing court therefore should have suppressed the evidence and statements derived from that arrest; (2) that the admission of historical cell-site information, in the absence of statutory authority, a warrant

based on probable cause, or a *Frye* hearing to determine if expert testimony regarding such evidence was reliable, violated Petitioner's rights under the Fourth Amendment, the SCA, and New York state law; (3) that out-of-court statements of the decedent were erroneously admitted, in violation of the hearsay rule and Petitioner's due-process rights, and that out-of-court statements of the medical examiner's colleagues were admitted in violation of the hearsay rule and the Confrontation Clause of the Sixth Amendment; (4) that the trial court abused its discretion in making a *Sandoval* ruling that denied Petitioner's request that any reference to his 2003 conviction for Endangering the Welfare of a Child not contain any reference to sexual contact; (5) that the trial court's failure to give a circumstantial-evidence charge violated Petitioner's right to a fair trial; and (6) that the maximum sentence of 25 years to life was harsh and excessive in light of Petitioner's age and the fact that the homicide was not premeditated. (*Id.*, at 2213-14.)

By decision dated March 8, 2012, the Appellate Division, First Department, unanimously affirmed Petitioner's conviction. (*Id.*, at 2468-69; *People v. Sorrentino*, 93 A.D.3d 450, 939 N.Y.S.2d 452 (1st Dep't 2012).) With respect to Petitioner's claim regarding the statements and evidence seized as a result of his arrest, the appellate court concluded that there was no basis to disturb the hearing court's finding that Petitioner was not under arrest until after he arrived in New York. (App'x, at 2468.) The appellate court further affirmed the hearing court's determination that, even if the New Jersey "Fresh Pursuit" statute had been violated, suppression would not have been required. (*Id.*, at 2469.) In addition, the Appellate Division held that the hearing court had properly denied Petitioner's motion to suppress historical cell-site location data, on the ground that such records were obtained pursuant to a valid court order in compliance with the SCA. (*Id.*) The court further stated that the introduction of such evidence did not violate the state or federal constitutions, and that, "given the People's evidentiary showing, the order was effectively a warrant." (*Id.*)

The Appellate Division also found that the trial court properly exercised its discretion in denying Petitioner's mistrial motion, made by Petitioner after the medical examiner testified regarding the opinions of other forensic examiners who were not present at the trial. (*Id.*) Without specifically indicating whether it was addressing Petitioner's hearsay claim or the Confrontation Clause violation that allegedly arose from the claimed evidentiary error, the appellate court reasoned that the medical examiner's brief reference to his

colleagues' opinions could not have caused any prejudice "given the overwhelming evidence of ... guilt," and that, in any event, the trial court's proposed curative instruction would have been sufficient to remove such prejudice, had Petitioner not declined that remedy and insisted on seeking a mistrial. (*Id.*) The Appellate Division also found that the trial court had "providently exercised its discretion in admitting the decedent's statements to his friends about his deteriorating relationship with [Petitioner], including his intention to terminate the relationship and stay away from [Petitioner]." (*Id.*) While not explicitly distinguishing between Petitioner's hearsay and due-process claims relating to the admission of Preito's statements, the Appellate Division further found that, "in any event, any error [resulting from the introduction of such statements] was harmless." (*Id.*) Finally, the Appellate Division found no basis for reducing Petitioner's sentence, and stated that it had "considered and rejected [Petitioner's] remaining claims." (*Id.*)

**\*9** By letter dated April 6, 2012, Petitioner, through counsel, sought leave to appeal to the New York Court of Appeals. (*Id.*, at 2470-71 (Application for Leave to Appeal, dated Apr. 6, 2012).) He also requested the opportunity to file a supplemental letter that would address the reasons why the Court of Appeals should review his claims, phrasing that request as follows:

> Nicholas Sorrentino respectfully prays for the issuance of a certificate ... granting permission to appeal and certifying that there is a question of law in the above-entitled case which ought to be reviewed by the Court of Appeals.....

> .... Mr. Sorrentino respectfully requests the opportunity to file a supplemental letter with the Judge to whom this matter is assigned, addressing in greater detail the reasons why the Court should review his case and how the issues are preserved for this Court's review.

> Copies of the Appellate Division's order and the briefs submitted below are enclosed.

(*Id.*, at 2470.)

On May 2, 2012, Petitioner proceeded to file a supplemental letter, in which he explicitly requested that the Court of Appeals review five out of the six claims that he had raised before the Appellate Division; the letter did not address Petitioner's claim that his sentence was excessive. (*Id.*, at 2472-81 (Letter Supplementing Application for Leave to Appeal, dated May 2, 2012).) On July 10, 2012, the Court of

2016 WL 11482062

Appeals denied Petitioner's application for leave to appeal. (*Id.*, at 2493; *People v. Sorrentino,* 19 N.Y.3d 977, 950 N.Y.S.2d 360, 973 N.E.2d 770 (2012).)

### 4. Federal Habeas Corpus Petition

On October 3, 2012, proceeding *pro se*, Petitioner commenced this action for habeas corpus relief by filing a petition under 28 U.S.C. § 2254.[11] (*See generally* Pet.) In the Petition, Petitioner appears to raise the same six grounds for relief that he argued in his brief on direct appeal.[12]

[11] Under the so-called "prison mailbox rule," *see Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245, (1988), a *pro se* prisoner's habeas petition is deemed filed on the date he gives it to prison officials for delivery to the Court, *see Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir. 2001), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197, 151 L.Ed.2d 139. Here, the affidavit of service that Petitioner included with the Petition states that the Petition was "submitted" and "served" on October 3, 2012 (*see id.*, at 48), and thus the Court will consider that to have been its filing date.

[12] As Petitioner is proceeding *pro se,* this Court construes the Petition to raise the strongest grounds for habeas relief that it suggests. *See Bell v. Ercole,* 631 F.Supp.2d 406, 413 (S.D.N.Y. 2009) (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir. 1999) ).

On April 3, 2013, Respondent filed an answer and memorandum of law in opposition to the Petition. (Resp. Answer and Mem.) On April 4, 2013, Respondent filed an Appendix that contained the relevant state court record. (Dkt. 13 (docket notation reflecting Court's receipt of Appendix).)[13] On July 18, 2013, Petitioner filed an affidavit and memorandum of law in reply to Respondent's opposition. (Affidavit in Reply to Respondent's Opposition to Writ of Habeas Corpus, dated July 8, 2013 (Dkt. 14).)

[13] *See supra*, at n.3.

### DISCUSSION

### I. APPLICABLE LEGAL STANDARDS

### A. Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petition must be filed within a one-year limitations period beginning on the latest of four dates, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A); *see also Williams v. Artuz,* 237 F.3d 147, 150-51 (2d Cir. 2001) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via certiorari").[14] The limitations period is tolled for "the time during which a properly filed application for State post-conviction or other collateral review" is pending. 28 U.S.C. § 2244(d)(2).

[14] The limitations period may alternatively begin to run on the following dates: (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence. *See* 28 U.S.C. § 2244(d)(1)(B)-(D).

### B. Exhaustion of State Judicial Remedies

**\*10** A federal court generally may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *see Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir. 1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his or her federal claims to the state courts, thereby affording those courts the "initial opportunity to pass upon and correct alleged violations of [the petitioner's] federal rights." *Picard,* 404 U.S. at 275, 92 S.Ct. 509 (internal quotation marks and citation omitted).

The petitioner must also have presented those claims to "the highest court of the pertinent state." *Larocco v. Senkowski,* 65 F. App'x 740, 742 (2d Cir. 2003) (summary order) (internal quotation marks and citations omitted); *Bossett v. Walker,* 41

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 115 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). To accomplish this in New York, on direct appeal, a petitioner must first appeal his or her conviction to the Appellate Division and then "seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). A federal habeas court will find the exhaustion requirement to be satisfied with respect to a particular claim where the "fair import" of the "total application" to the Court of Appeals suggests a request for review of that claim. *Id.* at 75-76.

The submission of appellate briefs along with a letter requesting leave to appeal is sufficient to exhaust all of the claims that were fairly presented to the Appellate Division. *Id.* at 76 (citing *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) ). By contrast, if a petitioner's application for leave to appeal argues some of the issues that were contained in his or her appellate brief, but ignores other claims that were before the Appellate Division, the claims that are not identified in the application for leave to appeal are deemed to have been abandoned, and thus not presented to the Court of Appeals. *Id.* at 74-75; *Grey*, 933 F.2d at 120 ("The fair import of petitioner's submission to the Court of Appeals, consisting of his brief to the Appellate Division that raised three claims and a letter to the Court of Appeals arguing only one of them, was that the other two had been abandoned."). This is the case even where an application that argues some claims at length attaches an appellate brief containing additional claims, but does not expressly alert the Court of Appeals that review of those additional claims is being sought. *See Batts v. Artuz*, 254 F. App'x 855, 856 (2d Cir. 2007) (citing *Jordan v. Lefevre*, 206 F.3d 196, 198-99 (2d Cir. 2000), and stating, "[I]n [*Jordan*], we held that a habeas petitioner had procedurally defaulted those claims contained in his Appellate Division briefs but omitted in his letter to the New York Court of Appeals by stating, in that letter, nothing beyond his request for leave to appeal '[f]or all of these reasons and the reasons set forth in his Appellate Division briefs.' Here, Batts did even less by attaching his briefs, making no reference at all to them, and discussing only one unrelated claim.").

## C. Standard of Review Under AEDPA

If a petitioner's federal constitutional claim has been adjudicated on the merits by the state court, then the federal court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA. *See* 28 U.S.C. § 2254(d); *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits"

means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that

> **\*11** [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under AEDPA, a state court's decision is contrary to clearly established federal law where the state court either applies a rule that contradicts governing law set forth in Supreme Court precedent, or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). An unreasonable application of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to a "set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The state court's decision "must have been more than incorrect or erroneous"; rather, "[t]he state court's application must have been 'objectively unreasonable.' " *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Williams*, 529 U.S. at 409, 120 S.Ct. 1495). In order to be entitled to habeas relief, the petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 116 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786-87, 178 L.Ed.2d 624 (2011).

In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## II. THE PETITION SHOULD BE DISMISSED.

As a threshold matter, this Court finds that the Petition was timely filed. On July 10, 2012, the New York Court of Appeals denied Petitioner's request for leave to appeal from the Appellate Division's affirmance of his conviction. *See People v. Sorrentino*, 19 N.Y.3d 977, 950 N.Y.S.2d 360, 973 N.E.2d 770 (2012). Accordingly, his conviction became final for AEDPA purposes 90 days later, on October 8, 2012. *See Williams*, 237 F.3d at 150; *see also Epps v. Poole*, 687 F.3d 46, 49 (2d Cir. 2012) (noting 90-day period for filing petition for writ of certiorari). As the Petition was filed just four days later, on October 12, 2012, the Petition is timely. Nevertheless, for the reasons set forth below, I recommend the dismissal of each of Petitioner's habeas claims.

### A. Ground One: Admission of Evidence and Statements Obtained Pursuant to July 10, 2007 Arrest

In his first stated ground for habeas relief, Petitioner alleges that NYPD detectives violated his rights when they arrested him in New Jersey and then transported him to New York, without first bringing him before a local judge, as required by New Jersey's "Fresh Pursuit" statute. (Pet., at 7-12; *see N.J. Stat. § 2A:155-5.)* Petitioner states that the NYPD officers intentionally violated that statute, in order "to subvert his constitutional right to counsel" (which would have been triggered by the judicial proceeding), and that the trial court erred when it denied his motion to suppress all evidence seized and statements made during this arrest. (Pet., at 7.) On appeal, Petitioner also argued that the denial of his motion to suppress violated his 14th Amendment right to a fair trial. Although the Petition does not specifically identify which constitutional right is now being invoked in connection with this habeas claim, Petitioner's challenge to the admission of evidence obtained during his allegedly unlawful arrest does not provide a basis for habeas relief, regardless of whether his claim is grounded in the Fourth Amendment's protection against unlawful arrest, the Sixth Amendment's guarantee of counsel, or the 14th Amendment's due-process protections.

Nor can a claimed violation of state law provide a basis for such relief.

### 1. Claims for Violations of the Fourth and 14th Amendments

**\*12** On direct appeal, Petitioner specifically invoked his Sixth Amendment right to counsel and 14th Amendment right to a fair trial in arguing that the evidence seized pursuant to his allegedly unlawful arrest should have been suppressed. (App'x, at 2260-64.) Petitioner did not, however, contend that the admission of such evidence violated his rights under the Fourth Amendment. Thus, to the extent that his *pro se* Petition can be construed to assert such a claim, *see Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) (holding that the Fourth Amendment governs both arrest and actions taken for some period following initial act of physical restraint), that claim is procedurally barred, as Petitioner did not exhaust the claim in state court and no longer has any means to do so. *See, e.g., Grey*, 933 F.2d at 120-21; *see also N.Y. Crim. Proc. Law § 440.10(2)(c)* (barring collateral review of claims that could have been raised on direct appeal); *People ex rel. Flemming v. Rock*, 110 A.D.3d 533, 972 N.Y.S.2d 901, 901 (1st Dep't 2013) (state writ of habeas corpus unavailable where claim could have been raised on direct appeal (citations omitted) ). Moreover, for the reasons set forth below, any Fourth Amendment claim that Petitioner may be asserting would be meritless, and Petitioner therefore cannot show any prejudice arising from the procedural default. *See McDowell v. Heath*, No. 09 Civ. 7887 (RO) (MHD), 2013 WL 2896992, at \*25 (S.D.N.Y. June 13, 2013) ("Petitioner also cannot establish actual prejudice [as would be necessary to overcome a procedural default] because this ... claim has no merit."); *Grullon v. United States*, No. 04 Civ. 7144 (SAS), 2006 WL 559668, at \*7 (S.D.N.Y. Mar. 8, 2006) ("[Petitioner] has not shown any prejudice because he has failed to demonstrate that his [claim] would succeed on the merits.").

In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court held that, where a state "has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. 3037. Under *Powell*, a state petitioner may obtain federal habeas review of a Fourth Amendment claim only if: (1) the state provides no corrective procedures to redress Fourth Amendment

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 117 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)
2016 WL 11482062

violations; or (2) the petitioner was precluded from utilizing such corrective procedures by an "unconscionable breakdown in that process." *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977). Further, to the extent that Petitioner claims that the denial of the suppression motion violated his 14th Amendment right to a fair trial, rather than his rights under the Fourth Amendment (*see* App'x, at 2264 (raising 14th Amendment claim in Petitioner's appellate brief) ), such claims are still foreclosed under the rule set out in *Powell, see Young v. Graham*, No. 6:11-CV-6481 (MAT), 2012 WL 2789707, at *3 (W.D.N.Y. July 9, 2012) ("Although Petitioner has couched his claim in terms of a fair trial violation and a denial of equal protection, it essentially raises a Fourth Amendment issue which is barred from habeas review unless the state denied Petitioner a full and fair opportunity to litigate that claim.").

Here, Petitioner sought suppression of the evidence obtained through his allegedly unlawful arrest through pretrial suppression proceedings (App'x, at 1-254, 2113-26), and on appeal (*id.*, at 2254-64). While Petitioner did not base his challenge to the introduction of such evidence on the Fourth Amendment, the combined *Mapp/Dunaway/Huntley/Wade* hearing clearly presented him with a full and fair opportunity to raise any such claim. *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure) ... the claim will never present a valid basis for federal habeas relief."); *Capellan v. Riley*, 975 F.2d 67, 70 n.1 (2d Cir. 1992) ("[T]he federal courts have approved New York's procedure for litigating Fourth Amendment claims ... as being facially adequate." (internal quotation marks and citation omitted) ). Furthermore, the Petition contains no facts suggesting that an unconscionable breakdown in the suppression proceedings denied Petitioner a full and fair opportunity to litigate any Fourth or 14th Amendment violations arising from the allegedly unlawful arrest or the subsequent admission of physical evidence and statements. Thus, Petitioner may not obtain habeas relief based on the trial court's failure to exclude such evidence.

## 2. Claims for Violations of New Jersey "Fresh Pursuit" Statute and the Sixth Amendment Right to Counsel

**\*13** As "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," it is well-settled that "federal habeas corpus relief does not

lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) ). For this reason, even if the NYPD officers who arrested Plaintiff did violate New Jersey law by transporting him to New York without first bringing him before a local judge, the fact of the state-law violation would not constitute grounds for habeas relief. *See Vasquez v. Walker*, No. 01 Civ. 8032 (AKH), 2004 WL 594646, at *4 (S.D.N.Y. Mar. 2004) ("Violations of state statutory rights are not reviewable by federal habeas courts.").

Furthermore, Petitioner's argument that detectives intentionally violated New Jersey law in order to circumvent his Sixth Amendment right to counsel cannot transform this state-law issue into a federal constitutional question. *See Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002) ("[N]ot every error of state law can be transmogrified by artful argumentation into a constitutional violation." (internal quotation marks and citation omitted) ). In *McCray v. Ercole*, No. 07 Civ. 6589 (DAB) (GAY), 2010 WL 6804661 (S.D.N.Y. Dec. 16, 2010), *adopted by* 2011 WL 2496232 (S.D.N.Y. June 22, 2011), a habeas petitioner made a nearly identical argument, contending that police officers intentionally violated a state extradition statute, so as to delay the attachment of his Sixth Amendment right to counsel until after the initiation of police questioning, when they failed to present him before a local judge immediately upon his arrest. *Id.* at *2-3. The court found that a federal habeas petition was not the appropriate vehicle to raise such issues, because any Sixth Amendment claim would be "inextricably tied" to the requirements of the state extradition statute. *Id.* at *3.

The reasoning of *McCray* is persuasive. To conduct an inquiry into whether NYPD officers intentionally subverted Petitioner's Sixth Amendment rights by ignoring New Jersey's "Fresh Pursuit" statute, this Court would necessarily have to reexamine the New York state courts' determination that the officers did not avoid the requirements of that state statute. (App'x, at 2135, 2468.) "This is precisely the type of inquiry that is outside the province of federal habeas review." *McCray*, 2010 WL 6804661, at *3 (citing *McGuire*, 502 U.S. at 68, 112 S.Ct. 475). In any case, the hearing court's finding that Petitioner was not in custody until after he arrived in New York must be presumed correct under AEDPA, and Petitioner has not offered clear and convincing evidence showing that this factual determination was erroneous. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 324, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("Factual

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 118 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)
2016 WL 11482062

determinations by state courts are presumed correct absent clear and convincing evidence to the contrary.").

For these reasons, Petitioner's argument that he was unlawfully arrested in New Jersey and transported to New York for the purpose of subverting his right to counsel does not provide a basis for granting habeas relief. Accordingly, I recommend that Petitioner's first habeas claim be dismissed in its entirety.

### B. **Ground Two: Admission of Historical Cell-Site Location Data**

Petitioner's second ground for habeas relief is that the trial court should have suppressed evidence and expert testimony regarding the location of cell sites accessed by Petitioner's cell phone on certain dates in May 2007. (Pet., at 14-22.) Petitioner argues that such evidence was obtained: (1) in violation of his constitutional rights under the Fourth Amendment; and (2) without statutory authority under either state or federal law. (*Id.*, at 14.) In addition, Petitioner states that the trial court further erred when it admitted such evidence without first conducting a *Frye* hearing. (*Id.*, at 15.)

### 1. **Fourth Amendment Claim**

 **\*14** First, as set forth above, the admission of evidence seized in violation of the Fourth Amendment does not provide a ground for habeas relief, as long as the petitioner was afforded a full and fair opportunity to litigate any Fourth Amendment claims in the state courts. *See Stone,* 428 U.S. at 494, 96 S.Ct. 3037. In this case, Petitioner raised his claims regarding the cell-site evidence in a pretrial motion to suppress (App'x, at 2162-99), and on direct appeal (*id.*, at 2265-80), and the Petition contains no facts suggesting that this process did not provide Petitioner with a full and fair opportunity to litigate the Fourth Amendment issue. Thus, to the extent that Petitioner's challenge to the admission of historical cell-site information is grounded in the Fourth Amendment, he cannot obtain habeas relief on this basis.

### 2. **Claims for Statutory Violations**

Petitioner argues that the release of cell-site location information was not authorized under the SCA because use of this data rendered his cell phone a "tracking device."[15] (Pet., at 18-19; 18 U.S.C. § 2510(12)(C) (excluding

communications by a tracking device from coverage under the SCA).) Where a habeas claim is premised on a federal statute, rather than the Constitution, relief is available only if the alleged violation is "a fundamental defect which inherently results in a complete miscarriage of justice." *Reed v. Farley,* 512 U.S. 339, 354, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994) (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962) ); *see also Medellin v. Dretke,* 544 U.S. 660, 664, 125 S.Ct. 2088, 161 L.Ed.2d 982 (2005) (noting that a violation of federal statutory rights is not cognizable in a postconviction proceeding unless the "fundamental defect" test is satisfied). Furthermore, as the New York courts resolved Petitioner's SCA claims on the merits (App'x, at 2195-99, 2469), AEDPA's deferential standard of review applies to this Court's review of their decisions with respect to such claims, *see* 28 U.S.C. § 2254(d). Thus, to obtain habeas relief on this claim, Petitioner must demonstrate both: (1) that the alleged SCA violation was a "fundamental defect," and (2) that New York courts' adjudication of Petitioner's challenge to the admission of historical cell-site information was contrary to, or an unreasonable application of, Supreme Court precedent regarding the interpretation of the SCA. *See Medellin,* 544 U.S. at 664-65, 125 S.Ct. 2088 (stating that habeas petitioner seeking relief for nonconstitutional violation must meet fundamental defect test and also overcome deferential standard of review under AEDPA).

15      To the extent that Petitioner also bases his challenge on the New York state "pen register" or "trap and trace" statutes, his claim is not cognizable on federal habeas review. *See McGuire,* 502 U.S. at 67, 112 S.Ct. 475 ("[F]ederal habeas corpus relief does not lie for errors of state law.").

As Petitioner cannot satisfy either of these requirements, his claim that the historical cell-site location data was obtained in violation of the SCA, and thus should have been suppressed, must be dismissed. First, the SCA explicitly provides that a person aggrieved by a violation of the statute may bring a civil action for certain appropriate relief and that these remedies are the exclusive "judicial remedies and sanctions for nonconstitutional violations" of the SCA. 18 U.S.C. §§ 2707-08. For this reason, suppression of evidence is not an available remedy for an SCA violation. *See United States v. Smith,* 155 F.3d 1051, 1056 (9th Cir. 1998) ("[T]he Stored Communications Act expressly rules out exclusion as a remedy."); *United States v. Ferguson,* 508 F.Supp.2d 7, 10 (D.D.C. 2007) ("Even if Defendant was correct that the Government did not comply with the SCA, the statute

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 119 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

does not provide for a suppression remedy."). In light of this, it would be difficult for the Court to conclude that a violation of the SCA (assuming a violation occurred) could have amounted to a fundamental defect, such that the admission of historical cell-site information at trial resulted in a complete miscarriage of justice. *Reed*, 512 U.S. at 354, 114 S.Ct. 2291. Second, Petitioner points to no Supreme Court precedent establishing that a cell phone is a tracking device or that 18 U.S.C. § 2703(d) does not authorize the release of historical cell-site data. *See Wearing v. Lavalley*, No. 10-CV-8307 (JPO), 2015 WL 6738327, at *25 (S.D.N.Y. Nov. 4, 2015) (noting lack of controlling authority on the question of whether the SCA "authorize[s] the issuance of an order requiring the disclosure of historical cell site information."). Absent such authority, Petitioner cannot meet the AEDPA standard for habeas relief, *see* 28 U.S.C. § 2254(d), based on any claimed violation of the SCA.

### 3. Claim Based on State Evidentiary Ruling

**\*15** Petitioner's claim that the trial court should have held a *Frye* hearing before admitting evidence regarding historical cell-site information also does not provide a basis for federal habeas relief. The purpose of a *Frye* hearing is only to determine whether expert testimony and evidence has gained general acceptance in the scientific community and is therefore admissible under New York law. *See Perez v. Graham*, No. 13 Civ. 1428 (WHP) (GWG), 2014 WL 523409, at *9 (S.D.N.Y. Feb. 5, 2014), *report and recommendation adopted by* 2014 WL 805958 (S.D.N.Y. Feb. 28, 2014). This is a state evidentiary matter wholly separate from the question of whether the admission of such evidence violates the federal Constitution. *Id.* In general, mere errors of state evidentiary law are not cognizable on habeas review. *See* 28 U.S.C. § 2254(a); *see also McGuire*, 502 U.S. at 68, 112 S.Ct. 475 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." (citations omitted) ); *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) ("[S]tate trial court evidentiary rulings generally are not a basis for habeas relief.").

For his claim to be cognizable in this habeas proceeding, Petitioner would have to demonstrate not only that the trial court's decision to admit historical cell-site data without conducting a *Frye* hearing was erroneous, but also that this error violated an identifiable constitutional right and deprived him of a "fundamentally fair trial." *See Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) ); *Velazquez v. Fischer*, 524 F.Supp.2d 443, 450 (S.D.N.Y. 2007). In so doing, Petitioner would "bear[ ] a heavy burden because evidentiary errors generally do not rise to constitutional magnitude." *Copes v. Schriver*, No. 97 Civ. 2284 (JGK), 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997) (citation omitted).

In this instance, Petitioner does not identify in the Petition (Pet., at 20) – and similarly did not identify in his state appellate brief (App'x, at 2280-82) – any federal constitutional right that was violated by the trial court's failure to conduct a *Frye* hearing. Rather, Petitioner has consistently framed this argument in state-law terms alone. For this reason, any federal due-process claim that Petitioner may now be seeking to raise regarding the denial of a *Frye* hearing must be considered unexhausted and procedurally barred, *see Romero v. Rock*, No. 08 Civ. 7791 (PAC) (FM), 2011 WL 1467238, at *6 (S.D.N.Y. Apr. 18, 2011) (finding that evidentiary claims were record-based, and thus procedurally barred where they were not raised on appeal), and the Petition provides no facts suggesting cause for the lack of exhaustion or prejudice sufficient to overcome the procedural bar, *see Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (holding that habeas review of a procedurally defaulted claim is barred unless the petitioner can show cause for the default and actual prejudice arising from the alleged federal violation). In any event, as Petitioner has not even attempted to demonstrate that the denial of a *Frye* hearing was an error of constitutional magnitude, Petitioner has not shown that this alleged state-law error gives rise to a claim that is cognizable on federal habeas review.

For all of these reasons, Petitioner's second claim for habeas relief, relating to the state court's admission of historical cell-site location data, should be dismissed in its entirety.

### C. Ground Three: Admission of Hearsay Statements

Petitioner's third habeas claim is that two categories of statements made by out-of-court declarants were erroneously admitted into evidence. First, Petitioner states that, by permitting Prieto's friends, DeLong and Dillon, to testify regarding statements purportedly made by Prieto before his death, the trial violated the hearsay rule; liberally construed, the Petition may also be read to assert that this error constituted a violation of Petitioner's constitutional due-process rights. [16] (*See* Pet., at 26-31.) Second, Petitioner argues that, by permitting the medical examiner, Dr. Lin,

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 120 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

to testify improperly about the medical opinions of his colleagues, the trial court again violated the hearsay rule, as well as Petitioner's rights under the Confrontation Clause of the Sixth Amendment. (*Id.*, at 23-26.)

16 Although the Petition does not specifically assert that the introduction of hearsay statements made by Prieto violated Petitioner's 14th Amendment right to a fair trial, Petitioner raised that argument on direct appeal (App'x, at 2283), and, in light of Petitioner's *pro se* status and his reference to his appellate arguments, this Court construes the Petition to raise the identical claim here.

### 1. **Statements of Decedent**

**\*16** As discussed above, errors of state evidentiary law are not cognizable on habeas review, *see* 28 U.S.C. § 2254(a); *McGuire*, 502 U.S. at 68, 112 S.Ct. 475, and thus erroneously admitted hearsay statements cannot provide a basis for federal habeas relief unless the evidentiary error so undermined the fairness of the trial as to violate the petitioner's constitutional right to due process, *see Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (noting that erroneous evidentiary ruling would not rise to the level of constitutional error unless it deprived the petitioner of a fundamentally fair trial (citing *Chambers v. Mississippi*, 410 U.S. 284, 302-03, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ) ); *see also Smith v. Conway*, No. 06 Civ. 7674 (RMB) (KNF), 2008 WL 780635 at \*8-11, 2007 U.S. Dist. LEXIS 89579 at \*18-19 (S.D.N.Y. Dec. 6, 2007) (noting that, even if the trial court erroneously allowed hearsay evidence, the "evidentiary ruling ... may provide a basis for habeas corpus relief only if [Petitioner] establishes that it so infused the trial with unfairness as to deny due process of law" (internal quotation marks and citation omitted) ), *report and recommendation adopted by* 2008 WL 780635, 2008 U.S. Dist. LEXIS 22750 (S.D.N.Y. Mar. 24, 2008).

In order to demonstrate that the trial court's admission of supposed hearsay rendered his trial constitutionally infirm, a petitioner must be able to show that the ruling not only constituted error, but also that the erroneously admitted evidence "was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Smith v. Grenier*, 117 F. App'x 779, 781 (2d Cir. 2004) (quoting *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985) ). Accordingly, in determining whether the introduction of a particular hearsay statement

violated a petitioner's constitutional right to due process, a habeas court must conduct a two-part analysis that inquires: (1) whether the trial court's evidentiary ruling was erroneous under state law, and (2) whether the error deprived the petitioner of the constitutional right to a fundamentally fair trial. *Kotler v. Woods*, 620 F.Supp.2d 366, 392 (E.D.N.Y. 2009); *Nowlin v. Greene*, 467 F.Supp.2d 375, 380 (S.D.N.Y. 2006).

In this case, Petitioner argued on his direct appeal – both in his brief to the Appellate Division and in his letter seeking leave to appeal to the New York Court of Appeals – that his 14th Amendment due-process rights were violated by the trial court's admission of testimony by which witnesses purported to recount statements made by Prieto before his death. To the extent Petitioner seeks to raise that constitutional claim here, it is thus exhausted, and, as it was rejected by the Appellate Division on the merits (*see* App'x, at 2469), [17] this Court must consider the claim under AEDPA's deferential standard. On the record presented, Petitioner cannot meet that standard, as, at bottom, even if the trial court's admission of the challenged statements made by Prieto constituted evidentiary error, the court's ruling cannot be said to have deprived Petitioner of a fundamentally fair trial.

17 As noted above (*see* Background, *supra*, at Section B(3) ), the Appellate Division did not make explicit whether it was addressing Petitioner's state-law evidentiary claim or his federal due-process claim in determining that "any error" with respect to the trial court's admission of this evidence "was harmless" (App'x, at 2469). Yet, even if this aspect of the court's decision related only to Petitioner's state-law claim, the appellate court must still be said to have rejected Petitioner's related, federal claim on the merits, given its further statement that it had "considered and rejected" Petitioner's remaining claims. (*Id.*; *see Jones v. Cuomo*, 254 F. App'x 6, 7 (2d Cir. 2007) ("As there is no basis ... for believing that the claim at issue was denied on procedural or any other nonsubstantive grounds, the Appellate Division's terse statement that [the petitioner's] arguments had been 'considered and rejected' suffices to trigger AEDPA deference." (internal quotation marks and citations omitted) ); *Ancrum v. Fischer*, No. 02 Civ. 2568 (LAP) (DF), 2003 WL 21976397, at \*2 (S.D.N.Y. Aug. 19, 2003) ("Courts in this district have subsequently found that the phrase

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 121 of 172
Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)
2016 WL 11482062

'considered and rejected' and similar phrases are sufficient to trigger the AEDPA's deferential standard of review.").)

**\*17** While the statements in question may arguably have identified the motive for Prieto's murder, they were not so material as to provide the basis for conviction or remove a reasonable doubt that would otherwise have existed. Indeed, the prosecution presented a substantial amount of strong evidence, including DNA evidence showing that Petitioner's DNA was present on the presumed murder weapon (App'x, at 1814-16), historical cell-site information demonstrating that Petitioner was in the vicinity of Prieto's apartment on the date of the murder (*id.*, at 1132-48, 1202-1223, 1568-72), Petitioner's possession of credit cards and checks that had belonged to Prieto (*id.*, at 979-82, 1024-25), false exculpatory statements that Petitioner made to NYPD detectives during questioning (*id.*, at 109-12), and the testimony of three witnesses – Johnson, Doherty, and Emmons – who all maintain that Petitioner admitted to killing Prieto (*id.*, at 853-54, 1028-29, 1305-07; *see also supra*, at n.8). In light of the overwhelming evidence of Petitioner's guilt, any evidentiary error that did result from the introduction of Prieto's hearsay statements did not deprive Petitioner of a fair trial.

Accordingly, Petitioner has not presented a cognizable federal claim based on the asserted evidentiary error. *See, e.g., Brown v. Breslin*, Nos. 02-CV-6044 (JBW), 03-MISC-0066 (JBW), 2003 WL 22952841 at \*6-7, 2003 U.S. Dist. LEXIS 22468 at \*19 (E.D.N.Y. Nov. 26, 2003) (habeas relief, sought on the ground that trial court made an evidentiary error, was denied where evidence of Petitioner's guilt was strong and evidentiary error did not have a substantial and injurious effect on the trial) (internal quotation marks and citation omitted). Certainly, in light of the strength of the other evidence presented by the prosecution at trial, there is no basis for this Court to conclude that the Appellate Division's rejection of Petitioner's asserted due-process claim was contrary to, or an unreasonable application of, established federal law. *See* 28 U.S.C. § 2254(d).

## 2. Statements of Medical Examiner

Under the Confrontation Clause of the Sixth Amendment, a criminal defendant has "the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. The Supreme Court has held that the Confrontation Clause is violated when an out-of-court declarant's testimonial statement is admitted against a criminal defendant, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Thus, admission of testimonial statements regarding the results of forensic analysis is not permitted in a criminal trial, unless the defendant has the opportunity to confront the individual whose analysis or conclusions are offered into evidence. *See Bullcoming v. New Mexico*, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).

Even when the Confrontation Clause has been violated, however, a writ of habeas corpus must not issue if the error was harmless. *See Bowen v. Phillips*, 572 F.Supp.2d 412, 419 (S.D.N.Y. 2008) (citing *Fuller v. Gorczyk*, 273 F.3d 212, 220 (2d Cir. 2001); *Mingo v. Artuz*, 174 F.3d 73, 78 (2d Cir. 1999) ). In a habeas proceeding, a federal court must assess the prejudicial impact of a constitutional error under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which provides that "an error is harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict,' " *Fry v. Pliler*, 551 U.S. 112, 116, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (quoting *Brecht*, 507 U.S. at 631, 113 S.Ct. 1710). The factors to be considered in harmless-error analysis include: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *See Brinson v. Walker*, 547 F.3d 387, 395 (2d Cir. 2008) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ). Of these factors, the overall strength of the prosecution's case is "probably the single most critical factor." *Perkins v. Herbert*, 596 F.3d 161, 177 (2d Cir. 2010) (quoting *United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006) ). Accordingly, in the habeas context, "[f]ederal courts commonly hold alleged Confrontation Clause violations to be harmless error when the evidence against the petitioner at trial was substantial and/or the improperly admitted testimony was cumulative of other admissible evidence." *Bowen*, 572 F.Supp.2d at 419 (citing *Ruiz v. Kuhlmann*, 80 F. App'x 690, 694 (2d Cir. 2003) ); *see also Perkins*, 596 F.3d at 177-78 (holding that petitioner did not suffer prejudice where erroneously admitted evidence was cumulative of properly admitted evidence and remaining evidence of guilt was strong).

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 122 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

**\*18**  In this instance, Petitioner claims that, by permitting Dr. Lin to testify regarding the opinions of other medical examiners, who were not available for cross-examination, the trial court violated Petitioner's Confrontation Clause rights. Petitioner exhausted this claim on his direct appeal (*see* App'x at 2283-88, 2479), and the Appellate Division denied the claim on the merits (*see* Background, *supra*, at Section B(3) ), finding, *inter alia*, that Petitioner had failed to demonstrate that the claimed error had caused him prejudice (*see* App'x, at 2469). This determination by the state court was neither contrary to, nor represented an unreasonable application of federal law, 28 U.S.C. § 2254(d), given that, even if Petitioner is correct that there was a Confrontation Clause violation here under *Crawford*, an evaluation of the relevant factors compels the conclusion that such a violation did not have a substantial and injurious effect on the jury's verdict, and was therefore harmless, *Brecht*, 507 U.S. at 623, 113 S.Ct. 1710.

As noted by the Appellate Division, "the offending testimony consisted, essentially, of a single use of the word 'We' instead of 'I.' " (App'x, at 2469; *Sorrentino*, 939 N.Y.S.2d at 454.) To the extent that the use of the plural pronoun buttressed the strength of Dr. Lin's own opinion by showing that he shared that opinion with his non-witness colleagues, the trial court attempted to limit any impermissible inferences by clarifying that Dr. Lin was testifying to his own expert conclusions and offering to give a curative instruction, which Petitioner declined. (App'x, at 1447.) While cross-examination of Dr. Lin's colleagues was impossible, Petitioner was otherwise able to question Dr. Lin regarding the strength and supportability of his own expert opinion. Moreover, regardless of whether it was impermissibly buttressed, Dr. Lin's testimony that the handle of the fire extinguisher could potentially have made a particular rectangular laceration was of little importance to the prosecution's case. Indeed, there was overwhelming evidence that the fire extinguisher was, in fact, the murder weapon: there was a stain on it that included blood and a mixture of DNA from both Petitioner and Prieto (*id.*, at 1829-30); Dr. Lin testified that any of its round or flat surfaces could have caused Prieto's brain injuries and "innumerable" skull fractures (*id.*, at 1397); and three witnesses testified that Petitioner had actually admitted that he used a fire extinguisher to kill Prieto (*id.*, at 853-54, 1028-29, 1305-07). The question of whether the fire extinguisher *also* caused a particular patterned laceration, or whether a second weapon was used in addition to the fire extinguisher, was of minimal importance. This is particularly true in light of the other

strong evidence of Petitioner's guilt. (*See* Discussion, *supra*, at Section II(C)(1).)[18]

[18]     To the extent that Petitioner also claims that the introduction of hearsay statements made by the other medical examiners violated his due-process right to a fair trial, the strength of the prosecution's evidence further demonstrates that the hearsay statements were not "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Smith*, 117 F. App'x at 781.

For these reasons, any constitutional claim arising from the trial court's admission of Dr. Lin's testimony cannot succeed, and, accordingly, I recommend that Petitioner's third habeas claim be dismissed in its entirety.

### D. Ground Four: *Sandoval* Ruling

For his fourth habeas claim, Petitioner asserts that the trial court abused its discretion when it ruled that, if Petitioner took the stand, the prosecution could elicit testimony from him that he had a prior conviction for Endangering the Welfare of a Child, and that this prior crime had involved sexual conduct. (Pet., at 33-37.) On direct appeal, Petitioner argued that this *Sandoval* ruling violated his 14th Amendment right to a fair trial (App'x, at 2300), and this Court liberally construes the Petition to raise the same constitutional claim. Even if exhausted, however, the claim cannot succeed in this Court, as Petitioner's decision not to testify at trial effectively bars the claim from habeas review.

**\*19**  The "admission of prior convictions for the purpose of impeaching the defendant has been characterized as evidentiary in nature," and an erroneous *Sandoval* ruling therefore is "not redressable in a federal habeas corpus proceeding absent a showing that the particular errors were of constitutional magnitude." *Blackman v. Ercole*, No. 06 Civ. 855 (SLT) (SMG), 2009 WL 4891767, at \*7 (E.D.N.Y. Dec. 17, 2009) (quoting *Jenkins v. Bara*, 663 F.Supp. 891, 899 (E.D.N.Y. 1987) ); *Peterson v. Greene*, Nos. 06 Civ. 41 (GEL), 06 Civ. 811 (GEL), 2008 WL 2464273, at \*5 (S.D.N.Y. June 18, 2008) (noting that a *Sandoval* ruling is "primarily a matter of state evidence law"). Not only has Petitioner failed to cite any Supreme Court law holding that an erroneous *Sandoval* ruling can rise to the level of a constitutional violation where the defendant does not take the stand, but the most relevant Supreme Court authority suggests the contrary, and courts in

this Circuit have repeatedly held that, in such circumstances, no constitutional violation can be found.

In an analogous context, the Supreme Court has held that the erroneous admission of evidence of prior convictions for impeachment purposes, under Rule 609(a) of the Federal Rules of Evidence, is a ruling that generally does "not reach[ ] constitutional dimensions." *Luce v. United States,* 469 U.S. 38, 41-43, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). Furthermore, in *Luce,* the Court held that, to preserve the issue for direct appellate review, the federal defendant must have *actually testified* at trial. *Id.* at 41, 105 S.Ct. 460. "Otherwise, any harm that the defendant faced is 'wholly speculative.' " *Walton v. Ricks,* No. 01 Civ. 5265, 2002 WL 3209795, at *10 (S.D.N.Y. Mar. 19, 2002), *report and recommendation adopted by* 2003 WL 1873607 (S.D.N.Y. Jan 31, 2003). This doctrine has been extended by this Court to the habeas context and "repeatedly applied" to federal review of similar, state-court *Sandoval* rulings. *Mercado v. Phillips,* No. 04 Civ. 2204 (GBD) (MHD), 2011 WL 1157617, at *6 (S.D.N.Y. Feb. 22, 2011) (collecting cases), *report and recommendation adopted by* 2011 WL 1157570 (S.D.N.Y. Mar. 29, 2011). Indeed, courts in this Circuit apply "a bright-line rule ... barring habeas relief for allegedly erroneous *Sandoval* rulings in instances where a defendant elects not [to] testify." *Melendez v. LaValley,* 942 F.Supp.2d 419, 424 (S.D.N.Y. 2013) (quoting *Shannon v. Senowski,* No. 00 Civ. 2865 (NRB), 2000 WL 1683448, at *6 (S.D.N.Y. Nov. 9, 2000) ). "It is well-settled that a petitioner's failure to testify at trial is fatal to any claims of constitutional deprivation arising out of a *Sandoval*-type ruling," because "absent such testimony, a court has 'no adequate non-speculative basis upon which to assess the merits of that claim.' " *Shannon,* 2000 WL 1683448, at *6 (quoting *McEachin v. Ross,* 951 F.Supp. 478, 481 (S.D.N.Y. 1997) (citation omitted) ); *see also Ciochenda v. Artus,* No. 06 Civ. 5057 (PAC) (GWG), 2009 WL 1026018, at *6 (S.D.N.Y. Apr. 9, 2009) ("When a defendant does not take the stand, he cannot challenge the trial court's ruling regarding impeachment evidence.").

Petitioner chose not to testify at trial. Accordingly, his *Sandoval* claim, regardless of whether it has been cast as a federal constitutional claim, cannot be redressed in a federal habeas proceeding. I therefore recommend that Petitioner's claim that the trial court's *Sandoval* ruling deprived him of his 14th Amendment right to a fair trial be dismissed.

**E. Ground Five: Circumstantial-Evidence Instruction**

For his fifth habeas claim, Petitioner argues that his constitutional right to a fair trial was violated when the trial court failed to issue a circumstantial-evidence instruction to the jury. (Pet., at 38-40.) Petitioner states that such an instruction was required because there was no direct evidence establishing the required element of intent. (*Id.*) Petitioner exhausted this claim on his direct appeal (*see* App'x, at 2301-03, 2480), but he cannot prevail on it here, as a trial court's failure to issue a circumstantial-evidence charge cannot provide a basis for federal habeas relief.

*20 As an initial matter, the propriety of a particular jury instruction is a matter of state law. *See Perez v. Grenier,* No. 00 Civ. 5504 (RCC) (KNF), 2005 WL 613183, at *6 (S.D.N.Y. Mar. 14, 2005). For that reason, a petitioner's challenge to jury instructions is subject to federal habeas review only if the alleged error deprived him or her of a federal constitutional right. *See Davis v. Strack,* 270 F.3d 111, 123 (2d Cir. 2001) ("[I]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law."); *Griffin v. N.Y. State Dep't of Corr.,* No. 06 Civ. 14217 (GEL), 2007 WL 1296203, at *2 (S.D.N.Y. May 2, 2007) (citing *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) ("Challenges to state court jury instructions are not reviewable on habeas corpus absent a showing that the alleged errors were so serious as to have deprived the defendant of a fair trial.") ).

There is, however, no constitutional requirement that a state court issue a circumstantial-evidence instruction to the jury, even where the evidence presented is purely circumstantial. *See Parisi v. Artus,* No. 08-CV-1785 (ENV), 2010 WL 4961746, at *4 (E.D.N.Y. Dec. 1, 2010) ("There is no federal constitutional right to a circumstantial evidence charge."); *Griffin,* 2007 WL 1296203, at *2 ("There is no constitutional right to a special jury instruction when a case is founded on circumstantial evidence."). "Indeed, far from there being any federal law requiring the kind of instruction that [Petitioner] seeks, there is Supreme Court authority suggesting that the sort of instruction sought by [Petitioner] may be 'incorrect.' " *Schachter v. Fischer,* No. 05 Civ. 9896 (RCC) (GWG), 2007 WL 404773, at *7 (S.D.N.Y. Feb. 7, 2007) (citing *Holland v. United States,* 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954) ), *report and recommendation adopted by* 2007 WL 4591978 (S.D.N.Y. Dec. 26, 2007). Thus, regardless of whether New York law requires a court to issue a particular

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 124 of 172

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

circumstantial-evidence instruction under the set of facts present in this case, the failure to issue such an instruction does not implicate any federal constitutional right. I therefore recommend that Petitioner's fifth habeas claim be dismissed.

### F. Ground Six: Excessive Sentence

Petitioner's sixth and final stated ground for habeas relief is that his sentence of 25 years to life is harsh and excessive. (Pet., at 41-43.) In this regard, Petitioner argues that the homicide was not a premeditated act and that imposition of even the minimum prison term of 15 years to life would have resulted in his not becoming eligible for parole until the age of 76. (*Id.*, at 41.) For the reasons set forth below, this claim must be dismissed.

As a threshold matter, based on the procedural history of Petitioner's direct appeal, as set out above, it appears that Petitioner may have abandoned this excessive-sentence claim in his application for leave to appeal to the state Court of Appeals, and that the claim should therefore be considered unexhausted. Specifically, Petitioner argued six grounds – essentially, the same six grounds now raised in his habeas Petition – in the brief he submitted to the Appellate Division. (App'x, at 2212-2311, 2434-67.) When Petitioner then submitted an application for leave to appeal to the Court of Appeals, he attached copies of the Appellate Division's decision and his appellate briefs. (*Id.*, at 2470-71.) He did not, however, ask that the Court of Appeals review all claims contained in the attached briefs; rather, he only requested the opportunity to file a supplemental letter at a later date. (*See id.*) In the supplemental letter that he submitted thereafter, Petitioner argued at length that the Court of Appeals should review his claims regarding the admission of historical cell-site location information (*id.*, at 2472-79), and additionally argued that the Court should consider: (1) the admission of evidence obtained pursuant to an allegedly unlawful arrest; (2) the admission of hearsay testimony; (3) the trial court's *Sandoval* ruling; (4) the trial court's failure to issue a circumstantial-evidence instruction; and (5) the trial court's refusal to conduct a *Frye* hearing regarding the admission of scientific evidence regarding the geographic range of cellular towers (*id.*, at 2480). Petitioner's supplemental letter made no mention, though, of his excessive-sentence claim. (*See generally id.*, at 2472-81.) Given that Petitioner raised an excessive-sentence claim before the Appellate Division, but then failed to address that claim in his submission to the Court of Appeals, despite the fact that he addressed each of the other claims from his appellate brief, Petitioner's excessive-sentence claim was, at least arguably, abandoned.

*See Jordan*, 206 F.3d at 198-99; *see also Butler v. Heath*, No. 12 Civ. 3327 (SAS) (DF), 2015 WL 3403926, at *10 (S.D.N.Y. Feb. 18, 2015) (deeming sufficiency-of-evidence claim abandoned where the petitioner filed an initial request for leave to appeal that did not identify any particular claims, but merely enclosed his appellate briefs, then later filed a supplemental letter detailing his arguments in support of certain other claims, without addressing any claim regarding the sufficiency of the evidence), *report and recommendation adopted by* 2015 WL 3403926 (S.D.N.Y. May 22, 2015); *Inesti v. New York*, No. 13 Civ. 6351 (WHP) (JCF), 2014 WL 2069645 (S.D.N.Y. Apr. 23, 2014) (finding that claims not raised in a supplemental letter were abandoned, where the petitioner had first submitted his appellate briefs along with an initial letter that did not specifically identify the claims upon which the petitioner sought leave to appeal), *report and recommendation adopted by* 2014 WL 2069645 (S.D.N.Y. May 14, 2014).

**\*21** In any event, Petitioner's excessive-sentence claim is plainly meritless. First, the Petition does not cite any federal law in support of this claim (*see* Pet., at 41-42), and Petitioner's argument on this point before the Appellate Division relied exclusively on state law, as well (App'x, at 2304-10). To the extent Petitioner's excessive-sentence claim is grounded in state law, it is not cognizable on federal habeas review. *See McGuire*, 502 U.S. at 68, 112 S.Ct. 475; *see also Bell v. Ercole*, 631 F.Supp.2d 406, 418 (S.D.N.Y. 2009) ("[Petitioner] contends that his sentence of fourteen years of imprisonment was excessive and should be reduced in the interest of justice. To the extent that this claim relies on state law principles, it is not cognizable on federal habeas review.").

Second, in order to state a federally cognizable excessive-sentence claim, a habeas petitioner must generally allege that the statute under which he was sentenced was itself unconstitutional, under the Eighth Amendment, *see United States v. Dawson*, 400 F.2d 194, 200 (2d Cir. 1968) ("when a statute provides for punishment thought to be violative of the [Eighth] [A]mendment the constitutionality of the statute itself must be attacked" (citations omitted) ), and Petitioner has made no such attack on the validity of the relevant statute.

Third, in the absence of a challenge to the relevant statute itself, an excessive-sentence claim may only be maintained if the sentence imposed fails to comply with state law. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where ... the

Sorrentino v. Lavalley, Not Reported in Fed. Supp. (2016)

2016 WL 11482062

sentence is within the range prescribed by state law." (citation omitted) ). A sentence that is within the range permitted by state law, like the sentence at issue here, *see* N.Y. Penal Law § 70.00, may not be held to be disproportionate under the Eighth Amendment. *Pinero v. Grenier*, 519 F.Supp.2d 360, 371 (S.D.N.Y. 2007); *see also Echevarria-Perez v. Burge*, 779 F.Supp.2d 326, 337 (W.D.N.Y. 2011) (noting that, under the sentencing provisions of N.Y. Penal Law § 70.00, the maximum sentence for second degree murder is 25 years to life). Moreover, the Supreme Court has ruled that "no sentence of imprisonment would be disproportionate" for the crime of felony murder, which does not require the specific intent to kill. *Harmelin v. Michigan*, 501 U.S. 957, 1004, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (quoting *Solem v. Helm*, 463 U.S. 277, 290 n.15, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) ). *A fortiori*, Petitioner's sentence of 25 years to life for Second-Degree Murder, in violation of N.Y. Penal Law § 125.25(1) – a crime that *does* require the "intent to cause the death of another person" – cannot have been disproportionate to Petitioner's conduct.

For these reasons, any Eighth Amendment claim that Petitioner may now be seeking to assert would necessarily be meritless. I therefore recommend the dismissal of Petitioner's claim that his sentence was excessive.

## **CONCLUSION**

For all of the foregoing reasons, I recommend that the Petition be dismissed in its entirety. I further recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), as Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Vernon S. Broderick, United States Courthouse, 40 Foley Square, New York, New York 10007, Room 415, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Broderick. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

**\*22** If Petitioner does not have access to cases cited herein that are reported only on Westlaw or LEXIS, he may request copies from Respondent's counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

## **All Citations**

Not Reported in Fed. Supp., 2016 WL 11482062

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 126 of 172

2021 WL 5139718
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jesse J. MORMAN, Petitioner,
v.
SUPERINTENDENT, MID-STATE
CORRECTIONAL FACILITY, Respondent.

9:18-cv-01338 (MAD/DJS)
|
Signed 11/04/2021

**Attorneys and Law Firms**

OF COUNSEL: JESSE J. MORMAN, 13-B-1990, Mid-State Correctional Facility, Inmate Mail/Parcel, P.O. Box 2500, Marcy, New York 13403, Petitioner pro se.

OF COUNSEL: PAUL B. LYONS, AAG, OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, 28 Liberty Street, New York, New York 10005, Attorneys for Respondent.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

*\*1* Petitioner Jesse J. Morman, a state prisoner appearing *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he challenges a conviction of, *inter alia*, four counts of Criminal Possession of a Controlled Substance in the Third Degree and two counts of Criminal Sale of a Controlled Substance in the Third Degree. *See* Dkt. No. 1 at 1-2. He was sentenced to serve an aggregate determinate term of thirty years in prison followed by three years of post-release supervision. *See id.* at 1. Petitioner appealed his conviction to the Appellate Division, Fourth Department, which affirmed the conviction but modified the sentence by reducing it to an aggregate determinate term of fifteen years. *People v. Morman*, 145 A.D.3d 1435 (4th Dep't 2016); *People v. Morman*, 145 A.D.3d 1439 (4th Dep't 2016). The New York Court of Appeals denied leave to appeal on April 27, 2017. *See* Dkt. No. 1 at 3.

Petitioner raises the following grounds for habeas relief: (1) that evidence was obtained pursuant to an unconstitutional inventory search; (2) that the trial jury violated his constitutional rights because two prospective jurors were overheard making comments indicating that Petitioner was already guilty; (3) that his trial counsel was ineffective because he failed to object to the alleged improper sealing of his drug sale indictment and failed to move to suppress certain evidence; (4) that the court incorrectly allowed the prosecuting attorney to make improper remarks; and (5) that the trial court erred by permitting a police investigator to offer improper hearsay and opinion testimony. *See id.* at 4-9; Dkt. No. 31 at 2. Respondent opposes the Petition and contends that the application should be denied. *See* Dkt. No. 16. In a Report-Recommendation and Order, Magistrate Judge Daniel J. Stewart recommended that Petitioner's request be denied and dismissed and that no Certificate of Appealability ("COA") be issued. *See* Dkt. No. 31. Petitioner has not objected to the Report-Recommendation and Order.

**II. BACKGROUND**

For a complete recitation of the relevant facts, the parties are referred to the Report-Recommendation and Order.

**III. DISCUSSION**

**A. Standard of Review**

*1. AEDPA*
The enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") brought about significant new limitations on the power of a federal court to grant habeas relief to a state prisoner under 28 U.S.C. § 2254. In discussing this deferential standard, the Second Circuit noted in *Rodriguez v. Miller*, 439 F.3d 68 (2d Cir. 2006), *cert. granted, judgment vacated and cases remanded on other grounds by*, 549 U.S. 1163 (2007), that

> a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication resulted in an outcome that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

**\*2** *Id.* at 73 (quoting 28 U.S.C. § 2254(d)) (footnote omitted); *see also DeBerry v. Portuondo*, 403 F. 3d 57, 66 (2d Cir. 2005) (quotation omitted); *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003) (quotation omitted).

In providing guidance concerning the application of this test, the Second Circuit has observed that

> a state court's decision is "contrary to" clearly established federal law if it contradicts Supreme Court precedent on the application of a legal rule, or addresses a set of facts "materially indistinguishable" from a Supreme Court decision but nevertheless comes to a different conclusion than the Court did. [*Williams v. Taylor*, 529 U.S. 362] at 405-406, 120 S. Ct. 1495 [(2000)]; *Loliscio v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001) .... [A] state court's decision is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts" of the case before it. *Williams*, 529 U.S. at 413, 120 S. Ct. 1495.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F. 3d 100, 108-09 (2d Cir. 2000)).

Significantly, a federal court engaged in habeas review is not charged with determining whether a state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2009); *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (citation omitted). Courts have interpreted "objectively unreasonable" in this context to mean that "some increment of incorrectness beyond error" is required for the habeas court to grant the application. *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quotation omitted).

As the Second Circuit has further instructed, the necessary predicate for a federal habeas court's deferential review is that a petitioner's federal claim has been " 'adjudicated on the merits' by the state court." *Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (quotation omitted). "If a state court has not adjudicated the claim 'on the merits,' " the federal habeas court applies the pre-AEDPA standards, and reviews *de novo* the state court disposition of the petitioner's federal claims. *Id.* (quoting *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001)). "[A] state court 'adjudicates' a petitioner's federal constitutional claims 'on the merits' when it (1) disposes of

the claim 'on the merits,' and (2) reduces its disposition to judgment.' " *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)). To determine whether a state court has disposed of a claim on the merits, a court will consider: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Aparicio*, 269 F.3d at 93 (quoting *Sellan*, 261 F.3d at 314).

### 2. Review of a Report and Recommendation

**\*3** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, 1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se*, waives any challenge to the report on appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point") (citation omitted). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to file a timely objection will result in the waiver of further judicial review and cites the pertinent statutory and civil rules authority. *See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

## B. Petitioner's Fourth Amendment Claim

Petitioner argues that the evidence that was found in his vehicle during the traffic stop on April 12, 2012, should have been suppressed because it was obtained as a result of an unlawful inventory search. *See* Dkt. No. 1 at 6. In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494; *see also Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) (holding that "once it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief") (citation omitted). Following *Stone*, review of Fourth Amendment claims in habeas petitions is permissible only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citations omitted).

New York has a corrective procedure for Fourth Amendment violations, which is facially adequate. *See Capellan*, 975 F.2d at 70 n.1. Under New York's Criminal Procedure Law ("CPL") § 710, a defendant may move to suppress evidence he claims was unlawfully obtained when he has "reasonable cause to believe that such [evidence] may be offered against him in a criminal action." *Huntley v. Superintendent, Southport Corr. Fac.*, No. 00-CV-191, 2007 WL 319846, *7 (N.D.N.Y. Jan. 30, 2007) (quoting N.Y. CRIM. PROC. § 710.20); N.Y. CRIM. PROC. § 710.20(1) (stating that a defendant may move to suppress evidence on the ground that it "[c]onsists of tangible property obtained by means of an unlawful search and seizure under circumstances precluding admissibility thereof").

 **\*4** Here, Petitioner took advantage of his opportunity to fully adjudicate the matter in state court by arguing the issue in the trial court and fully raising the issue on appeal. *See* Dkt. No. 18-1 at 153-157; *Morman*, 145 A.D.3d at 1436. Petitioner is therefore not entitled to habeas corpus relief on his Fourth Amendment claim.

## C. Petitioner's Claim Regarding the Jury Empanelment

Petitioner argues that the trial jury violated his constitutional rights because two prospective jurors were overheard making comments that implied that they already believed that Petitioner was guilty. *See* Dkt. No. 1 at 9; Dkt. No. 18-2 at 243. Respondent argues that Petitioner's jury misconduct claim is unexhausted and procedurally barred. *See* Dkt. No. 16 at 30.

An application for a writ of habeas corpus may not be granted until a petitioner exhausts all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(A), (B)(I), (ii). The exhaustion requirement " 'is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings[.]' " *Jimenez v. Walker*, 458 F.3d 130, 148-49 (2d Cir. 2006) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)).

To properly exhaust his claims, a petitioner must do so both procedurally and substantively. Procedural exhaustion requires that he raise all claims in state court prior to raising them in a federal habeas corpus petition. Substantive exhaustion requires that the petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). The petitioner must also use the proper procedural vehicle so that the state court may pass on the merits of his claims. *See Dean v. Smith*, 753 F.2d 239, 241 (2d Cir. 1985).

If a court determines that a claim is unexhausted, it considers whether the claim is procedurally defaulted. *See Aparicio v. Artuz*, 269 F.3d 78, 89-90 (2d Cir. 2001). Once a claim has been deemed procedurally defaulted, it is subject to dismissal unless the petitioner can demonstrate "cause for the default and prejudice, or that failure to consider the claim will result in a miscarriage of justice[.]" *Id.* at 90 (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). To establish cause for the default, a petitioner must show that " 'some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule.' " *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)); *accord, Maples v. Thomas*, 565 U.S. 266, 281 (2012). On a writ for habeas relief, the court need not examine the issue of prejudice if a petitioner fails to establish adequate cause for his procedural default because habeas relief is generally

unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Carrier*, 477 U.S. at 496.

In his Report-Recommendation and Order, Magistrate Judge Stewart correctly found that Petitioner's jury misconduct claim is unexhausted and procedurally defaulted because Petitioner relied exclusively on New York State law for his brief to the Appellate Division on this issue. *See Blond v. Graham*, No. 5:12-CV-1849, 2014 WL 2558932, *13 (N.D.N.Y. June 5, 2014).

**\*5** Moreover, even if the Court were to review the merits of the jury misconduct issue, Petitioner would still not be entitled to relief. The Supreme Court has consistently noted that jury selection is "particularly within the province of the trial judge." *Skilling v. United States*, 561 U.S. 358, 386 (2010) (quoting *Ristaino v. Ross*, 424 U.S. 589, 594-595 (1976)). In this case the trial court was told of the possible jury misconduct of the two potential jurors and dismissed the jurors without requiring either party to use a peremptory challenge. *See* Dkt. No. 18-2 at 247-48. The trial court also allowed defense counsel to question the other potential jurors to see if they had been tainted by the statements of the other jurors, at which time the defense attorney could have dismissed the jurors if he thought it was necessary. *See id.* at 252-53. Based on the record, the trial court reasonably dealt with this issue, and there was no constitutional violation.

### D. Ineffective Assistance of Counsel Claim

Petitioner also argues that he was denied effective assistance of counsel because his attorney failed to object to the alleged improper sealing of his drug sale indictment, failed to move to suppress Sgt. Young's identification of Petitioner, and should have moved to dismiss the drug sale charges. *See* Dkt. No. 1 at 4.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. XI. "It has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).

In assessing whether a habeas petitioner has been denied the effective assistance of counsel to which he is entitled under the Sixth Amendment, the court applies the standard established by *Strickland v. Washington*, 466 U.S. 668 (1984). Under that standard, the petitioner

> "must meet a two-pronged test: (1) he 'must show that counsel's performance was deficient,' 466 U.S. at 687, 104 S. Ct. 2052, so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance,' *id.* at 690, 104 S. Ct. 2052; and (2) he must show 'that the deficient performance prejudiced the defense,' *id.* at 687, 104 S. Ct. 2052, in the sense that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' *id.* at 694, 104 S. Ct. 2052."

*Matthews v. United States*, 682 F.3d 180, 186 (2d Cir. 2012) (quotation omitted).

As to the first prong of *Strickland*, attorney conduct is subject to an objective standard of reasonableness and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel. *See Strickland*, 466 U.S. at 688-89. As a result, reviewing courts " 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.' " *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689).

As to the second prong of *Strickland*, a petitioner must show that, but for his or her attorney's deficient performance, there is a reasonable probability that the result would have been different. *See Strickland*, 466 U.S. at 694. More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693.

**\*6** "The *Strickland* standard is 'highly demanding,' ... and 'rigorous[.]' " *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011) (quotations omitted). An ineffective assistance of counsel claim "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." *Id.* (citation omitted).

2021 WL 5139718

In his Report-Recommendation and Order, Magistrate Judge Stewart correctly found that Petitioner did not meet the high bar imposed by the *Strickland* test. *See* Dkt. No. 31 at 18-26. As Magistrate Judge Stewart mentioned, there is no requirement to immediately arrest someone once probable cause exists and there was no showing that the seven-day sealing of the indictment harmed Petitioner, so it was not unreasonable for counsel not to object to the sealing of the drug indictment. *See id.* at 22-26; *see also Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 761 (2005).

Petitioner's claim that his counsel was ineffective because they did not move to suppress Sgt. Young's identification of Petitioner also fails, in part because defense counsel did in fact move to suppress the identification by Sgt. Young on the grounds that it was unduly suggestive. *See* Dkt. No. 18-1 at 18-23. The Appellate Division ruled this argument was not preserved for review, because it was not raised in the lower court. *Morman*, 145 A.D.3d at 1435-36. Additionally, the Court agrees with the Report-Recommendation and Order and Respondent's argument and reasoning that the viewing of the photograph was confirmatory in nature and would not have affected the outcome of the motion or the trial. *See* Dkt. No. 16 at 22; Dkt. No. 31 at 20.

Petitioner's final claims are that his counsel failed to argue that there was no corroborating evidence for the two drug sale charges and counsel did not show that the prosecutor failed to establish the existence of a confidential informant that was the trigger for those sales. *See* Dkt. No. 1 at 4. The Court agrees with Magistrate Judge Stewart that witness testimony does not need to be corroborated so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt, and that the weight of the evidence is a question for the jury. *See* Dkt. No. 31 at 21; *Parks v. Sheahan*, 104 F. Supp. 3d 271, 283 (E.D.N.Y. 2015); (quoting *United States v. Hamilton*, 334 F.3d 170, 179 (2d Cir. 2003)).

For the reasons stated above, Petitioner is therefore not entitled to habeas corpus relief on his ineffective counsel claim.

### E. Prosecutor's Summation and the Police Officer's Opinion Testimony

Petitioner argues that the trial court erred in allowing improper remarks by the prosecutor during summation and allowing a police officer to offer improper hearsay and opinion testimony. *See* Dkt. No. 1 at 9. Petitioner claims that

the statement, "[a]lso, we already know defendant is a drug dealer because he sold cocaine to Sergeant Young January 5th and January 10th of 2012" constitutes prosecutorial misconduct. *See id.*; Dkt. No. 18-2 at 539. The Court agrees with Magistrate Judge Stewart that this does not constitute prosecutorial misconduct because Petitioner's prior drug sales were admissible with respect to the issue of Petitioner's intent to sell the cocaine at issue in this case. *See* Dkt. No. 31 at 26-27.

**\*7** The Appellate Division also found, and the Court agrees with the finding, that the above-mentioned prosecutorial misconduct claim and the claim that the narcotics officer submitted inadmissible hearsay evidence is unpreserved because defense counsel did not object to those statements. *See id.* at 27; *Morman*, 145 A.D.3d at 1438. The defense counsel's failure to object to the statements made by the prosecutor and the narcotics officer bars review of these claims in this Court. *Evans v. Colvin*, No. 9:16-CV-1346, 2018 WL 3069211, \*5 (N.D.N.Y. June 21, 2018).

Petitioner also argues that a portion of prosecutor's closing also constituted prosecutorial misconduct and the trial court improperly allowed the statement to remain. *See* Dkt. No. 18-2 at 524. While not condoning the trial court allowing the prosecutor's statement to remain on the record, the Court agrees with Magistrate Judge Stewart's statement in the Report-Recommendation and Order that the prosecutor did not engage in egregious misconduct. *See* Dkt. No. 31 at 28. The statements were made during closing arguments, in response to statements made by Petitioner's counsel, and the trial court instructed the jury that closing arguments are not evidence, so the comments did not create a level of unfairness that would deny Petitioner the right to a fair trial.

For similar reasons, the Court also concurs with Magistrate Judge Stewart and the Appellate Division's conclusion that the opinion testimony offered by Investigator DiPirro, while improper, was harmless because of the overwhelming evidence presented at trial. *Morman*, 145 A.D.3d at 1438. Petitioner is therefore not entitled to habeas corpus relief on these claims.

### F. Certificate of Appealability

The Court notes that 28 U.S.C. § 2253(c)(1) provides, in relevant part, that, "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from ... (A) the final order in a habeas corpus proceeding in which the detention complained of arises out

2021 WL 5139718

of process issued by a state court[.]" 28 U.S.C. § 2253(c)(1)(A). A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Since Petitioner has failed to make such a showing, the Court declines to issue a Certificate of Appealability in this matter regarding Petitioner's Section 2254 claims. *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998) (quotation omitted).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Stewart's September 20, 2021 Report-Recommendation and Order is **ADOPTED in its entirety** for the reasons set forth herein; and the Court further

**ORDERS** that the petition for a writ of habeas corpus is **DENIED and DISMISSED**; and the Court further

**ORDERS** that no Certificate of Appealability shall be issued with respect to any of Petitioner's claims; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 5139718

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by    ANDERSON v. MARTUSCELLO,    2nd Cir.,    October 27, 2021

2021 WL 4429333
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Omar ANDERSON, Petitioner,

v.

Daniel MARTUSCELLO, Jr., Superintendent,
Coxsackie Correctional Facility, Respondent.

No. 17-CV-9638 (KMK) (JCM)
|
Signed 09/27/2021

**Attorneys and Law Firms**

Omar Anderson, Coxsackie, NY, Pro Se Petitioner.

John J. Sergi, Esq., Lisa M. Denig, Esq., Westchester County District Attorney's Office, White Plains, NY, Counsel for Respondent.

ORDER ADOPTING REPORT & RECOMMENDATION

KENNETH M. KARAS, District Judge:

 **\*1** Omar Anderson ("Petitioner"), proceeding pro se, has filed a Petition for a Writ of Habeas Corpus (the "Petition") pursuant to 28 U.S.C. § 2254, challenging his April 17, 2014 conviction, following a jury trial in New York State Supreme Court, Westchester County ("County Court"), for one count of Assault in the Second Degree and one count of Attempted Assault in the Second Degree. (*See generally* Pet. for Writ of Habeas Corpus ("Pet.") (Dkt. No. 1).)

On August 3, 2016, Petitioner moved before the County Court to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10 ("440.10 Motion"), which the County Court denied on October 31, 2016. (*See* Resp't's Mem. of Law in Opp'n to Pet. ("Resp't's Opp'n") Exs. 3 (Dkt. No. 10-4) & 6 (Dkt. No. 10-7).) The New York Supreme Court, Appellate Division, Second Department ("Second Department") denied Petitioner's motion for leave to appeal the County Court's denial of his 440.10 Motion on March 9, 2017. (*Id.* Ex. 9 (Dkt. No. 10-10).)

Petitioner directly appealed his conviction to the Second Department on July 31, 2014; the Second Department affirmed the conviction on March 1, 2017. *See People v. Anderson*, 148 A.D.3d 714 (App. Div. 2017). The New York Court of Appeals denied Petitioner's motion for leave to appeal on May 10, 2017. *See People v. Anderson*, 29 N.Y.3d 1028 (2017).

Respondent filed a Memorandum of Law opposing the Petition on March 21, 2018. (*See* Resp't's Opp'n (Dkt. No. 10-1); Aff. in Opp'n to Pet. ("Resp't's Aff.") (Dkt. No. 10).) Petitioner filed a Memorandum of Law in reply to Respondent's Opposition ("Petitioner's Reply") on June 15, 2018. (*See* Mem. of Law in Reply to Opp'n ("Pet'r's Reply") (Dkt. No. 14).)

In a thorough Report and Recommendation ("R&R") dated January 29, 2021, Magistrate Judge Judith C. McCarthy ("Judge McCarthy") recommended that the Petition be denied in its entirety. (*See* Report & Recommendation ("R&R") 1 (Dkt. No. 17).) Petitioner filed Objections to the R&R on March 15, 2021, after seeking and receiving an extension of time to object. (*See* Pet'r's Obj's to R&R ("Obj's") (Dkt. No. 20).) Respondent has not responded to the Objections. After a review of the R&R and Petitioner's Objections, the Court adopts the result recommended in the R&R and denies the Petition.

I. BACKGROUND

The factual and procedural background of this case is set forth in the R&R and the Court assumes the Parties' familiarity therewith. (*See* R&R 1–9.) The Court nevertheless summarizes the relevant facts.

On October 6, 2012, Petitioner entered the Super Star Deli, located at 203 Ashburton Avenue, Yonkers, New York, evidently in search of certain grocery items. (Resp't's Aff. 2.) Petitioner asked one of the employees, Jason Lopez ("Lopez"), if the store had any limes, to which Lopez responded that there were no limes. (*Id.*) Petitioner and Lopez began arguing, which escalated into a near-violent altercation involving Petitioner, Lopez, and other deli employees, with Petitioner attempting to arm himself with a bottle. (*Id.* at 2–3.) Lopez and the other employees were ultimately able to remove Petitioner from the store, but Petitioner stated that he would return in five minutes. (*Id.* at 3.) About five minutes

2021 WL 4429333

later, Petitioner returned to the store with a wooden baseball bat and reengaged Lopez, repeatedly striking Lopez with the bat. (*Id.*) During the altercation, Petitioner stabbed Lopez in his lower left back area with a knife that was on the deli counter. (*Id.*) Lopez then barricaded himself in a storage room, where he called Officer Richard Meyers ("Meyers") of the Yonkers Police Department ("YPD") (who had given the deli employees his personal cell phone number) and told Meyers that "someone was trying to hit [him]." (*Id.* at 4, 11.) Meyers and his partner immediately responded to Lopez's call and headed to the store. (*Id.* at 5.) While en route, Meyers heard on the YPD radio dispatch that the store's holdup alarm had been activated and that an employee had called 911. (*Id.*)

*2 After Lopez called Meyers, Petitioner's cousin entered the store, armed with an aluminum baseball bat, and he and Petitioner approached the storage room where Lopez was sheltered. (*Id.* at 4.) Petitioner then broke down the storage room door with his baseball bat, and Lopez fled through an emergency exit. (*Id.* at 4.) Petitioner and his cousin exited the store to pursue Lopez, which Meyers witnessed as he arrived at the store. (*Id.* at 5.) A chase ensued, and Petitioner and his cousin were arrested. (*Id.*) Shortly after Petitioner and his cousin were taken into custody, Meyers received a dispatch on the YPD radio dispatch that there was a stabbing victim at 203 Ashburton Avenue. (Pet'r's Reply Ex. B 1.)[1] Lopez identified both Petitioner and his cousin as his assailants shortly after Petitioner and Petitioner's cousin's arrests, before he was taken to Jacobi Hospital to be treated for his stab wound. (Resp't's Aff. 6.)

[1]    When referring to Exhibit B to Petitioner's Reply, the Court refers to the native pagination at the top right-hand corner of each page, which is in the format of "page _ of _."

Petitioner was charged with Assault in the Second Degree, Attempted Assault in the Second Degree, two counts of Criminal Possession of a Weapon in the Fourth Degree, and Menacing in the Second Degree. (*Id.* at 9.) At trial, the prosecution called a number of witnesses, including Meyers, who, in response to a question on direct examination about why police dispatch instructed Meyers and the other responding units to use caution, mistakenly testified that he received a police dispatch that there was "a stabbing victim" at the deli *before* he arrested Petitioner. (*Id.* at 10–11.) Defense counsel objected to the prosecution's question, and the County Court instructed the jury that the content of the transmission was "not being offered for the truth of what's in

the transmission," but rather "just to explain what the officer did," and that it was "up to [the jury]" to determine whether to credit the evidence and what weight to give to it. (*Id.*; Pet'r's Reply Ex. E 153:12-18.) On April 17, 2014, the jury found Petitioner guilty of Assault in the Second Degree and Attempted Assault in the Second Degree. (Resp't's Aff. 12.)

On July 31, 2014, Petitioner directly appealed his conviction; he submitted his brief on February 19, 2016, which—as relevant to the instant Petition—argued that the County Court erred in admitting Meyers' testimony concerning the dispatcher's statement that there was "a stabbing victim" at the store, since this the statement was hearsay. (*Id.* at 15; *see also* Resp't's Opp'n Ex. 1 (Dkt. No. 10-2) 35–39.) Petitioner also claimed that the admission of this statement violated his Sixth Amendment right to confrontation. (Resp't's Aff. 15; Resp't's Opp'n Ex. 1 39–40.) On August 3, 2016, Petitioner filed a 440.10 Motion with the County Court to vacate his conviction on the ground that the prosecution knowingly misled the County Court by stating that Meyers received the dispatch about "a stabbing victim" before Petitioner's arrest, when the dispatch log (attached to Petitioner's 440.10 Motion, though not introduced at trial) demonstrated that this dispatch came after Petitioner's arrest. (Resp't's Aff. 15–16; *see also* Resp't's Opp'n Ex. 3 6–9.)[2] Petitioner also repeated his arguments that the dispatcher's statement constituted inadmissible hearsay. (Resp't's Aff. 16; Resp't's Opp'n Ex. 3 7–8.)

[2]    When citing to Exhibit 3 to Respondent's Opposition, the Court refers to the ECF-stamped page numbers at the top right-hand corner of each page.

On October 31, 2016, the County Court denied Petitioner's 440.10 Motion, and on March 1, 2017, the Second Department unanimously affirmed the judgment of conviction. (Resp't's Aff. 17, 18; Resp't's Opp'n Ex. 6.) *See also Anderson,* 148 A.D.3d at 714. On March 9, 2017, the Second Department denied Petitioner's application for leave to appeal the determination of the 440.10 Motion, and on May 10, 2017, the New York Court of Appeals denied Petitioner's application for leave to appeal the Second Department's affirmance of his conviction. (Resp't's Aff. 18, 19; Resp't's Opp'n Ex. 9.) *See also Anderson,* 29 N.Y.3d at 1028.

*3 Petitioner filed the Petition on December 18, 2017. (*See* Dkt. Nos. 1, 6.) Judge McCarthy issued the R&R on January 29, 2021, recommending that this Court deny Petitioner's request for relief and dismiss the Petition in its entirety. (*See*

2021 WL 4429333

R&R 1.) Petitioner subsequently filed the Objections. (*See* Dkt. No. 20.)

## II. DISCUSSION

### A. Applicable Law

#### 1. Review of a Magistrate Judge's R&R

A district court reviewing a report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by a magistrate judge." 28 U.S.C. § 636(b)(1). Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), a party may submit objections to the magistrate judge's report and recommendation. The objections must be "specific" and "written," FED. R. CIV. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition," *id.*; *see also* 28 U.S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Federal Rules of Civil Procedure 5(b)(2)(C)–(F), *see* FED. R. CIV. P. 6(d), for a total of seventeen days, *see* FED. R. CIV. P. 6(a)(1).

Where a party submits timely objections to a report and recommendation, as Petitioner has done here, the Court reviews de novo the parts of the report and recommendation to which the party objected. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3). The district court "may adopt those portions of the ... report [and recommendation] to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *Eisenberg v. New Eng. Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226 (S.D.N.Y. 2008) (quoting FED. R. CIV. P. 72(b)(2)).

Finally, pleadings submitted by pro se litigants are held to a less strict standard than those drafted by attorneys. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) ("Even in the formal litigation context, pro se litigants are held to a lesser standard than other parties." (italics omitted)). Because Petitioner is proceeding pro se, the Court construes his pleadings "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (italics and quotation marks omitted). However, this "does not exempt a [pro se litigant] from compliance with relevant rules of procedural

and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

#### 2. Standard of Review

Petitions for writs of habeas corpus are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides that a state prisoner may seek habeas corpus relief in federal court "on the ground that he is in custody in violation of the Constitution or laws ... of the United States." 28 U.S.C. § 2254(a). "The writ may not issue for any claim adjudicated on the merits by a state court unless the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States,' or was 'based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.' " *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012) (quoting 28 U.S.C. § 2254(d)(1)–(2)). In this context, "it is the habeas applicant's burden to show that the state court applied [federal law] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("The petitioner carries the burden of proof.").

**\*4** A decision is "contrary to" clearly established Federal law if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of the [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A decision is "an unreasonable application of clearly established Federal law" if a state court "correct identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08 (alterations and quotation marks omitted). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citations and quotation marks omitted); *see also id.* (noting that a petitioner must show a state court ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement" (quotation marks omitted)); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The

question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

"Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quotation marks omitted). Consequently, a federal court must deny a habeas petition in some circumstances even if the court would have reached a conclusion different than the one reached by the state court, because "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102; *see also Cullen*, 563 U.S. at 202–03 ("Even if the [Federal] Court of Appeals might have reached a different conclusion as an initial matter, it was not an unreasonable application of our precedent for the [state court] to conclude that [the petitioner] did not establish prejudice."); *Hawthorne v. Schneiderman*, 695 F.3d 192, 197 (2d Cir. 2012) ("Although we might not have decided the issue in the way that the [New York State] Appellate Division did—and indeed we are *troubled by the outcome we are constrained to reach*— we ... must defer to the determination made by the state court ....") (emphasis added) (citation omitted)).

Additionally, under AEDPA, the factual findings of state courts are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1); *Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir. 1997) ("When reviewing a habeas petition, the factual findings of the New York Courts are presumed to be correct." (alteration and quotation marks omitted)). The petitioner must rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003) (same).

Finally, only Federal law claims are cognizable in habeas proceedings. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also* 28 U.S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").

### 3. Procedural Requirements for Habeas Corpus Relief

"Habeas review is an extraordinary remedy," *Bousley v. United States*, 523 U.S. 614, 621 (1998), and a petitioner seeking a writ of habeas corpus must comply with the strict requirements of AEDPA, *see* 28 U.S.C. § 2254. Before the Court reviews the merits of a habeas corpus petition, the Court must determine whether Petitioner complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254.

### a. Timeliness

**\*5** AEDPA imposes upon a petitioner seeking federal habeas relief a one-year statute of limitations. *See* 28 U.S.C. § 2244(d)(1). The statute of limitations is tolled if any state post-conviction proceedings are pending after the conviction becomes final. *See* 28 U.S.C. § 2254(d)(2). The limitations period is also subject to equitable tolling, which is warranted only when a petitioner has shown "(1) that he [or she] has been pursuing his [or her] rights diligently, and (2) that some extraordinary circumstances ... prevented timely filing." *Finley v. Graham*, No. 12-CV-9055, 2016 WL 47333, at \*5 (S.D.N.Y. Jan. 4, 2016) (alterations in original) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

### b. Procedural Bar

A federal court "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Downs v. Lape*, 657 F.3d 97, 101 (2d Cir. 2011) (quotation marks omitted). A judgment is "independent" if the "last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (quotation marks omitted). A procedural bar is "adequate ... if it is based on a rule that is firmly established and regularly followed by the state in question." *Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006) (quotation marks omitted). In "exceptional cases," the "exorbitant application of a generally sound [state procedural] rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376 (2002).

#### c. Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citation and quotation marks omitted); *see also* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State ...."). To satisfy this requirement, "the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29 (quotation marks omitted); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the state, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."). This requirement reflects important "notions of comity between the federal and State judicial systems." *Strogov v. Att'y Gen. of State of N.Y.*, 191 F.3d 188, 191 (2d Cir. 1999).

There are two components to the exhaustion requirement. *See McCray v. Bennet*, No. 02-CV-839, 2005 WL 3182051, at *7 (S.D.N.Y. Nov. 22, 2005) ("A two-step analysis is used to determine whether a claim has been exhausted ...."). First, "a petitioner [must] fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011) (alterations and quotation marks omitted); *see also Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) (same); *Oliver v. Kirkpatrick*, No. 06-CV-6050, 2012 WL 3113146, at *5 (E.D.N.Y. July 31, 2012) (same). This requirement is satisfied if the claim is presented in a way that is "likely to alert the [state] court[s] to the claim's federal nature," *Carvajal*, 633 F.3d at 104 (quoting *Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000)), and the state courts are "apprise[d] ... of both the factual and legal premises of the federal claims ultimately asserted in the habeas petition," *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005); *see also Bermudez v. Conway*, No. 09-CV-1515, 2012 WL 3779211, at *8 (E.D.N.Y. Aug. 30, 2012) (same). In other words, a state prisoner need not cite "chapter and verse of the Constitution" to satisfy this requirement. *Carvajal*, 633 F.3d at 104 (quotation marks omitted). A petitioner may satisfy this requirement by:

> **\*6** (a) reliance on pertinent federal cases employment constitutional analysis[;] (b) reliance on state cases employing constitutional analysis in like fact situations[;] (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution[;] and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.* (quotation marks omitted). However, it is "not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citation omitted). Rather, the claims must be made in such a way so as to give the state courts a "fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." *Id.* (quotation marks omitted).

"Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim." *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981), *overruled on other grounds*, *Daye v. Att'y Gen.*, 696 F.2d 186, 195 (2d Cir. 1982) (en banc); *see also Pettaway v. Brown*, No. 09-CV-3587, 2010 WL 7800939, at *9 (S.D.N.Y. May 3, 2010) (same), *adopted by* 2011 WL 5104623 (S.D.N.Y. Oct. 26, 2011). In New York, "a criminal defendant must first appeal his or her conviction to the Appellate Division, then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez*, 394 F.3d at 74. If the petitioner fails to exhaust his or her state remedies through the entire appeal process, he or she may still fulfill the exhaustion requirement by collaterally attacking the conviction via available state methods. *See Klein*, 667 F.2d at 282–83 (noting that, "where the petitioner did not utilize all the appellate procedures of the convicting state to present his claim ... the petitioner must utilize available state remedies for collateral attack of his conviction in order to satisfy the exhaustion requirement");

*Bernardez v. Bannon*, No. 12-CV-4289, 2016 WL 5660248, at \*3 (S.D.N.Y. Sept. 29, 2016). For example, in New York a defendant may challenge a conviction based on matters not in the record that could not have been raised on direct appeal, *see* N.Y. CRIM. PROC. LAW § 440.10, but a defendant may not seek collateral review of claims that could have been raised on direct appeal and were not, *see id.* § 440.10(2)(c); *see also O'Kane v. Kirkpatrick*, No. 09-CV-5167, 2011 WL 3809945, at \*7 (S.D.N.Y. Feb. 15, 2011) ("Under New York law, all claims that are record-based must be raised in a direct appeal .... It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under [New York Criminal Procedure Law] § 440.10.)," *adopted by* 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011). In addition, New York permits only one application for direct review. *See Jiminez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) ("[The petitioner] has already taken his one direct appeal [under New York law] ...."). "New York procedural rules bar its state courts from hearing either claims that could have been raised on direct appeal but were not, or claims that were initially raised on appeal but were not presented to the Court of Appeals." *Sparks v. Burge*, No. 12-CV-8270, 2012 WL 4479250, at \*4 (S.D.N.Y. Sept. 18, 2014).

**\*7** Accordingly, in those situations, a petitioner no longer has any available state court remedy, and the claims are therefore deemed exhausted, but procedurally defaulted. *See Carvajal*, 633 F.3d at 104 ("If a habeas applicant fails to exhaust state remedies by failing to adequately present his federal claim to the state courts so that the state courts would deem the claim procedurally barred, we must deem the claim procedurally defaulted." (alteration and quotation marks omitted)); *see also Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (noting the reality that deeming an unpresented claim to be exhausted is "cold comfort"). A dismissal of a habeas petition on such grounds is a "disposition ... on the merits." *Carvajal*, 633 F.3d at 104 (quotation marks omitted). "An applicant seeking habeas relief may escape dismissal on the merits of a procedurally defaulted claim only by demonstrating 'cause for the default and prejudice' or by showing that he is 'actually innocent' of the crime for which he was convicted." *Id.* (quoting *Aparicio*, 269 F.3d at 90); *see also Dretke v. Haley*, 541 U.S. 386, 388 (2004) (holding that "a federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of a cause and prejudice to excuse the default," or showing that the petitioner "is actually innocent of the underlying offense").

**B. Application**

Petitioner makes two arguments in support of his Petition: (1) the trial court wrongfully admitted "inadmissible hearsay" from Meyers concerning the statement made by a police dispatcher that there was a stabbing victim at 203 Ashburton Avenue; and (2) the trial court's wrongful admission of this statement violated Petitioner's Sixth Amendment right to confrontation. (Pet. ¶ 12; Pet'r's Reply 7–13.) Judge McCarthy dismissed both claims. (*See* R&R 14–22.)

Petitioner objects to Judge McCarthy's rejection of Petitioner's claims, appearing to argue: (1) that Petitioner's case falls within an exception to the general rule that a state court's determination of a state law evidentiary issue is not subject to federal habeas review because the County Court's admission of the dispatcher's statement and subsequent limiting instruction to the jury were so flawed so as to deprive Petitioner of a fundamentally fair trial, (Obj's 5–7); and (2) that the admission of the dispatcher's statement violated Petitioner's Sixth Amendment right to confrontation because Meyers "was acting as a witness when he was testifying about a stabbing," (*id.* at 7–10). The Court will address each in turn.

### 1. Hearsay Claim

In the Petition and Petitioner's Reply, Petitioner repeatedly raised a number of arguments concerning the allegedly "[e]rroneous and [p]rejudicial [r]uling" made by the County Court to allow Meyers to testify to the content of the police dispatch Meyers received shortly after Petitioner was arrested. (Pet. ¶ 12.) At trial, the County Court allowed Meyers to testify to the content of a dispatch explaining "[t]hat there was a stabbing victim at 203 Ashburton Avenue" over Petitioner's objection "just to explain what the officer did" in responding to the incident and ultimately arresting Petitioner, and instructed the jury that the dispatcher's statement was "not being offered for the truth of what[ ] [was] in the transmission." (Pet'r's Reply Ex. E 153:19-20, 153:12-15.) However, Petitioner argues that the police dispatch log from that evening demonstrates that, in fact, Meyers received the dispatch in question 35 seconds after Petitioner was arrested, (*see* Pet'r's Reply Ex. B 1); thus, Meyers' receipt of the dispatch could not have "explain[ed] what [Meyers] did" in responding to the incident and ultimately arresting Petitioner, (Pet. ¶ 12; Pet'r's Reply 11). Moreover, Petitioner claims that Meyers had already testified that Meyers came to the scene after receiving Lopez's call that

"someone trying to hit him [sic]," so, according to Petitioner, Meyers' behavior in responding to the incident and ultimately arresting Petitioner required no further explanation. (Pet. ¶ 12; *see also* Pet'r's Reply 8–9, 11.) Petitioner argues that because of this, the dispatcher's statement could only have been offered for its truth (*i.e.*, to establish that there had been a stabbing) and thus, it was inadmissible hearsay and prejudiced Petitioner. (*See* Pet'r's Reply 2–3, 11–13.) Petitioner also argues that the County Court's limiting instruction had the effect of compounding the prejudice to Petitioner, rather than eliminating it. (*See id.* at 11–12.)

**\*8** Judge McCarthy concluded that Petitioner's claim was not subject to federal habeas review regardless of the propriety of the County Court's determinations, because the County Court's decision to admit the dispatcher's statement and to provide a limiting instruction concerned the application of state evidentiary rules and Petitioner failed to demonstrate that the alleged error "deprived him of a *fundamentally fair* trial." (R&R 15 (quoting *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983)) (alteration omitted).)[3] Judge McCarthy correctly explained that for an alleged evidentiary error to meet this standard, "the [alleged] trial error must have had 'substantial and injurious effect or influence in determining the jury's verdict.' " (R&R 15 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).) In assessing the gravity of an alleged error, courts consider a variety of factors, the most important of which is the strength of the prosecution's case. (*Id.*) Judge McCarthy reasoned that because the prosecution "adduced overwhelming evidence of Petitioner's guilt at trial" separate and apart from the dispatcher's statement, Petitioner's claim would not merit habeas review even if the County Court's decision to admit the statement and the subsequent jury instruction was in error. (*Id.* at 16.)

[3]    In his Objections, Petitioner writes that "[Judge McCarthy] did not address [P]etitioner's issues with regards to the [County Court] jury instruction in her DISCUSSION part of the Report and Recommendation," and "ask[s] this Court to also review [the] [County Court's] limiting jury instructions under the exception to the general rule that governs state court interpretation of the propriety of a jury instruction under state law." (Obj's 6.) While Petitioner is correct that Judge McCarthy did not include a separate analysis of the jury instruction in the R&R, the propriety of a jury instruction is an evidentiary question, and thus, Judge McCarthy's analysis of Petitioner's claim

based upon the County Court's jury instruction is encompassed by her wider analysis of Petitioner's hearsay claim. (*See* R&R 15–17.) As such, this Court will also consider Petitioner's Objections concerning the County Court's admission of the dispatcher's statement and the County Court's jury instruction together. *See Estelle*, 502 U.S. at 71–72 ("[T]he fact that the [jury] instruction was allegedly incorrect under state law is not a basis for habeas relief [because] the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules.... The only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." (citation, quotation marks, and alteration omitted)).

In objecting to Judge McCarthy's conclusion, Petitioner appears to acknowledge that "a federal court may only review a state application of state law ... [w]here [a] petitioner can show that the error complained of deprived him of a fundamentally fair trial," but argues that he has met that heavy burden. (Obj's 2.) In so doing, Petitioner reiterates many of the arguments made in the Petition and Petitioner's Reply, including that "Meyers' actions did not need an explanation," "Meyers did not know about any stabbing until after [P]etitioner's arrest," and "[the] [County Court's] limiting instructions to the jury validate[d] ... Meyer's [sic] deceptive, inaccurate and prejudicial statement about a stabbing." (*Id.* at 3–5.) He also argues that "[Judge McCarthy's] assertions that the prosecution presented highly probative physical and testimonial evidence of [P]etitioner's guilt are false," claiming that the only evidence the prosecution adduced at trial concerning the stabbing was Lopez's testimony and the at-issue testimony from Meyers. (*Id.* at 6.)[4]

[4]    Petitioner also argues that Meyers' allegedly improper testimony "prejudiced [P]etitioner in such a way it affected [P]etitioner's entire trial with error of constitutional dimensions that cause and prejudice is established," citing to *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012). (Obj's 4.) Petitioner appears to be conflating the standard for overcoming procedural default (demonstrating "either 'cause' and actual 'prejudice,' or ... 'actual innocence,' " *Gutierrez*, 702 F.3d at 111) and the standard for establishing that a state court determination of state law merits federal habeas review (demonstrating that the alleged

error "deprived [petitioner] of a *fundamentally fair* trial," *Taylor*, 708 F.3d at 891." In light of Petitioner's pro se status, the Court will construe Petitioner's "cause" and "prejudice" argument to the extent offered in support of his hearsay claim as an argument that Petitioner was deprived a fundamentally fair trial. *See Triestman*, 470 F.3d at 474 (explaining that pro se submissions shall be "construed liberally and interpreted so as to raise the strongest arguments that they suggest" (italics and quotation marks omitted)).

**\*9** The Court agrees with Judge McCarthy's conclusion that Petitioner failed to demonstrate that the County Court's alleged error in admitting the dispatcher's statement deprived him of a fundamentally fair trial and thus, that Petitioner is not entitled to habeas relief on his hearsay claim. Petitioner's objections appear to focus on Petitioner's oft-repeated arguments that the County Court's decision to admit the dispatcher's statement was improper because the statement constituted inadmissible hearsay. However, Judge McCarthy's conclusion was not based on a finding that the County Court's decision was appropriate; indeed, she specifically declined to rule on whether the admission of the dispatcher's statement at trial was a proper application of New York's rules of evidence. (*See* R&R 16 & n.12.) This Court sees no reason not to do the same, because regardless of the propriety of the County Court's decision, Petitioner has not demonstrated that the County Court's alleged error in admitting the dispatcher's statement "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623 (citation omitted), given the sheer volume of evidence presented to support Petitioner's conviction at trial, (*see* R&R 16–17).

Indeed, Petitioner's assertion that "[n]o other evidence outside Lopez's testimony about a stabbing and ... Meyers' statement about a stabbing was ever submitted to the jury," (Obj's 6), is belied even by Petitioner's own submissions to this Court. In Petitioner's Reply, Petitioner wrote that "Petitioner Anderson stands by the facts contained in his Direct Appeal, CPL 440.10 and Leave to Appeal to the Court of Appeals," (Pet'r's Reply 1); Petitioner then attached the statement of facts presumably submitted in conjunction with Petitioner's appeal to the Second Department, (*id.* at 2 & Ex. A). In this statement of facts, Petitioner describes, among other things, the testimony of Samantha Chernoguz, a DNA analyst with the Westchester County Forensic Laboratory, who testified that the knife recovered at the scene "had ... Lopez'[s] blood stains on it." (Pet'r's Reply Ex. A 25–26.) He goes on to

describe the testimony of Dr. Danielle Friedman, a doctor at Jacobi Hospital (where Lopez was taken to be treated for his injuries), who testified to the content of Lopez's medical records, which reflected the fact that Lopez had suffered a "stab wound to the left mid back." (*Id.* at 27–28.) Petitioner also recounted his own testimony at trial, in which he explained that when he returned to the deli with a baseball bat after the initial altercation, he "wasn't thinking straight," and admitted to at least "pick[ing] up the knife," "pointing at [another deli employee] with the knife," and "pacing back and forth through the store" with the knife. (*Id.* at 30–31.) And, Petitioner describes the testimony of Lopez, whose credibility the Court understands Petitioner questions, (*see, e.g.*, Obj's 3), but who clearly testified that Petitioner stabbed him, (*see* Pet'r's Reply Ex. A 13).

In short, there was substantial evidence submitted to the jury separate and apart from the dispatcher's statement and on which the jury could have convicted Petitioner for assault in the second degree. Petitioner may disagree with the way in which the jury weighed the evidence or with the credibility assessments that the jury made, but "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on habeas appeal." *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (quoting *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996)) (alterations omitted); *id.* at 470–71 (denying habeas petition based on an argument that a particular witness's testimony was "incredible" because "a habeas court must defer to the assessments of the weight of the evidence and credibility of the witnesses that were made by the jury" (quoting *Frazier v. New York*, 187 F. Supp. 2d 102, 109–10 (S.D.N.Y. 2002))); *see also Steinhilber v. Kirkpatrick, M.*, No. 18-CV-1251, 2020 WL 9074808, at \*34 (S.D.N.Y. Aug. 21, 2020) ("[I]t is well established that a weight of the evidence claim is based on state law and is not cognizable on federal habeas review." (collecting cases)), *report and recommendation adopted sub. nom, Steinhilber v. Kirkpatrick*, 2021 WL 1254554 (S.D.N.Y. Apr. 5, 2021).[5]

[5]    While not dispositive, the Court notes that Petitioner implies that the dispatcher's statement had much more probative value than is appropriate. Petitioner argues in his Objections that the dispatcher's statement "directly implicate[d] [P]etitioner in a stabbing." (Obj's 6.) However, Meyers' testimony concerning the statement was, in full: "Q And did you hear any further radio transmissions with respect to 203 Ashburton

Avenue? A For whatever officers were responding to use caution. Q Did they indicate why you should use caution? A Yes. Q What was said? [Objection and limiting instruction.] A That there was a stabbing victim at 203 Ashburton Avenue," (Pet'r's Reply Ex. E 153:5-20). Thus, even if it had been offered for its truth, Meyers' testimony about the statement did not "directly implicate [P]etitioner in a stabbing" at all. If anything, all the statement would have done was corroborate that a stabbing took place, which, given the physical evidence submitted at trial, was not reasonably in dispute.

**\*10** Petitioner is thus not entitled to habeas relief on his hearsay claim, and Judge McCarthy's recommendation on this point is adopted.

### 2. Confrontation Clause Claim

Petitioner also argues that the County Court's admission of the dispatcher's statement violated his Sixth Amendment right to confrontation because "[t]he caller [sic] did not testif[y] at trial and [P]etitioner did not have the opportunity for cross-examination and the jury did not have the chance to look at [him], and judge his demeanor upon the stand and the manner in which he g[ave] his testimony [to determine] whether he is worthy of belief." (Pet'r's Reply 7.) Judge McCarthy concluded that Petitioner's Confrontation Clause claim did not merit habeas relief for two reasons: (1) Petitioner's Confrontation Clause claim is procedurally barred based on the Second Department's ruling that this argument was "unpreserved for appellate review and, in any event, without merit," *Anderson*, 148 A.D.3d at 715; and (2) even if Petitioner's Confrontation Clause claim was not procedurally barred, the claim is meritless because the Second Department's ruling was neither contrary to, nor an unreasonable application of, federal law, since (a) the statement was not offered for its truth, (b) the statement was not testimonial, and (c) any alleged error in admitting the statement was harmless given the strength of the prosecution's case. (*See* R&R 19–22.)

Liberally construed, Petitioner argues that the County Court's decision to admit the dispatcher's statement was "contrary to ... clearly established federal law," *Epps*, 687 F.3d at 50 (quoting 28 U.S.C. § 2254(d)(1)), namely, the Confrontation Clause. Petitioner specifically objects on two grounds. First, Petitioner appears to argue that the statement was testimonial because the dispatcher's statement's primary purpose was not to enable police assistance to meet an ongoing emergency, since the statement was made after Petitioner was already in police custody. (Obj's 7.) Petitioner also seems to argue that to the extent the statement was not testimonial at the time it was made, it became testimonial when Meyers testified about it at trial. (*Id.* at 8.) Petitioner further argues, again, that because the statement "did not and could not explain why ... Meyers arrested [P]etitioner," "[t]hat leaves the alternative": that the statement was offered for its truth. (*Id.* at 8–9.) Second, Petitioner argues that his Confrontation Clause claim is not procedurally barred because "even if [P]etitioner did not exhaust his claim by expressly alleging a violation of his Sixth Amendment Confrontation Clause right at trial, [P]etitioner always maintained he did not stab Lopez." (*Id.* at 9–10.)

On Petitioner's Confrontation Clause claim, the Court again agrees with Judge McCarthy and finds that Petitioner is not entitled to habeas relief. The Court will address each of Petitioner's objections in turn.

### a. The Dispatcher's Statement Was Not Testimonial

As Judge McCarthy explained, the Confrontation Clause bars the use of "testimonial" out-of-court statements offered against a defendant in lieu of in-court testimony subject to cross-examination. (*See* R&R 20.) While the Supreme Court has declined "to spell out a comprehensive definition of 'testimonial,' " it has explained that "at a minimum," the term applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford v. Washington*, 541 U.S. 36, 68 (2004); *accord DeJesus v. Perez*, 813 F. App'x 631, 633 (2d Cir. 2020) (summary order). More broadly, statements are considered "testimonial" when they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (quotation marks omitted); *see also Michigan v. Bryant*, 562 U.S. 344, 354 (2011) ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (quotation marks and alteration omitted)). Finally, the admission of a testimonial statement from an out-of-court witness at trial only runs afoul of the Confrontation Clause if the statement is offered to establish the truth of the matter asserted. *Cf. Crawford*, 541 U.S. at 59, n.9 ("The [Confrontation] Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the

matter asserted."); *accord United States v. Stewart*, 433 F.3d 273, 291 (2d Cir. 2006) (same).

**\*11** At the outset, Petitioner appears to misunderstand which individual he was allegedly denied the right to confront in violation of the Confrontation Clause. Petitioner seems to argue in his Objections that he had the right to confront Meyers, since Meyers "was acting as a witness against [P]etitioner," and this right was denied. (Obj's 7–8.) There is no question that Meyers was acting as a witness against Petitioner, since Meyers testified on behalf of the prosecution at trial, but there is also no question that Petitioner was provided with the opportunity to confront Meyers and, in fact, did confront Meyers: the trial transcript demonstrates that Petitioner's attorney cross-examined Meyers. (*See* Pet'r's Reply Ex. E 161:2-165:5.) *See also Crawford*, 541 U.S. at 59 n.9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."). The pertinent question for purposes of Petitioner's Sixth Amendment claim is whether the *police dispatcher*—the individual who made the out-of-court statement concerning a stabbing, introduced via Meyers' testimony—was acting as a witness against Petitioner at the time he or she made the statement.

"In the end, the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Ohio v. Clark*, 576 U.S. 237, 245 (2015). Given the circumstances here—a general statement that a stabbing occurred made over a police dispatch during a period of time in which many such "status update" statements were made in quick succession, (*see* Pet'r's Reply Ex. B 1) —the Court agrees with Judge McCarthy that at the time the dispatcher made the at-issue statement, he or she "was neither acting as a witness," "testifying," "nor did he [or she] expect that his [or her] statement would be used in a future proceeding," (R&R 21); *see also Currie v. Graham*, No. 17-CV-1227, 2019 WL 2451762, at \*6, \*9 (E.D.N.Y. June 12, 2019) (noting that "the radio call [that the arresting officer] ... received describ[ing] [the physical appearance of] one of the perpetrators... was non-testimonial, which would mean the absence of any Confrontation Clause issue at all"). Moreover, given the County Court's explicit instruction that the statement was "not being offered for the truth of what's in the transmission," (Pet'r's Reply Ex. E 153:12-13), the Court further agrees with Judge McCarthy that the statement was not offered for its truth and thus, did not implicate Petitioner's

Sixth Amendment rights, (*see* R&R 21 (citing *Stewart*, 433 F.3d at 291)).

Petitioner argues that because "[P]etitioner was in custody" at the time the statement was made, "it can be said that there was no more ongoing emergency at hand for the police to resolve." (Obj's 7.) While Petitioner's implication is correct in principle, since " '[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency,' " *Bryant*, 562 U.S. at 356 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)), a statement does not need to be made under such circumstances for it to be considered nontestimonial. In other words, statements made with the purpose of enabling police assistance to meet an ongoing emergency are a *type* of nontestimonial statement, but do not encompass all nontestimonial statements. [6]

> [6]  While the instant ruling does not rest on a finding that the statement was made to enable police assistance to meet an ongoing emergency, the Court notes that Petitioner's argument that there was no ongoing emergency once he was arrested and in police custody belies his argument that Petitioner did not commit the stabbing. If Petitioner was not the perpetrator, then surely the emergency would have been ongoing after his arrest; the true perpetrator would still have been at large.

Moreover, the Court agrees with Judge McCarthy that even if the dispatcher's statement was testimonial and offered for truth and thus, the County Court's admission of the statement violated Petitioner's right to confrontation, this error was harmless. (*See* R&R 21–22.) Petitioner attempts to argue that "an error of this constitutional dimension prejudiced [P]etitioner in that it cannot be considered harmless on habeas review," (Obj's 9), but this assertion is directly controverted by Supreme Court precedent, *see Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1985) (holding that "Confrontation Clause errors" are "subject to ... harmless-error analysis"); *accord Perkins v. Herbert*, 596 F.3d 161, 174 (2d Cir. 2010) (same). In determining whether a Confrontation Clause error was harmless, courts consider a number of factors, the most important of which is "the strength of the prosecution's case." *Perkins*, 596 F.3d at 177 (quotation marks omitted). As explained above, the prosecution submitted ample evidence to the jury separate and apart from the dispatcher's statement on which the jury could have based Petitioner's conviction,

and thus, the Court finds that any Confrontation Clause error in admitting the statement was harmless.

### b. Petitioner's Confrontation Clause Claim Is Procedurally Barred

*12 Aside from the questionable merits of Petitioner's Confrontation Clause claim, the Court also finds that—consistent with Judge McCarthy's report and recommendation—Petitioner's Confrontation Clause claim is procedurally barred. As explained above, a federal court "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Downs*, 657 F.3d at 101. Here, the Second Department explicitly stated that Petitioner's Confrontation Clause claim was "unpreserved for appellate review," *Anderson*, 148 A.D.3d at 715, thus, the Second Department's decision on Petitioner's Confrontation Clause claim was based on an independent and adequate state law ground: Petitioner's failure to preserve his Confrontation Clause claim for appellate review, as required by New York Criminal Procedure Law § 470.05, *see People v. Perez*, 9 A.D.3d 376, 377 (N.Y. App. Div. 2004) ("Although the defendant objected to the testimony at issue, he did not specify the ground now raised on appeal. Therefore, the issue of whether he was deprived of his right to confrontation is unpreserved for appellate review." (collecting cases)); *accord Chrysler v. Guiney*, 14 F. Supp. 3d 418, 460 (S.D.N.Y. 2014) ("[T]o preserve a Confrontation Clause challenge on appeal to a New York court, trial counsel had to object specifically on Confrontation Clause grounds."). While the Second Department did also find that Petitioner's Confrontation Clause was "in any event, without merit," *Anderson*, 148 A.D.3d at 715, the Second Circuit has made clear that "where a state court says that a claim is 'not preserved for appellate review' and then rule[s] 'in any event' on the merits, such a claim is not preserved," *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810 n.4 (2d Cir. 2000) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724–25 (2d Cir. 1996)); *accord Grant v. Bradt*, No. 10-CV-394, 2012 WL 3764548, at *3 (S.D.N.Y. Aug. 30, 2012) (same).

In his Objections, Plaintiff argues that Judge McCarthy's finding that "[P]etitioner's Confrontation Clause claim is procedurally barred is without merit," because "even if [P]etitioner did not exhaust his claim by expressly alleging a violation of his Sixth Amendment Confrontation Clause

right at trial, [P]etitioner always maintained he did not stab Lopez." (Obj's 9.) However, the merit or wisdom of the Second Department's determination that Petitioner's Confrontation Clause claim was unpreserved for appellate review is immaterial; the Second Department's determination was based on an independent and adequate state law ground and thus, Petitioner's claim for habeas relief is procedurally barred. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991) ("The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.")

The only way that Petitioner can overcome this procedural bar is if he can demonstrate " 'cause for the default and prejudice' " or that he is " 'actually innocent' of the crime for which he was convicted," *Carvajal*, 633 F.3d at 104 (quoting *Aparicio*, 269 F.3d at 90), through "new reliable evidence," *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Petitioner can neither establish "cause" and "prejudice," nor that he is "actually innocent." A habeas petitioner can establish "cause" if he or she can demonstrate that "some objective factor, external to [t]he [p]etitioner's defense, interfered with his [or her] ability to comply with a state procedural rule," *Gutierrez*, 702 F.3d at 111–12, but as Judge McCarthy observed, (R&R 19–20), Petitioner has offered no explanation for his failure to preserve his Confrontation Clause claim at trial. Given that Petitioner cannot demonstrate "cause," it is unnecessary for the Court to determine whether he has demonstrated "prejudice," but as explained above, even if the County Court's decision to admit the dispatcher's statement did violate Petitioner's Confrontation Clause rights, this error was harmless. As such, Petitioner cannot demonstrate that this alleged error "resulted in 'substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions,' " as required to establish prejudice. *Gutierrez*, 702 F.3d at 112 (alteration in original) (quoting *Murray v. Carrier*, 477 U.S. 478, 494 (1986)). And, Petitioner has proffered no "new reliable evidence" demonstrating that he is actually innocent of assault in the second degree. *Schlup*, 513 U.S. at 324.

In sum, the Court finds that the dispatcher's statement was not testimonial and thus, the County Court's decision to admit the statement did not constitute a violation of Petitioner's Sixth Amendment right to confrontation, let alone an "extreme malfunction[ ] in the state criminal justice system[ ]" sufficient to merit federal habeas relief. *Harrington*, 562 U.S. at 102–03. Moreover, even if Petitioner's right to confrontation was violated, the error was harmless. And finally, Petitioner's Confrontation Clause claim fails for the

2021 WL 4429333

separate and independent reason that it is procedurally barred. Judge McCarthy's recommendation on this point is also adopted.

## III. Conclusion

**\*13** The Court, having conducted a thorough review of the remainder of the R&R, finds no error, clear or otherwise. The Court therefore adopts the outcome of Judge McCarthy's R&R. Petitioner's writ of habeas corpus is accordingly dismissed with prejudice.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Patrol*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be

taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a [petitioner's] good faith ... demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and noting that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it was not taken in good faith).

The Clerk of the Court is respectfully directed to enter judgment in favor of Respondent, send a copy of this Order to Petitioner at the address listed on the docket, and close the case.

SO ORDERED.

## All Citations

Slip Copy, 2021 WL 4429333

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3240710
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Miguel MALDONADO, Petitioner,
v.
William LEE, Respondent.

No. 09–CV–5270 (SJF).
|
July 31, 2012.

**Attorneys and Law Firms**

Miguel Maldonado, Stormville, NY, pro se.

Morgan James Dennehy, Brooklyn, NY, for Respondent.

**ORDER**

FEUERSTEIN, District Judge.

 **\*1** Incarcerated *pro se* petitioner Miguel Maldonado ("petitioner" or "Maldonado") has filed the instant petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. [Docket Entry No. 1]. For the reasons that follow, the petition is denied in its entirety.

I. Factual Background and Procedural History
In or around 2003, Maldonado was indicted in Kings County Supreme Court on four (4) counts: two (2) counts of murder in the second degree, in violation of Penal Law §§ 125.25[1] and 125.25[2], one (1) count of criminal possession of a weapon in the second degree, in violation of Penal Law § 235.03, and one (1) count of criminal possession of a weapon in the third degree, in violation of Penal Law § 265.02[4]. Affidavit of Morgan J. Dennehy [Docket Entry No. 5] ("Dennehy Aff.") at ¶ 5. According to respondent, Maldonado had driven an individual named Edwin Puga ("Puga") to a location in Brooklyn, where he handed Puga a firearm. Puga then shot a third individual, Santiago Camacho, who ultimately died from his injuries. *Id.* at ¶ 4.

On January 19, 2005, Maldonado entered a plea of guilty to one (1) charge of manslaughter in the first degree, in violation of Penal Law § 125.20[1]. *Id.* at ¶ 6. In an affidavit, respondent's attorney states that Maldonado was "promised"

a sentence of nineteen (19) years' imprisonment and five (5) years of post-release supervision; this is the same sentence imposed by Justice Gustin Reichbach on February 10, 2005. *Id.*

Petitioner's attorney moved the Appellate Division, Second Department for a reduction in petitioner's sentence in the interest of justice. *Id.* at ¶ 7. By order dated June 19, 2007, the Appellate Division affirmed defendant's sentence without opinion. *Id.* at ¶ 8; *People v. Maldonado,* 41 A.D.3d 736 (2d Dep't 2007).

On January 14, 2008, petitioner filed a petition for a writ of habeas corpus in this Court, arguing that his sentence was "excessive" and "over the sentence guideline for [his] crime," Case No. 08–CV–696, Docket Entry No. 1. In a letter dated April 14, 2008, petitioner sought to stay his petition in order to exhaust an "additional issue" in state court. Case No. 08–CV–696, Docket Entry No. 8. By order dated April 22, 2008, the Court dismissed that action without prejudice. Case No. 08–CV–696, Docket Entry No. 9.

On June 9, 2008, petitioner filed a motion pursuant to Criminal Procedure law § 440.20 in the Kings County Supreme Court, arguing, *inter alia,* that his sentence was greater than the maximum permitted by law and that his indictment had been defective because it had contained multiplicitous counts. Dennehy Aff. at ¶ 13. In an order dated March 9, 2009, the Supreme Court denied defendant's motion, holding that: (1) the sentence was legal because it was within the parameters specified by the Penal Law, (2) that his excessive sentence claim was not cognizable in a motion to set aside a sentence, and (3) that there were no multiplicity counts in the indictment. *Id.* at ¶ 14. Maldonado applied for leave to appeal to the Appellate Division, which was denied by order dated June 11, 2009. *Id.* at ¶ 15.

 **\*2** On November 6, 2009, petitioner filed the instant petition in this Court.

II. Discussion

  A. Standard of Review
Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus:

  "[S]hall not be granted with respect to any claim that was adjudicated on

2012 WL 3240710

merits in State court proceedings unless the adjudication of the claim —(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

"An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.' " *Bell v. Miller,* 500 F.3d 149, 155 (2d Cir.2007) (citing *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001)).

The Supreme Court has stated that "[a]s amended by AEDPA, 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington v. Richter,* ––– U.S. ––––, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) ("If this standard was difficult to meet, that is because it was meant to be."). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia,* 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring)). A state court's unreasonable application of law must have been more than "incorrect or erroneous"; it must have been "objectively unreasonable." *Sellan,* 261 F.3d at 315 (quotations and citation omitted); *see also Sorto v. Herbert,* 497 F.3d 163, 169 (2d Cir.2007).

Claims that were not adjudicated on the merits in state court are not subjected to the deferential standard that applies under AEDPA. *See Cone v. Bell,* 556 U.S. 449, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009) (citing 28 U.S.C. § 2254(d)). Where AEDPA's deferential standard of review does apply, the "state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence." *Bierenbaum v. Graham,* 607 F.3d 36, 48 (2d Cir.2010) (citing 28 U.S.C. § 2254(e)(1)). Federal habeas review is limited to determining whether a petitioner's custody violates federal law, *see* 28 U.S.C. § 2254(a), and "does not lie for errors of state law." *Swarthout v. Cooke,* ––– U.S. ––––, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011).

**B. Petitioner's Arguments**

It appears that petitioner seeks a writ of habeas corpus on the same grounds as those he raised in his C.P.L. § 440.20 motion, namely that: (1) his sentence is "excessive," and (2) that his indictment contained "multiplicitous counts" in violation of the Double Jeopardy Clause of the Fifth Amendment.

**C. Excessive Sentence Claim**

**\*3** Petitioner appears to argue that his sentence was above the range permitted by New York State law. This claim is plainly meritless. As respondent points out, petitioner entered a plea of guilty to one (1) count of manslaughter in the first degree, a class B violent felony offense. *See* Penal Law §§ 125.20, 70.02. In the case of a class B violent felony offense, the defendant's term of imprisonment "must be at least five years and must not exceed twenty-five years ...." Penal Law § 70.02(3)(a). Thus, petitioner's nineteen (19)-year sentence is well within the statutory range. *See White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992) ("No federal constitutional issue is presented where ... the sentence is within the range prescribed by state law.") . [1]

[1]    To the extent petitioner intends to argue that his sentence should be reduced in the interest of justice pursuant to Criminal Procedure Law §§ 470.15 and 470.20, this is a state law claim that cannot be raised in a habeas petition. *See Hudgins v. People of the State of New York.* No. 07–CV–01862, 2009 WL 1703266, at *9 (E.D.N.Y. June 18, 2009) ("[T]o the extent that petitioner relies on state law as a grounds for an excessive sentence claim, such claim is not cognizable on habeas review."); *see also Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

**D. Fifth Amendment Claim**

Next, Maldonado argues that his indictment contained multiplicitous counts, in violation of the Fifth Amendment's Double Jeopardy Clause, because it charged him with two (2) separate counts of second degree murder.

"A multiplicitous indictment 'violates the Double Jeopardy clause of the Fifth Amendment, subjecting a person to punishment for the same crime more than once,' and also

'may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes.' " *Timmons v. Lee,* No. 10–CV–1155, 2010 WL 3813963, at \*9 (E.D.N.Y. Sept.23, 2010) (quoting *United States v. Reed,* 639 F.2d 896, 904 (2d Cir.1981)). "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Kerley,* 544 F.3d 172, 178 (2d Cir.2008) (quoting *United States v. Chacko,* 169 F.3d 140, 145 (2d Cir.1999)). "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

The indictment does charge Maldonado with two (2) counts of murder in the second degree, one (1) under Penal Law § 125.25[1], and one (1) under Penal Law § 125.25[2]. Unlike the first count, the second count charges petitioner with second degree murder under a "depraved indifference to human life" theory. *See* Docket Entry No. 7 at 16. The fact that petitioner was *charged* with both crimes does not mean that there was a constitutional violation. Indeed, had petitioner proceeded to trial, the People would have been permitted to submit both counts to the jury, as long as these counts were submitted in the alternative. *See People v. Gallagher .* 69 N.Y.2d 525, 528, 516 N.Y.S.2d 174, 508 N.E.2d 909 (1987) ("Where a defendant is charged with a single homicide, in an indictment containing one count of intentional murder and one count of depraved mind murder, both counts may be submitted to the jury, but only in the alternative.").

 **\*4** However, this claim is meritless, because, despite his claim that he pleaded guilty to both counts of murder in the second degree, he actually pleaded guilty to only one (1) count of manslaughter in the first degree.[2] Therefore, there was no Double Jeopardy violation. *See Ross v. Kirkpatrick,* No.

09–CV–0631, 2011 WL 1599636, at \*4 (W.D.N.Y. Apr. 27, 2011) (no Double Jeopardy violation when petitioner who was charged with both depraved indifference and intentional murder only convicted of intentional murder).

2        The Supreme Court made this fact abundantly clear to petitioner. At the plea hearing, petitioner had this exchange with the court:

> THE COURT: [D]o you understand that if this plea is accepted by the Court, it will be exactly the same as if you had gone to trial and been found guilty after trial by the jury of manslaughter in the first degree?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And do you understand that that is what you're pleading guilty to, manslaughter in the first degree?
>
> THE DEFENDANT: Yes.
>
> Transcript of Plea Hearing, Docket Entry No. 7, at 5:11–20.

## III. Conclusion

For the foregoing reasons, Maldonado's petition for a writ of habeas corpus is denied in its entirety. As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(1). In accordance with Federal Rule of Civil Procedure 77, the Clerk of Court shall serve a copy of this order upon all parties, including petitioner at his last known address.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3240710

---

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3226849
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mark SERRANO, Petitioner,
v.
Robert A. KIRKPATRICK, Respondent.

No. 11 Civ. 2825(ER)(PED).
|
June 25, 2013.

## ORDER

RAMOS, District Judge.

**\*1** Before the Court is Magistrate Judge Davison's Report and Recommendation (the "Report"), dated May 10, 2013, on petitioner Mark Serrano's petition for a writ of habeas corpus pursuant to 28 U .S.C. § 2254, from his April 8, 2008 conviction for numerous counts of murder, arson, robbery, perjury and conspiracy, entered in County Court, Dutchess County. Doc. 28. Judge Davison recommended that the Court deny the petition. *Id.*

In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C). Parties may raise "specific," "written" objections to the report and recommendation "[w]ithin fourteen days after being served with a copy." *Id.; see also* Fed.R.Civ.P. 72(b)(2). A district court reviews *de novo* those portions of the report and recommendation to which timely and specific objections are made. 28 U.S.C. § 636(b)(1)(C); *see also* United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir.1997). The district court may adopt those parts of the report and recommendation to which no party has timely objected, provided no clear error is apparent from the face of the record. Lewis v. Zon, 573 F.Supp.2d 804, 811 (S.D .N.Y.2008).

In the present case, the Report advised the parties that they had seventeen days from service of the Report to file and serve written objections, and warned the parties that failure to timely object would preclude appellate review of any order or judgment in this case. Report 27. In addition, the Report expressly directed the parties' attention to 28 U.S.C. § 636(b)

(1)(B) and Rules 72(b) and 6(a-b), (d) of the Federal Rules of Civil Procedure. *Id.* Objections to the Report were due by May 28, 2013. *See* Doc. 28. However, as of the date of this Order, no objections have been filed and no requests for an extension of time to object have been made. Accordingly, Petitioner has waived the right to object to the Report, or to obtain appellate review. *See* Caidor v. Onondaga Cnty., 516 F.3d 601, 604 (2d Cir.2008); *see also* Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.1992).

Despite Petitioner's failure to object to the Report, the Court has reviewed Judge Davison's thorough and well-reasoned Report and finds no error, clear or otherwise.

## CONCLUSION

Accordingly, the Court adopts the Report in its entirety, and Petitioner's petition for a writ of habeas corpus is DENIED.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *Love v. McCray,* 413 F.3d 192, 195 (2d Cir.2005); 28 U.S .C. § 2253. In addition, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied. *See* Coppedge v. United States, 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to close this case.

**\*2** It is SO ORDERED.

## *REPORT AND RECOMMENDATION*

PAUL E. DAVISON, United States Magistrate Judge.

## TO: THE HONORABLE EDGARDO RAMOS UNITED STATES DISTRICT JUDGE

### I. *INTRODUCTION*

Proceeding *pro se,* Mark Serrano ("Petitioner") seeks a writ of *habeas corpus,* pursuant to 28 U.S.C. § 2254, with respect to his April 8, 2008 conviction in Dutchess County (Dolan, J.). Petitioner was convicted, after a jury trial, of numerous counts of murder, arson, robbery, perjury, and conspiracy, in connection with the execution of a drug dealer and his family. He is serving an aggregate term of fifty years to life

imprisonment. This petition comes before me pursuant to an Order of Reference dated June 1, 2011. (Dkt.8.) For the reasons set forth below, I respectfully recommend that this petition be **DENIED**.

## II. *BACKGROUND*

Sometime after midnight on January 19, 2007, Petitioner and his friend Charles Gilleo ("Gilleo") (together, "Defendants") went to the home of Manuel "Tony" Morey, III ("Morey"), located on Route 82 in the Town of Fishkill, New York, after Defendants agreed to forcibly steal narcotics from him. Defendants fatally shot Morey in the neck, fatally shot Tina Morey three times, fatally stabbed two of the Morey's children, Adam and Manuel, and stabbed and crushed the skull of the Morey's third child, Ryan. Defendants then removed the narcotics from the home and set fire to the home before they fled in the Morey's vehicle. Ryan Morey, who survived the stabbing, died from carbon monoxide poisoning. Defendants then burned the Morey's vehicle and agreed that they would lie to police and provide false alibis. In the days following the murders, both Defendants made statements to state police officers. Petitioner was arrested on January 26, 2007.

### A. *Indictment*

The May 7, 2007 superceding indictment charged Defendants with the following offenses:

(1) 20 counts of murder in the first degree, in violation of N.Y. Penal Law § 125.27(1)(a) (viii) (counts 1–20 of the indictment); [1]

[1]  A person is guilty of murder in the first degree when ... [w]ith intent to cause the death of another person, he causes the death of such person or of the same criminal transaction, the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of an additional person or person; provided, however, the victim is not a participant in the criminal transaction....

N.Y. Penal Law § 125.27(1)(a) (viii).

(2) 4 counts of murder in the first degree, in violation of N.Y. Penal Law § 125.27(1)(a)(v) (counts 21–24 of the indictment); [2]

[2]  A person is guilty of murder in the first degree when ... [w]ith intent to cause the death of another person, he causes the death of such person or of a third person; and ... the intended victim was a witness to a crime committed on a prior occasion and the death was caused for the purpose of preventing the intended victim's testimony in any criminal action or proceeding whether or not such action or proceeding had been commenced ....

N.Y. Penal Law § 125.27(1)(a)(v).

(3) 5 counts of murder in the second degree, in violation of N.Y. Penal Law § 125.25(1) (counts 25–29 of the indictment); [3]

[3]  "A person is guilty of murder in the second degree when ... [w]ith intent to cause the death of another person, he causes the death of such person or of a third person ...." N.Y. Penal Law § 125.25(a).

(4) 6 counts of murder in the second degree, in violation of N.Y. Penal Law § 125.25(3) (counts 30–35 of the indictment); [4]

[4]  A person is guilty of murder in the second degree when ... [a]cting either alone or with one or more other persons, he commits or attempts to commit robbery ... [or] arson, and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants ....

N.Y. Penal Law § 125.25(3).

(5) 1 count of arson in the first degree, in violation of N.Y. Penal Law § 150.20(1) (count 36 of the indictment); [5]

[5]  A person is guilty of arson in the first degree when he intentionally damages a building ... by causing an explosion or a fire and when ... such explosion or fire ... causes serious physical injury to another person other than a participant ... and when ... another person who is not a participant in the crime is present in such building ... at the time ... and ... the defendant knows that fact or the circumstances

are such as to render the presence of such person therein a reasonable possibility.
N.Y. Penal Law § 150.20(1).

(6) 1 count of arson in the third degree, in violation of N.Y. Penal Law § 150.10(1) (count 37 of the indictment); [6]

[6]    "A person is guilty of arson in the third degree when he intentionally damages a ... motor vehicle by starting a fire or causing an explosion." N.Y. Penal Law § 150.10(1).

(7) 2 counts of robbery in the first degree, in violation of N.Y. Penal Law § 160.15(1) (counts 38–39 of the indictment); [7]

[7]    A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime ... [c]auses serious physical injury to any person who is not a participant in the crime ....

N.Y. Penal Law § 160.15(1).

(8) 2 counts of robbery in the first degree, in violation of N.Y. Penal Law § 160.15(2) (counts 40–41 of the indictment); [8]

[8]    A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime ... [i]s armed with a deadly weapon...." N.Y. Penal Law § 160.15(2).

**\*3** (9) 2 counts of robbery in the first degree, in violation of N.Y. Penal Law § 160.15(3) (counts 42–43 of the indictment); [9]

[9]    "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime ... [u]ses or threatens the immediate use of a dangerous instrument ...." N.Y. Penal Law § 160.15(3)

(10) 1 count of conspiracy in the fourth degree, in violation of N.Y. Penal Law § 105.10(1) (count 45 of the indictment); [10]

[10]    "A person is guilty of conspiracy in the fourth degree when, with intent that conduct constituting ... a class B or class C felony be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct ...." N.Y. Penal Law § 105.10(1).

(11) 1 count of perjury in the second degree, in violation of N.Y. Penal Law § 210.10 (count 47 of the indictment); [11] and

[11]    A person is guilty of perjury in the second degree when he swears falsely and when his false statement is (a) made in a subscribed written instrument for which an oath is required by law, and (b) made with intent to mislead a public servant in the performance of his official functions, and (c) material to the action, proceeding or matter involved.
N.Y. Penal Law § 210.10.

(12) 1 count of conspiracy in the fifth degree, in violation of N.Y. Penal Law § 105.05(1) (count 49 of the indictment). [12]

[12]    "A person is guilty of conspiracy in the fifth degree when, and with intent that conduct constituting ... a felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct ...." N.Y. Penal Law § 105.05(1).

(Resp't's Aff. in Answer to a Pet. for a Writ of Habeas Corpus ("Resp't's Aff."), at Ex.1 (Dkt.14). [13] )

[13]    All exhibits cited herein are attached to Respondent's Affidavit.

### B. Pretrial Proceedings

Petitioner's counsel filed a pretrial omnibus motion requesting various forms of relief. The court granted the motion to the extent that it dismissed counts 21–24 of the superceding indictment, which had charged the Defendants with first degree murder, in violation of N.Y. Penal Law § 125.27(1)(a)(v), on a theory that the Defendants killed the victims so as to eliminate any potential eyewitnesses. The court denied

the motion to dismiss with respect to the other counts of the indictment. (Ex. 4, ¶ 2.)

The court also granted the motion to the extent that it ordered a suppression hearing to determine the admissibility of statements Petitioner made to law enforcement. The hearing was conducted in November 2007. The court determined that the statements that Petitioner made were voluntary and denied his motion to suppress. [14] The court also severed the Defendants' cases for trial. (Ex. 5.)

[14]  Petitioner offered various versions of events that occurred on the night of the murder in his statements. (Ex. 5.)

### C. The Verdict and Sentence

The trial began with jury selection on November 13, 2007. On December 4, 2007, the jury returned a verdict acquitting Petitioner of arson in the first degree (count 36 of the indictment), but finding him guilty of the other offenses charged. (Tr., at 2232–34 (Dkt.18).)

In light of Petitioner's acquittal of the first degree arson charge, the court later dismissed the second degree murder conviction that pertained to the felony murder of Ryan Morey during the course of the arson (count 35 of the indictment). (*See* Resp't's Aff. ¶ 10.) Petitioner was then sentenced as follows: indeterminate terms of 25 years to life imprisonment on each of the 20 murder in the first degree convictions (counts 1–20 of the indictment); indeterminate terms of 25 years to life imprisonment on each of the ten convictions for second degree murder (counts 25–34 of the indictment); an indeterminate term of 5 to 15 years imprisonment for the third degree arson conviction (count 37 of the indictment), which would run concurrent with all of the other sentences; determinate terms of 25 years on each of the six first degree robbery convictions (counts 38–43 of the indictment), which would run concurrent with all of the other sentences; an indeterminate term of 1 1/3 to 4 years imprisonment for the fourth degree conspiracy conviction (count 45 of the indictment), which would run concurrent with all of the other sentences; an indeterminate term of 1 1/3 to 4 years imprisonment for the second degree perjury conviction (count 47 of the indictment), which would run concurrent with all of the other sentences; and a determinate term of 1 year for the fifth degree conspiracy conviction (count 49 of the indictment), which would run concurrent with all of the other sentences. The court also ordered that the sentences for the first degree murder convictions for counts 1–8 of the

indictment run concurrent to each other, that the sentences for the first degree murder convictions for counts 9–20 run concurrent to each other, and that the sentences for counts 1–8 run consecutive to the sentences for counts 9–20. Accordingly, the court sentenced Petitioner to an aggregate term of 50 years to life imprisonment. (Ex. 1.)

### D. Direct Appeal

**\*4**  Through counsel, Petitioner appealed his conviction to the New York State Appellate Division, Second Department, on the following grounds:

(1) the court erred when "it failed to follow the mode of procedure set forth in *People v. O'Rama,* 78 N.Y.2d 270 [1991] and *United States v. Ronder,* 639 F.2d 931, 934 [2d Cir.1981]" by "conferring off the record with counsel" after the court received a jury note that asked the court to explain the elements of Arson in the first degree, (Appellant Serrano's Main Br. ("App.Br."), at 73 (attached to Resp't's Aff., at Ex. 6); *see id.* at 73–77);

(2) the court erred by failing to suppress Petitioner's pretrial statements that were "fruit of continuous unmirandized custodial interrogation and psychological coercion, a trick coupled with a promise in violation of the 4th and 14th Amendments to the U.S. Constitution and in violation of [N.Y.Crim. Proc. Law § ] 60.45(1) under *People v. McGuffin,* 55 A.D.2d 792 (Third Dept.1976), and *Arizona v. Fulmanente,* 499 U.S. 279, 286–287 (1991)." (*id.* at 77: *see id.* at 77–83);

(3) the evidence was legally insufficient and against the weight of the evidence with respect to Petitioner's "intent to rob, to commit murder [in the first degree] or to commit arson," (*id.* at 83; *see id.* at 83–87);

(4) the sentence was excessive, (*see id.* at 87–90);

(5) "[t]he Indictment was multiplicitous as to the Murder [in the first degree] counts, under *People v. John Taylor,* [No. 1845/2000, 2002 WL 825039 (Sup.Ct. Queens Cnty. Mar. 6, 2002) ] under the NYS Assembly and Senate Bill Memorandum to [N.Y.Crim. Proc. Law § ] 300.40," (*id.* at 90); and

(6) the grand jury instructions were legally insufficient, (*see id.*).

The Second Department affirmed the judgment in a written decision on February 23, 2010. *People v. Serrano,* 897

N.Y.S.2d 455 (App. Div.2d Dep't 2010). Leave to appeal to the New York Court of Appeals was denied on May 13, 2010. *People v. Serrano,* 14 N.Y.3d 892 (2010). Petitioner did not seek a writ of *certiorari* to the United States Supreme Court, nor has he sought state collateral relief. (*See* Pet. Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Pet.") ¶¶ 10(g), 11 (Dkt.2).)

### E. *Habeas Corpus Proceedings*

By petition dated March 29, 2011, Petitioner seeks a federal writ of *habeas corpus.* [15] He raises the same claims that were raised on direct appeal. (*Id.* ¶ 13.)

[15]    The petition was timely filed. *See* 28 U.S.C. § 2244(d).

### III. *DISCUSSION*

### A. *Applicable Law on Habeas Corpus Review*

"Habeas review is an extraordinary remedy." *Bousley v. United States,* 523 U.S. 614, 621 (1998) (citing *Reed v. Farley,* 512 U.S. 339, 354 (1994)). Before a federal district court may review the merits of a state criminal judgment in a *habeas corpus* action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254. If there has been procedural compliance with these statutes, the court must then determine the appropriate standard of review applicable to the petitioner's claim(s) in accordance with § 2254(d). The procedural and substantive standards applicable to *habeas* review, which were substantially modified by the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1220 (Apr. 24, 1996), are summarized below.

### 1. *Timeliness Requirement*

**\*5** A federal *habeas* petition is subject to AEDPA's strict, one-year statute of limitations. *See* 28 U.S.C. § 2244(d). The statute provides four different potential starting points for the limitations period, and specifies that the latest of these shall apply. *See id.* § 2244(d)(1). Under the statute, the limitation period is tolled only during the pendency of a properly filed application for State post-conviction relief, or other collateral review, with respect to the judgment to be challenged by the petition. *See id.* § 2244(d)(2). The statute reads as follows:

(d) (1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(d) (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

*Id.* § 2244(d).

The one-year limitation period is subject to equitable tolling, which is warranted when a petitioner has shown ' "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way' and prevented timely filing." *Holland v. Florida,* 130 S.Ct. 2549, 2262 (2010) (quoting *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005)). "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole,* 648 F .3d 132, 137 (2d Cir.2011). "To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances. He must further demonstrate that those circumstances caused him to miss the original filing deadline." *Id.* Finally, "[c]onsistent with the maxim that equity aids the vigilant, a petitioner seeking equitable tolling of AEDPA's limitations period must demonstrate that

2013 WL 3226849

he acted with reasonable diligence throughout the period he seeks to toll." *Id.* at 138 (internal quotation marks and citations omitted); *see also Valverde v. Stinson,* 224 F.3d 129, 134 (2d Cir.2000) (the applicant for equitable tolling must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances").

### 2. *Exhaustion Requirement*

**\*6** A federal court may not grant *habeas* relief unless the petitioner has first exhausted his claims in state court. *O'Sullivan v. Boerckel,* 526 U.S. 838, 842 (1999); *see* § 2254(b)(1) ("[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that— (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant"); *id.* § 2254(c) (the petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise, by any available procedure, the question presented"). The exhaustion requirement promotes interests in comity and federalism by demanding that state courts have the first opportunity to decide a petitioner's claim. *Rose v. Lundy,* 455 U .S. 509, 518–19 (1982).

To exhaust a federal claim, the petitioner must have "fairly present[ed] his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim," and thus "giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted). "Because non-constitutional claims are not cognizable in federal habeas corpus proceedings, a habeas petition must put state courts on notice that they are to decide federal constitutional claims." *Petrucelli v. Coombe,* 735 F.2d 684, 687 (2d Cir.1984) (citing *Smith v. Phillips,* 455 U.S. 209, 221 (1982)). Such notice requires that the petitioner "apprise the highest state court of both the factual and legal premises of the federal claims ultimately asserted in the habeas petition." *Galdamez v. Keane,* 394 F.3d 68, 73 (2d Cir.2005) (internal citation omitted). A claim may be "fairly presented" to the state courts

therefore, even if the petitioner has not cited "chapter and verse of the Constitution," in one of several ways:

> (a) [R]eliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye v. Attorney Gen. of N.Y.,* 696 F.2d 186, 194 (2d Cir.1982). A *habeas* petitioner who fails to meet a state's requirements to exhaust a claim will be barred from asserting that claim in federal court. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000).

However, "[f]or exhaustion purposes, a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997) (internal quotation omitted). "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991). Such a procedurally barred claim may be deemed exhausted by a federal *habeas* court. *See, e.g., Reyes,* 118 F.3d at 139. However, absent a showing of either "cause for the procedural default and prejudice attributable thereto," *Harris v. Reed,* 489 U.S. 255, 262 (1989), or "actual innocence," *Schlup v. Delo,* 513 U.S. 298 (1995), the petitioner's claim will remain unreviewable by a federal court.

**\*7** Finally, notwithstanding the procedure described above, a federal court may yet exercise its discretion to review and deny a mixed petition containing both exhausted and unexhausted claims, if those unexhausted claims are "plainly meritless." *Rhines v. Weber,* 544 U.S. 269, 277 (2005); see § 2254(b)(2) ( "An application for a writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also, e.g., Padilla v. Keane,* 331 F.Supp.2d 209, 216 (S.D.N.Y.2004) (interests in judicial economy warrant the dismissal of meritless, unexhausted claims).

### 3. *Procedural Default*

Even where an exhausted and timely *habeas* claim is raised, comity and federalism demand that a federal court abstain from its review when the last-reasoned state court opinion to address the claim relied upon "an adequate and independent finding of a procedural default" to deny it. *Harris,* 489 U.S. at 262; *see also Coleman v. Thompson,* 501 U.S. 722, 730 (1991); *Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991); *Levine v. Comm'r of Corr. Servs.,* 44 F.3d 121, 126 (2d Cir.1995).

A state court decision will be "independent" when it "fairly appears" to rest primarily on state law. *Jimenez v. Walker,* 458 F.3d 130, 138 (2d Cir.2006) (citing *Colman,* 501 U.S. at 740). A decision will be "adequate" if it is " 'firmly established and regularly followed' by the state in question." *Garcia v. Lewis,* 188 F.3d 71, 77 (2d Cir.1999) (quoting *Ford v. Georgia,* 498 U.S. 411, 423–24 (1991)). The determination of whether a state procedural rule is "firmly established and regularly followed" requires inquiry into "the specific circumstances presented in the case." *Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir.2003) (citing *Lee v. Kemma,* 534 U.S. 362, 386–87 (2002)). The Second Circuit has identified three "guideposts" for making this determination:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether the state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, legitimate government interest.

*Id.* (citing *Lee,* 534 U.S. at 381–85).

### 4. *AEDPA Standard of Review*

Before a federal court can determine whether a petitioner is entitled to federal *habeas* relief, the court must determine the proper standard of review under AEDPA for each of the petitioner's claims. § 2254(d)(1)-(2). This statute "modifie[d] the role of federal habeas corpus courts in reviewing petitions filed by state prisoners," and imposed a more exacting standard of review. *Williams v. Taylor,* 529 U.S. 362, 402 (2000). For petitions filed after AEDPA became effective, federal courts must apply the following standard to cases in which the state court adjudicated on the merits of the claim:

> **\*8** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1)-(2). The deferential AEDPA standard of review will be triggered when the state court has both adjudicated the federal claim "on the merits," and reduced its disposition to judgment. *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001). Where the state court "did not reach the merits" of the federal claim, however, "federal habeas review is not subject to the deferential standard that applies under AEDPA .... Instead, the claim is reviewed *de novo."* *Cone v. Bell,* 129 S.Ct. 1769, 1784 (2009); *see* § 2254(d).

Under the first prong of the AEDPA deferential standard, a state court decision is contrary to federal law only if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if [it] decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413. A decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from the Supreme Court cases but unreasonably applies it to the facts of the particular state prisoner's case," or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

2013 WL 3226849

Under § 2254(d), a habeas court must determine what arguments or theories supported or ... could have supported ... the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.... If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.... It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.... As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the federal claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement.

**\*9** *Harrington v. Richter,* 131 S.Ct. 770, 786–87 (2011) (internal quotation marks and citations omitted).

Under the second prong of AEDPA, the factual findings of state courts are presumed to be correct. § 2254(e)(1); *see Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir.1997) (citing *Green v. Scully,* 850 F.2d 894, 900 (2d Cir.1988) ( " ' [t]he factual findings of the New York Courts are presumed to be correct' "). The petitioner must rebut this presumption by "clear and convincing evidence." § 2254(e)(1).

**B.** *Analysis of Petitioner's Claims* [16]

[16] I identify the claims as I list them in Section II(D) above.

**1.** *Jury Note (Claim 1)*
Petitioner argues that the court erred by failing to discuss with counsel a note that it received from the jury before it responded to the note. (*See* App. Br., at 73–77.) The note at issue asked the court to explain the elements of arson in the first degree, a charge on which Petitioner was ultimately acquitted. Respondent contends, in part, that this claim does not present a basis upon which *habeas* relief may be granted. (*See* Resp't's Mem., at 134–39 .) I agree with Respondent that the claim should be denied.

The jury note at issue stated the following: "If an arson defendant believes that everyone in a building is already dead, does burning a building constitute arson in the first degree, yes or no." (Tr., at 2230.) The court read the note into the record in the presence of counsel and Petitioner. However, without first conferring with counsel on the record, the court issued the following supplementary instruction:

Unfortunately, I can't answer the question as it's posed. Let me try this: A person is defined in our law as a human being who has been born, and is alive. Now, the factual issue that the jury must decide in this case is whether this defendant, aiding, abetting and acting in concert with his codefendant, believed—I'm sorry, what the defendant or codefendant believed—

...

Excuse me a moment.... The issue you must decide, factual issue you must decide is as to what this defendant or his codefendant believed, and—strike that. You must make a factual determination as to what this defendant or his codefendant believed, and you must also consider whether or not there was a reasonable possibility that someone was still alive at the time the fire was set. I don't know if that helps. If not, let me know—

(*Id.* at 2230–31.) Defense counsel then asked for a side bar conference. After an off-the-record conference was held, the court issued the following supplementary instruction: "Mr. O'Neil correctly points out to me I said you must make a

factual determination. You must, if you can, make out a factual determination." (*Id.* at 2231.) The jury then returned to deliberations and shortly thereafter reached its verdict. The jury acquitted Petitioner of arson in the first degree (count 36 of the indictment). (*See id.* at 2231–33.) Later, the court set aside the corresponding felony murder conviction (count 35 of the indictment).

**\*10** It is clear from the Second Department's written decision that it actually denied this claim on direct appeal by relying on the state's procedural rule requiring claims to be properly preserved for appellate review. *Serrano,* 897 N.Y.S.2d at 456 (stating that "the defendant failed to make a sufficient record to permit review of his claim that the trial court erred in its response to a jury note"). The court's reliance on this procedural rule constitutes an independent and adequate ground for its decision denying the claim, which precludes this Court from considering the claim on *habeas* review. *See, e.g., Andrade v. Heath,* No. 11 Civ. 1086(KBF), 2012 WL 3848397, at \*8 (S.D.N.Y. Aug. 20, 2012) (collecting cases and holding that state court's denial of claim on ground that appellant failed to provide appellate court with sufficient record constituted independent and adequate procedural ground for dismissal of claim on *habeas* review).[17] Petitioner does not allege cause and prejudice for this default, nor has he argued a resulting fundamental miscarriage of justice. Accordingly, the claim remains unreviewable by this Court and must be denied.

[17]    Copies of unreported cases cited herein will be mailed to Petitioner as a *pro se* litigant. *See Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Even assuming, *arguendo,* that the claim is not procedurally barred, Petitioner cannot establish that federal *habeas* relief is warranted. As an initial matter, Petitioner's status as "a person in custody" for purposes of AEDPA, 28 U.S.C. § 2254(a), is not the result of a conviction for an offense that was the subject of this jury note. As noted above, Petitioner was *acquitted* of the first degree arson charge and the court later dismissed the related felony murder conviction.

Moreover, Petitioner cannot show that he was prejudiced from any error involving the jury note. It is true that a criminal defendant has a Sixth Amendment right to ensure that jury notes are answered in open court and that counsel is given the opportunity to be heard before the judge responds to the note. *United States v. Robinson,* 560 F.2d 507, 516 (2d Cir.1977) (*en banc* ) (citing *Rogers v. United States,* 422 U.S. 35, 39

(1975)). Accordingly, the Second Circuit has identified a specific procedure that courts should follow when responding to jury notes:

> Specifically, (1) the jury's inquiry should be submitted in writing; (2) before the jury is recalled, the note should be read into the record in the presence of counsel and defendant; (3) counsel should be afforded an opportunity to suggest appropriate responses; and (4) after the jury is recalled, the request should again be read in their presence to assure that it accurately reflects their inquiry and that they all appreciate the question being asked.

*Munoz v. Burse,* No. 02 Civ. 6198(NGG)(LB), 2007 WL 7244783, at \*10 (E.D.N.Y. Aug. 27, 2007) (Report & Recommendation), *adopted as modified by* 2010 WL 3394696 (E.D.N.Y. Aug. 20, 2010), *aff'd,* 442 F. App'x 602 (2d Cir.2011) (citing *United States v.. Leung,* 40 F.3d 577, 584 (2d Cir.1994)); *see also United States v. Ronder,* 639 F.2d 931, 934 (2d Cir.1981). New York courts follow the same approach. *See People v. O'Rama,* 8 N.Y.2d 270, 277 (1991) (citing *Rogers,* 422 U.S. at 39, *Ronder,* 639 F.2d at 934, and *Robinson,* 560 F.2d at 516).[18] However, a court's failure to follow this exact procedure does not automatically require reversal of a conviction. The criminal defendant must also establish that he suffered sufficient prejudice. *Munoz,* 2007 WL 7244783, at \*10 (citing *United States v. Adeniji,* 31 F.3d 58, 65 (2d Cir.1994)). In this case, although the trial court did not confer with counsel prior to responding to the jury note, it did read the note into the record in the presence of both counsel and the jury. This gave Petitioner's trial counsel an opportunity to suggest a further response, which he did. Petitioner was also acquitted of the charge that was the subject of the jury note, and the court later dismissed the felony murder conviction associated with the arson. For these reasons, Petitioner cannot establish that he was prejudiced from the court's failure to first confer with counsel.

[18]    Petitioner's brief on direct appeal cited, among other cases, *Rogers. Ronder,* and *Robinson.* (*See* App. Br., at 74.) Citation to relevant federal cases

2013 WL 3226849

is sufficient to alert the state court to the federal nature of a claim. *Daye,* 696 F.2d at 194. For this reason, I do not agree with Respondent that the federal nature of this claim remains unexhausted.

**\*11** Finally, to the extent that Petitioner also argues that the trial court erred by failing to comply with N.Y.Crim. Proc. Law § 310.30, [19] that argument must be denied. "A claim premised on a violation of [§ 310.30] does not allege a violation of a federally protected right," as required by AEDPA. *Cornado v. Bellnier,* No. 10 Civ. 5265(RA) (HBP) 2012 WL 6644637, at \*5 (S.D.N.Y. Sept. 20, 2012) (Report & Recommendation), *adopted by* 2012 WL 6681692 (S.D.N.Y. Dec. 21, 2012); *see also, e.g., id.* (collecting cases). Accordingly, the argument is a state law claim that is not cognizable upon federal *habeas* review. *See Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991) ( "we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

[19]     At any time during its deliberation, the jury may request the court for further instruction or information of any trial evidence, or with respect to any other matter pertinent to the jury's consideration of the case. Upon such a request, the court must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper.... N.Y.Crim. Proc. Law § 310.30.

For the reasons set forth above, Claim 1 should be denied.

### 2. *Petitioner's Statements to Law Enforcement (Claim 2)*

Petitioner argues that the court erred by admitting into evidence a series of inconsistent, contradictory, and inculpatory oral and written statements that Petitioner made to law enforcement in the days following the murders. (*See* App. Br., at 77–83; Tr., at 1410–96 (Dkt.20); *see also* Ex. 5.) Respondent contends, in part, that this claim is procedurally barred from *habeas* review. (*See* Resp't's Mem., at 139–50.) Respondent is correct.

Before the trial court, Petitioner maintained that he was in custody when he spoke to the police because he specifically asked to leave the police barracks and his requests were denied. (*See* Pretrial Mem. of Law, at 51–57 (Dkt.27).)

Switching course, Petitioner then argued on direct appeal—as he argues now on *habeas* review—that although the police informed him he was free to leave, "they effectively held him in involuntary constructive custody." Specifically, Petitioner argued on appeal that the investigators falsely told him that Gilleo was also being questioned and that if Petitioner "didn't 'tell the truth,' " they would release Gilleo and would fail to protect Petitioner from him. This led Petitioner to "infere[ ] that they would leave Gilleo to kill him." (App. Br., at 78.) A comparison of Petitioner's brief on direct appeal with his pretrial omnibus motion and the record of the suppression hearing confirms that this constructive custody argument was not presented to the trial court. (*Compare id.* at 77–83, *with* Pretrial Mem. of Law, at 51–57, *and* Nov. 7–8, 2007 Hr'g Tr. (Dkt.26).)

It is clear from the last-reasoned state court decision to address this claim that the Second Department denied it as "unpreserved for appellate review." *Serrano,* 897 N.Y.S.2d at 456; *see Ylst,* 501 U.S. at 803. Although the court went on to deny this claim on the merits, *see Serrano,* 897 N.Y.S.2d at 456 (stating that "[t]he defendant's remaining contention is unpreserved for appellate review and, in any event, is without merit"), its primary reliance on this state procedural law constitutes an independent ground for its decision, *see Harris,* 489 U.S. at 264 n. 10 (state court decision that relies on a procedural rule to dismiss a claim, but which, in the alternative, also proceeds to dismiss the claim on the merits, relies on the independent state law ground for dismissal); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 810 n. 4 (2d Cir.2000) (noting that when a state court opines that a claim is "not preserved for appellate review" and then rules "in any event" that the claim also fails on its merits, the claim rests on independent state law rule which precludes federal *habeas* review). This New York State "rule of preservation" requires that to preserve a claim for appellate review, the defendant must first present the same argument to the lower court in time to enable that court to cure the alleged error. *People v. Martin,* 50 N.Y.2d 1029, 1030–31 (1980) (defendant's failure to the raise same argument in his suppression motion that he later raised on direct appeal foreclosed appellate review of the claim). New York appellate courts routinely apply this rule to claims involving pretrial suppression hearings. *See, e.g., Hartley v. Senkowski,* No. 90 Civ. 395, 1992 WL 58766, at \*8–9 (E.D.N.Y. Mar. 18, 1992) (collecting cases). The Second Department's reliance on this rule therefore presents an adequate state law ground that prevents this Court from reviewing the merits of the claim upon federal *habeas. See, e.g., Underwood v. Artuz,* No. 95

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 157 of 172
Serrano v. Kirkpatrick, Not Reported in F.Supp.2d (2013)
2013 WL 3226849

Civ. 7866(SAS), 1996 WL 734898, at *2–3 (S.D.N.Y. Dec. 24, 1996) (state court's decision that denied *Miranda* claim due to the petitioner's failure to raise the same argument at his suppression hearing constituted independent and adequate ground for dismissal upon *habeas* review); *Hartley,* 1992 WL 58766, at *9. Petitioner does not assert cause and prejudice, nor a fundamental miscarriage of justice, that would allow this Court to circumvent his procedural default and review the merits of this claim. Accordingly, Claim 2 must be denied.

### 3. *Legally Insufficient Evidence (Claim 3)*

**\*12** Petitioner argues that the evidence presented at trial was legally insufficient to establish his intent to rob, murder, or commit arson. He also argues that the jury's verdict was against the weight of the evidence. (*See* App. Br., at 83–87.) Respondent contends, in part, that this claim remains procedurally barred and is otherwise not cognizable upon federal *habeas* review. (*See* Resp't's Mem., at 150–90.) Respondent is correct.

It is clear from the Second Department's written decision that it actually relied upon the state's contemporaneous objection rule to deny this claim on direct appeal. *Serrano,* 897 N.Y.S.2d at 456 (stating that "[t]he defendant's contention that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt is unpreserved for appellate review (*see* CPL 470.05(2))") .[20] While the court went on to alternatively dismiss the claim on the merits, *see id.* (stating that "[i]n any event, viewing the evidence in the light most favorable to the prosecution ..., we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt"), its reliance on the state procedural rule constitutes an independent and adequate ground for its decision denying the claim, and therefore precludes this Court from considering it on *habeas* review. *See Harris,* 489 U.S. at 264 n. 10; *Fama,* 235 F.3d at 810 n. 4; *see also Wainwright v. Sykes,* 433 U.S. 72, 86 (1977) (contemporaneous objection rule constitutes adequate procedural ground for dismissal); *Bossett v. Walker,* 41 F.3d 825, 829 n. 2 (2d Cir.1994) (same). Petitioner does not assert cause and prejudice, nor a resulting fundamental miscarriage of justice, that would allow this Court to circumvent his procedural default and review the merits of the claim. Accordingly, Petitioner's legal insufficiency argument remains unreviewable and must be denied.

[20] New York's contemporaneous objection rule provides:

For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.

N.Y.Crim. Proc. Law § 470.05(2). Accordingly, this rule requires "an objection to a ruling or instruction of a criminal court ... be raised contemporaneously with the challenged ruling or instruction in order to preserve the objection for appellate review." *Green v. Travis,* 414 F.3d 288, 294 (2d Cir.2005) (citing *People v. Jones,* 440 N.Y.S.2d 248 App. Div.2d Dep't 1981)).

It is also well-established that a weight of the evidence claim is exclusively a matter of state law. It therefore does not present a federal question that is necessary for federal *habeas* review. *See, e.g., McKinnon v. Superintendent, Great Meadow Corr. Facility,* 422 F. App'x 69, 75 (2d Cir.2011), *cert. denied,* 132 S.Ct. 1151 (2012) ("the argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus"); *Garrett v. Perlman,* 438 F.Supp.2d 467, 470 (S.D.N.Y.2006) (weight of evidence claim is a state law claim arising under N.Y.Crim. Proc. Law § 470.15 and therefore does not present a federal question); *Douglas v. Portuondo,* 232 F.Supp.2d 106, 116 (S.D.N.Y.2002) (a weight of the evidence claim is "an error of state law, for which habeas review is not available"); *see also Estelle,* 502 U.S. at 67–68 ("we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Accordingly, Petitioner's weight of the evidence argument must be denied.

**\*13** Claim 3 must be denied.

### 4. *Excessive Sentence (Claim 4)*

Petitioner argues that his sentence was excessive. (*See* App. Br., at 87–90.) Respondent contends, in part, that this claim fails to state a question that is cognizable upon federal *habeas* review. (*See* Resp't Mem., at 190–94.) Respondent is correct.

It is well-settled that "[n]o federal constitutional issue is presented where ... the sentence is within the range prescribed by state law." *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992) (per curiam); *see also United States v. McLean,* 287 F.3d 127, 136 (2d Cir.2002) (internal quotation omitted)

("there is no constitutionally cognizable right to concurrent, rather than consecutive, sentences"). At the time of the offense, New York law permitted terms of twenty-five years to life consecutive sentences for murder in the first degree convictions. *See* N.Y. Penal Law § 125.27 (classifying murder in the first degree a class A–I felony); *id.* § 70.00(1) (requiring indeterminate sentences for felony convictions); *id.* § 70.00(2)(a) (maximum term of imprisonment for a class A felony conviction is life imprisonment); *id.* § 70.00(3)(a)(i) (minimum term of imprisonment for a conviction of murder in the first degree under § 125.27 is between 20 and 25 years); *id.* § 70.25(1) (court has the authority to impose either concurrent or consecutive sentences).

Accordingly, Claim 4 must be denied.

### 5. *Multiplicitous Indictment (Claim 5)*

Petitioner argues that *habeas* relief is warranted because counts 1–20 of the indictment that charged him with murder in the first degree were multiplicitous. (*See* App. Br., at 90.) Respondent contends that this claim must be denied because: (1) the federal nature of the claim was not fairly presented to the state courts, (2) the claim fails to state a question that is cognizable upon federal *habeas* review, and (3) the charges were not multiplicitous. (*See* Resp't's Mem., at 194–96.) I agree with Respondent that the claim should be denied.

As an initial matter, I note that Petitioner's brief on direct appeal was sufficient to alert state courts to the federal nature of this claim. *See* Willette v. Fischer, 508 F.3d 117, 121 (2d Cir.2007) (quoting *Daye,* 696 F.2d at 194) (a claim arguing that certain counts of an indictment were "multiplicitous" "fairly presents" the federal nature of the claim because such an argument " 'assert[s] ... the claim in terms so particular as to call to mind' " the protection afforded by the Double Jeopardy Clause of the Fifth Amendment). The Second Department's written decision on Petitioner's direct appeal represents the last-reasoned state court decision to address Claim 5. *See* Ylst, 501 U.S. at 803. It is clear that court denied this claim on the merits. *See* Serrano, 897 N.Y.S.2d at 456. Accordingly, I address Claim 5 pursuant to AEDPA's deferential standard of review.

**\*14** "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko,* 169 F.3d 140, 145 (2d Cir.1999). A multiplicitous indictment "violates the Double Jeopardy Clause of the Fifth Amendment, subjecting a person

to punishment for the same crime more than once." *Id.* Such an indictment may also "improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes." *United States v. Reed,* 639 F.2d 896, 904 (2d Cir.1981).

"In passing on a double jeopardy claim of this type, the key inquiry is not whether the same conduct underlies the challenged counts; rather, it is 'whether the offense—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another.' " *Timmons v. Lee,* No. 10 Civ. 1155(JG), 2010 WL 3813963, at \*9 (E.D.N.Y. Sept. 23, 2010) (quoting *Chacko,* 169 F.3d at 146). "Accordingly, when the same statutory violation is charged twice, the critical question is 'whether the facts underlying each count were intended by Congress to constitute separate units of prosecution.' " *Id.* (quoting *United States v. Ansaldi,* 372 F.3d 118, 124 (2d Cir.2004)).

Here, Petitioner was charged with and convicted of 20 counts of first degree murder, in violation of N.Y. Penal Law § 125.27(1). Under this statute, a person is guilty of first degree murder when, with intent to cause the death of another person, he causes the death of that person or a third person, and an aggravating factor is also present. The aggravating factor relevant to Petitioner's convictions is that, "as part of the same criminal transaction, the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of additional person or persons." N.Y. Penal Law § 125.27(l)(a) (viii). Accordingly, "each charge under th[is] statute involves a primary victim whose death is the result of an intent to kill and an additional victim whose death as part of the same transaction is the result of either an intent to kill or an intent to cause serious physical injury or death." *Timmons,* 2010 WL 3813963, at \*8. "[T]he critical question," therefore, "is whether different permutations of primary and secondary victims in multiple-homicide cases were intended by the New York Legislature, in enacting Penal Law § 125.27, to constitute separate units of prosecution." *Id.* at \*9 (quotation omitted). After considering this same issue, the district court in *Timmons v. Lee* determined that this question is "is a matter of state law" that should not be revisited upon federal *habeas* review. *Id.* at \*9. I agree. The extent to which the New York State Legislature intended that "a subsequent § 125.27 count that names the same primary victim as an earlier count but a different secondary victim ... constitute[s] a separate unit of prosecution," is precisely the kind of state court decision to which a federal *habeas* court must defer. *Id.*

**\*15** In any event, and as the court in *Timmons* also determined, the state court's decision denying this claim cannot be said to have been contrary to, or an unreasonable application of, clearly established federal law. There exists no Supreme Court case that has decided a Double Jeopardy question in the context of units of prosecution and primary and secondary victims, such as that contemplated by N.Y. Penal Law § 125.27(1)(a) (viii). *See id.* at \*10. Accordingly, "in an absence of clearly established federal authority on the interaction between this type of first-degree murder statute and the Double Jeopardy Clause, the Appellate Division's decision [denying this claim] cannot be deemed objectively unreasonable." *Id.*

Claim 5 should be denied.

### 6. *Grand Jury Instructions (Claim 6)*

Petitioner argues that the court erred in failing to review the legal sufficiency of the instructions given to the grand jury. (*See* App. Br., at 90.) Respondent contends, in part, that this claim fails to state a question that is cognizable upon federal *habeas* review. (*See* Resp't's Mem., at 196–97.) Respondent is correct.

It is well-settled that a claim involving an error in a grand jury proceeding is not cognizable upon federal *habeas* review. There is no federal constitutional right to a grand jury proceeding. *See Alexander v. Louisiana,* 405 U.S. 625, 633 (1972); *Hurtado v. California,* 110 U.S. 516 (1884);

*LanFranco v. Murray,* 313 F.3d 112, 118 (2d Cir.2002). A defendant's guilt or innocence is not determined by a grand jury, and "any defect in the grand jury proceeding [is] cured by petitioner's subsequent conviction." *Bingham v. Duncan,* No. 01 Civ. 1371(LTS)(GAY), 2003 WL 21360084, at \*4 (S.D.N.Y. June 12, 2003). Accordingly, such errors do not provide a basis for a federal court to find that a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a); *see also, e.g., Robinson v. LaClair,* No. 09 Civ. 3501(KAM), 2011 WL 115490, at \*8 (E.D.N.Y. Jan. 13, 2011) (noting that "[c]laims concerning state grand jury proceedings do not entitle a petitioner to federal habeas relief," and collecting cases).

Accordingly, Claim 6 must be denied.

## IV. *CONCLUSION*

For the reasons set forth above, I conclude—and respectfully recommend that Your Honor should conclude—that the petition should be **DENIED.** Further, because reasonable jurists would not find it debatable that Petitioner has failed to demonstrate by a substantial showing that he was denied a constitutional right, I recommend that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel,* 529 U.S. 473, 483–84 (2000).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3226849

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 160 of 172
Gonzales–Martinez v. Kirkpatrick, Not Reported in Fed. Supp. (2017)
2017 WL 3891649

2017 WL 3891649
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Jairon GONZALES–MARTINEZ, Petitioner,
v.
Michael KIRKPATRICK, Respondent.

No 16–CV–5119 (JFB)
|
Signed September 6, 2017

**Attorneys and Law Firms**

Jairon Gonzales–Martinez, Dannemora, NY, pro se.

Thomas C. Costello, Suffolk County District Attorney, Riverhead, NY, for Respondent.

**MEMORANDUM AND ORDER**

Joseph F. Bianco, District Judge:

**\*1** Jairon Gonzales–Martinez (hereinafter "petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. Petitioner was convicted of murder in the second degree (N.Y. Penal Law § 125.25); attempted murder in the second degree (N.Y. Penal Law § 125.25, as modified by Penal Law § 100.05(3)); assault in the first degree (N.Y. Penal Law § 120.10(1)); gang assault in the first degree (N.Y. Penal Law § 120.07); and assault in the second degree (N.Y. Penal Law § 120.05(2)). Petitioner was sentenced to a period of incarceration of 20 years to life for the murder charge; a determinate, concurrent sentence of ten years' incarceration and five years' post-release supervision for the attempted murder, first-degree assault, and gang assault charges; and a determinate sentence of three years' incarceration and three years' post-release supervision for the second-degree assault charge. In sum, petitioner received a sentence of 33 years to life of imprisonment with five years' post-release supervision.

In the instant habeas petition ("Pet.," ECF No. 1), petitioner challenges his conviction and sentence, claiming that his constitutional rights were violated on the following grounds: (1) the trial court committed reversible error when it improvidently exercised its discretion by admitting into evidence autopsy photographs of the decedent when the defense did not contest the cause or time of death; (2) the trial court committed reversible error when it permitted a prosecution witness to testify that petitioner exchanged gang signs with other individuals without having established the proper foundation for such testimony; (3) the prosecution failed to prove petitioner guilty beyond a reasonable doubt, and petitioner's conviction was against the weight of the evidence; and (4) petitioner's sentence, the aggregate of which was a period of imprisonment of 33 years to life, was harsh and excessive and should be modified in the interest of justice. (Pet. at 2.) For the reasons discussed below, petitioner's request for a writ of habeas corpus is denied in its entirety.

I. BACKGROUND

A. Facts
The following facts are adduced from the instant petition and underlying record.

On the night of June 4, 2011, petitioner and Abraham Orellana, both patrons of the Fiesta Pool Hall at 1219 Suffolk Avenue in Brentwood, had an argument that ended in Mr. Orellana's hospitalization. (T. [1] 922–936.) The argument began because of petitioner's and his friends' alleged membership in the MS–13 gang. (T. 1241.) Because petitioner's group and Mr. Orellana's group "shouldn't be in the same place," the argument ensued. (T.1250.) The argument became physical outside of the bar, and ended after someone struck Mr. Orellana in the head with a brick. (T. 1252; 1524–25.) At this point, petitioner and his friends fled, and Mr. Orellana was transported to a hospital. (T. 1253; 1525.) At the hospital, Mr. Orellana was treated for a laceration above his right eye, a mark on his nose, and a cut to his mouth, which medical records attributed to being struck in the head by a rock. (T. 1979.)

[1]     Citations to "T." are references to the transcript of petitioner's April 2013 jury trial before the Honorable Mark Cohen.

**\*2** Approximately 15 minutes later, Jose Valasques, who witnessed the attack, was outside the bar calling for a cab when petitioner and a group of people walked towards the bar carrying bats and iron bars, yelling, "You want to die, you sons of bitches." (T. 1254, 1524–29.) At this point, Mr. Valasques reentered the bar, where Jorge Martinez, the bouncer and a witness to the attacks, closed the door to prevent both entry and exit. (T. 1258; 1529.)

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 161 of 172

Gonzales–Martinez v. Kirkpatrick, Not Reported in Fed. Supp. (2017)

2017 WL 3891649

Petitioner and his group continued their approach toward the Fiesta Pool Hall, where they surrounded Ramiro Garcia and Rumaldo Bethancourt–Lopez, who pleaded for the group to "not do anything to them, that they didn't want to have problems and not to kill them." (T.1537.) Petitioner and his cohorts then began striking Mr. Garcia and Mr. Bethancourt–Lopez in their heads with bats and pipes. (T. 1256.) The group also began kicking their victims. (T. 1257.) During the attack, the victims could be heard crying for help. (T. 1573.)

As the victims were on the ground, petitioner and his group went to the door of the establishment and demanded that Mr. Martinez come out; they then broke the bar's door and fled. (T. 1257.) Mr. Valasques identified petitioner as the individual responsible for jamming an iron bar about sixty inches in length into the door. (T. 1539.) After the group and petitioner fled, Mr. Martinez allowed the occupants to leave the pool hall, where he discovered that one victim, Mr. Garcia, was alive, while the other, Mr. Bethancourt–Lopez, lay dead. (T. 1259.)

At the time of the second attack, Suffolk County Police Officer Kenneth Meyerback was parked on the side of Suffolk Avenue near Willoughby Street when a lady in a car alerted him that "there [was] a fight going on at the bar back that way," at about 1:40 a.m. (T. 1049.) As Officer Meyerback approached the Fiesta Pool Hall, he saw several people outside and two Hispanic males running by him in a westbound direction toward Bergen Street. (T. 1051–1053.) One individual was in a white t-shirt, while petitioner was in a black t-shirt with a graphic design. (T. 1052.) Another woman told Officer Meyerback that "those two guys that are running, get them, they just beat somebody with a bat." (T. 1058.) Hearing this, Officer Meyerback then turned his car around in pursuit of the two individuals that he saw make a right onto Bergen Street. (T. 1060.)

After turning right onto Bergen Street and not seeing the fleeing individuals, Officer Meyerback then proceeded to Glenmore Avenue where he saw petitioner, in a dark shirt, running while looking over his shoulder. (T. 1060–61.) As Officer Meyerback turned left onto Glenmore Avenue, petitioner then ran into a backyard. (T. 1061.) Officer Meyerback followed petitioner into the backyard; however, upon not being able to see petitioner and hearing a dog barking in a neighboring yard, Officer Meyerback returned to his car and proceeded to Evergreen Street, which runs parallel to Glenmore Avenue. (T 1062–63.) While proceeding down

Evergreen Street, petitioner darted out in front of Officer Meyerback's patrol car. (T. 1063.) At this point, Officer Meyerback chased petitioner on foot past two or three houses before tackling him and placing him under arrest. (T. 1064.)

While petitioner was in custody and sitting in the passenger seat of the police car, Officer Meyerback performed a quick weapons search and observed what appeared to be blood on petitioner's pants. (T. 1069–70.) Then, petitioner's phone began to ring, so Officer Meyerback took the phone, without opening or looking through it, into his possession until he transferred it to homicide detectives present at the Fiesta Pool Hall. (T. 1097–98.) Officer Meyerback then returned to Fiesta Pool Hall, with petitioner, "to find out what had happened at the pool hall and if [petitioner] had been involved." (T. 1071.)

**\*3** At the pool hall, Mr. Martinez and Mr. Valasques both identified petitioner, who was sitting in the police car, as one of the assailants. (T. 1261–63, 1542.) Furthermore, Mr. Martinez identified petitioner by his nickname "Mapache," as well as two other assailants whom he had seen before and knew as "Sombra" and "Cuervo," but who were not present at the scene. (T. 1260, 1266.) Among the items recovered just outside of the door of the pool hall near the victims were three branches, a metal bar, two baseball bats, one pool cue, and two pool balls. (T. 1455–56.) Suffolk County Police Detective Timothy Kelly was unable to obtain fingerprints from any of the items. (T. 1457.)

Mr. Garcia, the survivor of the second attack, was taken by ambulance to Southside Hospital. (T. 922, 1692.) Mr. Garcia's injuries included lacerations and contusions to the face, fractures of the facial bones and skull, and contusions to the lungs, which resulted in Mr. Garcia's comatose state for a period of time. (T. 1982, 1694.) Accordingly, Mr. Garcia's medical records indicated that his injuries were consistent with being "struck with a baseball [sic] and pipe." (T. 1983.)

Mr. Bethancourt–Lopez, the decedent, had been injured so badly that his "face and head were beaten beyond recognition," according to Suffolk County Police Officer Michael Levy. (T. 967.) In fact, his autopsy revealed that Mr. Bethancourt–Lopez suffered severe injuries to the face and scalp, and that these injuries were consistent with blunt impact injuries to the head. (T. 1909.) Besides abrasions and contusions, there were also fractures of the facial bones and skull, injuries to the brain, and lacerations to the scalp. (T. 1909.) Also, evidence of patterned contusions, which take the shape of the object used to create the injury, was present on the

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 162 of 172

Gonzales–Martinez v. Kirkpatrick, Not Reported in Fed. Supp. (2017)

2017 WL 3891649

decedent's torso. (T. 1909.) The internal examination showed "blunt impact injuries of the internal organs, most markedly of the brain," which had contusions in multiple areas, and lacerations and hemorrhages in the brain's white matter, suggesting a widespread brain injury. (T. 1917.) Furthermore, fractures were discovered in cartilage of the neck along with contusions to the lungs and the testes. (T. 1917–18.)

Dr. Hajar Sims–Childs, the Deputy Medical Examiner who conducted Mr. Bethancourt–Lopez's autopsy, concluded that a "fracture of the face and skull would be caused by significant force." (T. 1918.) Dr. Sims–Childs further concluded that "blunt impact injury" to the head caused the victim's death, and that the injuries were consistent with being struck by baseball bats and a metal pipe. (T. 1918.) In fact, Dr. Sims–Childs found that the square metal pipe recovered outside of the pool hall was consistent with the rectangular patterned contusions found on Mr. Bethancourt–Lopez's chest. (T. 1941.) In addition, the baseball bats recovered were consistent with the injuries on Mr. Bethancourt–Lopez's left arm. (T. 1942.)

Surveillance video was unrecoverable from the Fiesta Pool Hall; however, video was recovered from the El Salvador Deli and Precision Driving School, both of which are located west of the pool hall. (T. 1185, 1186, 1193.) Although none of the camera angles showed the actual attack, several angles captured petitioner and his cohorts both before and after the two attacks. (T. 1721–79; 1175.) In one video from the deli taken hours before the attack, Suffolk County Police Detective John McLeer identified petitioner, also known as "Mapache," in a dark shirt; along with Jeovani Guzman–Hernandez, also known as "Sombra," in a white shirt; and Walter Cruz, also known as "Cuervo," in a white shirt. (T. 1721–27.) In this same video, Detective McLeer said that all three individuals were "throwing signs," or gang signals. (T. 1745–46.)

**\*4** The recovered surveillance video timestamped immediately after the first assault of Mr. Orellana showed petitioner and his friends leaving the area and, as petitioner was walking away, petitioner dropping an object to the ground. (T. 1766.) About 15 minutes later, petitioner and two other men approached the Fiesta Pool Hall, each holding objects presumed to be weapons, such as a long metal bar. (T. 1779, 2445.) After the murder, at least five individuals could be seen running away, immediately followed by a police car: two individuals first, followed by another two individuals, and then petitioner, immediately followed by

Officer Meyerback's police car, which turned left onto Glenmore Avenue. (T. 1780–81.)

A warrant was obtained to recover data from petitioner's cell phone. (T. 1699, 1703.) An analysis of petitioner's cell phone, which was immediately recovered by Officer Meyerback, showed calls were made to Guzman–Hernandez's phone on June 4, 2011 at 3:26 p.m. (T. 2025.) Furthermore, incoming calls from Guzman–Hernandez's phone to petitioner's were answered as late as 1:37 a.m. on June 5, 2011. (T. 2027.) Thirteen unanswered calls from four numbers, including Guzman–Hernandez's number, were also present in the missed calls log of petitioner's phone, some of which were timestamped immediately preceding the murder. (T. 2027–30, 2448.) Indeed, Guzman–Hernandez's number was in petitioner's contacts under the name "Sobar." (T. 2031.)

An analysis of Guzman–Hernandez's phone revealed that calls were made to his phone from petitioner's phone on several occasions. (T. 2033.) Specifically, petitioner's number under the name "Mapache" could be found in his outgoing calls log. (T. 2034.)

DNA testing of Mr. Bethancourt–Lopez's clothing revealed blood on a boot matching Mr. Garcia's DNA profile. (T. 2099.) In addition, blood on Mr. Garcia's shoe matched Mr. Bethancourt–Lopez's profile. (T. 2102.) A red metal bat recovered at the scene had blood matching Mr. Garcia's profile. (T. 2103.) Further, the handle of that same bat had blood matching Mr. Bethancourt–Lopez's profile (T. 2104), and the metal pipe had blood that matched Mr. Garcia's profile (T. 2104). The other bat recovered, a Louiseville Slugger, had blood on the barrel and handle that matched Mr. Bethancourt–Lopez's profile. (T. 2105.) Of two sticks recovered at the scene, one had both victims' DNA profiles, while the other had just Mr. Garcia's profile. (T. 2105–2106.)

DNA testing of petitioner's clothes showed that both victims' blood was present. (T. 2106–2111.) Specifically, a bloodstain on petitioner's shoe matched that of Mr. Garcia's profile. (T. 2107–08.) Moreover, the blood found on petitioner's jeans matched that of the decedent's profile. (T. 2106.) Regarding the samples that matched Mr. Bethancourt–Lopez's DNA, the probability of a randomly selected, unrelated individual having a DNA profile matching that of the blood stains are one in 523 quintillion. (T. 2109.) As for the samples that matched Mr. Garcia's DNA, the probability of a randomly selected, unrelated individual having a DNA profile matching that of the stains are one in 2.15 quintillion. (T. 2111.)

2017 WL 3891649

Along with the DNA analysis, the stains found on petitioner's clothing revealed bloodstain patterns on the black jeans and each sneaker, but not the t-shirt. (T. 2249–50.) The stains found on the t-shirt appeared to be blood, but no connection to the victims was detected. (T. 2250.) However, petitioner's jeans had three bloodstains that were classified as impact spatter patterns, as were the bloodstains on his shoes. (T. 2251.) The forensics analysis concluded that the person wearing these clothes had to be in close proximity to the blood's source, *i.e.*, the victim. (T. 2257.) Because of the way the blood was dispersed, there were impact spatter stains on a car and the door of the pool hall, while cast off patterned stains were present on the awning over the door. (T. 2277, 2281.)

**\*5** At trial, the prosecution moved to admit autopsy photographs of Mr. Bethancourt–Lopez into evidence. (T. 1922.) Upon viewing the photographs, defense counsel objected to three of them, arguing the photographs were prejudicial because "the medical examiner already indicated what the injuries" were and that the defense was not contesting the cause of death. (T. 1923–24; 1928–29.) Exhibit 90, which was a picture of Mr. Bethancourt–Lopez's face after the attack, and exhibit 96, which was a picture of Mr. Bethancourt–Lopez's removed lung, were admitted because they tended to prove the "material or disputed issue" of intent and helped the medical examiner's explanation of the decedent's autopsy, and were not "offered for the sole purpose of arousing the emotions of the jury." (T. 1934–37.) However, exhibit 92, which was a close-up photograph of lacerations to Mr. Bethancourt–Lopez's scalp already depicted in another photograph, was not admitted into evidence. (T. 1934.)

Also at trial, in addition to his recounting the events of June 5, 2011, Mr. Martinez testified that he had heard petitioner and his friends claim they were part of the MS–13 gang. (T. 1241.) Additionally, Mr. Martinez testified that he observed petitioner and his friends making MS–13 gang signs. (T. 1238, 1242.) After the defense objected, the trial court held that it would admit Mr. Martinez's testimony into evidence, with a limiting instruction regarding petitioner's alleged gang membership. (T. 1228–1234.)

**B. Procedural History**
On April 18, 2013, a jury convicted petitioner in the Supreme Court of Suffolk County of the following: assault in the second degree, gang assault in the first degree, assault in the first degree, attempted murder in the second degree, and murder in the second degree. (T. 2614–17.) On May 22,

2013, petitioner was sentenced to an aggregate sentence of 33 years to life of incarceration with five years' post-release supervision. (S. [2] 15–18.)

[2]    Citations to "S." are references to the transcript of petitioner's May 2013 sentencing before the Honorable Mark Cohen.

After sentencing, petitioner appealed his conviction and sentence to the Appellate Division, Second Department and raised the following challenges: (1) the trial court improperly admitted autopsy photographs into evidence; (2) testimony regarding petitioner's membership in a gang deprived him of a fair trial; (3) his guilt was not proven beyond a reasonable doubt and the jury's verdict was against the weight of the evidence; and (4) the sentence imposed was harsh and excessive.

On February 3, 2016, the Appellate Division, Second Department affirmed petitioner's judgement of conviction. *See People v. Gonzales–Martinez*, 136 A.D.3d 651 (N.Y. App. Div. 2016). In its opinion, the Second Department held that "the legal sufficiency of the evidence [was] mostly unpreserved for appellate review." *Id.* at 651. Nevertheless, in viewing the evidence in the light most favorable to the prosecution, the Second Department found there was enough evidence to find petitioner guilty beyond a reasonable doubt. *Id.* Moreover, the Second Department conducted an independent review of the record and determined that petitioner's conviction was not against the weight of the evidence. *Id.* It also held that the trial court did not err in allowing testimony regarding petitioner's gang affiliation because the probative value of that testimony outweighed any prejudice. *See id.* at 652. Specifically, the court held that "the testimony was relevant to the issue of [petitioner's] motive, was inextricably interwoven into the narrative, and explained the relationships between the parties." *Id.* In fact, the Second Department found that the trial court providently reduced any possible prejudice by "providing appropriate limiting instructions." *Id.* Finally, the Second Department held that petitioner's remaining, unaddressed claims were without merit; this included the claims about the admitted autopsy photographs and petitioner's sentence. *Id.*

**\*6** On April 29, 2016, petitioner's conviction became final when the New York Court of Appeals denied petitioner's application for leave to appeal. *See People v. Gonzales–Martinez*, 27 N.Y.3d 997, 59 N.E.3d 1219 (2016).

2017 WL 3891649

## C. The Instant Petition

On September 8, 2016, petitioner moved before this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on the following grounds: (1) the trial court committed reversible error when it improvidently exercised its discretion by admitting into evidence autopsy photographs of the decedent when the defense did not contest the cause or time of death; (2) the trial court committed reversible error when it permitted a prosecution witness to testify that petitioner exchanged gang signs with other individuals without having established the proper foundation for such testimony; (3) the prosecution failed to prove petitioner guilty beyond a reasonable doubt and the jury verdict was against the weight of the evidence; and (4) petitioner's sentence, the aggregate of which was a period of imprisonment of 33 years to life, was harsh and excessive and should be modified in the interest of justice. (Pet. at 2.) Respondent filed a memorandum of law opposing petitioner's application on October 19, 2016. (ECF No. 6.)

The Court has fully considered the parties' submissions.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented by the State court proceedings.

28 U.S.C. § 2554. "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005)

(quoting *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principles from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decisions applied clearly established federal law erroneously or incorrectly. Rather, that application must be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411, 120 S.Ct. 1495). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed feelings of fact and conclusions of law are reviewed *de novo*.' " *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III. DISCUSSION

**\*7** As set forth below, the Court concludes that each of petitioner's challenges to his conviction and sentence is without merit and, accordingly, denies his petition for a writ of habeas corpus in its entirety.

## A. Petitioner's Evidentiary Challenges

Petitioner raises two arguments that the trial court erroneously admitted certain evidence and testimony at trial. First, he contends that the trial court committed reversible error when it exercised its discretion by admitting into evidence autopsy photographs of the decedent when the defense did not contest

Case 9:18-cv-01204-GTS-TWD    Document 25    Filed 02/17/22    Page 165 of 172

Gonzales-Martinez v. Kirkpatrick, Not Reported in Fed. Supp. (2017)

2017 WL 3891649

the cause or time of death. Second, he contends that the trial court committed reversible error when it permitted a prosecution witness to testify that petitioner exchanged gang signs with other individuals without having established the proper foundation for such testimony. Specifically, petitioner claims that Jorge Martinez's testimony regarding petitioner's alleged gang membership and communication with gang signs was prejudicial. As set forth below, these claims are without merit because the evidence was properly admitted under New York law and, even if improperly admitted, the evidence and testimony were not so prejudicial as to deprive petitioner of a fair trial in accordance with his constitutional due process rights.

1. Legal Standard

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983); *see generally Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[H]abeas corpus relief does not lie for errors of state law." (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, he must "show that the error deprived [him] of a fundamentally fair trial." *Taylor*, 708 F.2d at 891; *see also Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.' " (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988))). In other words, "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.' " *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)).

To constitute a denial of due process under this standard, the erroneously admitted evidence must have been " 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.' " *Id.* (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (holding that evidence must be "crucial, critical, highly significant" (citation omitted)). Moreover, the court "must review the erroneously admitted evidence in light of the entire record before the jury." *Dunnigan*, 137 F.3d

at 125 (citation and omitted). In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *See Wade v. Mantello*, 333 F.3d 51, 59 n.7 (2d Cir. 2003); *Davis v. Strack*, 270 F.3d 111, 123–24 (2d Cir. 2001). As set forth below, the Court has reviewed petitioner's objections regarding hearsay under this two-part test and concludes that the purported evidentiary errors do not warrant habeas relief.

2. Application

a. The Autopsy Photographs

\*8 First, the trial court did not err by allowing the autopsy photographs to be admitted into evidence because they were admitted in accordance with New York law. Second, even assuming such error *arguendo*, the overwhelming evidence presented at trial made any such error insignificant, and, accordingly, admission of the photographs did not impinge petitioner's right to a fundamentally fair trial.

New York law generally allows admission of demonstrative evidence, such as photographs of deceased victims, so long as it tends "to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove other evidence offered or to be offered," such as testimony of a medical examiner. *People v. Pobliner*, 32 N.Y.2d 356, 369, 345 N.Y.S.2d 482, 298 N.E.2d 637 (1973) (citations omitted). "When relevance is demonstrated, the question as to whether on balance the jury should be permitted to view such photographs is addressed to the sound discretion of the trial court." *People v. Stevens*, 76 N.Y.2d 833, 835, 560 N.Y.S.2d 119, 559 N.E.2d 1278 (1990). In fact, "[p]hotographs of homicide victims are admissible to demonstrate the position of the victim's body or the placement of the victim's wound or wounds." *People v. DeBerry*, 234 A.D.2d 470, 651 N.Y.S.2d 559, 560 (App. Div. 1996). Just because "a photograph may be gruesome does not preclude its admission where it is not offered for the sole purpose of arousing the emotions of the jury or to prejudice defendant." *People v. Dickerson*, 42 A.D.3d 228, 837 N.Y.S.2d 101, 108 (App. Div. 2007). Furthermore, "[t]he fact that other evidence may be available on the point is a factor but is not dispositive." *Stevens*, 76 N.Y.2d at 835, 560 N.Y.S.2d 119, 559 N.E.2d 1278; *see also People v. Reyes*, 49 A.D.3d 565, 855 N.Y.S.2d

Gonzales-Martinez v. Kirkpatrick, Not Reported in Fed. Supp. (2017)

2017 WL 3891649

160, 162 (App. Div. 2008) ("The mere fact that there was other available evidence with regard to these matters did not require the exclusion of the photographs."). Accordingly, "[p]hotographic evidence should be excluded only if its sole purpose is to arouse the emotions of the jury and to prejudice the defendant." *Pobliner*, 32 N.Y.2d at 370, 345 N.Y.S.2d 482, 298 N.E.2d 637.

Here, the trial court did not err in admitting the autopsy photographs that showed the victim's face and removed lung after the murder. In fact, the photographs were necessary to help prove the disputed issue of petitioner's intent to kill, an element required for a second-degree murder conviction under New York Penal Law § 125.25. *See People v. Wright*, 38 A.D.3d 1004, 830 N.Y.S.2d 861, 864 (App. Div. 2007) (finding no reversible error because "only three of approximately 30 autopsy photographs were used and, showing the severity of the wound, they were probative on the issue of defendant's intent to kill"); *People v. Jones*, 43 A.D.3d 1296, 843 N.Y.S.2d 880, 882 (App. Div. 2007) (affirming the lower court's decision to admit autopsy photographs because, among other reasons, they showed an "intent to kill"); *People v. Blanchard*, 279 A.D.2d 808, 718 N.Y.S.2d 722, 725 (App. Div. 2001) ("We cannot say that County Court abused its discretion in determining that the probative value of the photographs outweighed their potential for prejudice since their depiction of the nature and manner of the killings tended to establish a material element ... namely, whether defendant intended to kill the victims."); *Flores v. Fischer*, No. CV-05-1970 (FB), 2006 WL 385317, at *4 (E.D.N.Y. Feb. 17, 2006) (finding that admission of autopsy photographs, including one showing a large opening in victim's head, did not violate petitioner's due process rights); *Franco v. Walsh*, No. 00 CIV. 8930AGSJCF, 2002 WL 596355, at *7–8 (S.D.N.Y. Apr. 17, 2002) (denying habeas claim where state court permitted the prosecutor to display severely injured victim to jury because "the extent of the victim's injuries was clearly relevant").

*\*9* The autopsy photographs were also relevant to corroborate Dr. Sims–Childs' testimony. Specifically, Dr. Sims–Childs testified that Mr. Bethancourt–Lopez died from a "blunt impact injury" to the head resulting in multiple fractures to the face and skull, which were caused by "significant force." *See, e.g.*, *People v. Coleman*, 48 N.Y.3d 478, 480, 148 A.D.3d 717 (App. Div. 2010) (finding that an autopsy photograph of the victim's skull with the scalp removed was "relevant to help illustrate and corroborate the testimony of the medical examiner regarding the cause of

death"); *People v. Simon*, 71 A.D.3d 1574, 897 N.Y.S.2d 578, 580 (App. Div. 2010) ("The autopsy photograph was relevant to illustrate and corroborate the testimony of the Medical Examiner with respect to the cause of death."); *People v. Hayes*, 71 A.D.3d 1477, 897 N.Y.S.2d 370, 371 (App. Div. 2010) ("The photographs were properly admitted in evidence to assist the jury in understanding the Medical Examiner's testimony concerning the extent of the victim's stab wound."). In fact, Dr. Sims–Childs also testified about a specific injury, contusions to the lung, that the victim suffered during petitioner's attack. Accordingly, "[t]he People were not bound to rely entirely on the testimony of the medical expert to prove this point and the photographs were admissible to elucidate and corroborate that testimony." *Stevens*, 76 N.Y.2d at 836, 560 N.Y.S.2d 119, 559 N.E.2d 1278. Thus, because the photographs were admitted into evidence for both proof of intent and to corroborate the medical examiner's testimony, the trial court properly admitted the photographs in accordance with New York state law.

Finally, given the overwhelming evidence of petitioner's guilt, these photographs (even if erroneously admitted) could not have had a significantly prejudicial effect on the jury's verdict. As discussed more fully *infra*, the surveillance footage depicting petitioner and his friends approaching the bar with weapons and then immediately fleeing the scene pursued by Officer Meyerback; Officer Meyerback's observation of the blood stains on petitioner's clothing; DNA analysis of the stains revealing it was the victim's blood; the blood pattern analysis; and the expert testimony of the medical examiner all overwhelmingly demonstrated petitioner's guilt, and the admission of the photographs did not deprive petitioner of a fundamentally fair trial or impact the outcome.

In sum, the state court's evidentiary decision regarding the autopsy photographs was neither contrary to, nor an unreasonable application of, clearly established federal law, and petitioner's claim is without merit.

### b. Jorge Martinez's Testimony

Likewise, the trial court did not err in permitting Jorge Martinez to testify about petitioner's alleged MS–13 gang membership and subsequent communication with "gang signs." In any event, even assuming *arguendo* that it was an error to admit that testimony under state law, any such error was not prejudicial and does not amount to a constitutional violation warranting habeas relief.

Gonzales-Martinez v. Kirkpatrick, Not Reported in Fed. Supp. (2017)

2017 WL 3891649

At trial, Mr. Martinez testified as follows regarding petitioner's purported gang activity:

Q. Now, I'm going to direct your attention again to that day, June 5th, 2011. In the early morning hours, did there come a time that there was an argument between two groups of people inside of the Fiesta Pool Hall that you saw?

A. Yes.

Q. And can you describe—tell the jury how the argument started.

A. The—The argument started—Well, there was one group, the Mara, the MS, they were having discussion with another group that were not. I mean, they were just friends, that other group.

Q. Just so we're clear, the first group you said, La Mara, is that MS—is that MS–13?

A. Yes. LaMara.

...

Q. And just for the jury's edification, what is MS–13?

A. A gang.

Q. How did you know that that first group was MS–13?

A. Because they're always making some kind of signs either between themselves or against other people, gang signs.

Q. Have any of them ever said that they were MS–13?

A. Yes.

...

Q. [F]irst of all, which group started the argument?

A. MS.

Q. And what was the argument about? When I say what was the argument about, what, if anything, did anyone from the MS–13 group say or do to anyone from the other group?

A. That they're making like hand signs saying that that other group—

MR. BROWN: Objection.

THE COURT: Overruled. The witness may describe what he saw. And that's what the witness so far [has] done.... Sir, you've indicated that, quote, they were making hand signs. Is that true?

*10 THE WITNESS: Yes.

...

Q. And did they say anything else? I'm talking about the MS–13 group.

A. Well, since I'm looking at everybody there, I mean, I saw the signs and then I saw that they were arguing with them, but I didn't hear what they said.

Q. And when you say "signs," could you just show with your hands to the jury what you're talking about.

A. They make a sign of the SM—I mean—an MS. I really don't know how they make the sign. I mean, I don't know how to do it.

Q. Was anyone from the second group making any signs with their hands?

A. No.

(T. 1239, 1241–42, 1251.)

With respect to this testimony, the trial court instructed the jury that:

[t]he statement about alleged gang membership or an alleged membership in MS–13 is—it's not being offered for the truth, but simply to complete the narrative and for its affect on the state of mind of this witness.

...

Before we move on to the cross examination of Mr. Martinez, ladies and gentleman, you've heard mention of the defendant's alleged membership in a gang. You are to draw no inference, negative or otherwise, with respect to this testimony. If you choose, you may consider this testimony only as it relates to the completion of the narrative. You may not consider this testimony for any other purpose.

(T. 1249, 1275–76.)

Gonzales–Martinez v. Kirkpatrick, Not Reported in Fed. Supp. (2017)

2017 WL 3891649

On petitioner's direct appeal, the Second Department found that, "[c]ontrary to [petitioner's] contention, the Supreme Court providently exercised its discretion in admitting testimony relating to [petitioner's] alleged membership in a gang, since the probative value of that testimony outweighed any prejudice to the defendant." *Gonzales–Martinez*, 136 A.D.3d at 652 (citing *People v. Borrero*, 79 A.D.3d 767, 912 N.Y.S.2d 634 (N.Y. App. Div. 2010); *People v. Jordan*, 74 A.D.3d 986, 902 N.Y.S.2d 379 (N.Y. App. Div. 2010)). "The testimony was relevant to the issue of the defendant's motive, was inextricably interwoven into the narrative, and explained the relationships between the parties. Moreover, the Supreme Court alleviated any prejudice to the defendant by providing appropriate limiting instructions." *Id.* (citations omitted).

That decision was not erroneous under state law because, as the Second Department noted, "[e]vidence of [petitioner's] gang membership provides context to his motive to commit murder." *Sandoval v. Lee*, No. 14-CV-5187 (JMA), 2016 WL 2962205, at *6 (E.D.N.Y. May 20, 2016) (citing *Washington v. Artuz*, No. 07-CV-7769, 2013 WL 1285877, at *2, 13 (S.D.N.Y. Mar. 29, 2013) (finding that evidence of membership in rival gangs was "probative of [the petitioner's] motive for an otherwise inexplicable murder" because without that evidence, the record would indicate that a young man had been shot at random on the street); *Shannon v. Artuz*, 984 F.Supp. 807, 809–10 (S.D.N.Y. 1997) (affirming the trial court's decision to permit testimony about the petitioner's gang membership because the evidence was "relevant to prove petitioner's motive for assisting in [a] murder" and also bolstered the prosecution's theory that the murder was "motivated by revenge and the [gang members'] desire to assert their dominance")). Thus, Mr. Martinez's testimony regarding the gang signs and the MS–13 explained to the jury what precipitated the dispute that led to petitioner's alleged criminal conduct.[3] *See id.*

[3]
To the extent petitioner objects because Mr. Martinez was a lay witness, that objection is without merit because he was testifying about what he saw and heard (including individuals making "MS" signs with their hands).

**\*11** Furthermore, even assuming *arguendo* that the trial court erroneously allowed Jorge Martinez's testimony about petitioner's alleged MS–13 gang membership and subsequent communication with "gang signs," that error does not amount to the denial of petitioner's right to a constitutionally fair trial. In fact, the trial court's prompt limiting instruction

regarding Mr. Martinez's testimony mitigated the potential for prejudice, which, as mentioned above, was minimal given the overwhelming evidence of petitioner's guilt. Such a limiting instruction lessens the potential prejudice of a witness's testimony because it sufficiently clarifies the limited purpose for which the jury could consider this testimony. *See, e.g.,* *People v. Asai*, 66 A.D.3d 1138, 888 N.Y.S.2d 617, 621 (App. Div. 2009); *People v. Doyle*, 48 A.D.3d 961, 852 N.Y.S.2d 433, 437 (App. Div. 2008) ("Additionally, [the] County Court gave proper and appropriate limiting instructions to the jury concerning the permissible uses of this evidence thus limiting its prejudicial effect."); *People v. James*, 797 N.Y.S 2d, 130 (App. Div. 2005) (finding the prejudicial effect of the admission of prior bad acts did not outweigh their probative value, "especially in light of the fact that the trial court properly charged the jury on how to use the prior act evidence in their deliberations"); *see also Wells v.. Brown*, No. 06-CV-857 (CBA), 2008 WL 2097612, at *7 (E.D.N.Y. May 15, 2008) (explaining, in context of a habeas petition involving a *Molineux* issue, that the state trial court's limiting instruction lessened the evidence's prejudicial effect).

Petitioner has failed to provide any basis to conclude that this limiting instruction was inadequate to relieve any potential prejudice. *See United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("As the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions.") (citing *Zafiro v. United States*, 506 U.S. 534, 540–41, (113 S.Ct. 933, 122 L.Ed.2d 317, 1993)); *United States v. Ebner*, 782 F.2d 1120, 1126 (2d Cir. 1986) ("Such limiting instructions are an accepted part of our present trial system ... and consequently there is a presumption that juries will follow [them]." (citations omitted)).

Finally, as noted above, any prejudicial effect from the testimony regarding petitioner's MS–13 gang membership would not have impacted the outcome of the trial given the overwhelming evidence of petitioner's guilt, as discussed *infra*. Accordingly, the Court's review of the trial transcript reveals that the claimed errors did not have a "substantial and injurious effect" on the verdict, *Bricht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), and leads the Court to conclude "beyond a reasonable doubt that the error[s] complained of did not contribute to the verdict obtained," *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Accordingly, habeas relief on this evidentiary claim is also unwarranted.

Case 9:18-cv-01204-GTS-TWD   Document 25   Filed 02/17/22   Page 169 of 172
Gonzales–Martinez v. Kirkpatrick, Not Reported in Fed. Supp. (2017)
2017 WL 3891649

**B. Insufficiency of the Evidence Claim**

Petitioner also argues that the prosecution failed to prove his guilt beyond a reasonable doubt and that his convictions were against the weight of the evidence. However, it is well established that a "weight of the evidence" claim is based on state law. *See, e.g., Correa v. Duncan*, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."). The Court cannot consider a purely state law claim on federal habeas review. *See Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law ...."). Therefore, to the extent petitioner raises a weight of the evidence claim under state law, the Court cannot review it.

However, the Court will construe the petition as raising a federal claim that the evidence was insufficient to support the conviction, which does present a question of federal law. *See Einaugler v. Supreme Court of the State of N.Y.*, 109 F.3d 836, 839 (2d Cir. 1997) (stating that the Fourteenth Amendment requires "sufficient evidence for a jury to find that the prosecution proved the substantive elements of the crime as defined by state law" (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979))). As discussed below, any claim that the evidence at petitioner's trial was insufficient to support a finding of guilt beyond a reasonable doubt on each count is without merit.

**1. Legal Standard**

**\*12** The law governing habeas relief from a state conviction based on insufficiency of the evidence is well-established. A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler*, 109 F.3d at 840. As such, a "state criminal conviction will be upheld if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Vassell v. McGinnis*, No. 04-CV-0856 (JG), 2004 WL 3088666, at \*5 (E.D.N.Y. Dec. 22, 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *see also Policano v. Herbert*, 507 F.3d 111, 115–16 (2d Cir. 2007) (" '[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2554[,] ... the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof

of guilt beyond a reasonable doubt.' " (quoting *Jackson*, 443 U.S. at 324, 99 S.Ct. 2781)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). Even when "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994). Thus, "[a] habeas court will not grant relief on a sufficiency claim unless the record is 'so totally devoid of evidentiary support that a due process issue is raised.' " *Sanford v. Burge*, 334 F.Supp.2d 289, 303 (E.D.N.Y. 2004) (quoting *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994)).

In sum, a petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Flowers v. Fisher*, 296 Fed.Appx. 208, 210 (2d Cir. 2008) (quoting *Jackson*, 433 U.S. at 324, 97 S.Ct. 2720). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

**2. Application**

Here, petitioner argues that his conviction was not based on legally sufficient evidence. (Pet. at 17.) The Second Department held that the legal sufficiency claim was "mostly unpreserved for appellate review." *People v. Gonzales–Martinez*, 136 A.D.3d 651, 651 (N.Y. App. Div. 2016). Further, when viewing the evidence in the light most favorable to the prosecution, the Second Department found that the evidence "was legally sufficient to prove the defendant's guilt beyond a reasonable doubt." *Id.* The court accorded "great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor," and, after conducting an independent review, held that "the verdict was not against the weight of the evidence." *Id.* This Court similarly concludes that the evidence was more than sufficient to prove petitioner's guilt beyond a reasonable doubt and raises no due process issues.

Here, in support of his insufficiency claim, petitioner argues that the testimony of Mr. Martinez changed from three

Case 9:18-cv-01204-GTS-TWD     Document 25     Filed 02/17/22     Page 170 of 172

individuals attacking the victims to seven. (Pet. at 16.) Further, petitioner argues that Mr. Martinez never made mention of the MS–13 gang or gang signals to the detectives on the night of the murder. (Pet. at 16.) Also, he claims that Mr. Velasquez's testimony about the statement, "You want to die, you sons of bitches," was subsequently undermined by Detective McLeer's testimony that Mr. Velasquez never told the detective about any such threat. (Pet. at 17.) Finally, petitioner calls into question Mr. Velasquez's written statements to the police because Mr. Velasquez failed to mention that one of the assailants wore a black shirt. (Pet. at 17.)

After careful review, the Court concludes that a rational trier of fact could have found that all the essential elements of petitioner's crimes were met for each count of conviction. First, regardless of whether Mr. Martinez saw three or seven attackers, the crime of gang assault occurs when one individual, accompanied by two or more individuals, causes serious physical injury. *See* N.Y. Penal Law § 120.07. Here, the surveillance footage shows the petitioner accompanied by two other individuals approaching the Fiesta Pool Hall, with what appear to be weapons. (T. 1779, 2445.) Furthermore, the surveillance footage also shows a group of five people, including petitioner, fleeing the scene of the crime. (T. 1721–27, 1745–46, 1766, 1779–81.)

**\*13** Second, the crime of second-degree assault is committed when one person intentionally causes injury to another with a dangerous instrument. *See* N.Y. Penal Law § 120.05(2). Dangerous instrument means "any instrument, article or substance, including a 'vehicle' as that term is defined in this section, which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13). Here, the surveillance footage shows petitioner leaving the first attack, dropping an object as he walked. (T. 1766.) Furthermore, Mr. Orellana's medical records attributed his injuries to being struck in the head by a rock, which would be considered a dangerous instrument under the statute. (T. 1979.)

Third, the crime of second-degree murder is committed when one person intentionally causes the death of another. *See* N.Y. Penal Law § 125.25. Here, the medical examiner testified that the decedent's injuries to the face and skull were caused by "significant force." (T. 1918.) Furthermore, the injuries were caused by multiple strikes from baseball bats and a metal pipe. (T. 1918.) Indeed, the blood stains on petitioner's

jeans and the expert's analysis indicated that petitioner was in close proximity to the victims. (T. 2099–2111, 2249–81.) Moreover, these same blood stains on petitioner's clothes matched the victims' DNA profiles, which were also found on the weapons recovered from the scene. (T. 2099–2111.)

Fourth, the crime of first-degree assault is committed when one intentionally causes serious physical injury to another by means of a dangerous instrument or deadly weapon. *See* N.Y. Penal Law § 120.10(1). Serious physical injury means a "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10). Here, Mr. Garcia, the survivor of the second attack, suffered similar injuries to the decedent, Mr. Bethancourt–Lopez. In fact, Mr. Garcia suffered fractures to the facial bones and skull, contusions to the lungs, and lacerations and contusions to the face, which resulted in his time in a coma. (T. 1982, 1694.) Additionally, these injuries were also consistent with being struck by baseball bats and a pipe. (T. 1983.)

Fifth, the crime of attempted second-degree murder is committed when, "with intent to commit a crime, he engages in conduct which tends to effect the commission ...," of second-degree murder. N.Y. Penal Law § 110.03; *see also* N.Y. Penal Law § 125.25. Here, the surviving victim of the attack suffered injuries that certainly supported a rational juror finding that there was an intent to murder Mr. Garcia, although he survived. (T. 1982, 1694, 1909–18.)

Accordingly, the overwhelming evidence discussed *supra*, along with the cell phone records (T. 2025–31) and the weapons recovered at the scene (which appear on the surveillance footage) (T. 1455–57), taken in the light most favorable to the prosecution, was sufficient for a rational trier of fact to convict petitioner for these crimes. Discrepancies about a failure to mention the color of a shirt, gang membership, the use of gang signs, and threats made to the victims, are not enough to satisfy the heavy burden placed on petitioner in the context of a habeas petition. (Pet. at 16–17.)

In sum, as stated *supra*, when "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson,* 34 F.3d 60, 66 (2d Cir. 1994).

2017 WL 3891649

Accordingly, the discrepancies between Mr. Martinez's and Mr. Velasquez's testimonies are presumed to be decided by the jury in favor of the prosecution, to which this Court gives great deference. Thus, the Court finds that, viewing the evidence presented at trial most favorably to the prosecution, there was sufficient evidence for a rational trier of fact to convict petitioner for the crimes of conviction beyond a reasonable doubt. Petitioner's insufficient evidence claim is, therefore, denied.

## C. Excessive Sentence Claim

**\*14** Finally, petitioner argues that his aggregate sentence of 33 years to life of imprisonment with five years' post-release supervision is harsh and excessive and should be modified in the interest of justice. For the reasons set forth below, the Court finds no basis for habeas relief in connection with petitioner's sentence.

As a threshold matter, to the extent that petitioner relies on state law as a ground for an excessive sentence claim, such a claim is not cognizable on habeas review. *See, e.g.*, *Wilson v. Ercole*, No. 06-cv-553 (DLI), 2009 WL 792089, at *11 (E.D.N.Y. Mar. 23, 2009) ("On his direct appeal, petitioner ... did not contend that this sentence violated his constitutional rights, but instead urged the Appellate Division to reduce the sentence under C.P.L. § 470.15(6)(b), which gives the state court broad plenary power to modify a sentence that is unduly harsh or severe, though legal. The Appellate Division declined, stating that 'the defendant's remaining contentions are without merit.' Petitioner now re-asserts this identical claim. Given that this claim rests exclusively on state law, the court may not review it under 28 U.S.C. § 2254(d)." (internal citations omitted)).

Insofar as petitioner raises a federal claim that his sentence was cruel and unusual punishment under the Eighth Amendment, the Court rejects such an argument. For the purpose of habeas review, "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Santiago v. Riley*, No. 92-cv-2302 (DRH), 1993 U.S. Dist. LEXIS 6990, at *11-12, 1993 WL 173625, at *4 (E.D.N.Y. May 14, 1993) ("Where the sentence imposed by a state trial judge is within the statutorily prescribed range, the constitution is not implicated and there is no federal question for habeas corpus review." (citation omitted)); *Underwood v. Kelly*, 692 F.Supp. 146, 152 (E.D.N.Y. 1988), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

Here, petitioner was convicted of five different crimes and was sentenced in aggregate to an imprisonment term of 33 years to life with five years' post-release supervision. Specifically, he received the following sentences: for murder in the second degree, a class A–1 felony, 20 years to life of incarceration; for attempted murder in the second degree, assault in the first degree, and gang assault in the first degree—all class B felonies—a determinate, concurrent sentence of ten years' incarceration with five years' post-release supervision; and finally, for assault in the second degree, a class D felony, a determinate sentence of three years' incarceration with three years' post-release supervision. *See* N.Y. Penal Law §§ 120.05(2), 120.07, 120.10(1), 125.25, 110.05(3)/125.25. An individual convicted of a class A–1 felony is subject to a minimum term of fifteen years' and a maximum term of life imprisonment, and when a sentence is indeterminate, the trial court has discretion to impose a term within that range. *See* N.Y. Penal Law §§ 70.00(2)(a), 70.00(3)(a)(i). Further, under New York law, a conviction of a class B felony may yield a determinate sentence of no more than 25 years' incarceration. *See* N.Y. Penal Law § 70.00(2)(b). Finally, for a class D felony conviction, a determinate sentence may not exceed seven years' incarceration. *See* N.Y. Penal Law § 70.00(2)(d).

**\*15** Accordingly, the sentences on the individual counts, as well as the aggregate sentence imposed by the trial court of 33 years to life of imprisonment, are within the statutory limits set forth by New York State law. *See* N.Y. Penal Law § 70.00. Because petitioner's sentence is within the statutorily-prescribed range, it raises no constitutional concerns, and, therefore, petitioner's habeas claim is without merit. [4]

[4]    In any event, the Court finds no basis to conclude that petitioner's indeterminate sentence was grossly disproportionate to the crime committed so as to violate his Eighth Amendment rights given the nature of his criminal activity in this case.

## IV. CONCLUSION

In sum, the Court concludes that petitioner's claims are without merit and do not provide a basis for habeas relief in this case. Accordingly, this petition for a writ of habeas corpus is denied in its entirety, and because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall close this case.

**Gonzales-Martinez v. Kirkpatrick, Not Reported in Fed. Supp. (2017)**

2017 WL 3891649

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3891649

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---